IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DANIEL BRYAN KELLY,            )
                              )
        Plaintiff,             )
                              )
vs.                           )        Civil Action No. 2:05-cv-01150-MHT
                              )
RICKY OWENS, et al.           )
                              )
        Defendants.           )

PLAINTIFF'S OPPOSITION TO DEFENDANT SHERIFF RICKY OWENS'
MOTION  TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Comes now the Plaintiff and submits this in opposition to Defendant Sheriff

Ricky Owen's motion to dismiss the amended complaint.

ARGUMENT

The Supreme Court has said that a court may not grant a motion to

dismiss unless it appears beyond doubt that a claimant can prove no set of facts that

would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46(1957).

I. OFFICIAL CAPACITY CLAIMS

Defendant Owens is sued both in his official capacity and his individual

capacity. With respect to the Plaintiff's 'official capacity' claims, Owens argues that

Plaintiff's claims are due to be dismissed for three reasons: 1) Eleventh Amendment

immunity; 2) public officials are not 'persons' in §1983 actions when sued in their

official capacity; and 3) plaintiff's claims are moot. He is wrong on all three grounds

because: 1) Eleventh Amendment immunity does not apply to injunctive relief, 2)

§1983 suits are allowed against public officials in their official capacities for

injunctive relief, and  3) Plaintiff's claims are not moot.

### A.  ELEVENTH AMENDMENT

In moving to dismiss the 'official capacity' claims against him, Owens  argues

that they are barred by the Eleventh Amendment, but the 11th Circuit has held that the

Eleventh Amendment does not bar §1983 suits against state officials in their official

capacities with regard to injunctive or declaratory relief. In *Parker v. Williams,* 862

F2d 1471,1475 (11th Cir. 1989), the court said: "the Eleventh Amendment does not

insulate from suit state officials acting in their official capacities, at least for

prospective injunctive relief, *Edelman v. Jordan,* 415 U.S. 651, 664, 94 S.Ct. 1347,

1356, 39 L.Ed.2d 662 (1974)...". Also  *Kentucky v. Graham* 473 U.S. 159, 170; 105

S.Ct. 3099, 3107 Fn.18 (1985) held that state officials can be sued in their official

capacity for injunctive relief. It said: "In an injunctive or declaratory action grounded

on federal law, the State's immunity *can* be overcome by naming state officials as

defendants...".  Since Plaintiff is seeking injunctive and declaratory relief, the

Eleventh Amendment is no barr to suit.

### B. §1983 PERMITS 'OFFICIAL CAPACITY' SUITS FOR EQUITABLE RELIEF

Owens has moved to dismiss the 'official capacity' claims against him, because a state official, such as himself, are not "persons" under §1983, citing *Will v. Michigan Dept. Of State Police*, 491 U.S. 58,71 (1989), and Carr v, City of Florence, 918 F2d 1521, 1525 n.3 (11th Cir. 1990). *Will v. Michigan Dept. Of State Police*, 491 at 71, however, specifically recognizes that §1983 'official capacity' suits for injunctive and declaratory relief are permitted. It says, at footnote 10: "of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." Plaintiff here is pursuing injunctive and declaratory relief against Defendant Owens in his official capacity, so for purposes of §1983 Owens is a 'person' in his official capacity.

C. PLAINTIFF'S REQUESTS FOR EQUITABLE RELIEF ARE GOOD CLAIMS

Owens argues that plaintiff's requests for equitable relief are insufficiently pled. While Plaintiff's claims against Owens in his individual capacity are governed by the heightened pleading rule, the claims against Owens in his official capacity are not. Plaintiff's 'official capacity' claims are governed by Rule 8(a), FRCP, which merely requires 1) a statement of the grounds for the court's jurisdiction, 2) a short, plain statement of the claim, and 3) demand for judgment for relief. Here Plaintiff has satisfied the requirements of Rule 8(a)FRCP. For instance, In Count I, Plaintiff

3

alleges that Defendant Owens violated the Eighth and Fourtheenth Amendment. This satisfies the first part of Rule 8(a)FRCP. Count I also alleges that, knowing that Plaintiff had serious need of medical care, Owens acted with deliberate indifference in failing or refusing to obtain prompt or adequate medical treatment for him. This satisfies the second part Rule 8(a)FRCP. Count I demands judgment against Defendant Owens for injunctive and declaratory relief. This satisfies the third part of Rule 8(a) FRCP. The purpose of the injunctive relief sought is to prevent similar future treatment by Owens in his official capacity. Counts II, III, IV and V are all similarly pled and, for the same reasons are adequately and sufficiently set out in compliance with Rule 8(a) FRCP.

## 1. NOT MOOT

Defendant Owens argues that Plaintiff has been transferred from the Coosa County jail so that Plaintiff's claims for injunctive and declaratory relief are moot. In support of this he cites to *Cotterall v. Paul*, 755 F2d 777,780 (11th Cir.1985), and to *McKinnon v. Talledega County*, 745 F.2d 1360, 1363 (11th Cir. 1984) for the proposition that a prisoner's transfer or release from jail moots his claim for declaratory or injunctive relief. First, to demonstrate mootness, the defendant has the heavy burden of showing that subsequent events made it absolutely clear that the alleged wrongful behavior could not reasonably be expected to occur. *U.S. Dept. of*

*Labor v. Burger King Corp.*, 955 F.2d 681, 686 (11th Cir. 1992). Second, because of the inherent difficulty in fashioning a test for mootness, the Supreme Court requires consideration of the facts on a case by case basis, *Maryland Casualty Co. v. Pacific Co.*, 312, U.S.270, 61 S.Ct. 510, 85 L.Ed. 826 (1941). Third, in both *Cotterall* and *McKinnon*, the court held that the claims were moot because the likelihood of the events recurring were too speculative. The facts here are different, Plaintiff is much more likely to be confronted with confinement in the Coosa County jail due to his mental and physical illnesses, and, additionally, Plaintiff's injury is ongoing, so that Plaintiff's claims for injunctive and declaratory relief are not moot.

