**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **DANIEL BRYAN KELLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.: 2:05-cv-1150-T** |
| | ) | |
| **RICKY OWENS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COOSA COUNTY SHERIFF RICKY OWENS'S**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW Coosa County Sheriff Ricky Owens, a Defendant in the above-entitled action, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves the Court to enter an Order granting him judgment in his favor as a matter of law.  In support thereof, Sheriff Owens states as follows:

**STATEMENT OF FACTS**

1.      The Plaintiff was incarcerated in the Coosa County Jail on Thursday, November 13, 2003, after failing a drug test in Court, in violation of his probation. (Exhibit A, Inmate Booking Sheet, "Booking Sheet," dated 11/13/2003).

2.      In November 2003, the Sheriff of Coosa County was Ricky Owens.  Sheriff Owens served as the Sheriff for four years and at all times relevant to the Plaintiff's Complaint was serving in this capacity.  He was the first African-American elected to the position of Sheriff in Coosa County. (Exhibit B, Declaration of Ricky Owens, "Owens dec.", ¶¶ 1 and 2).

3.      The Plaintiff was booked into the Coosa County Jail by Defendant Wendy Roberson at 1650 hours (Booking sheet; Exhibit C, Deposition of Wendy Roberson, "Roberson dep.," p. 59, ll. 10-23, p. 60, l. 23, p. 61, ll. 1-3).

1

4.      When the Plaintiff was booked into the jail, a Medical Screening Form was completed. The Medical Screening Form indicates that the Plaintiff reported to Defendant Roberson that he had asthma; that he was schizophrenic/bi-polar; that he had artificial vertebrae in his back; that he had a psychiatric disorder; that he was allergic to codeine; that he had seizures; and that he had attempted to commit suicide months earlier.  The Medical Screening Form also indicates that the Plaintiff was under the influence of drugs or alcohol at the time he was being booked and providing this information to Roberson. (Exhibit D, Medical screening form; Roberson dep., p. 63, ll. 20-23, p. 64, ll. 1-5).

5.      After the Plaintiff was booked into the jail, he was placed in a holding cell. He was placed here because he was under the influence of drugs and/or alcohol at the time he was booked into the jail (Booking sheet and Owens dec. ¶ 11, 12).

6.      The Coosa County Jail has two holding cells located outside the booking area. The two cells are not identical in size.  One of the holding cells is approximately eight feet by ten feet and the other one is approximately sixteen feet by fourteen feet.  The holding cells are lit by fluorescent lights.  There is no window to the outside in the cell. There is, however, a window located on the door of each cell which is approximately a square foot in size.  The holding cells do not have a sink, shower or toilet located within them.  There is, however, a flushable in-ground toilet located in the middle of the floor.  The in-ground toilet is primarily used for urination although it could be used for defecation.  The in-ground toilet cannot be flushed from inside the cell. There is button on the outside of the holding cells that flushes the in-ground toilet and, in accordance with jail policy, were flushed as soon as jailers were made aware that they needed to be flushed.  There is no furniture inside the holding cells. There is a wide concrete ledge that goes around the inside of each cell that an inmate can place his/her mattress on. There is more than adequate room in each holding cell for an inmate to lay on a mat on the floor

without being next to the in-ground toilet. In fact, if an inmate were to lay his mattress on the floor in the larger holding cell, he would be as far away from the in-ground toilet as he would be if he were on the bench.  (Exhibit E, Deposition of Al Bradley, "Bradley dep.," p. 63, l. 1-3; p. 64, ll. 1-17; p. 65, ll. 1-1-9; p. 66, ll. 2-23; p. 67, ll. 11-23; p. 68, ll. 1-23; p. 69, ll. 1-23; p. 70, ll. 1-23; p. 71, ll. 1-23; Owens dec. ¶¶ 13, 14, 15, and 17).

7.      The mats that the Coosa County Jail had for the inmates to use were 5-6 inches thick and were quite comfortable.  They provided more than enough padding and provided excellent insulation from the floor. Because of the back problems the Plaintiff said that he had, the Plaintiff was given two mats while he was in the holding cell. (Owens dec., ¶¶ 18 and 19).

8.      The holding cells do not contain telephones.  In order for an inmate in a holding cell to use a telephone, he would have to be let out by a jailer to use the phone located outside the booking area. (Owens dec., ¶ 20).

9.      Each cell has a camera mounted within it so the inmate(s) in the cell can be monitored from the tower at all times. (Owens dec., ¶ 20).

10.     The holding cells have ventilation located in the ceiling of each cell. There is no thermostat located within the cell and the inmate(s) do not have the ability to control the temperature inside the cell.  (Bradley dep., p. 72, ll. 8-17).

11.     The Plaintiff was in both of the holding cells at one time or another during his incarceration. (Owens dec., ¶ 16).

12.     The holding cells have a key entry. (Bradley dep., p. 119, ll. 19-21).

13.     The inmates refer to the holding cell as "the hole". (Bradley dep., p. 71, ll. 8-20).

14.     There are five different cell blocks located in the jail. There is A, B, C, D, and E block.  Each block in the jail has individual cells on two tiers.  When the doors of the individual cells are closed, it is not possible for anyone not directly looking through the door windows to

3

see into the cell.  Each block has a common area where there is a phone and a television set. The cells in each block have a sink, toilet and two beds. (Bradley dep., p. 41, ll. 17-22; p. 45, ll., 19-23; p. 46, ll. 1-6 and Owens dec., ¶ 22).

15.     The Plaintiff was moved from the holding cell to the B-block on November 14, 2003. (Jail logs 11/14/03 and Owens dec., ¶ 21).[1]

16.     Upon incarceration at the Coosa County Jail, inmates are provided with a copy of the Coosa County Jail Inmate Rules and Regulations.  In the Inmate Rules and Regulations, inmates are made aware of the policy regarding visitation, exercise, health care and grievances, among other things. (Section 8 – Exercise, Section 9 – Visitation, Section 10 – Health Care, and Section 13 – Grievances).

17.     The Plaintiff does not recall anyone making him aware that he could file a grievance (Exhibit G, Deposition of Daniel Bryan Kelley, "D. Kelley dep., p. 90, ll. 13-21; p. 119, ll. 6-17).  However, the Plaintiff filled out approximately 20 Inmate Request Forms during his incarceration at the jail.  In addition, on December 20, 2003, the logs indicate that the Plaintiff was witnessed waiving his rulebook at the camera. (Exhibit H, Inmate Request Forms and logs of 12/20/03).

18.     The jailers working in the dispatch area and in the tower during both the day shift and the night shift make jail logs during their shifts, logging different events which occur during that shift.  These logs were then reviewed by Terry Wilson, as the Jail Administrator.  Any problems found in the logs were reported to Sheriff Ricky Owens. Minor incidents like an inmate's request for water or to use the bathroom are usually not recorded in the jail logs.

