**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DANIEL BRYAN KELLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.: 2:05-cv-1150-T** |
| | ) | |
| **RICKY OWENS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM BRIEF IN SUPPORT OF COOSA COUNTY
SHERIFF RICKY OWENS'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Coosa County Sheriff Ricky Owens, a Defendant in the above-entitled action, and submits this Memorandum Brief in support of his contemporaneously filed Motion for Summary Judgment.

**INTRODUCTION**

Plaintiff filed this action alleging that Defendants Coosa County Commission, Sheriff Ricky Owens, former Coosa County Jail Administrator Terry Wilson, Interim Jail Administrator Wendy Roberson, Dr. Randall Weaver, and Jailer Al Bradley are liable to him for the treatment he received while incarcerated in the Coosa County Jail between November 13, 2003 and January 16, 2004. After the Plaintiff's Amended Complaint was filed, Sheriff Owens filed a Motion to Dismiss. The motion to dismiss was granted in part by the Court and now, at summary judgment, only four Fourteenth Amendment claims remain against Sheriff Owens in his individual capacity: (1) deliberate indifference to a serious medical need by failing to obtain prompt treatment (Count I); (2) deliberate indifference to a serious medical need by providing

1

inadequate treatment (Count II); (3) unconstitutional conditions of confinement (Count III); and failure to prevent the use of excessive force (Count V).  (Doc. 71 at p. 21.)[1]

The parties have engaged in extensive discovery.  Based upon the evidence in the record, Sheriff Owens is entitled to judgment in his favor as a matter of law on each of the Plaintiff's remaining claims.

## ARGUMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment: "A party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

"The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to

---

[1] The document cited is actually the magistrate judge's Report and Recommendation.  The Court adopted the Report and Recommendation in its December 4, 2006 Order. (Doc. 80.)  For ease in citation, this brief will cite to the Report and Recommendation.

secure the just, speedy and inexpensive determination of every action.'"  Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex, 477 U.S. at 327.

On a motion for summary judgment, the court should view the evidence in the light most favorable to the non-movant.  Greason v Kemp, 891 F.2d 829, 831 (11th Cir. 1990).  However, a plaintiff "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only reasonable inferences with a foundation in the record inure to the non-movant's benefit.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000).  "[T]he court should give credence to the evidence favoring the non-movant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  Id. (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299).[2]  The Court "need not 'swallow plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited.'"  Marsh v. Butler County, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc) (quoting Massachusetts School of Law v. American Bar, 142 F.3d 26, 40 (1st Cir. 1998)).

---

[2] Although Reeves was a review of a motion for judgment as a matter of law after the underlying matter had been tried, the Supreme Court, in determining the proper standard of review, relied heavily on the standard for summary judgment stating, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  Reeves, 530 U.S. at 150, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Just a few months ago, the United States Supreme Court, in a qualified immunity case, revisited the standard of review in the context of a motion for summary judgment emphasizing the "reasonable jury" aspect of the standard:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.*

Scott v. Harris, 127 S. Ct. 1769, 1776 (2007) (Emphasis added).

In Scott, the Supreme Court rejected the reading of the record by the district court and the Eleventh Circuit Court of Appeals which had, in an effort to view the evidence in a light most favorable to the plaintiff, credited the plaintiff's deposition testimony. In his deposition, Harris swore that "[he had] remained in control of his vehicle, slowed for turns and intersections, and typically used his indicators for turns. He did not run any motorists off the road. Nor was he a threat to pedestrians in the shopping center parking lot, which was free from pedestrian and vehicular traffic as the center was closed." Id. at 1775. Yet the plaintiff's words were flatly contradicted by other more credible aspects of the record, particularly a videotape showing driving in an extremely reckless manner: "The videotape tells quite a different story." Id.

Nothing in the Scott opinion, however, limited its application to cases where the plaintiff's testimony is pitted against videotape. The Ninth Circuit in Skylstad v. Reynolds, 2007 WL 2766436 at *2 (9th Cir. 2007), relying on Scott's broadening of the motion for summary

4

judgment standard, rejected the plaintiff's version of the facts *even without a videotape disputing it*.

