# EXHIBIT B

# Declaration of Ricky Owens

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DANIEL BRYAN KELLY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:05-cv-1150-MHT |
| | ) |
| RICKY OWENS, et al., | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF RICKY OWENS

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF MONTGOMERY | ) |

1. My name is Ricky Owens. I am over the age of nineteen and competent to make this declaration which is based upon my personal knowledge.

2. At al times relevant to the Plaintiff's Amended Complaint, I was the duly elected Sheriff of Coosa County and served in the capacity for four years.

3. I was the first African-American elected to the position of Sheriff in Coosa County.

4. I have a total of 13 years of law enforcement experience.

5. All of the inmate records, logs, policies, and inspection reports included in the Defendants' Joint Evidentiary Submissions are true and correct copies of documents that were generated and kept in the regular course of business at the Coosa County Jail during my time as the Sheriff.

1

6. In accordance with jail policy, the aforementioned jail logs were prepared contemporaneously with the events they depict. I have reviewed the logs and they are consistent with my recollection of the events.

7. The Jail Administrator, Terry Wilson, reviewed all of the logs, handled any problems he found in them, and reported these to me.

8. Minor incidents like an inmate's request for water or to use the bathroom are usually not recorded in the jail logs.

9. These logs show that the Plaintiff was given medication that was prescribed for him by physicians, which is consistent with jail policy and practice.

10. The Plaintiff required, and received, a great deal of attention both from the jail staff and medical personnel while he was in the jail, which is consistent with jail policy and practice.

11. The Plaintiff was brought to the jail and initially placed in a holding cell on November 13, 2003, for failing a drug screen.

12. He was initially placed in a holding cell because his positive screen indicated he was under the influence of some substance, which is consistent with jail policy and practice.

13. The Coosa County Jail has two holding cells. The cells do not have any furniture other than a concrete bench that is wide enough for an inmate to lay down. In the middle of the floor is an in-ground toilet that is primarily used for urination although it could be used for defecation.

14. The in-ground toilets were flushed from outside of the cells and, in accordance with jail policy, were flushed as soon as jailers were made aware that they needed to be flushed.

15. The two cells are not identical, the smaller cell is approximately 8' x 8' and the larger cell is approximately 10' x 12'.

2

16. The Plaintiff was in both of these cells at one time or another during his incarceration.

17. There is more than adequate room for an inmate to lay on a mat on the floor without being next to the in-ground toilet. In fact, if an inmate were to lay his mattress on the floor in the larger holding cell, he would be as far away from the in-ground toilet as he would be if he were on the bench.

18. Additionally, contrary to what the Plaintiff alleged in his Amended Complaint, the mat the Plaintiff had was not "thin". The mats we had for the inmates were 5-6 inches thick and were quite comfortable. They provided more than enough padding and provided excellent insulation from the floor.

19. In fact, because of the problems the Plaintiff said he had with his back, he was given two mats while he was in the holding cell.

20. The holding cells did not contain telephones. In order for an inmate in a holding cell to use a telephone, he would have to be let out by a jailer to use the telephone in the booking area near the holding cells.

21. Initially, the Plaintiff did not stay long in the holding cell and was transferred to general population in B-block as soon as it was deemed safe for him to do so.

22. Each block in the jail has individual cells on two tiers. When the doors of the individual cells are closed, it is not possible for anyone not directly looking through the door windows to see into the cell. This is why inmates who require close supervision are kept in the holding cells.

23. On November 23, 2003, the Plaintiff was taken from general population to one of the jail's two holding cells for observation because he reported that he slipped and hurt his back. He was put under observation and a doctor's appointment was made for him, which is consistent

with jail policy and practice. Less than two hours later, the Plaintiff stated that he was feeling better and wanted to go back to general population.

24.   On November 26, 2003, the Plaintiff was taken to Dr. Weaver and then to Russell Hospital because he claimed he had a broken foot. He was returned to the jail the same day.

25.   The next day the Plaintiff claimed he had a seizure and was again taken to a holding cell for medical observation, which is consistent with jail policy and practice.

26.   The Plaintiff was given a mat and required to sleep on the floor because there was concern he would fall off of the concrete bench and hurt himself. The precaution was taken because of his demonstrated history of allegedly falling and allegedly hurting himself.

27.   The Plaintiff was placed again under close observation and the checks that were made are reflected in the logs for November 27, 2003 and November 28, 2003.

28.   Only hours later, the Plaintiff again stated he felt fine and wanted to go back to general population. He was allowed to do so.