Both in *Cotterall* and *McKinnon* the courts emphasize the speculative nature of the Plaintiff ending back up in those jails. Both *Cotterall* and *McKinnon* based their holding in reliance on *Dudley v. Stewart,*, 724 F.2d 1493, 1494 (11th Cir.1984) (See *Cotterall* at 780, *McKinnon* at 1363) *Dudley* held that the claim for injunctive relief was moot because "since Dudley is no longer in the custody of county jail officials, <u>the most that can be said for his standing</u> is that *if* he is released from prison, is convicted of another crime, and is incarcerated in the Daugherty County Jail, he might again be subject to disciplinary confinement without due process."[1]

---

[1] Mootness is the doctrine of standing set in a continuing time frame. Church v. City of Huntsville, 30 F.3d 1332, 1338. fn.2 (11th Cir.1994)

(emphasis supplied). *Dudley*, in turn, based its holding on the holding in *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 675-76, 38 L.Ed.2d 674 (1974) that "past exposure to illegal conduct does not in itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing, present injury or real and immediate threat of repeated injury."(emphasis supplied) *Dudley* at 1494. Dudley also relied on *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) which reaffirmed *O'Shea*.

Here, as a result of Plaintiff's treatment by defendants, including Defendant Owens, Plaintiff has been diagnosed as suffering Post Traumatic Stress Disorder (Complaint ¶ 40). This continuing injury makes plaintiff especially sensitive and reactive. Plaintiff expects the evidence will be that, since he has been confined in the state penitentiary, he has had involuntary reactions that caused to be revisited upon him all the horrors he suffered in the Coosa County jail when he was awakened and merely given an order by a prison guard. Plaintiff expects the evidence will be that this reaction caused the prison system to transfer him to the state prison system's psychiatric unit. In this way, plaintiff's continuing injury makes him much more vulnerable, so that merely being arrested and confined in the Coosa County jail in its current condition will likely further exacerbate his injuries.

Combined with the foregoing, Plaintiff has a history of mental and physical

illnesses (bi-polar disorder, seizures, memory loss, migraine headaches, lower back pain, and degenerative disc disorder)(Complaint ¶¶ 5,6). These illnesses make it more likely that plaintiff will be re-confined in the Coosa County jail. Plaintiff expects the evidence will be that he is prone to substance abuse, in an attempt to get relief from his illnesses. Plaintiff also expects the evidence will be that his probation has already, once before, been revoked for substance abuse. Plaintiff's mental illness and proneness to engage in substance abuse, as a result of his many physical and mental injuries, will make it likely that he will be re-confined in the Coosa County jail, confinement to which will likely exacerbate his continuing injury. This is so, not only because parole revocation is vested in the circuit judge, here the judge in Coosa County, See *Crowe v State*, 661 So.2d 112, 113(Ala. Crim. App. 1995), but also because even prior to any adjudication, he is likely, pursuant to Code of Ala. 15-22-31(b), to be held in the Coosa County jail if Plaintiff's parole officer says in writing that, in his judgment, Plaintiff has violated his parole.

In light of the foregoing facts, this case is more like *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994) and *Lynch v. Baxley*, 747 F.2d 1452 (11th Cir.1984) where the Eleventh Circuit found that the claims for injunction were not moot, than like *Cotterall*, *McKinnon* or *Dudley*. In *Church,* the court held that homeless people, who were seeking an injunction against the city from harassing and

7

removing them from the city, was not moot. In *Lynch* the court held that mentally ill people's claim for an injunction against the state's practice of detaining people in county jails pending commitment hearings was not moot. Both rely upon an analysis of *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) in arriving at their conclusion, as do *Cotterall,* *McKinnon* and *Dudley.*

To begin with, Plaintiff has alleged that he continues to suffer the adverse effects of Defendants' wrongful conduct. *Lyons,* 461 U.S. at 102, 103 S.Ct. at 1665 (quoting *O'Shea,* 414 U.S. at 496, 94 S.Ct. at 676) held that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." (Emphasis supplied). It follows, where it is accompanied by present adverse effects, that there is a case or controversy regarding injunctive relief and since Plaintiff has alleged continuing adverse effects, his claim is not moot. For these reasons this case is not like those cases cited by Defendant (*Cotterall,* *McKinnon,* *Dudley* and *Lyons*) where the wrongs that prisoners suffered lay all in the past. So Plaintiff's claim for injunctive and declaratory relief is not moot.

Second, The *Church* Court distinguished the situation there from the *Lyons* case by finding that "the plaintiffs here are far more likely to have future encounters with the police than was Lyons." *Church* at 1337. *Church* observed that though the

8

*Lyons* Court refused to assume the plaintiff would again violate traffic laws, prompting police to stop him, the Supreme Court has permitted such assumption when, for reasons beyond the plaintiff's control, he is unable to avoid repeating the conduct that led to the original injury, citing *Honig v. Doe,* 484 U.S. 305, 320, 108 S.Ct. 592, 602, 98 L.Ed.2d 686 (1988) . *Church* at 1337-8.

In *Honig*, officials removed an emotionally disturbed child from class for misconduct without following the Education of the Handicapped Act requirements. The *Honig* Court held it was reasonable to assume the child would return to class, and further held that, given his history of behavior problems, it was likely that he would engage in misconduct again. It also found it equally probable that officials would remove the adolescent from class without complying with the EHA. So *Honig* held the Plaintiff had standing, *Honig* at 323, 108 S.Ct. at 604.