---

[1] References to "jail logs" as used in this motion refer to Exhibits F (November 2003 logs), W (December 2003 logs), and GG (January 04 logs) in the Defendants' Joint Evidentiary Submissions.  Specific dates will be cited where appropriate.

(Exhibit I, Deposition of Terry Wilson, "Wilson dep.," p. 33, ll. 10-23 and Owens dec., ¶¶ 6, 7 and 8).

19.     The Plaintiff's mother testified that on the date the Plaintiff was incarcerated he was taking Zyprexa and Lorcet Plus.  (Exhibit J, Deposition of Wanda Kelley, "W. Kelley dep.," p. 35, ll. 9-13).

20.     At the time the Plaintiff was incarcerated, he was getting all of his prescription medications filled at the Food World Pharmacy in Sylacauga.  (D. Kelley dep., p. 53, ll. 10-14 and W. Kelley dep., p. 36, ll. 20-23; p. 37, ll. 1-2).

21.     The records from the Food World Pharmacy show that within the two months prior to the Plaintiff's incarceration, the Plaintiff got the following four prescriptions filled: 09/02/03 - Hydrocodone - 24 7.5 mg tablets for a 3 day period of time; 10/31/03 – Zyprexa – 10 20mg tablets for a 10 day period of time; 10/31/03 – Clonazepam- 10 1mg tablets for a 10 day period of time; and 11/03/03 – Lorcet Plus- 30 7.5 mg tablets for a period of 7 days. (Food World Pharmacy records).

22.     The Plaintiff was out of his medication on the date he was incarcerated.  (W. Kelley dep., p. 42, ll. 10-16).

23.     The Plaintiff's mother was made aware by Defendant Roberson that the jail would administer any medications brought to the jail pursuant to the jail policy. (W. Kelley dep., p. 43, ll. 8-16; Exhibit K, Inmate Rules and Regulations Section 10.4).

24.     The Plaintiff's father went to Food World Pharmacy on November 13, 2003, to get the Plaintiff's Zyprexa and Methocarbamol filled and then took them to the jail. He only got 2 1.5 mg tablets of Zyprexa on this date which were for a period of 1 day. He got 60 tablets of Methocarbamol which were for a period of 30 days.  (W. Kelley dep., p. 42, ll. 7-8; p. 43, ll. 1-3 and  Food World Pharmacy records).

25.    The Plaintiff's parents did not get his prescription for Lorcet Plus filled. (W. Kelley dep., p. 48, ll. 9-13).

26.    The Food World Pharmacy records show that the Plaintiff's Zyprexa was filled again on November 15, 2003, and this time was for 3 tablets for a period of 3 days.  It was filled for 3 tablets to cover another 3 day period on November 18, 2003 and then again for 3 tablets to cover a 3 day period on November 22, 2003.   (Exhibit L, Food World Pharmacy medical records).

27.    After the Plaintiff was incarcerated, the Plaintiff's mother did not have the Plaintiff's treating physician, Dr. Howard Strickler, fax a medication list for the Plaintiff to anyone at the Coosa County Jail. (W. Kelley dep., p. 60, ll. 17-23).

28.    On November 18, 2003, the Plaintiff filled out an Inmate Request form stating that he needed the following medications filled:   "Zyprexa, Klonapin, Flexareal, Nuroten, and Serquel".  (Exhibit M, Inmate Request form dated 11-18-03).

29.    On November 23, 2003, the Plaintiff complained that he had slipped and that his back was hurting.  He was brought to the front and placed in one of the two holding cells for observation.  The Plaintiff was given a mat and his blood pressure was taken.  A doctor's appointment was made for him and in less than two hours, the Plaintiff reported that he was feeling better and wanted to be returned to general population. (Owens dec., ¶ 23 and Jail Log of 11/23/03).

30.    On November 25, 2003, the Plaintiff was evaluated by Matt Hillyer from Cheaha Mental Health.  Mr. Hillyer made a list of the Plaintiff's history of prescription medication and a note of his visit. The prescriptions that Matt Hillyer reported the Plaintiff was taking were: Clonazepam – 2mg; Neurontin – 300 mg; Zyprexa – 5 mg; Phenobarbital – 60 mg; and Seroquel – 200 mg.   Mr. Hillyer's note was faxed to Dr.  Weaver and an appointment was made for the

Plaintiff to see Dr. Weaver on the following day. (Exhibit NN, Hillyer's notes; Exhibit N, Coosa County Sheriff's Dept. Doctor Visit-Rx form dated November 26, 2003).

31.    The Plaintiff's parents testified that prior to the Plaintiff's incarceration at the jail, that he was not taking all of the medications that he was given while at the jail. (Exhibit KK, Deposition of Raymond Kelley, "R. Kelley dep.," p. 88, ll. 6-16; W. Kelley dep., p. 95, ll. 18-21).

32.    Dr. Weaver was a local physician that had an office in close proximity to the jail. Dr. Weaver was the doctor that was used by Coosa County Jail for inmate care.  When Dr. Weaver was unavailable, Dr. James in Alexander City was the doctor that was used for inmate medical care. (Roberson dep., p. 67, ll. 8-17; Wilson dep., p. 39, ll. 12-20, p. 44, l. 23, p. 45, ll. 1-14).

33.    On November 26, 2003, the Plaintiff was seen by Dr. Weaver for medication check and to check for a possible fracture to the Plaintiff's foot. Dr. Weaver noted that the Plaintiff's medications would be transferred from Food World pharmacy in Sylacauga to Crew's Drug Store and that the Plaintiff's medical records would be transferred from his doctor to Rockford Family Health Center. (Coosa County Sheriff's Dept. Doctor Visit –Rx Form dated November 26, 2003; Owens dec., ¶ 24; Exhibit OO, Declaration of Dr. Randall Weaver, "Weaver dec.").

34.    Dr. Weaver also advised that the Plaintiff should be taken to Russell Medical Center to have his foot x-rayed.  The Plaintiff was taken to Russell Medical Center Emergency Room on that same date, November 26, 2003.  (Coosa County Sheriff's Dept. Doctor's visit – Rx form dated November 26, 2003; Jail logs dated 11/26/03; Exhibit O, Russell Medical Center Emergency Room notes of November 26, 2003; and Weaver dec.).

35.     The Plaintiff reported to Dr. Michele Goldhagen at Russell Medical Center that he had slipped on jail steps five days earlier.  He also reported that his current medications included Clonazepam, HS, Zyprexa,  and Methocarbamol.  (Russell Medical Center Emergency Room records of 11/26/03).