> Skylstad disputes that he actively resisted arrest. Declarations from officers on the scene unanimously state that Skylstad refused to exit the car and violently resisted arrest. Skylstad states that he voluntarily surrendered, that the officers unnecessarily used a K-9 dog to repeatedly bite and attack him, and that the officers smashed his head against the car and cut his arms open at the scene to take his blood. Skylstad offers the declarations of his wife and two other witnesses to support his version of events. The medical evidence, however, directly contradicts Skylstad's version of events. Although the dog bite was serious and required medical attention, there is no medical evidence of multiple dog bites, head injury, or cuts on the arms. . . . In summary, Skylstad failed to raise a triable issue for a jury on his claim of excessive force.

Skylstad, 2007 2766436 at *2 - *3.

Similarly, the Northern District of Georgia granted summary judgment on an excessive force claim, citing Scott v. Harris's standard and concluding that "the evidence supporting Williams's claim that Hatcher used unconstitutionally excessive force is exceptionally weak." Williams v. Martin, 2007 WL 4139476 (N.D. Ga. Oct 29, 2007); see Morales-Arcadio v. Shannon Produce Farms, Inc. 2007 WL 2106188, *9 (S.D. Ga. 2007) ("There thus is no genuine issue of fact that the checks face-dated 8/11/04 were printed and given to the workers in late September or early October 2004. Though Shannon would like to take a position without evidentiary support other than the user-selected face date on the check, that 'position is so utterly discredited by the record that no reasonable jury could . . . believe [ ]' it." (quoting Scott v. Harris, 550 U.S. ---, 127 S. Ct. 1769, 1776 (2007)).

Sheriff Owens is entitled to judgment in his favor as a matter of law on each of the Plaintiff's claims because he is entitled to qualified immunity. Once a defendant has asserted the defense of qualified immunity and demonstrated that he was acting within his discretionary authority, the burden shifts to the plaintiff who must first demonstrate from the record that the defendant official violated his federally protected rights. Saucier v. Katz, 533 U.S. 194, 201

(2001).  However, even if the Plaintiff successfully makes such a showing, he must also point the Court to clearly established law that provided "fair warning" that the conduct of the Defendants was illegal.  Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003).  In making an assessment of whether the particular conduct of these Defendants was clearly established as being violative of constitutional dictates, the reviewing court must examine the state of law at the time the alleged deprivation occurred.  See Rodgers v. Horsley, 39 F.3d 308, 311 (11th Cir. 1994).  A constitutional right is clearly established only if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987); Lancaster v. Monroe County, 116 F.3d 1419, 1424 (11th Cir. 1998).  "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."  Jenkins v. Talladega Bd. of Educ., 115 F.3d 821, 827 (11th Cir. 1997) (en banc) (citations omitted).

Applying the Supreme Court's reasoning in Scott and its progeny in the context of qualified immunity, this Court is justified in concluding that no reasonable jury would find the Plaintiff's outrageous claims (which find no objective support in the record) credible.  As set forth more extensively below, Sheriff Owens is entitled to qualified immunity for three reasons. First, Sheriff Owens was acting within his discretionary authority.  Second, the evidence in the record would not convince any reasonable juror that Sheriff Owens violated any of the Plaintiff's federally protected rights.  Third, even if the record contained evidence of a constitutional violation, no clearly established law provided Sheriff Owens with the requisite fair warning that his conduct was unlawful.

## I.    SHERIFF OWENS ACTED WITHIN HIS DISCRETIONARY AUTHORITY.

Once a public official has asserted the defense of qualified immunity, he bears the burden of proving that he was acting within his discretionary capacity.  Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir. 1988).  In order to establish that he is acting within his discretionary capacity, a public official asserting qualified immunity need only show "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."  Id. at 1564 (quoting Barker v. Norman, 651 F.2d 1107, 1121 (5th Cir. 1981)).  Courts should not be "overly narrow" in interpreting this requirement. Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994).  To determine this question "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties."  Harbert Intern., Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998) (citation omitted).  As one district court observed, "the determination that an officer was acting within his discretionary authority is quite a low hurdle to clear."  Godby v. Montgomery County Bd. of Educ., 996 F. Supp. 1390, 1401 (M.D. Ala. 1999).

As noted by the Court at the motion to dismiss stage, the Plaintiff did not contest that Sheriff Owens was acting within his discretionary authority.  (Doc. 71 at p. 12.)  No evidence that has come out of discovery leads to any conclusion other than Sheriff Owens as acting in his discretionary authority.  At all times he was the Sheriff of Coosa County.  At all times the Plaintiff was an inmate of the Coosa County Jail.  It was only in his capacity as Sheriff that Ricky Owens had any authority or obligation to run a jail, supervise jail staff, supervise inmates, or provide inmate medical care.  As all of the alleged actions were taken under the auspices of these roles, Sheriff Owens was acting within his discretionary authority.