29.   Curiously, he predicted that he wouldn't have another "seizure" for at least a week.

30.   However, on November 28, 2003, the Plaintiff again claimed to have a seizure and was brought back to a holding cell and had his blood pressure checked.

31.   The Plaintiff predicted another seizure early on the morning on December 5, 2003. He expressed concern that he would not be found if he had a seizure in his cell but declined the offer of being given a roommate.

32.   Less than an hour after reporting that he was going to have another seizure, the Plaintiff stated he was fine.

4

33.  On December 9, 2007, the Plaintiff purportedly fell down the stairs in his cell block. At the time, he was housed on the upper tier of the block. The Plaintiff was taken to the emergency room where he was again released the same day.

34.  Upon the Plaintiff's return he was placed in the holding cell where he remained until he could be reassigned a cell on the first floor of his cell block. When he was returned to his cell block he was instructed not to use the stairs at all.

35.  On December 11, 2003, the Plaintiff was taken to see Dr. James. After he returned, the Plaintiff refused to take his evening medications.

36.  On December 16, 2003, the Plaintiff had another incident. He claimed that he fell over a mop bucket and had problems with this head, back, and one leg. Consistent with jail policy and practice, an ambulance was summoned but the crew stated it was not necessary for the Plaintiff to go to the hospital.

37.  As a result, the Plaintiff was again moved from general population to a holding cell so he could be observed. As the logs reflect, he was kept under close observation, consistent with jail policy and practice.

38.  We were able to do this because the holding cells had cameras in them and the jailer in the control tower of the jail could see the Plaintiff at all times while he was in the holding cell.

39.  A search of the Plaintiff's cell in general population revealed several of the Plaintiff's medications. Apparently he had not been taking them and was saving them. He told a jailer later that he had a plan to save up 20 pills and take them all at one time to get some desired effect.

40.  The Plaintiff was required to sleep in the holding cell on a mat on the floor because of his propensity to fall and hurt himself. As previously stated, the benches in the

holding cell were wide enough to put a mat on them and for inmates to sleep on them. However, they were made of concrete and the floor of the holding cell was also concrete. My staff and I were very concerned that given all of the Plaintiff's previous problems with falling that he would hurt himself if he fell off the bench while sleeping. By placing his mat against a wall, the Plaintiff was far enough away from the in-ground toilet.

41. This measure was for the Plaintiff's protection and was not punitive in nature.

42. The following day, the Plaintiff requested to go back to general population. He was told that he would remain in the holding cell for medical observation.

43. The Plaintiff became angry and beat on the door.

44. The following day the Plaintiff was taken back to general population for several hours. He was allowed to take a shower, use the phone, watch television, and gather his property from his old cell.

45. He was allowed to take all of his clothing back into the holding cell, including his socks.

46. On December 18, 2003, I met with my jail supervisors. Orders were issued to the jail staff that the Plaintiff was allowed to have a bath every night. He was to be allowed to use the telephone occasionally.

47. I also ordered that the Plaintiff be allowed to use the restroom in the medical examination room. The medical examination room was a room located between the two holding cells and it had its own toilet facilities.

48. Nonetheless, the holding cell where Kelley was kept contained a fully functioning floor toilet.

6

49. I also ordered that the Plaintiff be observed by camera continuously and his activities documented. These orders were carried out and are reflected in the logs contained in the Defendants' Evidentiary Submissions.

50. The Plaintiff took full advantage of my orders. As the logs reflect he was given a shower nearly every day. He was allowed to stay in general population during those times for hours at a time. He was allowed to use the telephone. He was allowed regular visitation.

51. The Plaintiff was kept under close observation at all times – a condition known to every member of the jail staff.

52. It would have been impossible for anyone to have abused the Plaintiff in the holding cell without being observed. Had such abuse been observed it would have been stopped, logged, reported, and investigated. No report was ever made.

53. My policy was that inmates were not to be abused or mistreated in any way. Any jailer who would have abused an inmate – or failed to take action while another member of the staff was abusing an inmate – would have been in violation of my policy.

54. There were, however, occasions when the Plaintiff did try to thwart our efforts to watch him by placing playing cards over the camera in the holding cell. This resulted in his cards being confiscated.

55. From this point forward, the Plaintiff continued to receive his medications and medical attention. He had his blood pressure checked. The Plaintiff was taken to Dr. James and Dr. Currie.