Here Plaintiff, due to the nature of his ongoing injury, combined with his mental illness, his physical illnesses, and his propensity to substance abuse, as relief for the effects of his illness, put him in the situation that he will be much more likely to be rearrested and confined, like the plaintiff in *Honig* rather than the plaintiff in *Lyons. Church* observes, citing *Lyons*, that "because Lyons had not resisted police--and there was no indication he would do so if stopped again in the future--he had no basis to challenge a policy that only authorized use of chokeholds against

9

suspects who resist arrest." *Church* at 1339. It follows that if Lyons had had a predisposition to resist arrest because of some mental illness, then Lyons' would have had standing to seek an injunction. As already noted, Plaintiff's injury, unlike those in *Honig* and *Lyons*, is ongoing, and so it is not a question of repeating the injury, but of exacerbating it.

Similarly, in *Lynch v. Baxley,* 744 F.2d 1452, 1456-57 & nn. 6-7 (11th Cir.1984), citing *Lyons*, the Eleventh Circuit held that a mentally ill plaintiff had standing to seek an injunction, stopping the practice of holding him in the county jail pending commitment hearings. Though Lynch was no longer in jail when he became a plaintiff, it held that his mental illness would likely recur so he would likely continue to be the subject to commitment proceedings. Likewise, due to Plaintiff's mental illness, his physical illnesses, and his demonstrated propensity for substance abuse, he will be sufficiently likely to be arrested and confined in the Coosa County jail to give him standing to seek an injunction. When this is taken together with Plaintiff's continuing adverse effects he satisfies the requirements for standing and his claims are not moot.

## II. EIGHT AMENDMENT CLAIMS

Plaintiff pled that Defendant's conduct violated both the Eighth and the Fourteenth Amendments. As Defendant correctly notes, the Eighth Amendment

governs the rights of convicted prisoners, while the Fourteenth Amendment governs the rights of pretrial detainees, *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996), and that the analysis under either is the same, *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir.1985). Plaintiff has alleged that he was a pretrial detainee (Complaint ¶4). Insofar as Plaintiff is seeking money damages for past wrongs, then, he is maintaining his claims under the Fourteenth Amendment, under the Eighth Amendment.

Insofar as Plaintiff is seeking injunctive and declaratory relief, however, Plaintiff is maintaining his claims under the Eighth Amendment because he is now a convicted prisoner and is likely to be subject to re-confinement in the Coosa County jail as a convicted prisoner. This is so because parole revocation is vested in the circuit judge, here, the Coosa County Circuit Court, See *Crowe v State*, 661 So.2d 112, 113(Ala. Crim. App. 1995), and he is likely to be held in the Coosa County jail if in his parole officer's judgment, he has violated parole, Code of Ala. 15-22-31(b). For these reasons Plaintiff is entitled to maintain some of his claims for injunctive relief under the Eight Amendment.

### III. OWENS NOT ENTITLED TO QUALIFIED IMMUNITY

Plaintiff's claims against Defendant Owens fall into four categories: 1) that the jail conditions violated his constitutional rights; 2) that denial of his serious medical

needs violated his constitutional rights; 3) that Owens's knowing failure to stop jail staff from abusing plaintiff violated his constitutional rights; and 4) that failure to train jail staff violated his constitutional rights. These rights were clearly established at the time. As a consequence, Defendant Owens is not entitled to qualified immunity on these claims. The Eleventh Circuit has said that the only time it is appropriate to do so is when five elements are satisfied: (1) from the face of the complaint (2) the court must conclude that (3) the law supporting the existence of that claim-given the alleged circumstances-was not already clearly established (4) to prohibit what the defendant is alleged to have done (5) before the defendant acted, *Marsh v. Butler Cty.*, 268 F.3d 1014,1023 (11th Cir. 2001). Defendant Owens cannot satisfy this standard, so his motion to dismiss is due to be denied.

## OWENS VIOLATED PLAINTIFF'S FEDERAL RIGHTS

With respect to what constitutes clearly established law, for purposes of overcoming qualified immunity in a §1983 case, the Supreme Court has criticized the Eleventh Circuit's use of the "materially similar" standard as a "rigid gloss on the qualified immunity standard" that was not consistent with Supreme Court precedent. See *Hope v. Pelzer*, 536 U.S.730, 739 (2002). The *Hope* Court explained the "clearly established" standard for §1983 liability was identical to "fair warning" requirement under §242. The court pointed out that it had affirmed convictions under §242

despite notable factual distinctions between precedents relied on and the cases before the court, see *Hope* at 739. The *Hope* Court specifically criticized the Eleventh Circuit's failure to recognize circuit precedent in *Ort v. White*, 813 F2.d 318 (11th Cir.1987) and *Gates v. Collier*, 501 F.2d 1291 (5th Cir.1974) in addressing the qualified immunity of the officers who chained the plaintiff to the hitching post and denied him drinking water.

The *Hope* Court said that the situation in Gates which identified several forms of impermissible conduct lessened the force of any one of the instances for purpose of clearly establishing the violation. It said:

> The fact that *Gates* found several forms of punishment impermissible does not, as respondents suggest, lessen the force of its holding with respect to handcuffing inmates to cells or fences for long periods of time. Nor, for the purpose of providing fair notice to reasonable officers administering punishment for past misconduct, is there any reason to draw a constitutional distinction between a practice of handcuffing an inmate to a fence for prolonged periods and handcuffing him to a hitching post for seven hours. The Court of Appeals' conclusion to the contrary exposes the danger of a rigid, overreliance on factual similarity. *Hope* at 742

Similarly, the *Hope* Court analyzed the *Ort* case and found that even though the facts were significantly different, the reasoning gave sufficient "fair warning" to clearly establish the violation. It said:

> In *Ort v. White,* 813 F.2d 318, the Court of Appeals held that an officer's temporary denials of drinking water to an inmate who repeatedly refused