36.     The Plaintiff's foot was x-rayed and the radiology report indicates there was no fracture or dislocation.  The impression was that there was no evidence of acute right ankle injury.  The Plaintiff's foot was wrapped with an ace bandage and he was told to use Tylenol for pain.  No prescriptions were given to the Plaintiff.  (Russell E.R. notes dated 11/26/03 and Coosa County Sheriff's Department Doctor Visit – Rx form dated 11/26/03).

37.     On November 27, 2003, the Plaintiff would not come out of his cell for head count. He advised that he didn't want his medicine at bedtime and that he did not want to be bothered again.  The Plaintiff was moved to a holding cell and placed on a semi-suicide watch. After being in the holding cell for only a few minutes, the Plaintiff fell on the floor and said he had a seizure.  His blood pressure was taken and he was given a mat and required to sleep on the floor because there was concern he would fall off of the concrete bench and hurt himself.  This precaution was taken because of the Plaintiff's demonstrated history of allegedly falling and allegedly hurting himself.  The Plaintiff was once again placed under close observation and the checks that were made on him are reflected in the logs for November 27, 2003, and November 28, 2003. (Jail logs dated 11/27/03-11/28/03 and Owens dec., ¶¶ 25, 26, and 27).

38.     Only hours after being placed in a holding cell, the Plaintiff again stated he felt fine and wanted to go back to general population.  He was allowed to do so.  Curiously, he predicted that he wouldn't have another "seizure" for at least a week. (Jail logs dated 11/27/03; Owens dec., ¶¶ 28 and 29).

39.     On November 28, 2003, the Plaintiff was seen lying in the floor. He complained that he had a seizure.  He was once again brought to a holding cell up front where his blood pressure was taken and was fine.  Within two hours the Plaintiff requested to return to B-block. His request was honored and he was returned. (Jail logs dated 11/28/03).

40.     On November 28, 2003, the Plaintiff completed an Inmate Request Form stating that he needed to see Dr. James to get his medication filled and that he needed to see a doctor because his foot was still hurting. (Exhibit P, Inmate Request Form dated 11/28/03).

41.     The Plaintiff's medication had already been filled by Crew Drugs on November 26, 2003, and the Plaintiff was receiving the medications which had been prescribed. (Exhibit Q, Crew Drugs records; Inmate Request Form dated 11/28/03).

42.     The records from Crew Drug Store in Rockford, Alabama, indicate the following medications were filled for the Plaintiff:

**November 26, 2003**:
Zyprexa – 5 mg (14 tablets)
Clonazepam (28 tablets)
Neurontin (42 tablets)
Seroquel (42 tablets)
Phenobarbital (28 tablets)

**December 9, 2003:**
Zyprexa (14 tablets)
Clonazepam (28 tablets)
Neurontin (42 tablets)
Seroquel (42 tablets)
Phenobarbital (28 tablets)

**December 12, 2003:**
Methocarbamol 28 tablets

**December 26, 2003:**
Zyprexa – (16 tablets)
Clonazepam – (32 tablets)
Neurontin – (48 tablets)
Seroquel – (48 tablets)
Phenobarbital (32 tablets)

**January 2, 2004**
Methocarbamol (28 tablets)
Zyprexa – 10 mg (28 tablets)

**January 6, 2004**
Clonazepam – (14tablets)
Neurontin – (42 tablets)
Seroquel – (42 tablets)
Phenobarbital (28 tablets)

**January 7, 2004**
Hyproxyzine – (40 tablets)
**January 12, 2004**
Methocarbamol (28 tablets)

**January 15, 2004**
Zyprexa – 10 mg (28 tablets)

43.    On November 29, 2003, the Plaintiff completed an Inmate Request Form stating that he needed to see Dr. James to get his medication straight and to see about a rehab program. The Plaintiff was advised on that same date that his medication was being prescribed by Dr. Weaver and that he would have to go through the court system for rehab.   The Plaintiff completed a second Inmate Request Form on this same date requesting to speak with Sheriff Owens before his cousin Troy's funeral. The Plaintiff was informed that Sheriff Owens would not be in until 12/01/03.  (Exhibit R, Inmate Request Form dated 11/29/03).

44.    On November 30, 2003, the Plaintiff filled out an Inmate Request Form stating that he needed to see Dr. James because his foot was still hurting. The Plaintiff stated that the doctor at Russell Hospital had told him that he should see the doctor as soon as possible.   The Plaintiff was informed on December 1, 2003, that Dr. Michele Goldhagen did not advise him that he needed to go to see Dr. James and that he had told him that his foot was sprained and that he should keep it elevated at night and he could have Tylenol for pain.  (Exhibit S, Inmate Request Form dated 11/30/03).

45.     The Plaintiff filled out an Inmate Request Form on December 1, 2003, asking to see Dr. James because "my foot is going to have to have surgery to fix those ligaments".  The Plaintiff was told that Dr. Goldhagen at Russell Medical Center had told him that his foot was just sprained and that she had wrapped it and had told him to keep it elevated and to take Tylenol.  The Plaintiff was also advised that his foot had been x-rayed and that there was no damage to his foot.  (Exhibit T, Inmate Request Form dated 12/1/03).

46.     On December 2, 2003, the Plaintiff filled out two (2) Inmate Request Forms, asking to see Dr. James "light the ER Order" and "for my foot and lower back". (Exhibit U, Inmate Request Forms dated 12/02/03).

47.     On December 3, 2003, the Plaintiff filled out another Inmate Request Form stating, "got to see the doctor cause foot still has something sticking out the side & hurts".  On December 8, 2003, the Plaintiff was advised that x-rays were taken of his foot in the Russell Emergency Room and that everything was okay. The officer advised that he would check to make sure the wrap did not need to be changed.  (Exhibit V, Inmate Request Form dated 12/03/03).

48.     On December 5, 2003, the Plaintiff requested that his blood pressure be taken.  He said he felt lightheaded and predicted he would have a seizure in a half-hour. He was taken to a holding cell for medical observation.  He expressed concern that he would not be found if he had a seizure in his cell but quickly declined a roommate when the offer was made.  Less than one hour after the Plaintiff had predicted he would have a seizure and after having juice and coffee, the Plaintiff advised that he felt fine.  (Jail logs dated 12/5/03; Owens dec. ¶¶ 31 and 32).

49.     The Plaintiff's mother has never witnessed the Plaintiff having a seizure and, in fact, the Plaintiff never told his mother he had ever had a seizure.  Likewise, none of the Plaintiff's doctors had ever told her that her son had seizures. (W. Kelley dep., p. 41, ll. 7-18).

50.     On December 9, 2003, an inmate called the front and advised that the Plaintiff had fallen down the stairs.  The officer in the tower noted that he did not see this fall. The Plaintiff was transported to Russell Medical Center Emergency Room by ambulance.  The Plaintiff was released and returned to the jail where he was placed back in a holding cell for medical observation. (Jail logs dated 12/9/03; Exhibit X, Russell Medical Center records dated 12/9/03; Exhibit TT, Inmate Summary of Wendy Roberson dated 12/11/03).