**B.    Sheriff Owens Did Not Violate the Plaintiff's Federally Protected Rights.**

Supervisory officials like Sheriff Owens are not liable under § 1983 for the unconstitutional acts of their subordinates "on the basis of *respondeat superior* or vicarious liability."  Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994) (citation and quotation omitted).  The Eleventh Circuit has stated what is required to make out a § 1983 claim against a supervisor:

> Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation.  The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.

Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted).  The causal connection may be established where the supervisor's improper "custom or policy . . . result[s] in deliberate indifference to constitutional rights."  Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991) (citing Zatler v. Wainwright, 802 F.2d 397 (11th Cir. 1986)).

Here, the Plaintiff's claims appear to be based upon Sheriff Owens's alleged direct involvement with respect to his medical care and conditions of confinement and apparent policy of not taking action against the jailers who abused him.  All of these claims lack merit.  First, as a matter of law, Sheriff Owens was not deliberately indifferent to the Plaintiff's serious medical needs.  Second, the Plaintiff was not subjected to unlawful jail conditions.  Finally, Sheriff Owens did not fail to intervene or allow Al Bradley to harm the Plaintiff.

**1.    Sheriff Owens was not deliberately indifferent to the Plaintiff's medical needs.**

In order to prevail under 42 U.S.C. § 1983 on a medical claim, the Plaintiff must demonstrate that Sheriff Owens was deliberately indifferent to a "serious" medical condition, such that his conduct constitutes a violation of the Fourteenth Amendment.  Hudson v.

8

McMillian, 503 U.S. 1, 9 (1992) ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'") (citing Estelle v. Gamble, 429 U.S. 97, 103-104 (1976)). In Estelle, the Supreme Court stated:

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. ***Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.*** In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. ***It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment***.

429 U.S. at 105-06 (emphasis added). See also, Farmer v. Brennan, 511 U.S. 825, 837 (1994) ("Deliberate indifference describes a state of mind more blameworthy than negligence."). Furthermore, where a prisoner has received medical attention and the dispute concerns the adequacy of the medical treatment, deliberate indifference is not shown. Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985). Assuming, *arguendo*, the Plaintiff had a serious medical condition, the evidence in the record shows that Sheriff Owens was not deliberately indifferent to it.

Prior to January 16, 2004, the Plaintiff did not have a serious medical condition. To be sure, he had a sprained ankle and his long standing back problems. However, as the records clearly show, the Plaintiff was seen by physicians, received treatment, and was given prescribed medications. The Plaintiff received medications daily. (See generally Jail logs; Crews Pharmacy recs.)[3] The Plaintiff was taken to Dr. Weaver, Dr. James, and Dr. Currie four times. Paramedics were called when the Plaintiff had his "seizures" and falls. (Jail logs dated 12/9/03,

---

[3] References to "jail logs" as used in this brief refer to Exhibits F (November 2003 logs), W (December 2003 logs), and GG (January 04 logs) in the Defendants' Joint Evidentiary Submissions. Specific dates will be cited where appropriate.

12/16/03.)  The Plaintiff was taken to Russell Hospital and the treatment plan of his doctor there was followed.  (Russell Hospital docs., treatment dates 11/26/03, 12/9/03).  The Plaintiff had a mental health evaluation.  (Hillyer notes.)  Hillyer's recommendation was followed and the Plaintiff followed up with Dr. Weaver.  (Jail logs dated 11/26/03; Weaver dec., treatment records.)

Even the main thing complained of by the Plaintiff – moving him from general population to the holding cells – demonstrates that Sheriff Owens and his staff were not indifferent.  As the jail logs reflect, jailers were able to, and did, keep a close watch on the Plaintiff because of the cameras in the holding cells.  If the Plaintiff had actually developed a medical problem, the staff would have been able to quickly respond, unlike in general population where there were areas of the cell blocks – such as the cells themselves – that were not in view of the jail's security cameras.  It is perhaps not coincidental that once the Plaintiff was moved to the holding cell for the last time on December 16, 2003, he stopped having "falls" and "seizures" – he knew he was being watched.

The evidence conclusively demonstrates that the Plaintiff received medical treatment from at least three doctors, a dentist, and a mental health professional.  He was taken to the hospital.  Paramedics were called for him when needed.  All of this occurred in roughly a six week period.  There is absolutely no evidence whatsoever that Sheriff Owens personally, or through his policies, was indifferent to the Plaintiff's medical condition.  To the contrary, all of the evidence shows that the Defendants took extraordinary steps to ensure that the Plaintiff received medical, dental, and mental health care.