56. Dr. Currie was a dentist who performed dental work for our inmates.

57. The Plaintiff was disruptive during this time. He would yell, beat on the door, and throw things at his door.

58. The Plaintiff's conduct got worse on occasion when he would hear someone in the booking area. He would come to the door, look through the window, and heap abuse and demands on jail staff and other persons in the booking area.

59. It is my understanding that there were times when the Plaintiff was being so disruptive that a folder would be placed over the window in the door so he could not see what was going on in the booking area. This was done in an effort to calm him down and allow the jail staff to conduct their duties without having to deal with his disruptions. It is extremely important to note that when this happened, the Plaintiff was *still* under constant observation of the jailer in the tower via the camera in the holding cell.

60. As early as three days after the Plaintiff was placed in a holding cell following his December 16, 2003 fall, he was already claiming he had a lawyer who would file a lawsuit related to his conditions.

61. There was a time in early to mid December when it was somewhat cold in the jail. This was not because of anything intentional on the part of the staff, but because there was a problem with the heat pump. Consistent with jail policy and practice, a repair order was immediately put in and the heater was repaired around December 12, 2003.

62. The jail had a monthly pest control contract during the time relevant to the Plaintiff's Amended Complaint.

63. The services we received were effective because the only issue we had during the Plaintiff's incarceration with bugs was before the Plaintiff was moved to the holding cell for the last time. On December 7, 2003, bugs were found in oatmeal but it was not served to the inmates. Instead, they were given grits. This fact was widely known by the inmates.

64. I have never known Al Bradley to abuse or mistreat any inmate – including the Plaintiff. I have never seen any evidence that he in fact abused or mistreated the Plaintiff in any manner whatsoever.

65. I never personally witnessed Al Bradley strike the Plaintiff, grab him by the mustache, or do any of the other acts alleged in the Amended Complaint.

66. The first time I became aware of the Plaintiff's physical abuse allegations was when I was served with the Plaintiff's Complaint.

67. To be clear, prior to being served with the Complaint, I had never been told or received any information that would lead me to believe, that the Plaintiff was being abused by anyone in any way.

68. It is highly unlikely that Al Bradley would even have the physical ability to abuse the Plaintiff in the manner alleged in the Amended Complaint. Mr. Bradley is an older, slightly built man, with health problems. He had six surgeries related to a hip replacement prior to the Plaintiff's incarceration in the Coosa County Jail.

69. If I had become aware that Mr. Bradley or any other member of the jail staff was abusing the Plaintiff, I would have stopped it from occurring. Abusing or mistreating inmates was against the policy of my department while I was Sheriff.

70. I dispute that Mr. Kelly ever stated words to the effect "when are you going to stop Al Bradley from beating me?" But even if Kelly had said something like that, especially phrased that way, I would have had difficulty taking such a remark seriously given the fact that I never saw any signs of abuse or mistreatment on Kelly, I knew cameras monitored the jail at all times – particularly the holding cells – and no one had reported such conduct, Kelly had already "cried wolf" with respect to other supposed injuries which paramedics found to be

9

asymptomatic, and, finally, the disparity in size, age and agility between Mr. Kelly and Al Bradley.

71. The Plaintiff also alleges that he was taken to the dentist, Dr. Curie, to have the teeth that Al Bradley broke pulled. If that happened, the Plaintiff apparently did not tell Dr. Curie what happened to his teeth because had he done so, Dr. Curie would have reported it to me.

72. None of the Plaintiff's medical providers ever reported to me that the Plaintiff had stated to them that he had been abused. No provider ever confirmed the Plaintiff had a seizure.

73. At no time while the Plaintiff was in the jail was I ever made aware that the Plaintiff was not getting water, showers, toilet paper, bathroom breaks, or suffering any of the deprivations alleged in the Amended Complaint. Had such deprivations been occurring and come to my attention, I would have taken steps to correct them. Had such deprivations occurred they would have been violations of the policies I established for the jail.

74. I never received a grievance form from Mr. Kelly regarding any of the claims in his Amended Complaint. I know for a fact that Mr. Kelly was well aware of our grievance procedure because I discovered later that he completed many request forms, and was observed in the holding cell reading his copy of the inmate rule book. Jail policy was that grievances were to be handled at the lowest level possible and only grievances that required my personal attention were forwarded to me. I have subsequently learned that the Plaintiff's requests regarding me were generalized requests to speak to me. Only one such request contained specific complaints and, in accordance with jail policy, was properly handled by a staff member.

75. I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit, and that the above statements were made by drawing from my personal knowledge of the situation.

Executed on this the 29TH day of November, 2007.

_____
Ricky Owens

11