13

to do his share of the work assigned to a farm squad "should not be viewed as punishment in the strict sense, but instead as necessary coercive measures undertaken to obtain compliance with a reasonable prison rule, *i.e.,* the requirement that all inmates perform their assigned farm squad duties." *Id.,* at 325. "The officer's clear motive was to encourage Ort to comply with the rules and to do the work required of him, after which he would receive the water like everyone else." *Ibid.* The court cautioned, however, that a constitutional violation might have been present "if later, once back at the prison, officials had decided to deny [Ort] water as punishment for his refusal to work." *Id.,* at 326. So too would a violation have occurred if the method of coercion reached a point of severity such that the recalcitrant prisoner's health was at risk. *Ibid. Although the facts of the case are not identical, Ort's premise is that "physical abuse directed at [a] prisoner after he terminate[s] his resistance to authority would constitute an actionable eighth amendment violation." Id., at 324. This premise has clear applicability in this case. Hope was not restrained at the worksite until he was willing to return to work. Rather, he was removed back to the prison and placed under conditions that threatened his health. Ort therefore gave fair warning to respondents that their conduct crossed the line of what is constitutionally permissible.  Hope* at 743 (emphasis added)

## OWENS DELIBERATELY INDIFFERENT TO MEDICAL CONDITIONS

Plaintiff has alleged that Defendant Owens was made aware of his extensive medical problems, but that Owens acted with deliberate indifference in failing to address his medical conditions.  Owens' failure to address Plaintiff's medical conditions, either at all or in a timely manner, violated clearly established constitutional law.  The Complaint alleges the following:

When Plaintiff was put in the jail he disclosed to Owens and others that he had

an extensive medical history: that he suffered from bipolar disorder and had recently been treated for that, that he was on medication and under a doctor's care for his bipolar condition, that he had a history of lower back pain and a degenerative disc problem in his lower back for which he had surgery, that he had a history of migraine headaches and that he was on medication without which he would suffer seizures. Despite that, no medication or treatment was provided.

On November 25, due to seizures that Plaintiff suffered, Owens had Plaintiff evaluated by a mental health professional This mental health professional notified Owens of Plaintiff's serious medical conditions with regard to seizures, memory loss and his bipolar disorder. The evaluation told Owens that the Plaintiff needed an evaluation by a doctor for seizures. Plaintiff then fell and was taken to Doctor Randall Weaver for treatment of his back and leg injury. Plaintiff's family told Owens that Plaintiff's regular doctor at Brookwood Hospital had requested that he be brought to a lock down in Birmingham for medical supervision. Plaintiff grew increasingly disoriented. On December 5th Plaintiff again suffered seizures, which Defendant Owens knew about. Plaintiff again had a fall and was taken to Russell Hospital for treatment. At this point Owens was fully aware of Plaintiff's serious physical and psychiatric illnesses.

On December 6th , Plaintiff was returned from Russell Hospital and placed in

15

the hole. Plaintiff repeatedly requested that he be provided medication and be taken to a doctor because he was in pain and suffering from seizures. Owens was aware that Plaintiff was requesting medications and requesting to see a doctor repeatedly, but did not respond to his request by providing medication or medical treatment at the time he requested it. Instead he left him lying in pain, crying, hallucinating and begging for help. Owens was aware that Plaintiff was confused, distressed and begging for medical attention. That was when he took a piece of paper and taped it over the window of the hole in response to Plaintiff's cries for help.

Plaintiff's mental condition was deteriorating and Owens was aware of it. but neither called a doctor nor provided access to personal hygiene. On December 16th, 2003, Plaintiff's family, concerned, requested a copy of the evaluation of the mental health professional, but Owens refused to provide it although he had the evaluation that told him that Plaintiff had a serious medical condition and needed an evaluation by a doctor for seizures. Plaintiff continued to beg for help. Owens commented that Plaintiff's medications were costing about $900 a month. Plaintiff's family complained to Owens that he had been given too much medication and not in accord with what his doctors had previously given him, but Owens told Plaintiff's family members that they had their own rules regarding medications and doctors.

Plaintiff's condition continued to deteriorate. His skin and eyeballs turned

16

yellow.  Owens knew of Plaintiff's deteriorating mental and physical condition, repeated begging for help, and need for a doctor, but did not provide access to adequate medical attention.  Plaintiff was in such poor condition that he spent most of his time lying on the mat on the floor next to the drain.  Plaintiff began to experience pains in his right side and complained to Owens that he needed to see a doctor, but he was not provided access to any medical treatment.  Plaintiff began to hallucinate that he was seeing dead people, but was not provided access to any medical or psychiatric treatment.  Defendants gave Plaintiff medications, but did so without any training or supervision and not in accordance with any medically appropriate treatment scheme.  Plaintiff was given high doses of medication that exacerbated rather than helped his conditions.

Plaintiff developed a rash all over his body and began to itch very badly.  He complained about this to Defendants, cried repeatedly, and begged to see a doctor, but he was not provided with adequate timely access to medical treatment.  After an extended time of several weeks, Plaintiff was finally taken to see a doctor to address his skin rash.  Even after this, Plaintiff continued to be confused and depressed.  Plaintiff experienced shocking feelings all over his body and complained about them to Defendants.  Even after he was taken to the doctor for his skin rash, Plaintiff continued to have shocking spells all over his body.  Plaintiff's condition continued

to deteriorate further when he was lying on the floor, itching all over and begging for help, on a continuous basis until January 16 when he was transported to Russell hospital.

Plaintiff's diagnosis included drug induced hepatitis and drug poisoning. Owens was aware of Plaintiff's serious medical condition but refused to take either prompt or adequate medical treatment and instead took an easier way less effective treatment method. As a result of Plaintiff's treatment by Defendant, he has been diagnosed as suffering from post traumatic stress disorder. As a result of Owens constitutional violations, Plaintiff has suffered physical and mental anguish and permanent injury. Even after mental health professional advised Owens that Plaintiff needed evaluated procedures by a doctor, nothing was done. (Complaint ¶¶ 5, 6, 7, 8, 9, 15, 16, 17, 18, 19, 20, 27, 29, 30, 31, 32, 38, 40, 43, 45).