51.     At the time of the Plaintiff's alleged December 9, 2003 fall, the Plaintiff was being housed on the upper tier of the block. He was reassigned to a cell on the lower level of the block and advised that he was not to use the stairs at all. (Owens dec., ¶¶ 33 and 34; Inmate Summary of Wendy Roberson dated December 11, 2003).

52.     On December 10, 2003, the Plaintiff filled out an Inmate Request Form asking to see a doctor to get his right knee checked and to get his Zyprexa refilled.  An appointment was made for him to see Dr. James on December 11, 2003. (Exhibit Y, Inmate Request Form dated 12/10/03).

53.     The Plaintiff filled out two additional Inmate Request Forms on December 10, 2003, asking in one to see Sheriff Owens and asking to see the doctor for his knee, back and a sleep disorder.  In the other request form he asked to see Sheriff Owens and advised that he had contacted State Senator Ron Johnson to call and ask if he could speak with him.  The Plaintiff was advised by Defendant Roberson that if he had a problem he needed to talk to someone about that the Sergeant or Lieutenant would speak with him about it and that Sheriff Owens would only speak with him if it was a problem that went beyond the authority or ability of either of them. (Inmate Request Form dated 12/10/03).

54.     The Plaintiff was taken to see Dr. James on December 11, 2003. The Plaintiff reported to Dr. James that his shoulder, knee and lower back were hurting.  The Plaintiff's

shoulder was injected with two cortisone shots. His other medications remained unchanged. (Exhibit Z, Coosa County Sheriff's Department Doctor Visit – Rx form dated 12/11/03; Exhibit ZZ, Medical Records of Dr. John James).

55.    On the evening of December 11, 2003, the Plaintiff refused his medication.  (Jail logs dated 12/11/03; Owens dec., ¶ 35).

56.    On December 12, 2003, Dr. James' records indicate the Plaintiff needed his Robaxin filled and that the prescription was called in to Crews Drug Store. (Dr. James records).

57.    On December 13, 2003, the Plaintiff and another inmate were observed to be throwing fake punches at each other. Both inmates were laughing and cutting up with each other. The officer noted that this behavior lasted about 7-8 minutes.  (Jail logs dated 12/13/03).

58.    On December 16, 2003, the Plaintiff had another incident.  He claimed that he fell over a mop bucket and had problems with his head, back and one leg.  Consistent with jail policy and practice, an ambulance was summoned.  Upon arrival, the EMS determined it was not necessary for the Plaintiff to be transported to the hospital.   EMS advised to place Kelley under medical observation.  The Plaintiff was returned to a holding cell for medical observation and given a mattress to put on the floor. As the logs reflect, he was kept under close observation, consistent with jail policy and practice. The Plaintiff could be observed at all times while in a holding cell because there was a camera located in the cell. The Plaintiff was observed getting up numerous times, walking to the door and around his cell.  At one time, he was observed moving his mattress from the floor to the bench. (Jail logs dated 12/16/03; Owens dec., ¶¶ 37 and 38; Exhibits QQ, RR, and SS, Statements of Corporal Kay Taylor, Dana Harris, and Aaron Green).

59.    After the Plaintiff was placed in the holding cell, an officer discovered that the Plaintiff had not been taking all of his medications.  He told a jailer later that he had saved up 20

pills at one time and that his plan was to save them and take them all at one time to get a good buzz.  (Jail logs dated 12/16/03, 12/19/03; Owens dec., ¶ 39).

60.     On December 17, 2003, the Plaintiff requested to be returned to general population.  When he was told that he would remain in the holding cell for observation, he became upset and hit the door several times. (Jail logs dated 12/17/03; Owens dec., ¶¶ 42 and 43).

61.     On December 18, 2003, the Plaintiff was taken back to general population for several hours.  He was allowed to take a shower, use the phone, watch television, and gather his property from his old cell.  (Jail logs dated 12/18/03; Owens dec., ¶ 44 and 45).

62.     On December 18, 2003, Sheriff Owens met with his jail supervisors and issued orders to the jail staff that the Plaintiff was allowed to have a bath every night and to use the telephone occasionally. Sheriff Owens also ordered that the Plaintiff be allowed to use the restroom in the medical examination room, which was a room located between the two holding cells.  This room had its own toilet facilities.   Nonetheless, the holding cell where the Plaintiff was kept contained a fully functioning floor toilet.  (Owens dec., ¶¶ 46, 47 and 48).

63.     Sheriff Owens also ordered that the Plaintiff be observed by camera continuously and his activities documented. These orders were carried out and are reflected in the logs. (Owens dec., ¶ 49; Jail logs dated 12/16/03-1/16/04).

64.     On December 18, 2003, the Plaintiff completed an Inmate Request Form complaining about being in the holding cell and wanting to know why he was there.  Defendant Bradley responded to the Plaintiff, telling him that he had been told several times why he was up front.  (Exhibit BB, Inmate Request Form dated 12/18/03).

65.     On December 18, 2003, the Plaintiff also requested (by a different Inmate Request form) that he see a real doctor to find out about "falling out" and to express his dissatisfaction

with being in the holding cell. It was explained to him that he was placed up front so that he can be monitored by camera 24 hours and that it was for his safety due to his medical problems. (Inmate Request Form dated 12/18/03).

66.     On January 2, 2004, Dr. James' records indicate they had received a phone call asking that the Plaintiff's Zyprexa be changed from 5mg to 20mg. The records indicate that the Plaintiff's mother had initially been incorrect as to the dosage the Plaintiff had been receiving. The records further indicate that Food World Pharmacy had been contacted to confirm that the Plaintiff had been receiving 20mg of Zyprexa. The Plaintiff's prescription was then changed. (Dr. James records dated 1/2/04).

67.     On January 6, 2004, Dr. James' records indicate he received a phone call from the Sergeant at the jail advising that the Plaintiff had experienced a reaction to the Robaxin.  (Dr. James' records dated 1/6/04).

68.     The Plaintiff completed an Inmate Request Form on December 27, 2003, stating that his tooth was hurting.  He also stated that he needed to see a medical doctor to get "stomach pills that matalocalic was keeping my back and toothache down".  There is nothing in this note that says that the Plaintiff had a broken or cracked tooth.  An appointment was made for the Plaintiff with Dr. David Currie, a dentist in Sylacauga, and the Plaintiff was taken to see Dr. Currie on January 14, 2004.  Dr. Currie's records indicate that the Plaintiff advised that he did not have seizures.  The only health problem the Plaintiff advised Dr. Currie that he had was a broken back at L4-L5-S1.  In addition, the Plaintiff's methocarbamol was refilled on January 2, 2004.(Exhibit CC, Inmate Request Form dated 12/27/03; Exhibit DD, Medical records of Dr. Currie; Exhibit EE, Coosa County Sheriff's Department Doctor Visit – Rx Form dated 1/14/04; Crew Drug records).