Where the Plaintiff's real bone of contention lies in the type of assistance he received. The Plaintiff appears to be laboring under the misunderstanding that jail personnel are required to provide him with the treatment option he desires.  However, as a matter of law, an inmate does

not have a right to a *specific* kind of treatment.  City of Revere v. Massachusetts General Hosp., 463 U.S. 239, 246 (1983) (holding, "the injured detainee's constitutional right is to receive the needed medical treatment; ***how [a municipality] obtains such treatment is not a federal constitutional question***.") (emphasis added).  Additionally, this Court should not substitute its medically untrained judgment for the professional judgment of the medical health professionals who treated Plaintiff.  See Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) (observing that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation"); Hamm, 774 F.2d at 1575 (stating that the evidence showed the plaintiff received "significant" medical care while in jail, and although plaintiff may have desired different modes of treatment, care provided by jail did not constitute deliberate indifference), cert. denied, 475 U.S. 1096 (1986); Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (stating "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments").

Furthermore, Sheriff Owens did not have any kind of medical education, training or experience.  He relied upon the professional judgment of medical professionals who provided care to the inmates in general and the Plaintiff in particular.  In Williams v. Limestone County, 198 Fed. App'x 893 (11th Cir. 2006), the Eleventh Circuit addressed in an unpublished opinion the issue of whether an inmate may maintain a medical claim under the auspices of § 1983 against prison officials with no medical background.  In Williams, the Eleventh Circuit held that a Sheriff was not liable for failure to train his employees in emergency medical procedures.  In so holding, the Court noted:

> [W]e cannot say, on this record, that "the need for more or different training [was] obvious," such that by failing to ensure jail personnel were trained in emergency medical procedures, Sheriff Blakely disregarded a substantial risk that the jail staff would be deliberately indifferent to inmates' medical needs ….

[T]here is no indication from the record that Sheriff Blakely had notice his policies, training procedures, or supervision were "likely to result in the violation of a constitutional right." . . .

[S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. See, e.g., Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir.1993); White v. Farrier, 849 F.2d 322, 327 (8th Cir.1988). In this case, Sheriff Blakely promulgated general procedures for dealing with emergency situations, which procedures relied primarily on the medical expertise Naphcare was obligated by contract to provide …. "[D]eliberate indifference is a stringent standard of fault, requiring proof that [the] actor disregarded a known or obvious consequence of his action." Bd. of County Comm'rs v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 1391, [] (1997). See also Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995). Williams [the plaintiff], as the district court concluded, thus failed to meet his burden on summary judgment of establishing that Sheriff Blakely's failure to train jail personnel amounted to deliberate indifference to Williams' serious medical condition.

198 Fed. App'x at 897-98.

The Eighth Circuit has also addressed whether a jail official may be held liable for claims of deliberate indifference to a medical condition when medical treatment is provided. In Meloy v. Bachmeier, 302 F.3d 845 (8th Cir. 2002), a former inmate sued several prison doctors, a nurse, and the prison's medical director[4] for failing to provide him with a positive air pressure machine needed to treat his sleep apnea. Meloy, 302 F.3d at 847. Reversing the district court's denial of summary judgment for the director, the Eighth Circuit began by making some common sense observations. "A prison's medical treatment director who lacks medical expertise cannot be liable for the medical staff's diagnostic decisions." 302 F.3d at 847 citing, Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995). Further, the Meloy court stated "[p]rison officials cannot substitute their judgment for a medical professional's prescription." Id. citing, Zentmyer v. Kendall County, 220 F.3d 805, 812 (7th Cir. 2000). Finally, the court held:

The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision. Because the law was not clearly established that [the director] was deliberately indifferent to

_____
[4] The medical director was a trained and licensed nurse. Zentmyer, 302 F.3d at 846.

[the plaintiff's] serious medical needs, [the director] is entitled to qualified immunity.

302 F.3d at 849.

Similarly, Sheriff Owens and his staff obtained treatment for the Plaintiff. The instructions from the Plaintiff's medical providers were followed. To the extent there were any inadequacies with the treatment the Plaintiff received, Sheriff Owens cannot be held liable under 42 U.S.C. § 1983.