Contrary to Owens' assertion in his motion, Plaintiff's complaint satisfies both the objective and subjective components set out in *Farmer v. Brennan*, 511 U.S.825 (1994). It is alleged that Owens knew that Plaintiff had a history of serious medical conditions that required treatment by a doctor and that he was currently being treated by a doctor. It is also alleged that Owens knew Plaintiff needed ongoing treatment of his serious medical treatment, but failed to have Plaintiff evaluated for seizures. Nor did he have Plaintiff's medications adequately administered even when he was told

that the medication was not being properly administered. Owens was further aware that Plaintiff was crying for help, but chose to cover the window where plaintiff could see to ask for help. Owens also knew that plaintiff was lying on the floor most of the time, but failed to respond to plaintiff's constant pleas for medical attention.

In his motion, Defendant Owens seeks to average the number of doctor visits plaintiff made over the time plaintiff was in the jail, but the complaint alleges that Plaintiff did not see a doctor from December 6, when he went in to the hole, until January 7, which is over a month. The Plaintiff did not go to a doctor again until January 16, except to see a dentist. Thus, when facts are taken in light most favorable to the plaintiff as required at this stage, Plaintiff has sufficiently pled that Defendant Owens had knowledge of Plaintiffs serious medical condition and knowingly did not provide adequate access to medical treatment for over 32 day the first time and 9 days the second time.

Defendant argues that he did all he could when he notified Dr. Weaver of Plaintiff's seizure on November 25, 2003. However, given that he knew that plaintiff was suffering from a serious medical condition after that date, his refusal to respond to plaintiff's continuous pleas for medical treatment, after he returned from the hospital on December 5, 2003 until January 7, 2004, satisfies both subjective and objective aspects of *Farmer's* requirement.

19

Prior to Plaintiff's admission to the jail, it was clearly established in this Circuit that prison officials have an obligation to either take action or inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care, See *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989). Citing *Estelle v. Gamble*, 429 U.S. 97, 104-5 (1976). The failure to notify competent officials of an inmates dangerous psychiatric state can constitute deliberate indifference, see *Waldrop, supra* at 1036. The failure to provide an inmate with an environment that does not impair his physical and mental health violates the due process clause of the Fourteenth Amendment. *Anderson v. Nosser*, 456 F.2d 835 (1972). When prison guards ignore, without explanation, a prisoner's serious medical condition that is known or obvious to them, then deliberate indifference may be inferred. *Bozeman v. Orum*, 422 F.3d 1265, 1274(2005), citing *Harris v. Coweta Cty.*, 21F.3d 388,393 (11th Cir.1994). Failure to administer physician prescribed medication to a prisoner demonstrates deliberate indifference to the prisoner's rights, see *Aldridge v. Montgomery*, 753 F.2d 970, 972-973 (11th Cir. 1985)

Removal of a seriously ill patient from a hospital and confining him in the jail with no medial facilities, under the untrained observation of jail personnel amounts to deliberate indifference. *Lancaster v. Monroe County Alabama*, 116 F.3d 1419, 1425 (11th Cir. 1997). It is clearly established that a serious medical need is one that

20

has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, see *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994). Cases stating a constitutional claim for immediate or emergency medical treatment are concerned with medical needs that are obvious, even to a lay person, because they involve life threatening conditions or situations where it is apparent that delay would exacerbate the medical problem. *Landcaster, supra,* at 1425. This is the case here.

If necessary medical treatment was delayed for non- medical reasons, a case of deliberate indifference has been made out, see *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). Delay in access to medical attention can violate the inmate's constitution rights when it is tantamount to unnecessary and wanton infliction of pain. *Hill, supra at 1187.* The number and range cases of serious medical needs, where delayed treatment violates the Constitution, is large and varied. See *Hill* at 1187 fn.21.

Where a Sheriff intentionally delays providing treatment that he knows has been prescribed for an inmate's serious medical need it violates Plaintiff's constitutional rights. See *Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994). Failure to provide prompt attention to serious medical needs by delaying

21

medical treatment for non medical reasons constitutes deliberate indifference.  See, *Thomas v. Town of Davie*, 847 F.2d 771, 773, (11th Cir. 1988).  Even if medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying treatment for serious medical needs, even for hours.  See *Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994); *Brown v. Hughes*, 894 F.2d 1533, 1537-39 (11th Cir. 1990).

In *Carswell v. Bay County*, 854 F.2d 454 (11th Cir. 1988).  Plaintiff repeatedly requested medical treatment for complaints of a rash, constipation, and significant weight loss.  The jail administrator, Grigsby, and the physician's assistant, Belz, were denied qualified immunity.  The court held that evidence established that Grigsby and Belz had knowledge of Carswell's need for medical care. In *Ancata v. Prison Health Services, Inc.*, *supra,* the court held that knowledge of the need for medical care and intentional refusal to provide the care constituted deliberate indifference.  The court held that Grigsby, confronted with Plaintiff's condition, receiving requests for medical attention and requests from the public defender, did nothing significant to insure that Plaintiff receive medical attention and, consequently, his failure to act was deliberate indifference.  This is similar to the facts pled in the present case.  Furthermore, where a jail administrator threw a juvenile detainee against the wall and bunk in an isolation cell and, subsequently, denied the detainee's immediate pleas for

22

medical attention, the court held that the individuals were implicated personally. See *H.C. by Hewitt v. Jarrard*, 786 F.2d 1080, 1087 (11th Cir. 1986).

Because Owens was on notice of Plaintiff's serious medical conditions concerning his seizures, bipolar condition, back injury, a shocking feeling all over his body, a rash all over his body, hallucinations, depression, and degrading and declining physical and mental condition, it was clearly established that Owen's failure to take action violated Plaintiff's constitutional rights. Likewise, it was clearly established that where one takes insufficient action, it is tantamount to taking no action. See *Waldrop v. Evens, supra*, *McElligott v. Foley,* at 1258-9, citing *Ancata* at 704, *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2nd Cir. 1994); *West v. Kave*, 571 F.2d 158-162 (3rd Cir. 1978).