69.     The Plaintiff completed an Inmate Request Form (which is not dated) advising that he had sores all over and was allergic to something.  The logs indicate that on January 6, 2004, that there was a red rash seen on the Plaintiff's arms and the Inmate Request Form indicates that the Plaintiff was told on January 6, 2004, that an appointment would be made for him.  (Exhibit FF, Inmate Request Form dated 1/6/04; Jail logs dated 1/6/04).

70.     The Plaintiff was taken to see Dr. John James on January 7, 2004, where the records indicate his present illness as "body rash".  Dr. James wrote a prescription for Atarax for the Plaintiff and, in addition, did blood work, which included a CBC with Platelet and a Comprehensive Metabolic Panel. (Dr. James records; Exhibit HH, Coosa County Sheriff's Department Doctor visit – Rx form dated 1/7/04).

71.     The Plaintiff advised jail staff on the evening of January 7, 2004, that the new medication was helping with the itching. (Jail logs dated 1/7/04).

72.     Dr. James records also indicate that the Plaintiff's liver tests on 01/07/04 were abnormal and that the Plaintiff should follow up in 2 weeks. (Dr. James records).

73.     The Plaintiff was allowed to get a shower almost every day during the time he was in the holding cell.  He was allowed to stay in general population during those times for extended periods of time.  In addition, he was allowed to use the telephone, sometimes several times a day and he was allowed regular visitation. (Owens dec., ¶¶ 50 and 51).

74.     The Plaintiff alleges that during the time he was in the holding cell, that he was only taken out to go and take a shower "maybe once or twice a week".  The Plaintiff filled out an Inmate Request form on a date not specified stating that he had been in the holding cell for six days and had only had a bath two times.  The officer noted on the Inmate request form that the Plaintiff had received a bath on December 21, 2003.  In addition, the logs indicate the Plaintiff was removed from the holding cell and taken for a shower on the following dates: December 18-

27, 29, 31 and January 1-3, 6-16.  The logs also indicate that the Plaintiff was not moved to the holding cell until after 8:00 p.m. on December 16, 2003.  (D. Kelley dep., p. 121, ll. 2-5; and p. 122, ll. 17-18 and see generally Jail logs).

75.     The Plaintiff was required to sleep in the holding cell on a mat on the floor because of his propensity to fall and hurt himself.  The benches in the holding cell were wide enough to put a mat on them and for inmates to sleep on them.  However, they were made of concrete and the floor of the holding cell was also concrete.  Sheriff Owens and the jail staff were concerned that given all the Plaintiff's previous problems with falling that he would hurt himself if he fell off the bench while sleeping.  By placing his mat against a wall, the Plaintiff was far enough away from the in-ground toilet. This measure was taken for the Plaintiff's own protection and was not, in any way punitive in nature.  (Owens dec., ¶¶ 40 and 41).

76.     The Plaintiff acknowledges that he was given a mat and a blanket when he was placed in the holding cell. The Plaintiff also acknowledges that Sheriff Owens told him that he was being moved for his own protection. (D. Kelley dep., p. 85, ll. 21-23, p. 86, ll. 5-20).

77.     The policy of the Coosa County Jail is to allow inmates to have visitation from persons other than their attorneys, on Saturdays after they have been incarcerated for a period of one week.  (Exhibit II, Coosa County Jail Inmate Rules and Regulations Section 9 – Visitation).

78.     During the Plaintiff's incarceration, the Visitation Log shows that the Plaintiff had visitors on November 29, 2003; December 6, 2003, December 13, 2003, December 20, 2003, January 3, 2004, January 9, 2004, and January 10, 2004.   The January 9, 2004 visit was from the Plaintiff's attorney, Thomas Radney. (Visitation log; D. Kelley dep., pg. 61, ll. 13-17).

79.     The logs from the time of the Plaintiff's incarceration through the time the Plaintiff was released show that the Plaintiff was given his medication during his incarceration. (See generally Jail logs).

80.    The Plaintiff alleges in his Complaint that after being placed in the hole, that he was abused by Defendant Al Bradley. (Doc. 42 at ¶¶ 21-23).

81.    It would have been impossible for anyone to have abused the Plaintiff in the holding cell without being observed.  Had such abuse been observed it would have been stopped, logged, reported, and investigated.  No report was ever made.  Sheriff Owens' policy was that inmates were not to be abused or mistreated in any way.  Any jailer who would have abused an inmate – or failed to take action while another member of the staff was abusing an inmate – would have been in violation of the policy.    If Sheriff Owens had become aware that Mr. Bradley or any other member of the jail staff was abusing the Plaintiff, he would have stopped him from occurring.  Abusing or mistreating inmates was against the policy of the Sheriff's Department. (Owens dec., ¶¶ 52, 53, and 69).

82.    Sheriff Owens has never known Al Bradley to abuse or mistreat any inmate – including the Plaintiff.  Sheriff Owens never saw any evidence that he in fact abused or mistreated the Plaintiff in any manner whatsoever.  He has never witnessed Al Bradley strike the Plaintiff, grab him by the mustache, or do any of the other acts alleged in the Amended Complaint. Prior to the filing of the Plaintiff's Complaint, Sheriff Owens had never received any information that would lead him to believe that the Plaintiff was being abused by anyone in any way. (Owens dec., ¶¶ 64, 65, 66, and 67).

83.    It is highly unlikely that Al Bradley would even have the physical ability to abuse the Plaintiff in the manner alleged in the Amended Complaint.  Mr. Bradley is an older, slightly built man, with health problems.  He has six surgeries related to a hip replacement prior to the Plaintiff's incarceration in the Coosa County Jail. (Owens dec., ¶ 68).

84.    The Plaintiff alleges in Paragraph 28 of his Complaint, that on one occasion Defendant Bradley "grabbed him by the lip and told him that he needed to shave his mustache or

that he would not be allowed to see his parents at visitation." The Plaintiff does not specify a date that this allegedly occurred but states in his deposition that it was on his way to visitation. (D. Kelley dep., p. 91, ll. 13-23; p. 92, ll. 1-3).

85.    The Plaintiff testified that he would tell his mother things after they had occurred and that she would write them down. (D. Kelley dep., p. 111, ll. 2-3).

86.    The Plaintiff's mother testified that she visited the Plaintiff every Saturday during his incarceration. However, the Visitation Logs indicate, Mrs. Kelley only visited the Plaintiff three (3) times; December 20, 2003, and January 3, 2004, and January 10, 2004. (W. Kelley dep., p. 72, ll. 20-22; Visitation logs)

87.    The journal and other notes kept by the Plaintiff's mother indicate that the incident with Defendant Bradley at the time of visitation allegedly occurred on January 3, 2004. (Exhibit YY, Notes/calendar kept by Plaintiff's mother).