### 2.     Sheriff Owens did not subject the Plaintiff to unlawful jail conditions.

There is no constitutional mandate that prisons or jails be made comfortable. Rhodes v. Chapman, 452 U.S. 337, 349 (1981). "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285 (1948). "Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Bell v. Wolfish, 441 U.S. 520, 546 (1979). A claim by a pretrial detainee regarding conditions of confinement is reviewed under the Fourteenth Amendment's due process standard. Id. at 575 n.16. The Plaintiff cannot prevail on his conditions of confinement claim because the evidence shows that he was not punished and Sheriff Owens was not deliberately indifferent.

### a.     The Plaintiff's conditions of confinement did not amount to punishment.

The standard for evaluating the constitutionality of a particular restriction for purposes of affording due process under the Fourteenth Amendment is whether the restriction amounts to punishment of the detainee. Bell, 442 U.S. at 535. The Supreme Court went on in Bell to spell out how the Court determines whether conditions amount to punishment. "[I]f a particular condition or

restriction of pretrial detention is ***reasonably related to a legitimate governmental objective***, it does not, without more, amount to 'punishment.'" Id. at 539 (emphasis added).  In general, moving the Plaintiff to the holding area after his repeated "falls" and "seizures" cannot be said to be anything but a legitimate governmental objective.  The objective was the very thing the Plaintiff accuses the Defendants of not doing – looking after his health.

The Plaintiff was not kept in the holding cell continuously for 40 days as alleged in the Amended Complaint.  Although the Plaintiff was in and out of the holding cell for a variety of reasons previously, he was not moved into the holding cell for the last time until December 16, 2003.  He remained there until he was taken to Russell Hospital on January 16, 2004 – a period of 31 days.  (Jail logs dated 12/16/03 and 12/16/04).

Placing the Plaintiff in the holding cells enabled jail staff to monitor him around the clock and immediately summon assistance if he needed it.  Prior to December 16, 2003, the Plaintiff had apparently fallen down stairs, tripped over a mop bucket, and had self-described "seizures" for which no medical confirmation was ever received.  (Jail logs dated 11/23/03-12/16/03.)  Moreover, the Defendants went so far as to first try a lesser restrictive means of accomplishing the objective by moving the Plaintiff to a lower tier cell to prevent him from having any problems with the stairs. (Jail logs dated 12/10/03.)  This was clearly insufficient because the Plaintiff then had a problem with a mop bucket.  (Jail logs dated 12/16/03.)  The jail staff also could not monitor him while he was in his cell.  (Owens dec. at ¶ 22.)  When the Plaintiff complained about being moved to the holding area through the grievance process, he was specifically informed "you are placed up front so you can be monitored on camera 24 hrs [sic] for your safety due to your medical problems – this has been explained to you several times."  (Request form dated 12/18/03.)

The evidence also shows that once the Plaintiff was moved to the holding area, he was still afforded nearly the same amenities as he received in general population.  Contrary to the allegations

in the Amended Complaint, the Defendants did not simply throw the Plaintiff in "the hole" and throw away the key. ***By order of Sheriff Owens and Jail Administrator Wilson***, the Plaintiff was allowed to leave the holding area for, on occasion, hours at a time to shower, use the telephone, watch television, etc. (See generally Jail logs dated 12/16/03-1/16/04; Owens dec. at ¶¶ 46-49.)

Consequently, the Defendants' act of moving the Plaintiff to the holding area and treatment of him while he was there were related to a legitimate governmental objective, did not amount to punishment, and did not violate his Fourteenth Amendment rights. Bell, 441 U.S. at 539.

> **b.    Sheriff Owens was not deliberately indifferent to the Plaintiff's conditions of confinement.**

The evidence also shows that Sheriff Williams was not deliberately indifferent with respect to the Plaintiff's conditions claims. In order to overcome Sheriff Owens's entitlement to qualified immunity, the Plaintiff must allege and prove that Sheriff Owens was deliberately indifferent. Farmer v. Brennan, 511 U.S. 825, 836 (1994). Specifically, in this context, Sheriff Owens must have been subjectively aware of a serious risk to the Plaintiff's safety due to his conditions of confinement and disregarded it. Id.

No reasonable juror would find that the Plaintiff was subjected to unconstitutional conditions based upon the evidence in the record. The Plaintiff has alleged a wide variety of allegedly deficient conditions including lack of showers (except on "rare occasions"), drinking water (for "hours at a time"), toilet paper, and exercise outside of his cell. He has also asserted that he was required to sleep on a "thin" plastic mat on the floor near the holding cell's in-ground toilet. (Doc. 42 at pp.4-11.) The facts that have emerged do not support the Plaintiff's claims.