Deliberate indifference may also be established by showing a grossly inadequate care, as well as by a decision to take an easier but less efficacious course of treatment that reflected deliberate indiference to Plaintiff's pain and suffering. See *McElligott v. Foley*, 182 F.3d 1248, 1255-8 (11th Cir. 1999); *Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996); *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). Inmates also have the right to have evaluations and diagnoses in the treatment of their serious medical conditions; the denial of which are clearly established constitutional violations. See *Harris v. Coweta* at 394, *H. C. By Hewitt* at 1086.

23

OWENS LIABLE FOR UNLAWFUL JAIL CONDITIONS

In this case Plaintiff Daniel Bryan Kelly has alleged that certain jail conditions existed that Owens knew about and which injured him, were clearly established as being constitutional violations. The complaint alleges the following:

Owens put Plaintiff in a solitary cell called "the hole" and required him to sleep on the cold concrete floor on a thin plastic mat, even though Owens knew he had back surgery, had recently injured his back in a fall, and suffered from degenerative back problems. "The hole" did not have running water or toilet. Urinating and defecating was done in a drain hole in the center of the floor beside the plastic mat where he was forced to sleep. He could not flush the drain hole, only jail staff outside could and Owens was aware that it was not flushed for hours on several occasions, for days at a time, urine and feces accumulated where plaintiff was forced to sleep. He was not given toilet paper. He was not given water for hours at a time. Owens was aware he repeatedly called for water to drink and was constantly thirsty. He was denied access to a shower or means to perform personal hygiene for extended periods, on several occasions for days at a time. Owens covered the only window with paper. He repeatedly requested to use a toilet and to be allowed to take a bath. Owens was aware of this but denied him access to basic hygiene. He repeatedly complained that there were bugs on the wall and in his food and Owens was aware of this. He was

24

in "the hole" from December 6 to January 16, and repeatedly complained that he was

extremely cold, but Owens would not let him move to a bed off the cold concrete

floor. (See complaint ¶¶9,10,11,13,13,14,16,17,20).

A similar situation has been held to be unconstitutional. In *Gates v. Collier*,

supra the Court found the following similar situation unconstitutional:

> In addition, each side has one 6' X 6' cell, known as the dark hole, with
> no lights, commode, sink or other furnishings. A hole in the concrete
> floor is located in the middle of the cell and is approximately 6'[sic] in
> diameter that will flush to dispose of body wastes. A heavy metal door
> without a window closes the cell. For solitary confinement at Parchman
> the inmates are placed in the dark hole, naked, without any hygienic
> material, without any bedding, and often without adequate food. It is
> customary to cut the hair of an inmate confined in the dark hold by
> means of heavy-duty clippers. Inmates have frequently remained 7968
> also expressly discourages corporal [sic] and may be confined there for
> up to seventy-two hours. While an inmate occupies the dark hole, the
> cell is not cleaned, nor is the inmate permitted to wash himself.

> Even under the restrictive standards for determining cruel and unusual
> punishment enunciated in Novak, this solitary confinement in the dark
> hole at Parchman undoubtedly meets the test as found by the district
> court. It is unassailable that the solitary confinement of naked persons
> in MSU's dark hole, without any hygienic materials, any bedding,
> adequate food or heat, without opportunity for cleaning either
> themselves or the cell, and for longer than twenty-four hours
> continuously, is constitutionally forbidden under the Eighth
> Amendment. *Gates* at 1305.

The  facts in this case similar to those in *Gates* are that the Plaintiff is held in

a solitary cell with no commode, sink or other furnishing.  There is a hole in the

25

concrete floor in the middle of the cell that will flush to dispose of bodily waste. The door is without a window (because Owen's covered it). Plaintiff was placed in it without any hygienic material. The cell was not cleaned while the Plaintiff was in it. The Plaintiff was not permitted to wash himself. The differences are that in *Gates* there was no light and inmates were put in the "dark hole" naked, without any bedding and often without adequate food. Inmates in the "dark hole" often had their hair cut.

On the other hand, here, while Plaintiff was given a plastic mat to lie on, it was insufficient against the cold. Several factors made the plaintiff's situation worse than that in Gates. Unlike *Gates*, there were bugs on the walls and in Plaintiff's food. Unlike *Gates,* Plaintiff was in "the hole" for forty-one days instead of 24 to 72 hours. Unlike *Gates*, here urine and feces were not flushed for extensive periods of time, on several occasions for days. As a consequence of this Plaintiff was forced to lie beside the open drain hole that was filled with human waste. Unlike *Gates,* Plaintiff was not given toilet paper. Here, Plaintiff was given a thin plastic mat to sleep on where in Gates there was no bedding But here Plaintiff was so sick he had to lie on the floor, and had severe back injuries that included degenerative back problems, recent back injuries and previous back surgery, all of which Owens knew about. So lying on a thin plastic mat on a cold floor was objectively worse than the fact picture in *Gates*.

26

One of the things the Supreme Court in *Hope* identified, as previously established by *Gates,* was depriving inmates of hygienic materials. See *Hope* at 742 referencing *Gates* at 1306. Plaintiff's deprivation of basic hygiene was therefore clearly established as a constitutional violation. Additionally, Plaintiff went for hours at a time without receiving clean drinking water. The Supreme Court in *Hope,* citing Eleventh Circuit President of *Ort v. Wright*, held that the denial of drinking water to an inmate violates clearly established constitutional law. In *Ort* the Plaintiff was denied water for as much as two hours. The Supreme Court in *Gates* held that such denial amounted to physical abuse when it was directed at a prisoner when he was not resisting authority and so would violate his constitutional rights. So it was clearly established that deprivation of drinking water, when there was no immediate corrective basis for it, for several hours would constitute a constitutional violation.