88.    The time sheets kept by the Coosa County Sheriff's Department reflect that Defendant Al Bradley did not work on January 3, 2004. (Exhibit JJ, Time sheet of Al Bradley).

89.    The Plaintiff also makes allegations that Defendant Bradley beat him and says that these beatings occurred almost every day after he was put in the holding cell for the final time. (D. Kelley dep., p. 97, l. 23; p. 98, ll. 1-7; p. 106, ll. 14-23; p. 107, ll. 1).

90.    The Plaintiff told his father that the beatings by Defendant Bradley occurred at night. (R. Kelley dep., p. 83, ll. 7-23, p. 84, ll. 11-22).

91.    The Plaintiff did not tell his father about Defendant Al Bradley allegedly beating him until after he was released. (R. Kelley dep., p. 84, l. 23; p. 85, ll. 1-15).

92.    Defendant Wendy Roberson first went to work for the Coosa County Sheriff's Department in 1995 or 1996. She worked as a Corrections Officer in the jail and as a dispatcher

for approximately a year and a half under Sheriff Bill Evans.  (Roberson dep., p. 20, ll. 12-16, pg. 21, l. 21, pg. 22, ll. 10-17).

93.    After leaving her employment at the Jail, she remained a Reserve Deputy. (Roberson dep., p. 23, ll. 2-23, p. 24, ll. 1-6).

94.    In 2000, Defendant Roberson went back to work at the Coosa County Jail to help assist with the change in computers within the Sheriff's Department. At that time, there was no ranking system in place and she did not have any supervisory authority. (Roberson dep., p. 24, ll. 7-23; p. 25, l. 23; p. 26, ll. 1-6).

95.    At some point, either Sheriff Evans or Sheriff Owens adopted a rank system and Defendant Roberson was made Sergeant over the jail. Her direct supervisor was Terry Wilson, who was named lieutenant. (Roberson dep., p. 29, ll. 21-23; p. 30, ll. 1-14).

96.    Defendant Roberson reported directly to Lieutenant Wilson. She did not report to the sheriff. (Roberson dep., p. 30, ll. 15-21).

97.    Defendant Roberson's duties as Sergeant included handling the day-to-day operations of the jail, working with the other officers to oversee training and job performance, meal preparation, ordering of supplies, and operating the canteen, among other things.  She would work in the tower and dispatch as needed. (Roberson dep., p. 32, ll. 1-12).

98.    The Alabama Department of Corrections does an annual inspection of the Coosa County Jail.  An inspection was done on June 5, 2003.  The Jail Inspection Report prepared by Sidney Rodgers indicates the jail was being provided with monthly pest control service and that the heating and ventilation system was in good working order.  (Exhibit MM, State of Alabama Jail Inspection Report).

99.    The Plaintiff's incarceration at the Coosa County Jail from November 13, 2003 to January 16, 2004 was for a total of 65 days.  (Booking Sheet; Exhibit LL, Judge Rochester's Order).

100.    Defendant Al Bradley is a Deputy with the Coosa County Sheriff's Department. He has been employed since 1998.  Prior to his employment at the Coosa County Sheriff's Department, he served in the Army for six years as an investigator; worked for the Alexander City Police Department for four years; worked as an Alabama State Trooper for six years; and ran his own business for six years. He has never been sued.  (Bradley dep., p. 13, ll. 1-23, p. 14, ll. 1-23, p. 14, ll. 1-23, p. 15, ll. 1-23, p. 17, ll. 1-15; p. 18, ll. 2-23; p. 19, ll. 14-23)

101.    In the fall of 2003 and spring of 2004, Bradley's immediate supervisors were Terry Wilson, as the Jail Administrator, and Wendy Roberson, as the assistant Jail Administrator. (Bradley dep., p. 22, ll. 19-23; p. 23, ll. 1-5, p. 24, ll. 14-17).

102.    In the fall of 2003 and spring of 2004, Bradley worked in the jail.  He did not work patrol because of his legs. (Bradley dep., p. 26, ll. 5-6).

103.    Bradley's duties during this period of time included working as a dispatcher, and occasionally delivering meals and medications to the inmates.  He also worked in the tower, overseeing all the inmates and operating the telephone and radio. He would also work booking and prepare arrest reports. He always worked the day shift. (Bradley dep., p. 25, ll. 11-23).

104.    Bradley has always worked the day shift which is from six in the morning to six in the evening.  (Bradley dep., p. 26, ll. 1-20).

105.    During the time the Plaintiff was incarcerated Bradley worked twenty-seven days. He worked November 14, 15, 16, 19, 20, 24, 25, 28, 29, and 30; December 3, 4, 8, 9, 12, 13, 14, 17, 18, 22, 23, 26, 27, and 31; and January 2, 5, and 6. (Time sheets of Al Bradley).

106. On day shift, one person works in dispatch and booking and one person works in the tower. (Bradley dep., p. 27, ll. 12-23, p. 24, ll. 1-8).

107. The tower is an observation pod upstairs. It overlooks the day rooms where the inmates are housed. From the tower, you are able to see down into the cell blocks and you can view all the monitors from the cameras that are throughout the jail. The person working in the tower cannot leave. (Bradley dep., p. 28, ll. 9-15).

108. Medication sheets would be filled out by whoever administered the medications to the inmates. Medication would be given to an inmate according to the prescription for the inmate. The jailer would then initial the medication log and so would the inmate. (Bradley dep., p. 96, ll. 1-23; p. 97, ll. 15-23; p. 98, ll. 1-5; p. 104, ll. 21-23; p. 105, ll. 110).

109. Defendant Bradley has never struck the Plaintiff. He has never kicked him in the face, broken his teeth or kicked him in the ribs or in the testicles. (Bradley dep., p. 146, ll. 6-9; p. 149, ll. 7-11; p. 150, ll. 7-14; p. 151, ll. 15-23).

110. Defendant Bradley has never had an inmate accuse him of kicking him. (Bradley dep., p. 150, ll. 3-6).

111. Defendant Bradley never slapped the Plaintiff or any other inmate. He never took a broom and tried to insert it in the Plaintiff's rectum. Likewise, he never struck the Plaintiff with a hose. (Bradley dep., p. 152, ll. 1-13; p. 154, ll. 13-17).

112. Defendant Bradley did not give the Plaintiff any medication other than at the time he was to receive it. (Bradley dep., p. 154, ll. 1-12).

113. Defendant Bradley did not take away the Plaintiff's toilet tissue or letters. (Bradley dep., p. 153, ll. 20-23; p. 152, ll. 14-17).