As noted previously, during the 31 days the Plaintiff was in the holding cells, the Plaintiff was allowed out each and every day. (See generally Jail logs dated 12/16/03-1/16/04.) Sheriff Owens and Jail Administrator Wilson specifically instructed that the Plaintiff be allowed to take a bath every night and use the phone occasionally. (Owens dec. at ¶ 46; Jail logs dated 12/18/03.)

The jail's logs show that these orders were carried out on every day the Plaintiff was in the holding cell with the exceptions of December 17th, December 28th, December 30th, and January 4th-5th. (Jail logs dated 12/16/03-1/16/04.)

The longest the Plaintiff ever went without a shower while he was in the holding cell was two days. (Jail logs dated 12/16/03-1/16/04.) Federal courts have authorized much longer deprivations. Davenport v. DeRobertis, 844 F.2d 1310, 1316-17 (7th Cir. 1988) (holding one shower per week sufficient); Briggs v. Heidlebaugh, 1997 WL 318081, *3 (E.D. Pa. 1997) (holding denial of shower for two weeks not constitutional violation); DiFilippo v. Vaughn, 1996 WL 355336, *5 (E.D. Pa. 1996) (holding Eighth Amendment does not require inmates be given frequent showers); Tinsley v. Vaughn, 1991 WL 95323 at *4 (E.D. Pa. 1991) (holding no violation when shower privileges suspended for twelve days); Bensinger v. Nichols, 1994 WL 561924, *1 (E.D. Pa. 1994) (granting motion to dismiss where plaintiff alleged, *inter alia*, that he received showers only once every three days); Mugmuk v. Beyer, 1988 WL 80875, *2 (D.N.J. 1988) (holding no constitutional violation where plaintiff was permitted to shower only once every three days); Pendleton v. Housewright, 651 F. Supp. 631, 634 (D. Nev. 1986) (approving three-day shower rule imposed by prison official).

Moreover, when the Plaintiff took his showers he was usually allowed to take them in B-block. On at least once instance he remained out of the holding cell for over five hours. (Jail logs dated 1/13/04.) During the time the Plaintiff was allowed out for showers, he had the opportunity to get water, use the bathroom, use the telephone, watch television, and walk. (See generally Jail logs dated 12/16/03 -1/16/04.)

The Plaintiff was also allowed out of the holding cell on numerous occasions to use the telephone and for weekly visitation. While he was in the holding cell, the Plaintiff never missed a visitation. (Jail logs dated 12/20/03, 1/3/04, 1/10/04; Visitation logs dated 12/20/03, 12/27/03,

1/3/04, 1/10/04.)  The Plaintiff also was allowed out of his holding cell to use the telephone at least once every day.  (Jail logs dated 12/16/03-1/16/04.)  The record makes it clear that the Plaintiff was absolutely not cut off from the outside world.

Sheriff Owens also specifically directed that the Plaintiff be allowed to use the toilet in the exam room located between the two holding cells.  (Jail logs dated 12/18/03; Owens dec. at ¶ 47.)  While the Plaintiff's bathroom trips were not as well-documented as some of his other trips outside of his cell, when combined with the shower trips, it is clear that the Plaintiff was allowed to regularly leave the holding cell to use the restroom.  Furthermore, the Plaintiff never filed a grievance that would have given Sheriff Owens subjective knowledge of the alleged deprivation.  (Owens dec. at ¶¶ 73-75.)

With respect to the Plaintiff being forced to sleep on the floor, three points need to be made.  First, the evidence shows that the mats were not "thin" and were sufficient to insulate the Plaintiff from the floor.  (Owens dec. at ¶ 18.)  The mats were 5-6" thick and the Plaintiff was allowed to have two of them because of his back.  Id. at ¶ 19.  Second, the cells were sufficiently large enough that the Plaintiff could sleep well away from the in-ground toilet and, in the larger cell, sleep against a wall and be as far away from the in-ground toilet as he would be were he to sleep on the bench.  Id. at ¶ 40.  Third, the order was given because of the Plaintiff's demonstrated propensity for falling and supposedly hurting himself.  In short, the order was given for his own protection.  Id. at ¶ 41.  If the Plaintiff felt the mats were insufficient, he never filed a specific grievance to let Sheriff Owens know about it.  (Owens dec. at ¶¶ 73-75.)[5]

The Plaintiff has also alleged that there were bugs in his food and in his cell.  There was one incident on December 7, 2003, in which bugs were found in some oatmeal.  (Jail logs dated 12/7/03;

---

[5] The Plaintiff did file several grievances that said little more than he wanted to talk with Sheriff Owens.  (Request forms dated 12/2/03 (signed), 12/2/03 (unsigned), 12/3/03, 12/10/03, "Unknown 12-3.")  However, these never got to Sheriff Owens because they were not specific and the only one that mentioned something specific was handled by a staff member in accordance with jail policy.  (Owens dec. at ¶ 74.)