Other Eleventh Circuit cases have held that the treatment to which Owens subjected Plaintiff, were clearly established as violating the Plaintiff's constitutional rights. In *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991) the court held that a cell where Plaintiff was forced to sleep on the floor, deprived of running water for two days, deprived of toilet paper for three days, and where there is filth on the cell floor, was sufficient to make out a violation of constitution of law with regard to the cell

27

temperature and the denial of hygiene.  The *Chandler* court said:

> Plaintiff's description of sleeping on the floor with only under cloths and a mattress with a plastic cover in sixty degree "real cold" temperature was graphic, and his question, "what kind of effect would that have on you?" was sufficient to preserve were sufficient to preserve the issue of harm.  Moreover, he later unambiguously stated: "as far as being in solitary confinement or administrative confinement...I am sure I was depressed from it."  *Chandler* at 1066.

The *Chandler* court held that this was evidence of a constitutional violation.  The Plaintiff's facts, here, are very similar.

Defendant Owens argues for the facts to be construed in his favor, but this is not the appropriate standard to be applied at the motion to dismiss stage, See *Conley*. For instance, Defendant argues, at page 16 of his brief, that plaintiff was put in the 'hole' for plaintiff's protection. However the complaint at ¶9 says that Defendant placed Plaintiff in the 'hole' for Owens' protection, not Plaintiff's protection. Also, in footnote 2 on page 16 of Owen's brief, he argues that bugs were not really in the cell and in Plaintiff's food, but that they were hallucinations. However, facts and inferences are to be construed in the Plaintiff's favor at this stage, see *Conley*.

Defendant Owens also argues, at page 17 of his brief, that Plaintiff's claims concerning denial of hygiene, exercise, and water do not allege serious harm. However, the other fact and inferences therefrom sufficiently show that Plaintiff has suffered serious harm from these deprivations. He alleges that he was always thirsty

and that his urine became dark. He alleges that he had to lie down much of the time next to the very open hole that had feces and urine sitting in it for extended periods. He alleges he had to wipe himself with candy wrappers and it follows that, without water to wash his hands, this presented an unhealthy and unsanitary situation. When this is considered together with his declining health, it poses an obvious and serious health risk.

Defendant Owens cites several cases from out of the Eleventh Circuit for the proposition that denial of shower privileges for several weeks does not constitute a constitutional violation with regard to jail conditions. In this way Defendant seeks to pick apart the several pieces of an obvious and unreasonably unhealthy jail condition. But it does not make legal sense or common sense to consider all the circumstances of the jail conditions and Plaintiff's particular health condition piecemeal, rather than as a totality. When taken as a totality, Plaintiff has sufficiently pled a case of constitutional deprivation with respect to jail conditions and has sufficiently pled that Defendant Owens had sufficient knowledge of the circumstances to satisfy both the objective and subjective requirements of *Farmer*.

Because Plaintiff's constitutional deprivation by Owens was clearly established by the Circuit and Supreme Court case law, Plaintiff's jail condition claims against Owens are such that his Motion to Dismiss should be denied.    `

## FAILURE TO STOP ABUSE

Plaintiff alleges that he was subjected to abuse by jail staff and that Owens knew of this, but failed to stop it.  This was clearly established as  a constitutional violation at the time it occurred.  The Complaint alleges the following:

Owens was aware that Plaintiff repeatedly asked for water, but went for hours at a time without providing it to him.  Jailor Bradley repeatedly told Plaintiff that he was tired of him asking for water.  After Plaintiff was place in "the hole" on December 6,   Bradley assaulted him on several occasions beginning shortly after he was placed in the 'hole' and it continued up until he was taken to Russell Hospital on January 16th, 2004.  On two occasions, Bradley, with another officer, came into the 'hole'. While the other officer held the Plaintiff's legs apart, Bradley kicked Plaintiff in the groin.  On another occasion, Bradley came into "the hole" when Plaintiff was sick and lying on his stomach on the floor and tried to stick a broomstick in Plaintiff's rectum.  On another occasion, when Plaintiff requested medication from Bradley, Bradley hit him in the face.  Bradley was often intoxicated and would confront Plaintiff repeatedly and curse at him.   Plaintiff complained about Bradley to Lieutenant Wilson, but nothing was done.  Plaintiff complained to Wendy Robinson, but nothing was done.  Plaintiff complained to Owens asking him when the treatment was going to stop and when he was going to get out of "the hole."  Owens called

Plaintiff "a son of a bitch" and told him he would stay in "the hole" until he left the jail.

Bradley kicked Plaintiff in the mouth and broke two of his teeth. Owens was aware of this and they took Plaintiff to the dentist to get the teeth pulled. Owens was aware Bradley would come into work intoxicated and would be abusive towards prisoners, but he did nothing about it. Owens acknowledged to Plaintiff's family that he knew Bradley would come to work intoxicated. Jailors Wilson, Roberson, and Bradley laughed at Plaintiff when he asked them to clean the drain hole that he used for his toilet facility. When Plaintiff was finally allowed access to a shower and a razor, Bradley grabbed him by the cheek and told him that he needed to shave his mustache or that he would not be allowed to see his parents at visitation. (Complaint ¶¶ 12, 21, 22, 23, 24, 26, 28).

At the time Plaintiff was subjected to abuse, as set out above, it was clearly established that "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. This is true whether or not significant injury is evident." See *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). In *Hudson*, the plaintiff was beat up by guards, McMillian and Woods, while supervisor Mezo watched the beating and told the officers not to have too much fun. Hudson suffered minor bruises and swelling of his face, mouth, and lips. The court

31

held that this was sufficient to establish a constitutional violation, not only against McMillian and Woods, but also supervisor Mezo.  Likewise, in *Gates v. Collier*, 501 F.2d 1291, 1306 (5th Cir. 1974).  The Fifth Circuit held that whipping inmates and instances of physical brutality and abuse, in which was acquiesced by prison officials, violated Plaintiffs' constitutional rights.