114. The Plaintiff never complained to Defendant Bradley about being cold (Bradley dep., p. 155, ll. 19-23; p. 156, l. 1)

115.    Defendant Bradley would flush the drain in the Plaintiff's cell. The drain would have been flushed 2 to 3 times per shift. (Bradley dep., p. 156, ll. 2-23).

116.    The Plaintiff testified that he did not tell his attorney about the incidents where Defendant Bradley hit him because he did not meet with his attorney after it happened. He met with his attorney on 1/9/04. Bradley did not work after the January 6, 2004.

117.    During the Plaintiff's incarceration, he filled out approximately 20 Inmate Request Forms, requesting to see a doctor, asking to see Sheriff Owens, complaining about being in a holding cell and stating that he had only had a shower two times in six days.  Not one of the Inmate Request Forms completed by the Plaintiff addressed the fact that he was cold, that he had not been provided store, that he was not being allowed to use the bathroom or get water, or that he was not provided with toilet paper or that the drain inside the holding cell was not being flushed.  (Inmate Request Forms; Owens dec., ¶ 74).

118.    The Plaintiff was placed in the holding cell on the evening of December 16, 2003, for medical observation.  He remained in the holding cell until he was released on January 16, 2004.  (See generally Jail logs).

119.    The Plaintiff testified in his deposition that there were bugs in his food on one occasion.  (The Plaintiff initially said they were in oatmeal, but then later changed his testimony to say they were in the grits).  The Plaintiff also testified that there were roaches in his cell and that he complained about this to Ricky, Terry, Wendy, Al, Mr. Lipscomb, and Mr. Harris.  The Plaintiff said they never would do "nothing about it". (D. Kelley dep., p. 140, ll. 1-23; p. 141, ll. 1-18).

120.    The jail logs indicate that on December 7, 2003, that bugs were found in the oatmeal that morning and so they were not served.  Grits were made in replacement. (Jail logs dated 12/7/03, and Owens dec., ¶ 63).

121.    The Department of Corrections performed a Jail Inspection at the Coosa County Jail on June 5, 2003.  The inspection report indicates that the jail was under a monthly contract with a pest control agency to provide pest control service. (State of Alabama Inspection Report; Owens dec., ¶ 62)

122.    The Inmate Rules and Regulations state that inmates are taken out for exercise as often as possible (staff and weather permitting).  Inmates are allowed to use the indoor common areas for walking and/or aerobic exercise at all times.  (Section 8 of the Coosa County Inmate Rules and Regulations).

123.    The Plaintiff could have exercised in his cell at any time, should he have chosen to do so.  The logs reflect that on several occasions while the Plaintiff was in the holding cell, he was observed walking around and on one occasion was doing sit-ups.  In addition, the Plaintiff could have easily exercised in the common area when he was taken for a shower.  There were numerous times when the Plaintiff was allowed to stay back in the block after getting his shower before he was returned to the holding cell. (Jail logs dated 12/24/03; Owens dec., ¶ 50).

124.    There were occasions when the Plaintiff tried to thwart the efforts made by the jailers to watch him by placing playing cards over the camera in the holding cell.  This resulted in the cards being confiscated. (Owens dec. ¶ 54).

125.    After the Plaintiff was placed in the holding cell on December 16, 2003, the Plaintiff continued to receive his medications and medical attention.  He had his blood pressure taken.  He was taken to see Dr. James and Dr. Currie. (Owens dec., ¶ 55; Jail logs dated 12/16/03-1/16/04).

126.    The Plaintiff was disruptive during the time period he was in he was in the holding cell.  He would yell, beat on the door, and throw things at his door. The Plaintiff's conduct got worse on occasion when he would hear someone in the booking area. He would

come to the door, look through the window, and heap abuse and demands on jail staff and other persons in the booking area. (Owens dec., ¶ 57, Roberson dep., and Jail logs dated 12/16/03-1/16/04).

127.    There were times when the Plaintiff was so disruptive that a folder would be placed over the window in the door so he could not see what was going on in the booking area. This was done an effort to calm him down and allow the jail staff to conduct their duties without having to deal with disruptions. It is extremely important to note that when this happened, the Plaintiff still remained under constant observation of the jailer in the tower via the camera in the holding cell. (Owens dec., ¶ 59).

128.    As early as three days after the Plaintiff was placed in a holding cell following his December 16, 2003, fall, he was already claiming he had a lawyer who would file a lawsuit related to his conditions. (Owens dec., ¶ 60; Jail logs dated 12/16/03).

129.    There was a time in early to mid December when it was somewhat cold in the jail. This was not because of anything intentional on the part of the staff, but because there was a problem with the heat pump. Consistent with jail policy and practice, a repair order was immediately put in and the heater was repaired around December 12, 2003. (Owens dec., ¶ 61)

130.    If the Plaintiff had ever complied with the grievance procedure and made Sheriff Owens aware of his claims, his claims would have been investigated and, if substantiated action would have been taken to alleviate the condition. (Owens dec., ¶ 75).

131.    None of the Plaintiff's medical providers ever reported to Sheriff Owens that the Plaintiff had stated to them that he had been abused. No provider ever confirmed that the Plaintiff had a seizure. (Owens dec., ¶ 72)

132.    The Plaintiff alleges that he was taken to Dr. Currie to have the teeth that Al Bradley broke pulled. If that happened, the Plaintiff apparently did not tell Dr. Currie what

happened to his teeth because had he done so, Dr. Currie would have reported it to Sheriff Owens. (Owens dec., ¶ 71)

133.    At no time during the Plaintiff's incarceration was Sheriff Owens ever made aware that the Plaintiff was not getting water, showers, toilet paper, bathroom breaks, or suffering any of the deprivations alleged in the Amended Complaint.  Had such deprivations been occurring and come to the attention of Sheriff Owens, he would have taken steps to correct them.  Had such deprivations occurred they would have been violations of the policies Sheriff Owens had established for the jail.  (Owens dec., ¶ 73).

134.    Sheriff Owens never received a grievance form from the Plaintiff regarding any of the claims in his Amended Complaint.  Jail policy was that grievances were to be handled at the lowest level possible and only grievances that could required Sheriff Owens' personal attention were forwarded to him.  To the best of Sheriff Owens' knowledge, only one of the Inmate Request Forms completed by the Plaintiff contained specific complaints and, in accordance with jail policy, the complaint was properly handled by a staff member. (Owens dec., ¶ 74).