Owens dec. at ¶ 63.)  However, the oatmeal was *not* served to the inmates and grits were substituted instead.  Id.  Additionally, as the June 2003 Alabama Department of Corrections inspection report shows, the jail had a monthly pest control contract.  (See also, Owens dec. at ¶ 62.)  Accordingly, even if having bugs in the jail amounted to a constitutional violation, Sheriff Owens was not indifferent because he had taken corrective action.

Another of the Plaintiff's allegations that has a kernel of truth to it is his complaints about the heat.  It is true that there was a problem with the jail's heat pump in December.  However, a work order was put in immediately and the heat pump was repaired on or about December 12, 2003.  (Owens dec. at ¶ 61.)  Once again though, the Plaintiff never provided Sheriff Owens with a specific grievance that would have let him know there was a problem.  (Owens dec. at ¶¶ 73-75.)

There is no evidence in the record to support the Plaintiff's condition of confinement claim against Sheriff Owens.  The undisputed evidence regarding the orders that Sheriff Owens gave, the contemporaneously prepared jail logs showing the efforts to comply with Sheriff Owens's orders, the actions taken by Sheriff Owens and his staff to correct the problems that did exist, and the lack of the Plaintiff's use of the grievance procedure make the Plaintiff's deliberate indifference burden insurmountable.  He cannot show subjective awareness on the part of Sheriff Owens nor can he show indifference to the conditions of which Sheriff Owens became aware.

### 3.    Sheriff Owens Did Not Fail to Prevent Harm to the Plaintiff.[6]

The Eleventh Circuit has held that an officer who is present when another officer uses excessive force can be held liable for failing to intervene.  Fundiller v. City of Cooper City, 777 F.2d 1436, 1441-42 (11th Cir. 1985).  However, liability only arises if the defendant officer is

---

[6] Sheriff Owens adopts by reference Defendant Bradley's arguments contained in his brief that he did not use excessive force on the Plaintiff.  If Al Bradley did not use excessive force, then, *a fortiori*, Sheriff Owens did not fail to intervene or cause Al Bradley to abuse the Plaintiff.  Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir.1999) (stating that a claim for supervisory liability fails where there is no underlying constitutional violation).

actually in a position to intervene and fails to do so. Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998). Fundiller stands for the proposition that an officer *who is present* can be held liable under 42 U.S.C. § 1983 for failing to intervene. Fundiller, 772 F.2d at 1441-42.

There is absolutely no evidence in the record to demonstrate that Sheriff Owens was ever present when the alleged incidents between the Plaintiff and Al Bradley took place. There is no evidence whatsoever that Sheriff Owens took part in the alleged abuse. Consequently, under Fundiller, Sheriff Owens cannot be held liable on a direct liability theory of failure to intervene. 772 F. 2d at 1441-42.

However, as this Court noted in its earlier decision, it is possible for a supervisory official to be held liable for excessive force if there is a causal connection between his actions and the alleged constitutional violation. (Doc. 71 at p. 20 n.8 citing Braddy v. Florida Dep't of Labor & Empl. Sec., 133 F.3d 797, 802 (11th Cir. 1998). The Court pointed out, however, that the Plaintiff would have to prove the facts alleged in his Complaint. Id. He has not done so.

The evidence in the record clearly shows that Sheriff Owens's conduct could not have caused or allowed the alleged abuse to have occurred. As discussed at length above, Sheriff Owens specifically ordered that the Plaintiff be moved to cells that would allow him to be closely monitored by the jail staff. Not one entry in the jail logs states "Al Bradley beat Kelly," or words to that effect. (See generally jail logs.)

The only evidence of any sort that Sheriff Owens had subjective knowledge of the alleged assaults is the Plaintiff's self-serving testimony that he asked Sheriff Owens to tell him when he was going to get Al Bradley to stop beating him. (Pltf dep. at 249:3-250:7.) Besides the fact that this "when are you going to stop beating your wife" kind of question was woefully lacking in any sort of details, it could not suffice to convince a reasonable juror that Sheriff Owens had notice.