Supervisor liability under § 1983 occurs when a supervisor personally participates in the unconstitutional conduct or there is a causal connection between his action or inaction and the alleged constitutional depravation.  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).  A causal connection may be established when there is a history of wide spread abuse, which puts the responsible supervisor on notice, yet he then fails to correct the problem; or where a supervisor's custom or policy results in the deliberate indifference to constitutional rights; or when facts support an inference that the supervisor directed the subordinate to act unlawfully or knew that the subordinate would act unlawfully and failed him to stop him from doing so.  *Cottone* at 1360.

In  *Young v. Augusta*, 59 F.3d 1160, 1173 (11th Cir. 1995), a history of mistreatment, or failure to provide treatment, occurring over a period of months, and involving at least three different jailors, was held to constitute sufficient evidence that policymakers had a pattern or custom of deliberate indifference to unconstitutional

32

conduct. Here Owens knew Bradley frequently came to work intoxicated and, when he was intoxicated, that he was abusive with inmates.  Moreover, Owens' own conduct of taping over the window when Plaintiff was crying for help, not flushing the drain filled with feces and urine when Plaintiff was lying on the floor, calling Plaintiff a "son of a bitch" when Plaintiff was asking him when the treatment from Bradley would end, satisfies the necessary causal connection.  Also, the *Gates* court held that depriving inmates of basic hygiene and putting them in the "black hole" constituted acts of brutality and abuse, see *Gates* at 1306.  Since it is alleged Owens participated in these acts of abuse, this would constitute sufficient evidence that he condoned, participated in, or established a custom or practice of abuse.

## OWENS LIABLE FOR FAILURE TO TRAIN

Plaintiff has alleged that Owens knew that Plaintiff was not receiving adequate medical attention.  Not only had he observed it in person, but he had been told by a mental health care professional that Plaintiff needed to have an evaluation for seizures and he had heard from Plaintiff's family that he was being given too much medication, not in accordance with what the doctors had previously given him. Owens had refused to provide Plaintiff's family a copy of the evaluation that the mental health professional had done.  Plaintiff's condition  was widely known at the jail, so much so that Defendant Roberson, on several occasions, informed Plaintiff's

family that Plaintiff had suffered from seizures, but no doctor was called.  Owens, himself, had told Plaintiff's family members that the jail had its own rules and regulations regarding medication and their doctor.  Owens was repeatedly begged by Plaintiff to see a doctor.  Yet none was provided in an adequate or timely manner.  Even after Owens had been advised by family and mental health professionals, nothing was done.  (See Complaint ¶ 5, 6, 7, 9, 15, 16, 17, 18, 20, 27, 29, 30, 31, 32, 37, and 48).

It is clearly established in this Circuit that a custom or a practice of a constitutional depravation can result by the inadequate treating of jail employees.  See *Young v. Augusta Georgia*, 59 F.3d 1160, 1173 (11th Cir. 1995).  Policies of failing to adequately train jail employees on the need to move ill inmates to a hospital or to dispense medication as prescribed, have been held to be cognizable constitutional violations.  See *Young v. Augusta* at 1171.  Before a finding of liability, the policymaker must have had actual or constructive notice that the particular omission is substantially certainly a result of the violation of Plaintiff's constitutional rights.  *Young* at 1172.  This may be proven by showing a pattern of constitutional violations exists such that the policy maker knows or should know that corrective measures are needed.  *Young* at 1172.

In fact, such liability can arrive from failure to train officers for a single

34

decision by a policymaker, see *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991). In Rivas, the Sheriff was the policymaker who had previous knowledge that his deputies were detaining individuals, even though discrepancies of identification existed. The court held this would constitute a failure to adequately train officers regarding identification techniques. It said it was sufficient basis for 1983 liability.

Here, Owens was repeatedly warned about problems regarding medication and failure to provide medical treatment. He knew that Plaintiff was not getting the proper medication that his doctors had prescribed for him. Based on this, it is clearly established that Owens had a duty to train his employees sufficiently, to remove ill inmates to the hospital, and to properly dispense medication as prescribed. Owens was also on actual notice that this was not occurring. Also, in Goodson v. City of Atlanta, 763 F.2d 1381, 1388 (11th Cir. 1985) the defendant jail administrator received notice that jail guards were not responding to prisoner's request for medical treatment. This constituted sufficient notice of a pattern or custom of constitutional violations to make him liable for failing to train employees.

Finally, Plaintiff alleges that Defendant Owens failed to provide training to jail staff regarding mistreatment, proper treatment of prisoners and remedial action for ongoing abuses by jail staff. As set out above, it was clearly established that such abusive conduct was violating inmates constitutional rights. That Plaintiff

35

complained to Willson, Roberson, Bradley and Owens but the abuse did not stop. Defendant Owens had a duty to prevent that.  See *Cottone v. Jenne*, 326 F.3d 1352, 1358-9, 1361 (11th Cir. 2003).  A recent decision has used this analysis in *Cottone* to find supervisory liability where guards beat an inmate to death, see *Valdes v. Crosby*, 390 F.Supp.2d 1084, 1101 (M.D. Fla.2005). Though *Valdes* is not itself precedent, the analysis there shows how *Cottone* clearly establishes the law in this Circuit.

<u>CONCLUSION</u>

Based on the facts alleged in the Complaint and the law that was clearly established at the time of the alleged constitutional deprivation, Plaintiff respectfully submits that this Court should deny the  motion to dismiss.

Respectfully submitted

<u>s/Richard J. Stockham III</u>
State Bar No.STO034
Attorney for the Plaintiff
Stockham, Carroll, & Smith P.C.
2204 Lakeshore Drive, Suite 114
Birmingham, Alabama 35209
Telephone (205) 879-9954
Fax: (205) 879-9990
E-Mail: rjs@stockhampc.com