135.    Sheriff Owens disputes that the Plaintiff ever stated words to the effect "when are you going to stop Al Bradley from beating me?"  However, even if the Plaintiff had said something like that, especially phrased that way, Sheriff Owens would have had a difficult time taking such a remark seriously given the fact that he never saw any signs of abuse or mistreatment of the Plaintiff.  In addition, Sheriff Owens knew there were cameras monitoring the jail at all times- particularly the holding cells- and no one had reported such conduct.  The Plaintiff had already "cried wolf" with respect to other alleged injuries which paramedics found to be asymptomatic, and, finally, the disparity in size, age, and agility between the Plaintiff and Al Bradley. (Owens dec., ¶ 70).

136.    Defendant Terry Wilson went to work as a deputy for the Coosa County Sheriff's Department in July of 1995.  He left the department in August of 2004 and in January 2007, he was sworn in as the Sheriff of Coosa County.  (Wilson dep., p. 15, ll. 13-23; p. 16, ll. 1-9).

137.    In 2003, Defendant Wilson was a Lieutenant.    As a Lieutenant, he was responsible for overseeing the D.A.R.E. program, acted as the Jail Administrator, and was the Day Shift supervisor.  Most of his time was spent on the road as a deputy. (Wilson dep., p. 22, ll. 7-10).

138.    Defendant Wilson's role as the Jail Administrator included handling any problems that come up during the day that the jail staff could not handle.  Wendy Roberson, as the Sergeant, was the Assistant Jail Administrator and was the person responsible at the jail on a day-to-day basis. (Wilson dep., p. 22, ll. 7-22; p. 23, ll. 1-7; p. 26, ll. 25, ll. 20-23; p. 26, ll. 1-17; Roberson dep., p. 38, ll. 9-18).

139.    If an inmate had a medical emergency, the policy was that we would call EMS to come in and respond.  If an inmate developed a problem that he needed to see a doctor about then he would fill out a request form for medical attention. An appointment would be made for the inmate at that time. (Wilson dep., p. 38, ll. 4-23; p. 39, ll. 1-11).

140.    In November 2003, there was no specific policy concerning the handling of inmates who would then determine whether the inmate needed to go to the hospital. (Wilson dep., p. 40, ll. 22-23; p. 41, ll. 1-5; p. 42, ll. 11-23, p. 43, ll. 1-15).

141.    Defendant Wilson is not aware that the Plaintiff ever requested water and did not get it.  The Plaintiff would have been given water at each meal and he would have been allowed to have a plastic cup that he kept in his cell with water.  (Wilson dep., p. 66, ll. 18-23, p. 67, l.1; Bradley dep., p. 157, ll. 17-23; p. 158, ll. 1-1).

142.    Defendant Wilson never saw Defendant Bradley in the cell with the Plaintiff and he never saw Defendant Bradley trying to kick the Plaintiff in the testicles. (Wilson dep., p. 75, ll. 15-23; p. 76, ll. 1-7).

143.    On January 16, 2004, Chief Deputy Brett Oakes received a call from Corrections Officer Aaron Green regarding Bryan Kelley.  Officer Green advised that he felt that the Plaintiff needed to be looked at because he was "as yellow as a post it note".  Lt. Wilson and Deputy Oakes went to the booking area of the jail and got the Plaintiff out of his cell and took him into the exam room.  They noted the Plaintiff's skin had a yellow tone to it.  He told them that he had liver problems in the past and that for the past few days he had been urinating a real dark color. They escorted the Plaintiff back to his cell and told him to get his shoes on and get ready to go to the emergency room.  When Deputy Oakes went into the cell, he noticed that there was a dark stain on the floor where the toilet is which had not been there earlier in the day when Deputy Oakes was there. Deputy Oakes then transported the Plaintiff to Russell Medical Center Emergency Room. (Exhibit UU, Statement of Brett Oakes dated January 23, 2004).

144.    On January 16, 2004, the Plaintiff was admitted to Russell Medical Center.  The nursing assessment sheet indicates that the Plaintiff had recently had an abnormal liver test done by Dr. James.  The primary diagnosis upon admission was hepatic coma.  The Plaintiff was discharged on January 20, 2004. (Exhibit PP, Russell Medical Center records dated 1/16/04).

145.    Judge Rochester, a Circuit Court Judge in Coosa County, Alabama, entered an Order on January 16, 2004, granting a furlough to the Plaintiff from the Coosa County Jail to Russell Medical Center.  (Order of Rochester).

146.    Prior to the Plaintiff's incarceration at the Coosa County Jail, the Plaintiff had been recently hospitalized at Brookwood Hospital in Birmingham, Alabama.  The hospitalizations were in July and September of 2003.  On both admissions, the Plaintiff was

admitted for alcohol abuse, prescription drug abuse and illicit drug abuse. The History and Physical done on both occasions specifically states the Plaintiff has no history of seizures (Exhibits VV and WW, Brookwood Hospital records of July and September 2003).

147.    On January 20, 2004, the Plaintiff was again admitted to Brookwood Hospital. The records do not reflect that the Plaintiff told anyone of any abuse he had suffered while incarcerated at the Coosa County Jail.  Likewise, the Plaintiff did not seek treatment for any physical abuse he allegedly suffered by Defendant Al Bradley during this admission. (Exhibit XX, Brookwood Hospital Record dated 1/20/04).

148.     In 2007, the Plaintiff had a series of admissions to Hillcrest Behavioral Hospital in Birmingham, Alabama.  The Discharge Summaries and notes from the Plaintiff's admissions indicate the Plaintiff's tendency to be medication seeking, manipulative, and malingering. (Exhibit ZZ, Hillcrest Behavioral Hospital records).

## GROUNDS FOR SUMMARY JUDGMENT

1.    The Plaintiff has four Fourteenth Amendment 42 U.S.C. § 1983 claims remaining against Sheriff Owens in his individual capacity:

    a.    Deliberate indifference to a serious medical need by failing to obtain prompt treatment (Count I);

    b.    Deliberate indifference to a serious medical need by failing to obtain adequate treatment (Count II);

    c.    Unconstitutional conditions of confinement (Count III); and

    d.    Failure to prevent excessive force (Count V).

2.    Sheriff Owens is entitled to judgment in his favor as a matter of law because the evidence in the record demonstrates his clear entitlement to qualified immunity.

3.    Sheriff Owens requests the opportunity to be heard orally on this motion.

Respectfully submitted this 30th day of November, 2007.

**s/Gary L. Willford, Jr.**
KENDRICK E. WEBB – Bar No. WEB022
GARY L. WILLFORD, JR. – Bar No. WIL198
Attorney for Defendant Ricky Owens
WEBB & ELEY, P.C.
7474 Halcyon Pointe Road (36117)
Post Office Box 240909
Montgomery, Alabama  36124
Telephone:  (334) 262-1850
Fax:  (334) 262-1889
E-mail:  gwillford@webbeley.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 30th day of November, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  **Richard J. Stockham, III**, and **Kristi McDonald**.

**s/Gary L. Willford, Jr.**
OF COUNSEL