19

As Sheriff Owens testified in his declaration the Plaintiff did not make this statement to him. However, even if he did, Sheriff Owens would simply have had no reason to believe him. He was under 24 hour surveillance – any assault would have been observed and the perpetrator stopped. The Plaintiff had been caught "crying wolf" on previous occasions. There were never any signs of such abuse on the Plaintiff.[7] Of course there was also the disparity in age, size, and physical infirmity between the two men that also belied the likelihood that Al Bradley was involved in such conduct. (Owens dec. at ¶ 70.)

The Plaintiff has also adduced no evidence of any other jailers being involved. To be sure, he did allege in his Amended Complaint that an unnamed jailer assisted Al Bradley during one of the assaults. However, there is no evidence in the record of such information coming to Sheriff Owens's attention. Additionally, the jailer at the tower station could not have left the tower because someone must be in the tower to open the door to the tower. If the unknown jailer had been the officer assigned to the tower, he would have locked himself out of the tower and this fact would have been discovered by the jail's supervisory personnel. (Bradley dep. 36:6-10; 37:12-15; 38:13-40:21.)

## C.    No Clearly Established Law Provided Sheriff Owens With "Fair Warning" That His Conduct Violated the Plaintiff's Federally Protected Rights.

The Plaintiff's final burden under the qualified immunity analysis is to show that clearly established law provided Sheriff Owens with fair warning that his conduct was unlawful by either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or federal constitutional provision is specific enough to demonstrate conduct was illegal, even in the total absence of case law. Storck v. City of Coral Springs, 354 F.3d 1307, 1317 (11th Cir. 2003) (citations omitted). The Eleventh Circuit has

---

[7] The Plaintiff apparently did not report his abuse to any of his medical providers. There is no mention of any of the attacks or injuries suffered therefrom in the Russell Hospital records, Dr. Weaver's records, Dr. James's records, or Dr. Currie's records.

identified the latter method as an "obvious clarity" case. <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted). In order to show that the conduct of the Defendants was unconstitutional with "obvious clarity," "the unlawfulness must have been apparent." <u>Willingham</u>, 321 F.3d at 1301. "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." <u>Storck</u>, 354 F.3d at 1318 (quoting 28 F.3d at 1149).

After a diligent search of the relevant case law, counsel for the Defendants has been unable to find a case involving materially similar facts that held conduct similar to that engaged in by the Defendants to be unlawful. Consequently, the Plaintiff has the burden of either identifying such a case or proving that the conduct of Sheriff Owens was obviously illegal. In light of the law cited above finding similar conduct constitutional, the Plaintiff simply cannot meet his burden. <u>See, e.g.</u>, <u>City of Revere</u>, 463 U.S. at 246; <u>Bell</u>, 441 U.S. at 539; <u>Hamm</u>, 774 F.2d at 1575; <u>Camberos</u>, 73 F.3d at 176; <u>Davenport</u>, 844 F.2d at 1316-17; <u>French</u>, 777 F.2d at 1255; <u>Sewell</u>, 117 F.3d at 490; <u>Fundiller</u>, 772 F. 2d at 1441-42; <u>Williams</u>, 198 Fed. App'x at 897-98. Consequently, even if the Court were to conclude the presence of a constitutional violation on the part of Sheriff Owens, he is nonetheless entitled to judgment in his favor as a matter of law.

## CONCLUSION

Based upon the foregoing, Sheriff Owens requests that the Court issue an Order granting him judgment in his favor as a matter of law and awarding him attorney's fees pursuant to law and 42 U.S.C § 1988.

Respectfully submitted this 30th day of November, 2007.

**s/Gary L. Willford, Jr.**
KENDRICK E. WEBB – Bar No. WEB022
GARY L. WILLFORD, JR. – Bar No. WIL198
Attorney for Defendant Ricky Owens
WEBB & ELEY, P.C.
7474 Halcyon Pointe Road (36117)
Post Office Box 240909
Montgomery, Alabama  36124
Telephone:  (334) 262-1850
Fax:  (334) 262-1889
E-mail:  gwillford@webbeley.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 30th day of November, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  **Richard J. Stockham, III**, and **Kristi McDonald**.

**s/Gary L. Willford, Jr.**
OF COUNSEL

22