# EXHIBIT C

# Deposition of Wendy Roberson

Part I

# Transcript of the Testimony of

# Wendy Roberson

**Date:** September 28, 2007

## DANIEL B. KELLY
## vs.
## RICKY OWENS

Printed On: October 18, 2007

Daniel Court Reporting, Inc.
Phone: 205-250-7765
Fax: 205-252-6224
Email: danielreporting@aol.com

Daniel Court Reporting, Inc.

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DANIEL BRYAN KELLY,          )
                             )
        Plaintiff,           )
                             )
vs.                          )  Civil Action No.
                             )  2:50-cv-01150-MHT
RICKY OWENS, et al.,         )
                             )
        Defendant.           )

DEPOSITION OF WENDY ROBERSON

S T I P U L A T I O N S

        IT IS STIPULATED AND AGREED,
by and between the parties through
their respective counsel, that the
deposition of WENDY ROBERSON may be

**Page 2**

1  taken before Sandra Peebles Daniel,
2  Commissioner, Notary Public, State
3  at Large, at the Coosa County
4  Courthouse, Courthouse, One Main
5  Street, Rockford, Alabama 35136, on
6  the 28th day of September, 2007,
7  beginning at approximately 8:20 a.m.
8        IT IS FURTHER STIPULATED AND
9  AGREED that the reading of and
10 signature to the deposition by the
11 witness is waived, the deposition to
12 have the same force and effect as if
13 full compliance had been had with
14 all laws and rules of Court relating
15 to the taking of depositions.
16       IT IS FURTHER STIPULATED AND
17 AGREED that it shall not be
18 necessary for any objections to be
19 made by counsel to any questions,
20 except as to form or leading
21 questions, and that counsel for the
22 parties may make objections and
23 assign grounds at the time of the

**Page 3**

1  trial, or at the time said
2  deposition is offered in evidence,
3  or prior thereto.
4        IT IS FURTHER STIPULATED AND
5  AGREED that notice of filing of the
6  deposition by the Commissioner is
7  waived.

**Page 4**

1            I N D E X
2  EXAMINATION BY:              PAGE:
3  Mr. Stockham ............... 9-229
4  Mr. Wilson ................. 229-230
5  Ms. McDonald ............... 230-237
6
7
8
9        E X H I B I T S
10 FOR THE PLAINTIFF:           PAGE:
11 Exhibit 1 ...................  58
12 (Medical summary form)
13 Exhibit 2 ...................  61
14 (Authorization to release of
15 medical information)
16 Exhibit 3 ...................  85
17 Inmate request form, 10-13-03)
18 Exhibit 4 ...................  89
19 (Medical request form, 12-11-03)
20 Exhibit 5 ...................  92
21 (Inmate request form, 11-30-03)
22 Exhibit 6 ...................  96
23 (Inmate request form, 12-1)

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205       danielreporting@aol.com

Daniel Court Reporting, Inc.

**5**

1  Exhibit 7 .................   98
2  (Inmate request form, 12-2)
3  Exhibit 8 .................   100
4  (Inmate request form, 12-3-03)
5  Exhibit 9 .................   105
6  (Inmate request form, 12-7-03)
7  Exhibit 10 .................   112
8  (Inmate summary form)
9  Exhibit 11 .................   116
10  (Inmate medical summary)
11  Exhibit 12 .................   128
12  (Summary of inmate care, 1-16-04)
13  Exhibit 13 .................   129
14  (Inmate request form, 12-10)
15  Exhibit 14 .................   134
16  (Statement, Kay Taylor)
17  Exhibit 15 .................   137
18  (Statement, Dana Harris)
19  Exhibit 16 .................   139
20  (Statement, Aaron Green)
21  Exhibit 17 .................   145
22  (Inmate request form, 12-18)
23

**7**

1   A P P E A R A N C E S
2
3  BEFORE:
4  Sandra Peebles Daniel,
5  Commissioner, Notary Public
6
7  FOR THE PLAINTIFF:
8  Mr. Richard J. Stockham, III
9  STOCKHAM, CARROLL & SMITH, P.C.
10  2204 Lakeshore Drive
11  Suite 114
12  Birmingham, Alabama 35209
13
14  FOR THE DEFENDANT:
15  Ms. Kristi McDonald
16  McDONALD & McDONALD
17  1005 Montgomery Highway
18  Birmingham, Alabama 35216
19
20  Mr. Gary L. Willford
21  WEBB & ELEY
22  7475 Halcyon Pointe Drive
23  Montgomery, Alabama 36124

**6**

1  Exhibit 18 .................   149
2  (Inmate request form, 12-18)
3  Exhibit 19 .................   158
4  (Inmate request form, 12-03)
5  Exhibit 20 .................   168
6  (Inmate questionnaire)
7  Exhibit 21 .................   169
8  (Booking sheet)
9  Exhibit 22 .................   175
10  (Inmate request form, 12-27)
11
12  FOR THE DEFENDANT:        PAGE:
13  Exhibit 1 .................   235
14  (Day shift tower log, 12-23)
15  Exhibit 2 .................   236
16  (Day shift tower log, 12-22)
17
18
19
20
21
22
23

**8**

1  ALSO PRESENT:
2  Mr. Rick Owens
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1310 32nd Street S.                     205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

9

```
1        I, Sandra Peebles Daniel, a
2   Court Reporter of Birmingham,
3   Alabama, Notary Public, State at
4   Large, acting as Commissioner,
5   certify that on this date, as
6   provided by Rule 30 of the Alabama
7   Rules of Civil Procedure, and the
8   foregoing stipulation of counsel,
9   there came before me at the Coosa
10  County Courthouse, Courthouse, One
11  Main Street, Rockford, Alabama
12  35136, on the 28th day of September,
13  2007, at or about 8:20 a.m., WENDY
14  ROBERSON, witness in the above
15  cause, for oral examination,
16  whereupon the following proceedings
17  were had:
18
19       THE COURT REPORTER:  Usual
20  stipulations?
21       MR. STOCKHAM:  Yes, ma'am.
22       MS. MCDONALD:  That's fine.
23
```

10

```
1        WENDY ROBERSON,
2   having first been duly sworn, was
3   examined and testified as follows:
4
5   EXAMINATION BY MR. STOCKHAM:
6       Q.   What's your name, please,
7   ma'am?
8       A.   Wendy Waites Roberson.
9       Q.   And where do you live?
10      A.   I live at 2200 98th Avenue
11  in Vero Beach, Florida.
12      Q.   How long have you lived
13  there?
14      A.   About a year, a little
15  over a year.
16      Q.   And where did you live
17  before that?
18      A.   I lived at Route 1, Box
19  130, Rockford, Alabama.
20      Q.   And how long did you live
21  there?
22      A.   About twenty-five years.
23      Q.   Now --
```

11

```
1        MR. WILLFORD:  Excuse me.
2        (Whereupon, an
3        off-the-record
4        discussion was held.)
5       Q.   (By Mr. Stockham)  Now, in
6   -- what's your date of birth?
7       A.   April 22, 1963.
8       Q.   That makes you --
9        MS. MCDONALD:  Forty-four.
10      Q.   -- forty-four?
11      A.   That'd be correct.
12      Q.   Let me get your
13  educational background, please,
14  ma'am.
15      A.   Well, I started school in
16  Ft. Pierce, Florida at Indian River
17  Academy.  I then moved to Vero
18  Beach, Florida where I went through
19  elementary school at St. Edwards
20  Academy, and then I went to public
21  school in Vero Beach, which was
22  middle -- middle school, junior
23  high, and a portion of high school
```

12

```
1   at Vero Beach High School.
2       Q.   Where did you graduate
3   from high school?
4       A.   I graduated on a G.E.D.
5       Q.   Did you have any post-high
6   school education?
7       A.   I went to Alexander City
8   Community College for the purpose
9   of emergency medical technician
10  basic.
11      Q.   When was that?
12      A.   That was, I believe, in
13  1996, 1997.
14      Q.   When did you last attend
15  high school?
16      A.   In 1979.
17      Q.   Now, between -- after you
18  graduated from high school or got
19  out of high school -- well, before
20  I go there.
21       Have you ever given a
22  deposition before?
23      A.   No, I have not.
```

3  (Pages 9 to 12)

Daniel Court Reporting, Inc.

13

1      Q.     Have you ever given sworn
2  testimony in any legal proceeding?
3      A.     Yes, sir.
4      Q.     And what occasions have
5  you given sworn testimony?
6      A.     In the capacity of my job
7  as working for the Coosa County
8  Sheriff's Department.
9      Q.     Was that a regular thing
10 for you?
11     A.     I wouldn't say regular,
12 but occasional.
13     Q.     Other than -- that was in
14 court in criminal matters?
15     A.     Yes, sir, and I also gave
16 sworn testimony during a custody
17 child support matter.
18     Q.     Your own custody child
19 support?
20     A.     Yes, sir.
21     Q.     When was that?
22     A.     Oh, gosh.  It was probably
23 2002, maybe -- no -- yeah, around

14

1  -- around 2000 -- no, it was prior
2  to that.  It was probably around
3  2000 -- 2000, 2001.  It was here in
4  this county.
5      Q.     That was arising out of
6  divorce?
7      A.     Yes, sir.
8      Q.     Who where you married to
9  that you got divorced from?
10     A.     At that time I was married
11 to Duane Roberson, but the custody
12 child support matter was with my
13 previous husband, Robert Jackson.
14     Q.     All right.  Well, when did
15 you divorce Robert Jackson?
16     A.     In 1997.
17     Q.     And how many children did
18 you have with Robert Jackson?
19     A.     Two.
20     Q.     And what are their ages
21 today?
22     A.     Jimmy is twenty-one and
23 Brian is seventeen.

15

1      Q.     Their names are Jimmy and
2  Ryan?
3      A.     Brian, Charles Brian and
4  Jimmy Lee --
5      Q.     Jackson?
6      A.     -- Jackson.
7      Q.     And you married Duane
8  Roberson?
9      A.     Yes.
10     Q.     When was that?
11     A.     In 1999.
12     Q.     And are y'all still
13 married?
14     A.     No, sir.
15     Q.     When did you divorce?
16     A.     We divorced in 2002.
17     Q.     What name do you go by
18 now?
19     A.     Wendy Roberson.
20     Q.     Are you married now?
21     A.     No, I'm not.
22     Q.     Do you have any other
23 children other than Jimmy and

16

1  Brian?
2      A.     Yes, I have Mark Jackson.
3  He was born from a brief previous
4  marriage to Melvin Padgett, but he
5  was later adopted by Robert
6  Jackson.
7      Q.     P-a-d-g-e-t-t?
8      A.     Yes.
9      Q.     How old is Mark Jackson?
10     A.     He is twenty-six.
11     Q.     Where does he live?
12     A.     He lives here in Coosa
13 County.
14     Q.     What does he do?
15     A.     He is an industrial
16 electrician.
17     Q.     Where does Jimmy Jackson
18 live?
19     A.     He lives here in Coosa
20 County.
21     Q.     What does he do?
22     A.     He is recently out of the
23 military and is unemployed at this

4  (Pages 13 to 16)

Daniel Court Reporting, Inc.

17

1 time. He's getting ready to go
2 back in.
3     Q.    And Brian?
4     A.    Brian is a student --
5 full-time student.
6     Q.    Where is he a student?
7     A.    Vero Beach High School.
8     Q.    Do you have any other
9 family here in Alabama?
10    A.    No.
11    Q.    When did you first move to
12 Coosa County?
13    A.    Well, I was eighteen, so I
14 believe 1980, '81.
15    Q.    And why did you first move
16 to Coosa County?
17    A.    My -- originally my family
18 was from here. My great
19 grandparents lived here. I was
20 raised by my grandparents. They
21 were retiring and decided to come
22 back to Coosa County to help take
23 care of their parents, and I came

18

1 with them.
2     Q.    And what is their name?
3     A.    Brian Waites, who is
4 deceased, and Ruth Waites.
5     Q.    How do you spell Waites?
6     A.    W-a-i-t-e-s.
7     Q.    Are there any other Waites
8 here in Coosa County that you are
9 related to?
10    A.    Distantly, I think there's
11 a Johnny Waites here, but it's --
12 it's not a close relation, it's on
13 down the line.
14    Q.    Tell me what your
15 employment history is, please,
16 ma'am.
17    A.    Well, prior to moving here
18 as a teenager I had various jobs.
19    Q.    Let me go at this another
20 way.
21          What was your job after
22 you first came to Coosa County?
23    A.    I was a stay-at-home mom

19

1 for several years. My first job
2 was with the Coosa County News as a
3 reporter.
4     Q.    When was that?
5     A.    Probably 1995. It may have
6 been earlier than that, but I'm not
7 certain.
8     Q.    How long were you a
9 reporter with the Coosa County
10 News?
11    A.    Off and on, probably about
12 five years.
13    Q.    What was your next job?
14    A.    Coosa County Sheriff's
15 Department.
16    Q.    When did you start with
17 the Coosa County Sheriff's
18 Department?
19    A.    I'd have to look at the
20 employment records. I worked for
21 the sheriff's department actually
22 on three separate occasions, and
23 actually was back and forth between

20

1 the sheriff's department and the
2 newspaper office based on hours.
3 When my schedule at the sheriff's
4 department, because I was a mother,
5 got changed around to where I could
6 not work those hours, then I would
7 go back to work for the newspaper.
8 And then kind of back and forth
9 like that.
10    Q.    When did you first work
11 for the sheriff's department?
12    A.    Probably 1995, 1996.
13    Q.    And how long did you work
14 that first time?
15    A.    Probably a year and a
16 half.
17    Q.    When was the second time
18 you worked for the sheriff's
19 department?
20    A.    I can't say; I'm not sure.
21 I really can't remember because
22 they -- that period of time in
23 there between the newspaper and the

5 (Pages 17 to 20)

Daniel Court Reporting, Inc.

21

1 sheriff's department, I can't say
2 specifically I took a -- I went to
3 work with the newspaper, went to
4 work with the sheriff's department.
5 They were going to put me on second
6 shift, so I went back to work for
7 the newspaper, and then I went back
8 to work for the sheriff's
9 department, but I don't know -- all
10 I can say is it was somewhere
11 between 1995 and 1999 that that
12 happened. And in 1999 I opened my
13 own newspaper, the Coosa Weekly,
14 operated that for one year and then
15 came back to work for the sheriff's
16 department in 2000 where I remained
17 until 2006.
18     Q.    Now, who was the sheriff
19 the first time you worked for the
20 sheriff's department?
21     A.    Sheriff Bill Evans.
22     Q.    Who was the sheriff the
23 second time you worked for the

22

1 sheriff's department?
2     A.    Bill Evans.
3     Q.    And who was the sheriff
4 the third time you worked?
5     A.    Rick Owens.
6     Q.    Owens was the Sheriff --
7     A.    Well, sheriff and -- Evans
8 -- it traded places during my
9 third --
10     Q.    Now, what were your job
11 duties the first time you worked
12 for the sheriff's department?
13     A.    Corrections officer.
14     Q.    What do you mean by
15 corrections officer?
16     A.    I worked in the jail as a
17 jailer and a dispatcher.
18     Q.    Have you ever held a
19 position in the sheriff's
20 department at any other capacity
21 other than corrections officer?
22     A.    Reserve deputy.
23     Q.    When were you a reserve

23

1 deputy?
2     A.    It was during my second
3 term of employment with the
4 sheriff's department that Sheriff
5 Bill Evans made me a reserve
6 officer.
7     Q.    And as a reserve deputy
8 did you not work in the jail at
9 that time?
10     A.    No, I worked in the jail
11 when I became a reserve officer,
12 but when I left the jail as a
13 corrections officer I remained a
14 reserve officer.
15     Q.    What's the -- I'm not
16 following.
17     A.    A reserve officer is not
18 paid, and they are sworn but
19 they're not paid. And they act on
20 the orders of the sheriff on
21 special details or volunteering any
22 time that they want to devote to
23 the sheriff's department in the

24

1 capacity of a reserve deputy. And
2 they have all of the same powers of
3 a deputy other than arrest powers
4 under the supervision of a sworn
5 deputy -- certified, post-certified
6 deputy.
7     Q.    Now, when you returned in
8 2000 to work in the jail, what was
9 the structure in the jail, what
10 position did you hold?
11     A.    Well, they didn't start
12 with a rank system immediately when
13 I came back the third time.
14 However, I came back the third time
15 because they were getting ready to
16 automate the sheriff's department.
17 In other words, it was fixing to go
18 completely computerized.
19         And Sheriff Bill Evans had
20 asked me to come to work for him to
21 oversee that, that change and
22 handle the training on the new
23 system, which I did. And after

6 (Pages 21 to 24)

Daniel Court Reporting, Inc.

25

1  they created a rank structure
2  Deputy Terry Wilson was --
3      Q.    Before we go to that -- I
4  want to come to that next, but --
5  so when you first returned on your
6  third occasion, who was your
7  immediate supervisor?
8      A.    Sheriff Evans.
9      Q.    Did you have anyone who
10 reported to you at that time?
11     A.    Only in the capacity that
12 -- of training in the sense that I
13 was trained specifically by the
14 software company to run the new
15 program and I therefore had to,
16 with the assistance of the software
17 provider, handle the training of
18 the other officers on it.
19         So therefore, any officers
20 in the jail would come to me for
21 direction in the capacity of
22 learning the new system.
23     Q.    But as far as you being

26

1  someone's supervisor --
2      A.    Not at that time, no, sir.
3      Q.    And you didn't have anyone
4  over you other than the sheriff?
5      A.    Not at that time, not
6  initially, no, sir.
7      Q.    At that time how many
8  people were employed in the jail as
9  jailers?
10     A.    I believe possibly twelve,
11 ten or twelve.
12         MS. MCDONALD:  If you know
13 -- if you don't know --
14     A.    I don't -- I'm not
15 certain.
16     Q.    Well, I'm just trying to
17 get a ballpark right now.
18     A.    Around ten or twelve.  It
19 requires, bare minimum, ten or
20 twelve officers for a rotation.
21     Q.    And that contemplates how
22 many on any one shift?
23     A.    The budget contemplates

27

1  how many on any one shift.
2      Q.    Okay.
3      A.    Necessity requires two per
4  shift.
5      Q.    And has -- was that always
6  the case during your tenure from
7  when you returned in 2000 until you
8  left in 2006?
9      A.    Yes, sir.
10     Q.    I'll follow up that in a
11 minute.  But let me ask you, why
12 did you leave in 2006?
13     A.    There was a -- there were
14 a lot of things going on in my life
15 at the time.  I was still trying to
16 recover from my last divorce.  All
17 of my family had moved from the
18 area.  There was only myself and my
19 youngest son, and it was time for a
20 change.  We were -- and there were
21 -- it was just time for a change.
22     Q.    No particular incident
23 occurred that caused you to leave

28

1  your employment?
2      A.    There were -- there were
3  some pay issues.  I felt that I
4  should be getting a certain level
5  of pay that I was not getting.  And
6  -- but it was not the determining
7  factor.  It was just one more
8  reason for me to go ahead and make
9  a change in my life at that time.
10     Q.    Other than the pay issues
11 there was nothing else that
12 occurred that caused you leave your
13 job at that time?
14     A.    No, sir.
15     Q.    And did you turn in a
16 resignation?
17     A.    I did.
18     Q.    And who did you turn it in
19 to?
20     A.    Sheriff Owens.
21     Q.    Did you try to work out
22 any pay increase before you did
23 that?

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

29

1    A.    I did.
2    Q.    Now, who is paying for
3  your defense in this case?
4    A.    To be honest with you, I
5  don't know.
6    Q.    Now, are you taking any
7  medications today?
8    A.    No, sir.
9    Q.    Have you ever been sued
10  before?
11    A.    No, sir.
12    Q.    Except for maybe in a
13  divorce situation?
14    A.    I've -- I've never been
15  sued in a divorce.
16    Q.    You always brought the
17  suit?
18    A.    Yes, sir.
19    Q.    Now, returning to the
20  situation in the Coosa County jail.
21      At some point were you
22  made supervisor over other
23  personnel in the jail?

30

1    A.    Yes, sir. When the
2  sheriff adopted a rank system for
3  corrections officers I was made
4  sergeant over the jail, or within
5  the jail. And my direct supervisor
6  then became Deputy Terry Wilson who
7  was named lieutenant.
8    Q.    Now, who was the sheriff
9  that set up the rank system?
10    A.    I can't remember if it was
11  Sheriff Evans or Sheriff Owens. It
12  was either at the end of Sheriff
13  Evans' term or at the beginning of
14  Sheriff Owens' term, I'm not sure.
15    Q.    What were your duties --
16  so you reported directly to -- to
17  whom at that point?
18    A.    Lieutenant Wilson.
19    Q.    Did you have any direct
20  report to the sheriff at that time?
21    A.    No, sir.
22    Q.    And did you have anyone
23  who assisted you?

31

1    A.    I had corporals. I had a
2  corporal on each shift and then
3  eventually they gave me a straight
4  daytime corporal to assist me.
5    Q.    Now, as -- in addition to
6  being called sergeant, did you have
7  any other title, like,
8  administrator or anything like
9  that?
10    A.    No, sir.
11    Q.    Okay.
12    A.    Not -- let me -- let me
13  clarify that. Not until 2006,
14  right before I -- I resigned.
15    Q.    Now, what were your duties
16  in your position as sergeant, and
17  let me take you to the time frame
18  of 1993, 1994?
19    A.    I was not in that position
20  at that time.
21    Q.    Oh, excuse me. 2003,
22  2004.
23    A.    2003, 2004, my duties as

32

1  Sergeant included the proper
2  operations of the jail on a
3  day-to-day basis, working directly
4  with the other officers overseeing
5  their training, their job
6  performance, somewhat overseeing
7  within my scope of ability the
8  medical care or records of inmates,
9  the legal issues of inmates in
10  court, meal preparation, ordering
11  of supplies, and operating the
12  canteen of the jail.
13    Q.    And where was your office
14  in 2003, 2004?
15    A.    Well, I can't say the
16  exact dates. At one point I had an
17  office in the second secured area
18  of the jail, which later became the
19  storage for the canteen, at which
20  time I moved to the front offices,
21  the administrative offices, for a
22  short period of time, and then
23  moved into the first secured area

8  (Pages 29 to 32)

Daniel Court Reporting, Inc.

33

1   of the jail, an office there that
2   used to be an exercise room.
3       Q.   Was that what's called,
4   the booking room?
5       A.   No, sir.
6       Q.   Where is it in relation to
7   the booking room?
8       A.   It would have been just
9   down the hall from the booking
10  area.
11      Q.   If I'm coming in and the
12  booking area is on my right, it'd
13  be on the same side further down
14  the hall?
15      A.   Yes, sir.
16      Q.   Now, when -- and you don't
17  know when you were in those various
18  locations?
19      A.   I could not tell you the
20  exact dates, no, sir.
21      Q.   I gather from what you've
22  testified that your -- your duties
23  required you to be all over the

34

1   jail?
2       A.   Yes, sir.  And I -- I had
3   other duties as well.  In a small
4   county you wear many hats, and
5   especially in a small department.
6   So everybody generally had more
7   than one responsibility or one
8   capacity in which they worked, so I
9   assisted with investigations
10  involving women, children, and as a
11  reserve deputy I also served in
12  capacities where we were -- needed
13  extra hands as far as deputies were
14  concerned.
15      Q.   In the jail did you ever
16  work in the tower, for example?
17      A.   I did.
18      Q.   Did you ever work in the
19  dispatch?
20      A.   Yes, sir.
21      Q.   Did you -- and would you
22  do those on a regular basis?
23      A.   I did them as needed.  If

35

1   -- if I had an officer call in that
2   they could not report for duty, the
3   basic protocol was that all the
4   other off duty officers would be
5   given the opportunity to take that
6   overtime if they wanted it.  If
7   nobody could be found to work then
8   it was my responsibility to fill
9   that slot.
10      Q.   Other than an officer who
11  was out sick, were there any other
12  occasions where you would fill in?
13      A.   Only -- only during times
14  when an officer needed a break
15  during busy times.  But other than
16  that each shift had two officers
17  that rotated from the tower to the
18  dispatch or booking area, and other
19  than that, no, sir.
20      Q.   You said one of your
21  duties was the medical area for the
22  inmates.  What did that involve?
23      A.   Well, we implemented

36

1   several different procedures for
2   medical over the years, all of
3   which met the state requirements
4   and, of course, when they initiated
5   the HIPAA law things changed there
6   for us.
7           We also tried to
8   incorporate different
9   pharmaceutical companies in trying
10  to control our costs.  And, of
11  course, each pharmaceutical company
12  had their own requirements or
13  demands as to what we had to do on
14  our part to initiate a smooth
15  system with them.  But as far as my
16  responsibility over that I was the
17  go-to person between the
18  pharmaceutical company and the
19  sheriff's department as far as how
20  medications would be ordered, when
21  they would be ordered, and the
22  process for doing that.
23          Also, if an inmate had a

9 (Pages 33 to 36)

Daniel Court Reporting, Inc.

37

1  medical problem that the corporals
2  were having difficulty contacting
3  doctors or getting information
4  because of the HIPAA laws, then it
5  would become my project to try to
6  get those issues resolved.
7      Q.    Let's focus on the time
8  frame of 2003, 2004; what were your
9  duties with regard to the medical?
10     A.    It would have been the
11  same throughout the entire --
12     Q.    Were you responsible for
13  making arrangements with doctors to
14  come in and see inmates?
15     A.    Corporals usually handled
16  that on their shift. Each corporal
17  was responsible for the operation
18  of their shift. Basically what I
19  did was I insured that those shifts
20  were properly run according to
21  policy and procedure. If there was
22  some difficulty or some unexpected
23  incident that we had not

38

1  encountered before, then the
2  corporal would come to me and say,
3  I'm having difficulty with this or
4  I've been trying to get in touch
5  with this doctor, or so forth and
6  so on, which at that point I would
7  assist them in resolving the
8  situation.
9      Q.    Now, what duties did you
10  have with regard to advising or
11  communicating with the jail
12  administrator?
13     A.    It was my responsibility
14  to report to the jail administrator
15  of the status of the day-to-day
16  operations of the jail and of any
17  situations or problems that we may
18  be encountering in the jail.
19     Q.    And how would you do that?
20     A.    I would either do it by
21  written memo or I would do it in
22  person.
23     Q.    A face-to-face meeting?

39

1      A.    Yes, sir.
2      Q.    Was this done on a daily
3  basis?
4      A.    Yes, sir.
5      Q.    And was the jail
6  administrator in the jail or did
7  you -- was he not in the jail?
8      A.    He was on the road, he was
9  a road deputy. But he was also in
10  the jail intermittently, so we
11  would try to meet in the mornings
12  at the beginning of his shift.
13  However if the call of duty was
14  such that he was not available to
15  me, then I did have the ability to
16  contact him by phone, in an
17  emergency by radio. But there was
18  at no time -- well, very few times
19  that I was unable to make contact
20  with the lieutenant.
21     Q.    How about the sheriff,
22  would you communicate with the
23  sheriff about matters of daily

40

1  goings-on in the jail?
2      A.    Not unless I was asked.
3  My direct rank supervisor was the
4  lieutenant and that is who I
5  reported to, and it would not be --
6  it would be out of -- out of order
7  for me to bypass my direct
8  supervisor and go directly to the
9  sheriff unless asked. If the
10  sheriff directly asked me about an
11  issue then most certainly I would
12  report to him about it.
13     Q.    Did you ever have an
14  instance where the lieutenant would
15  tell you to go to the sheriff about
16  anything?
17     A.    No, sir, not unless it was
18  a situation where we had to get
19  approval for something that the
20  lieutenant was not in a capacity
21  where he could have that meeting
22  with the sheriff. If he was out --
23  if the lieutenant was out in the

10  (Pages 37 to 40)

Daniel Court Reporting, Inc.

41

1   field and I was at the jail and we
2   had an issue that had to be
3   resolved immediately, then I would
4   be directed to go to the sheriff
5   and tell him what we need.
6       Q.   Now, do you have any
7   records of your activities in the
8   jail that occurred on a day-to-day
9   basis from the time frame of 2003,
10  2004?
11      A.   I do not now.  During the
12  time that I was employed with the
13  sheriff's department I did.  I kept
14  a log on my computer as well as we
15  had day-to-day shift logs.
16      Q.   Now, I have been given the
17  shift logs and the tower reports.
18  You're saying you had a log on your
19  computer as well?
20      A.   I did.
21      Q.   Do you know where that is?
22      A.   I do not.
23      Q.   Was this something that

42

1   was maintained on your official
2   computer?
3       A.   On my -- the computer in
4   my office.  We are taught in
5   corrections as well as law
6   enforcement that you document
7   everything.  So in the capacity of
8   my day-to-day supervision of the
9   operations of the jail, anything
10  that I thought was significant I
11  would notate in my log.  And it was
12  a personal log, it was not
13  something that I was required to do
14  or that I was required to turn in.
15  It was for my own protection, for
16  my own recollection, and basically
17  just to be as a reminder to myself
18  of the details of any incident that
19  was out of the ordinary.
20      Q.   If I were to request that,
21  what would I ask for?
22      A.   I guess you would ask for
23  a file off of the computer that

43

1   was --
2           MS. MCDONALD:  If you
3   know.  If you don't --
4       A.   I don't know.
5       Q.   Well, if you were going to
6   go ask for it, what would you ask
7   for?
8       A.   I would ask if they had
9   cleaned my computer, first of all,
10  because when I left I'm sure
11  somebody else started using that
12  computer and I doubt they kept my
13  stuff on it.
14      Q.   You left in --
15      A.   2006.
16      Q.   -- 2006.  And that would
17  have been after this lawsuit had
18  been initiated?
19      A.   Yes, sir.
20      Q.   Did you tell anyone that
21  you had notes from the time frame
22  of this lawsuit on your computer?
23      A.   No, sir, because they were

44

1   not official records.  They were
2   just my personal notes.
3       Q.   And do you know where the
4   computer is that you used?
5       A.   I have no idea.
6       Q.   How would you identify
7   that computer?
8       A.   It was just a Dell
9   computer.
10      Q.   Who would know that is
11  currently in the jail?
12      A.   I don't know.
13      Q.   Did the -- where was it
14  housed the last time you saw it?
15      A.   In my office.
16      Q.   Where was your office the
17  last time --
18      A.   My office was located one
19  door down from the booking area.
20          MR. STOCKHAM:  Would y'all
21  look and see if there's anything
22  like that?
23          MS. MCDONALD:  My

11 (Pages 41 to 44)

Daniel Court Reporting, Inc.

45

1  understanding is after our
2  deposition was completed the other
3  day that they have changed
4  computers about three times in the
5  last years. I'll be more than
6  happy to ask.
7       MR. STOCKHAM: This would
8  be just last year.
9       MS. MCDONALD: It's my
10  understanding, though, that they've
11  changed computers again recently.
12  I'll ask, though.
13       MR. STOCKHAM: Okay.
14       MS. MCDONALD: I'll be
15  happy to ask.
16     Q.    (By Mr. Stockham) Now,
17  other than notes that were on your
18  computer, did you have any other
19  notes?
20     A.    No, sir, just the basic
21  log, shift log. Anything that was
22  of important -- importance that I
23  felt needed to be reflected in the

46

1  shift log, I would either
2  incorporate into the shift log
3  myself or direct the corporal to
4  add it to his shift log.
5     Q.    Now, when you say you
6  would add it to your -- you would
7  just go over and type it in?
8     A.    Yes, sir.
9     Q.    And that was -- the shift
10  log was something that was kept up
11  on a computer?
12     A.    Yes, sir.
13     Q.    And it was dated and --
14     A.    Time --
15     Q.    -- maintained in that
16  computer?
17     A.    Yes, sir.
18     Q.    And it was kept in that
19  computer for --
20     A.    Well, let's distinguish
21  "that computer" because there were
22  three computers in the booking area
23  in addition to the computer in my

47

1  office and a computer in the tower.
2     Q.    Were they linked?
3     A.    They were all networked.
4     Q.    So a file from one could
5  be sent to another without --
6     A.    No, sir, not in that
7  capacity. They were networked in
8  the sense that they were all on the
9  same software program. However,
10  the logs were kept on a separate
11  word document program that was
12  specifically to that computer. It
13  was -- the word program was not
14  networked.
15     Q.    So you didn't have any
16  internal email --
17     A.    No, sir.
18     Q.    -- where you could send
19  one to the other?
20     A.    We had email and we had --
21  we had internet service. So it
22  would be possible to instant
23  message somebody on a Yahoo

48

1  messenger or something like that if
2  that was downloaded on the -- that
3  particular computer. But there was
4  no in-house massaging system.
5     Q.    So whatever was on the
6  particular computer that was used for the
7  that was used for the shift report,
8  it was independent and different
9  from the computer that had the
10  tower report?
11     A.    Correct.
12     Q.    Then was it always the
13  same computer that was used for the
14  shift report?
15     A.    Not necessarily. If --
16  you know, if the computer -- we had
17  situations where a computer would
18  not be working properly and they
19  would have to do their shift report
20  on a different computer. But in
21  most cases, yes.
22     Q.    Did you keep a backup --
23     A.    Yes, sir.

12  (Pages 45 to 48)

Daniel Court Reporting, Inc.

49

```
 1    Q.    -- computer backup?
 2    A.    Yes, sir.
 3    Q.    And the shift reports
 4  would be kept on the computer
 5  backup?
 6    A.    Yes, sir, and on a
 7  separate disc.
 8    Q.    How do you mean, on a
 9  separate disc?
10    A.    Backed up onto a disc, a
11  hard copy disc that was kept and
12  dated as well as on the hard drive.
13    Q.    Okay.  So it was like,
14  when you say a hard copy disc, like
15  a CD or --
16    A.    Just a disc, a floppy.
17    Q.    Oh, a floppy disc?
18    A.    Yes, sir.
19    Q.    And where was that floppy
20  kept?
21    A.    They were kept in a floppy
22  container box in the booking area
23  near the medical.
```

50

```
 1    Q.    And were they still there
 2  when you left in 2006?
 3    A.    They were.
 4    Q.    And when was it you left
 5  in 2006?
 6    A.    I think it was March or
 7  April.
 8    Q.    Now, you said that you
 9  would on occasion add things that
10  you thought were significant to the
11  shift report.  Did you ever add
12  things that you thought were
13  significant to the tower log?
14    A.    Not unless I was up there
15  and the incident occurred within my
16  view, then, you know, naturally I
17  would document that, but I would
18  not specifically go up to the tower
19  to add something.  Most of what I
20  would add would be downstairs where
21  it was accessible to me without
22  having to go through two secured
23  doors and to the tower.
```

51

```
 1    Q.    Now, if you were in your
 2  office, would you go around and add
 3  something to the shift log or would
 4  you just -- only do it if you were
 5  in the booking area?
 6    A.    No.  If -- if it was a
 7  situation where the officer in the
 8  booking area was in the back of the
 9  jail I would go and add it myself,
10  or if the officer was busy doing
11  dispatch I would add it myself.
12  But in most cases I would simply
13  pick up the phone and call the
14  officer at the front and ask them
15  and dictate to them what I wanted
16  written in the log, and they would
17  add it.
18    Q.    Now, apart from yourself,
19  who else had access to the entering
20  in the -- yourself and the officer
21  on duty, who else had access to
22  entering into the shift log?
23    A.    Any corrections officer on
```

52

```
 1  shift, and that would be the
 2  entirety of it.  There was no
 3  reason for a deputy to enter
 4  anything or anyone else, and they
 5  -- they certainly -- it was not
 6  part of their job to have to do
 7  that.  So, just the corrections
 8  officers and myself.
 9    Q.    Well, how about Mr.
10  Wilson?
11    A.    It would be possible that
12  he could add something but not
13  probable.
14    Q.    How about the sheriff?
15    A.    Well, certainly, there
16  again, it would be possible but not
17  probable.
18    Q.    Are you aware of either
19  one of them entering anything into
20  the shift report?
21    A.    Not to my knowledge.
22    Q.    Now, did you do intake
23  when officers -- when new inmates
```

13  (Pages 49 to 52)

Daniel Court Reporting, Inc.

53

1  would come into the jail?
2     A.   Certainly, I assisted with
3  that in cases where we were busy.
4     Q.   And when you did that,
5  tell me what was involved.
6     A.   Well, a lot of things were
7  involved. The officer would ask
8  personal information, such as
9  Social Security number, driver's
10  license number, birth date. They
11  would collect information
12  concerning the height, weight,
13  gender, who to contact in an
14  emergency. And then there was a
15  medical portion that asked various
16  medical questions, one of which is,
17  is there any other medical
18  condition that you have that I
19  should know about.
20     Q.   Let me show you what I've
21  been produced as part of the jail
22  file in this case. But before that
23  let me ask you.

54

1       Is there a jail file kept
2  on every inmate?
3     A.   Yes, sir.
4     Q.   What goes in that?
5     A.   Well, everything from
6  their booking information to their
7  canteen orders to any medical
8  receipts or information, legal
9  documentation from court
10  appearances.
11     Q.   And who keeps that?
12     A.   It's kept in a file of
13  active inmates and once that inmate
14  is released, then it is put in a --
15  in another filing system, but it's
16  always kept on hand in house.
17     Q.   And whose custody in the
18  jail is particularly responsible
19  for keeping up with the inmate
20  file?
21     A.   I don't understand the
22  question.
23     Q.   Well, I mean, is that kept

55

1  back in the booking area, is it
2  kept in front in the administrative
3  area where the --
4     A.   It's kept in the booking
5  area.
6     Q.   In the booking area?
7     A.   Uh-huh.
8     Q.   And so that would be
9  something that the jailer on the
10  shift would have access to?
11     A.   Certainly.
12     Q.   And is that something that
13  you would refer to on a daily basis
14  while inmates were actively housed
15  in the jail?
16     A.   Not always on a daily
17  basis unless we were adding
18  something to that file. The file
19  is pulled -- if they've been in
20  jail before the file is pulled from
21  the master files and put in an
22  active inmate location for the
23  duration of their stay in the jail.

56

1  But as far as referring to that
2  file on a daily basis, unless there
3  is a reason to refer to that file,
4  then -- not daily.
5     Q.   Were the jailers required
6  to review the inmate files of the
7  active inmates?
8     A.   They weren't required to
9  unless they were looking for
10  something specific; then I guess it
11  would have to -- you would have to
12  be more specific as to what in, you
13  know -- specifically that you're
14  inquiring about --
15     Q.   Sure.
16     A.   -- as far as a need to
17  look.
18     Q.   For example, there was a
19  medical screening form that you
20  took -- someone took when someone
21  came into the jail?
22     A.   Uh-huh.
23     Q.   Were all of the jailers,

1310 32nd Street S.        205-250-7765
Birmingham, Alabama 35205   danielreporting@aol.com

Daniel Court Reporting, Inc.

57

1  including yourself, required to
2  look at that to see what the
3  medical conditions were of the
4  inmates that came into the jail?
5      A.   No, sir, it would not be
6  necessary because those same
7  medical questions would be asked
8  again at booking.  And certainly a
9  person's medical condition changes
10 from stay to stay.
11         Now if there was a reason
12 for the officer to look back at a
13 former medical record, then they
14 certainly would.  But the reason
15 that medical form exists is to
16 update that medical information
17 upon the -- the inmate's current
18 incarceration.
19     Q.   That's what I was asking,
20 is, when someone comes in and is
21 booked in the jail and you get the
22 medical information, are all the
23 jail staff required to know what

58

1  the inmate's current medical
2  condition is?
3      A.   No, sir.  That --
4  generated from that medical form --
5  if there are any medications or
6  conditions that an officer needs to
7  know about, then a medical -- a
8  medication log sheet is then
9  created for that inmate.  They
10 would note when they came on to
11 shift the logs from the past few
12 days, the shift logs from the past
13 few days, and then that shift log,
14 if there was anything that the
15 officer needed to be aware of, it
16 would be noted there or they would
17 be reported to orally from the
18 person they were relieving, the
19 officer that they were relieving on
20 shift.
21         (Whereupon, Plaintiff's
22         Exhibit One
23         was marked for

59

1      identification.)
2      Q.   I'm going to show you what
3  I've marked as Exhibit One, a
4  two-page Exhibit.  And it indicates
5  at the top that it's a medical
6  screening form.
7      A.   Correct.
8      Q.   Is that originally a
9  computerized document?
10     A.   Yes, sir.  It prints out
11 with the initial booking papers.
12     Q.   And on this particular one
13 it shows at the very top, it's got
14 11-13-2003, seventeen twenty-four
15 forty-two, which I -- about five
16 twenty-four in the afternoon; is
17 that right?
18     A.   Yes, sir.
19     Q.   Now --
20     A.   Actually it's four ten or
21 about ten till five.
22     Q.   Is there somewhere
23 other --

60

1      A.   The time I'm looking at
2  says sixteen fifty, which would be
3  about ten minutes to five.
4      Q.   Okay.  I'm looking at a
5  different place.  Where are you
6  looking at sixteen --
7      A.   At the top.
8      Q.   Okay.  Up at the very top?
9      A.   Yes, sir.
10         MS. MCDONALD:  It says,
11 time.
12     Q.   Yeah, but if you look at
13 the very top, the very top line,
14 it's got seventeen twenty-four
15 forty-two.  Do you know why there's
16 a difference in that time?
17     A.   Sixteen fifty would be the
18 initial time that the -- the
19 booking process was started.
20 Seventeen twenty-four would
21 probably be the time that it was
22 actually completed.
23     Q.   And do you know whose

15  (Pages 57 to 60)

Daniel Court Reporting, Inc.

61

1  handwriting this is (indicating)?
2      A.    It appears to be my
3  handwriting.
4      Q.    All right.
5          (Whereupon, Plaintiff's
6          Exhibit Two
7          was marked for
8          identification.)
9      Q.    I'm going to show you what
10  I'm going to mark, another two-page
11  medical screening document marked.
12  I'll show you what I've marked as
13  Exhibit Two.
14          MS. MCDONALD:  Can we take
15  a break and let me go get the
16  original files?  I don't have
17  those.
18          MR. STOCKHAM:  Sure.
19          MS. MCDONALD:  Those are
20  in Terry's custody and since he's
21  not here I don't have them --
22          MR. STOCKHAM:  Sure.
23          MS. MCDONALD:  -- and I

62

1  think it's probably a good idea
2  that we have the whole file.
3          MR. STOCKHAM:  Sure.
4  That'd be fine.  In fact, if you
5  can get a stapler it'd make --
6  that'd be great.
7          (Whereupon, a brief
8          recess was taken in
9          the deposition.)
10      Q.    (By Mr. Stockham)  This
11  information that you recorded here
12  that -- on this exhibit indicates
13  that Mr. Kelly, when he checked in
14  with you on the 13th of November,
15  2003, told you that he had
16  seizures, that he had a problem
17  with being schizophrenic and
18  bi-polar, and that he had
19  artificial vertebrae in his back;
20  is that right?
21      A.    That's what it appears to
22  state.
23      Q.    Do you have any

63

1  independent recollection of that?
2      A.    No, sir.
3      Q.    It also reflects that he
4  had attempted suicide six months
5  prior to that time?
6      A.    Correct.
7      Q.    It's got a place for a
8  signature.  Is that -- did he sign
9  that in your presence?
10      A.    Yes, sir.
11      Q.    And it's got a place for
12  the date and time, but that's
13  blank.
14      A.    Yes, sir.
15      Q.    It's got a place for the
16  booking officer to sign.
17      A.    Yes, sir.
18      Q.    Is there some reason
19  why --
20      A.    Well, you will also note
21  that on number five it says, does
22  inmate appear to be under the
23  influence of drugs or alcohol, and

64

1  it's marked yes.  So under those
2  circumstances I could not be
3  certain that the information he was
4  giving me was accurate or even
5  true.
6      Q.    So did you do anything to
7  follow up to find out if those
8  things were true?
9      A.    Yes, sir.  It would then
10  -- my next step, or our next course
11  of action would be to try to
12  establish whether in fact he had
13  these conditions, which would
14  inquire a good deal of
15  investigation trying to find out
16  doctor names, trying to find out
17  where those doctors were located,
18  phone numbers and so forth, which
19  is a very tedious task and in many
20  cases unfruitful.
21      Q.    So do you have any record
22  of your having done that in this
23  case?

16  (Pages 61 to 64)

Daniel Court Reporting, Inc.

133

```
 1   then the sergeant or the lieutenant
 2   will be glad to speak with him?
 3       A.    In fact, that is correct,
 4   and which I did speak with him.
 5   The officers, the other corrections
 6   officers spoke with him and as I
 7   was addressing in that his constant
 8   request to see the sheriff. It is
 9   not a common incidence for the
10   sheriff to speak with the inmates.
11   That is what he has the lieutenant,
12   myself and the other corrections
13   officers for. There is a grievance
14   policy that if the situation cannot
15   be resolved between the officers,
16   the sergeant and the lieutenant,
17   then certainly that inmate would
18   take his grievance to the sheriff.
19   But at this point there was
20   nothing -- his demands were being
21   met. He was getting medical care.
22   He was getting medication according
23   and prescribed by a doctor. And
```

134

```
 1   beyond that, I believe that the
 2   officers as well as myself, and
 3   Lieutenant Wilson, met everything
 4   within the state required legal
 5   standards for medical care.
 6       Q.    Now, on the 16th of
 7   December Mr. Kelly had another
 8   fall, did he not?
 9           MS. MCDONALD: Object to
10   the form.
11       A.    Not to my knowledge.
12   Well, alleged fall.
13       Q.    Well, an alleged fall?
14       A.    An alleged fall.
15       Q.    Well, let me show you what
16   I'm going to mark as Exhibit
17   Fourteen.
18           (Whereupon, Plaintiff's
19           Exhibit Fourteen
20           was marked for
21           identification.)
22       Q.    This is a statement signed
23   by Kay Taylor. Who is Kay Taylor?
```

135

```
 1           Ma'am?
 2       A.    Sir?
 3       Q.    Who's Kay Taylor?
 4       A.    Kay Taylor was a
 5   corrections officer at the jail.
 6       Q.    Do you have that document
 7   there in your file?
 8       A.    I do.
 9       Q.    Why don't you look at that
10   so we can go over it together.
11           Did you instruct Kay
12   Taylor to write out this statement?
13       A.    No, sir, I did not. I
14   don't know -- well, I'll say that I
15   don't recall. She may have called
16   me. I may have said, be sure you
17   write it down, but I don't
18   necessarily know that I did.
19           Officers knew that when
20   they had an incident that they were
21   required to write a statement of
22   what they saw and heard.
23       Q.    Now, in addition to Mr.
```

136

```
 1   Kelly reporting that he had a
 2   seizure, a correction officer had
 3   seen him flopping around on the
 4   ground.
 5           MS. MCDONALD: Object to
 6   the form. Let her read over this
 7   but I don't --
 8       Q.    Have you reviewed that
 9   document?
10           MS. MCDONALD: Kay
11   Taylor's --
12           MR. STOCKHAM: Yes.
13           MS. MCDONALD: -- report?
14   I don't -- does it say what --
15           (Witness examining
16           documents.)
17       A.    Yes, sir.
18           MS. MCDONALD: Wait a
19   minute. What was the question,
20   Richard?
21           MR. STOCKHAM: Have you
22   read the document?
23       A.    Yes, sir.
```

1310 32nd Street S.                      205-250-7765
Birmingham, Alabama 35205       danielreporting@aol.com

Daniel Court Reporting, Inc.

137

1      MS. MCDONALD:  Okay.
2      (Whereupon, Plaintiff's
3      Exhibit Fifteen
4      was marked for
5      identification.)
6      Q.    (By Mr. Stockham)  Now,
7  I'm going to show you the next
8  Exhibit. This is a -- Exhibit
9  Fifteen is a statement by Dana M.
10 Harris.
11     A.    Yes, sir, we have that.
12     Q.    Who is Dana M. Harris?
13     A.    She also was a corrections
14 officer at the county jail.
15     Q.    And at the very top of
16 that she says, I was in the tower.
17 At approximately nineteen
18 forty-nine hours, I heard a loud
19 noise come from B block. I got up
20 to see what the noise was and I
21 observed Bryan Kelly flopping
22 around on the floor.
23     A.    Correct.

139

1  ground?
2      A.    Correct.
3      (Whereupon, Plaintiff's
4      Exhibit Sixteen
5      was marked for
6      identification.)
7      Q.    This is Exhibit Sixteen.
8      MS. MCDONALD:  Okay.  We
9  have that one.
10     Q.    It is a statement by --
11 who?
12     A.    It appears to be officer
13 Aaron Green.
14     Q.    Now, do statements
15 Fourteen, Fifteen and Sixteen all
16 relate to the same incident?
17     A.    Not all of them are dated.
18 However, they all reflect the same
19 time of day, so I would assume
20 that, yes, they do.
21     Q.    And why were they all
22 filled out?
23     A.    Because each officer had

138

1      Q.    It says, I called on the
2  radio for two or three times for
3  someone to come back to check on
4  him. When two two five six and two
5  two five two came back to check on
6  him he was still flopping but not
7  as much.
8      Who is two two five six?
9      A.    I don't know at that time.
10     Q.    What does two two five six
11 refer to?
12     A.    An officer's number,
13 identification number.
14     Q.    And two two five two?
15     A.    I don't know.
16     Q.    Is that another officer?
17     A.    Yes, sir.  Those numbers
18 change every time an officer leaves
19 and another officer is hired in
20 their place, so I could not tell
21 you who those were at that time.
22     Q.    So according to Dana
23 Harris, she saw him flopping on the

140

1  some participation in this
2  incident.
3      Q.    And why was an incident
4  report -- a report of incident
5  generated by each of these
6  officers?
7      A.    It's part of policy and
8  procedure if there is an incident.
9      Q.    You didn't direct them to
10 do it?
11     A.    Again, I don't recall
12 speaking with anyone on this
13 incident. I don't recall that
14 conversation. I'm sure that I did.
15 It was their policy to contact me
16 any time an inmate had a medical
17 issue of a -- of a serious nature.
18 Whether I told them to write it or
19 not is irregardless because it is
20 part of corrections officers'
21 training and policy and procedure
22 that any officer on duty that
23 participates in any incident is to

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

141

1  write a statement as to what they
2  saw and heard during that incident.
3      Q.   Now, this statement says,
4  Kelly was lying on his side close
5  to the door twitching. I first
6  checked visually to see if his
7  breathing -- if he was breathing.
8  Upon doing so he licked his lips,
9  so I knew he hadn't swallowed his
10  tongue. Then I proceeded to check
11  his eyes. When I pulled his eye
12  open he looked at me and then
13  started to look up as if to his
14  forehead. Kelly was responding to
15  me verbally when I attempted to
16  straighten his body position by
17  supporting his chest and back to
18  relieve any strain he may have been
19  in.
20          Now, did you have him
21  evaluated for a seizure disorder
22  after this incident?
23          MS. MCDONALD:  Object to

142

1  the form.
2      A.   What I would answer to
3  that is, nowhere in any of these
4  three statements has an officer
5  said or stated that Mr. Kelly has
6  experienced a seizure. What is
7  stated in these statements is that
8  Kelly was seen flopping and then
9  twitching. In my experience as a
10  corrections officer I have seen
11  numerous faked seizures. Now, I
12  cannot say whether Mr. Kelly had a
13  seizure or whether he did not. Mr.
14  Green in his statement makes record
15  of the fact that Mr. Kelly licked
16  his lips and that when Mr. Green
17  tried to open his eye that Mr.
18  Kelly looked at him and then looked
19  up. Those are not, in what brief
20  medical experience I have as an
21  EMT, are not indicative of somebody
22  that's just had a seizure.
23          However, I'm not a medical

143

1  doctor. I can't say whether he
2  experienced a seizure or not. But
3  the terminology, seizure, is used
4  nowhere in these statements.
5      Q.   My question was, you
6  didn't do anything to have him
7  evaluated for a seizure disorder,
8  did you?
9      A.   I took him to be -- I made
10  appointments or someone made
11  appointments for him to be
12  evaluated for his falls.
13      Q.   Yes, ma'am. My question
14  was, you didn't do anything to have
15  him evaluated for a seizure
16  disorder after this?
17      A.   No, sir, nor did I have
18  him evaluated for a heart condition
19  after this. I had him evaluated
20  for falls.
21      Q.   What did you do to have
22  him evaluated for falls?
23      A.   We simply made an

144

1  appointment, explained to the
2  doctor what we had witnessed, and
3  the rest was up to Mr. Kelly to
4  explain to the doctor as his
5  physician and patient
6  confidentiality.
7      Q.   When did you make the
8  appointment with the doctor for the
9  falls?
10      A.   Well, there are several
11  incidents that are recorded in this
12  chronological where he was taken to
13  the doctor for exams, for X-rays
14  and so forth following his alleged
15  falls.
16      Q.   Yes, ma'am. I'm looking
17  at the 12-16 entry on your
18  summary --
19      A.   Yes, sir.
20      Q.   -- inmate medical summary,
21  Exhibit Eleven.
22      A.   Yes, sir.
23      Q.   After the 12-16 incident I

36 (Pages 141 to 144)

Daniel Court Reporting, Inc.

145

1  don't see any entry where you've
2  taken him to the doctor for tests.
3      A.   I don't see anything
4  specific regarding anything other
5  than on 12-16 EMS was summoned for
6  his alleged fall, and then on
7  January 7th he was taken to
8  Pri-care for a medical exam.
9          However, it does not state
10 what that medical exam was for.
11     Q.   Well, between December
12 16th and January 7th, he wasn't
13 taken to any doctor for evaluation
14 for his falls, according to your
15 summary, was he?
16     A.   According to this summary,
17 there is no event stated. However,
18 I cannot say that he was not taken
19 to the doctor in between those
20 times.
21         MR. STOCKHAM:  Mark this
22 as the next Exhibit.
23         (Whereupon, Plaintiff's

146

1          Exhibit Seventeen
2          was marked for
3          identification.)
4      Q.   I'll show you what I've
5  marked as Exhibit Seventeen and ask
6  if you'll look at the original of
7  that.
8      A.   And what is the question?
9      Q.   Do you have the originals?
10 Do you have the original in front
11 of you?
12     A.   Yes, sir.
13     Q.   This document says, need
14 to see a real doctor to find out
15 about falling out so I won't be put
16 in holding pen for being sick.  I
17 don't understand why I try to tell
18 the truth and get in trouble for
19 it.  They won't let me talk to
20 Ricky Owens so my father is.
21         Now, did you see this
22 document, this complaint?
23     A.   I don't recall.

147

1      Q.   This would have been put
2  out somewhere where you could have
3  seen it, wouldn't it?
4          MS. MCDONALD:  Object to
5  the form.  I think she's already
6  told you where these were put.
7      A.   These are placed in file.
8      Q.   Now, the response is by
9  whom?
10     A.   The initials are AB.  I
11 would assume that is Al Bradley.
12     Q.   Now, Mr. Owens' request to
13 see a real doctor about his falling
14 out on the 18th -- he wasn't
15 provided any evaluation of his fall
16 at least until the 7th of January.
17         MS. MCDONALD:  Object to
18 the form.
19     A.   I -- the only response I
20 can give to that is I don't recall
21 and I do not have a time line that
22 reflects any visits to the doctor
23 by Mr. Kelly other than what I have

148

1  written.  There may have been other
2  doctor visits, and I would like to
3  note that Mr. Kelly does not say,
4  to find out about my seizures, he
5  says to find out about, falling
6  out.
7          And I would also like to
8  state that I have had numerous
9  inmates in the jail that did have
10 bonafide conditions of seizures.
11 When those inmates have seizure, it
12 is not always the policy of the
13 jail to call EMS.  If this inmate
14 comes into the jail, tells us they
15 have seizures, is on medication for
16 seizure and experiences a seizure,
17 there's nothing really that medical
18 can do for a seizure.  You have to
19 let that patient ride that seizure
20 out and unless they're having an
21 active seizure for a prolonged
22 period of time, you give them
23 space, you protect them from

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

149

1  injuring themselves further in the
2  act of that seizure, and then you
3  give them a quiet place to rest
4  until they recover from that
5  seizure. But it was not our
6  practice that every time a known
7  inmate to have seizures had a
8  seizure to transport them anywhere.
9        (Whereupon, Plaintiff's
10       Exhibit Eighteen
11       was marked for
12       identification.)
13    Q.    Let me show you what I've
14  marked as Exhibit Eighteen.
15    A.    Yes.
16    Q.    Do you have the original
17  in front of you?
18    A.    Yes, sir.
19    Q.    This Exhibit Eighteen is a
20  request from the plaintiff saying,
21  I can't understand why one person
22  can fall out and then come back for
23  two days in bed but I get in

150

1  trouble so I get sent to the hole.
2  I'm schizophrenic and bipolar and I
3  can't take that hole; that's what
4  it says, right?
5    A.    That's what it appears to
6  say, yes, sir.
7    Q.    And the response is,
8  you've been told several times why
9  you're up front.
10    A.    Correct.
11    Q.    You didn't have him
12  evaluated as to whether or not
13  leaving him up front was
14  deleterious to his health, did you?
15        MS. MCDONALD: Object to
16  the form.
17    A.    The holding cell -- Mr.
18  Kelly was placed in the holding
19  cell to limit his movement.
20  Apparently and obviously he was
21  having problems with balance and
22  with falling. Our solution to that
23  was to put him in a limited space

151

1  with a camera on him twenty-four
2  hours with an officer close at hand
3  so that we could monitor his health
4  and his activity through that time.
5  There were stairs in the cell
6  block. There was an open floor
7  area. There were tables and
8  benches in there that, obviously,
9  he had already hit his head on
10  once, fallen down the stairs once
11  or so he allegedly did.
12        But in that situation I
13  have no idea who he's referring to
14  in his statement that somebody else
15  gets two days in bed or whatever.
16  We didn't have a bed for two days
17  in bed for somebody. We had a
18  holding cell. We were a county
19  jail. We were not a hospital. We
20  were not a rehab center. We were a
21  county jail and the best place to
22  put an inmate with medical issues,
23  especially those such as Mr. Kelly

152

1  had, was close up front where we
2  could respond to his needs
3  immediately.
4    Q.    Now, there was no bathroom
5  facility in the holding cell, was
6  there?
7    A.    There is not.
8    Q.    And there's nowhere to get
9  water in the holding cell, is
10  there?
11    A.    No, sir, there's not.
12    Q.    And there is no bed in the
13  holding cell, is there?
14    A.    No, sir, there's not.
15    Q.    And who made the decision
16  to put him in the holding cell?
17    A.    I would imagine that that
18  was a collective decision between
19  myself and Lieutenant Owens and the
20  officers on -- I mean, Lieutenant
21  Wilson and the officers on shift.
22    Q.    I see an entry in the
23  shift log that two oh oh -- two two

38 (Pages 149 to 152)

Daniel Court Reporting, Inc.

153

1 oh one and two two one three were
2 the people who made that decision.
3 Do you know who two two one three
4 was?
5     A.    Two two one three was my
6 number.
7     Q.    Do you know who two two oh
8 one was?
9     A.    Two two oh one was always
10 reserved for the sheriff.
11    Q.    And you recall discussing
12 that issue with the sheriff?
13    A.    I don't recall the
14 specific conversation, but I do
15 recall discussing Mr. Bryan Kelly
16 with the sheriff quite frequently.
17    Q.    What do you recall
18 discussing quite frequently with
19 the sheriff?
20    A.    His medical condition and
21 interaction with his parents.
22    Q.    What do you recall
23 discussing with the sheriff about

154

1 Mr. Kelly's medical condition with
2 the sheriff?
3     A.    Updating him on the
4 incidents that were occurring in
5 the back, and updating him on steps
6 being taken to provide him medical
7 care. Updating him on his -- the
8 medications that he was taking.
9 Updating him on the phone calls
10 from Ms. Kelly, and the frequent
11 visits from Mr. Kelly.
12    Q.    And when you say,
13 updating, was this something that
14 you did every day?
15    A.    Probably not daily but as
16 needed.
17    Q.    How frequently did you
18 talk to the sheriff about Mr.
19 Kelly?
20    A.    As needed.
21    Q.    Well --
22    A.    I can't -- I can't say.
23 It might be two or three times in

155

1 one day. It might be three days
2 before I talk to him again about
3 it. It just depended on what was
4 happening at that time.
5     Q.    And what did the sheriff
6 tell you about Mr. Kelly?
7     A.    Just to -- I mean, I don't
8 recall specifically what he told
9 me, but I can tell you that in
10 general it was basically to
11 continue doing what we were doing
12 and providing what medical care we
13 could for his claims, providing his
14 medication as prescribed, and
15 meeting his needs as was within our
16 ability to do.
17    Q.    I'll show you what -- the
18 entry on the day shift's report for
19 12-18-03, and it indicates that he
20 was to be moved to be held in a
21 holding cell till further notice
22 per two two one three and two two
23 oh one. Does that refresh your

156

1 recollection about having any
2 discussion with the sheriff about
3 putting Mr. Kelly in the --
4     A.    Certainly.
5     Q.    -- holding cell?
6     A.    Certainly. As I said, it
7 was a collective decision between
8 everybody involved that was trying
9 to meet the needs of Mr. Kelly.
10 Obviously, giving him space to roam
11 was becoming detrimental to his
12 health seeing as he was having
13 continued falls, alleged falls.
14 And the solution to that was to
15 limit his space so that if he did
16 fall it wouldn't be downstairs, it
17 wouldn't be hitting his head on a
18 table, and there would be an
19 officer close by to make an
20 immediate response and it would be
21 on camera.
22    Q.    Now, the camera situation,
23 there was a film?

39 (Pages 153 to 156)

1310 32nd Street S.                205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

157

1    A.    Yes, sir. There's a -- we
2  have cameras in the holding cells
3  and placed throughout the jail for
4  security purposes, but also for
5  situations such as this where they
6  can be reviewed.
7       Q.    Do you know what happens
8  to the films?
9       A.    Well, they're stored for a
10 period of time. I think -- I think
11 they're kept -- well, I can't -- I
12 can't say how long they're kept
13 before they are recorded over.
14      Q.    Well, as of the time that
15 you wrote Exhibit Eleven, the
16 inmate medical summary, where would
17 those tapes have been?
18      A.    They were kept in the
19 tower.
20      Q.    Well, I believe you
21 testified that the reason that you
22 wrote this inmate medical summary
23 was because you perceived that

158

1  there were some potential for
2  ending up here. Well, were the
3  tapes kept from this time frame?
4       A.    I don't know.
5       Q.    Who would know?
6       A.    I'd imagine that the
7  sheriff at that time would know. I
8  don't recall -- or Lieutenant
9  Wilson. I don't -- it would not
10 have been my decision to sequester
11 a particular tape.
12      It was my job as sergeant
13 to document everything I could and
14 to present it to the lieutenant for
15 further decision.
16      MR. STOCKHAM: Mark this
17 as the next Exhibit.
18      (Whereupon, Plaintiff's
19      Exhibit Nineteen
20      was marked for
21      identification.)
22      THE WITNESS: Some of this
23 is not legible to me.

159

1       (Whereupon, an
2       off-the-record
3       discussion was held.)
4       Q.    (By Mr. Stockham) This is
5  a request and at the bottom it
6  appears to be dated, 12-21-03; is
7  that right?
8       A.    Yes.
9       Q.    And that was the
10 corrections officer's response,
11 correct?
12      A.    Correct.
13      Q.    And the corrections
14 officer is BS. Do you know who
15 that was?
16      A.    No.
17      Q.    Is Mr. Stroud possible?
18      A.    Could have been Brandon
19 Stroud, yes.
20      Q.    And this says, I've been
21 locked down for six days. I've had
22 a bath two times. Aaron took me
23 one time and Al the other. The --

160

1  it says, the rule book; is there a
2  rule book?
3       A.    There's an inmate rule
4  book.
5       Q.    It says, nothing about
6  lock down. It says, you see a
7  doctor on lock down. It says that
8  I can only be held for twenty-three
9  hours.
10      Is there a provision in
11 the rule book that says that you
12 can only be held for twenty-three
13 hours in lock down?
14      A.    I believe that's regarding
15 disciplinary issues.
16      Q.    Does the rule book say you
17 can only be held in lock down for
18 twenty-three hours?
19      MS. MCDONALD: If you
20 know.
21      A.    On a disciplinary issue.
22 And I would actually have to see
23 the rule book to see what it

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

161

1  actually states.
2       Mr. Kelly was not being
3  disciplined. Mr. Kelly was up
4  there for his own well-being.
5     Q.    This says, I can only be
6  held for twenty-three hours without
7  getting out. I've been held for up
8  to seventy hours without getting
9  out. I want a hearing to get out
10 of here. I fell in here as well
11 back there. I'm being treated
12 worse than an animal and a hearing
13 will be set or I'll notify the
14 right ones on the outside. I can't
15 help I have seizures and my leg
16 goes numb.
17    A.    Okay. I would also state
18 that at the top, where it says
19 date, Mr. Kelly also states,
20 unknown.
21    Q.    So he -- at the time that
22 he wrote this that he doesn't know
23 the date?

162

1     A.    Apparently not.
2       MR. WILLFORD:  Object to
3  the form.
4       MS. MCDONALD:  Same
5  objection.
6     A.    I would -- I would state
7  that apparently Mr. Kelly's
8  perception of what is happening to
9  him is -- may not be accurate
10 either.
11    Q.    But we know that it is the
12 -- at least before the 22nd that he
13 wrote this --
14    A.    Correct.
15    Q.    -- because Mr. Stroud
16 writes his response on the 21st?
17    A.    Correct. But I would
18 state that because Mr. Kelly is not
19 sure of the date, that he also
20 probably is not certain of how many
21 times he's bathed, how many times
22 he's been taken out.
23    Q.    Well, it doesn't address

163

1  that one way or the other in this
2  response, does it?
3     A.    No, sir, it doesn't.
4     Q.    Was this brought to
5  anyone's attention other than Mr.
6  Stroud?
7     A.    I can't say.
8     Q.    He's asking for a hearing
9  to be let out of the lock down,
10 isn't he?
11    A.    Yes, sir.
12    Q.    Was he told anything about
13 why he wasn't being let out of the
14 lock down?
15    A.    Sir, I would state to you
16 that he had been told multiple,
17 numerous times why he was being
18 held in observation.
19    Q.    And here he says that he's
20 being treated worse than an animal,
21 doesn't he?
22       MS. MCDONALD:  That's what
23 it's -- if it's --

164

1     A.    I can't state his frame of
2  mind, sir, but, obviously, his
3  perception of what was happening to
4  him was not in keeping with the
5  actual events and reality of what
6  was happening to him.
7     Q.    Well, at this time,
8  according to his note, he had been
9  in lock down for six days.
10    A.    I can't say exactly how
11 long he had been in lock down.
12 However, I would prefer that we
13 call it a holding cell. Lock down
14 is for an inmate that is on some
15 kind of disciplinary watch. He was
16 being held for medical observation
17 to prevent him from falling and
18 injuring himself further.
19    Q.    Now, he -- by the way, you
20 had never held anyone as long in
21 the holding cell as you held Mr.
22 Kelly, had you?
23       MS. MCDONALD:  Object to

41 (Pages 161 to 164)

Daniel Court Reporting, Inc.

165

1  the form.
2      A.    I can't say that either.
3      Q.    Can you name anyone that
4  came close to being held as long in
5  a holding cell as you held Mr.
6  Kelly?
7      A.    I cannot name anyone in
8  particular, but I do know that
9  there have been other medical
10  incidents that we have had to keep
11  inmates up front for their
12  well-being.
13      Q.    Now, according to Mr.
14  Kelly, he had been in the cell for
15  seventy hours without getting out.
16      A.    According to Mr. Kelly he
17  didn't even know the date.
18      Q.    Now, is there a -- any
19  window in the holding cell?
20      A.    Yes, there is.
21      Q.    Where is the window?
22      A.    The window is created in
23  the upper portion center of the

166

1  door.
2      Q.    Now, is that at eye level?
3      A.    Yes, sir.
4      Q.    If you're standing?
5      A.    Yes, sir.
6      Q.    Now, in Mr. Kelly's case,
7  the sheriff had taped over that --
8      A.    I can't say --
9      Q.    -- door --
10      A.    -- that any -- any piece
11  of cardboard was taped over that
12  window or by whom for what period
13  of time.
14      Q.    You can't say one way or
15  the other?
16      A.    No, sir, I cannot.
17      Q.    Is it a practice of taping
18  over the hole in the --
19      A.    On occasion it is.  When
20  we are booking people in, if we
21  have an inmate that stands at the
22  window and watches, yes, we will
23  tape a piece of cardboard over that

167

1  window to ensure the privacy of the
2  inmate being booked it.
3      In addition to that, if an
4  inmate is brought to the front for
5  medical reasons and has to be
6  treated to have a wound changed or
7  by any -- any random reason such as
8  that where an inmate in holding is
9  standing at the door watching and
10  is asked to back away from the
11  door, and does not comply, then a
12  cardboard will be taped over the
13  window.
14      Q.    In fact, the cardboard was
15  put over the window by Sheriff
16  Owens?
17      A.    I don't have any
18  recollection of Sheriff Owens
19  taping anything over the cell
20  window.
21      Q.    Do you recall the
22  cardboard being put over the window
23  and left there for the duration of

168

1  Mr. Owens' --
2      A.    No, sir.
3      Q.    You're saying that didn't
4  happen?
5      A.    I'm saying I have no
6  recollection of that.
7      MR. STOCKHAM:  Mark this
8  as the next Exhibit.
9      (Whereupon, Plaintiff's
10      Exhibit Twenty
11      was marked for
12      identification.)
13      Q.    I'm going to show you what
14  I've marked as Exhibit Twenty and
15  ask you what that document is.
16      A.    It appears to be a medical
17  sheet that is filled out at the
18  time of booking.
19      Q.    I don't see a date on it,
20  that's why I'm asking you because
21  it --
22      A.    No, I don't and I don't
23  see a -- an inmates' name on it

42  (Pages 165 to 168)

Daniel Court Reporting, Inc.

169

1  either.
2      Q.    It was provided me with
3  Mr. Kelly's file and that's why I'm
4  asking you about it because I don't
5  have that -- while I'm asking about
6  it I'm going to ask about this next
7  document.
8          (Whereupon, an
9          off-the-record
10         discussion was held.)
11         (Whereupon, Plaintiff's
12         Exhibit Twenty-one
13         was marked for
14         identification.)
15     Q.    (By Mr. Stockham)  That's
16 the other one I'm going to show
17 you, which is Exhibit Twenty-One.
18         MS. MCDONALD:  We've got
19 it.
20     A.    Okay, but what I want to
21 say about this, first of all, is
22 that there is no inmate name on
23 this and I can't say what inmate it

170

1  actually refers to.  There's no
2  date, there's no booking number,
3  there's no anything on this.
4      Q.    Now, it's in Mr. Kelly's
5  file.
6      A.    I understand that it's in
7  the file, but I can't identify it
8  as Mr. Kelly's.
9      Q.    Okay.  But it's still
10 nailed down in the file?
11     A.    Yes.
12     Q.    Okay.  Looking at Exhibit
13 -- let me see the Exhibits, please,
14 and you can look at the originals.
15         Exhibits Twenty and
16 Twenty-one, both of them have
17 entries, lock down booking sheet.
18 Do you have a special booking sheet
19 that you use when you put someone
20 in lock down?
21     A.    No, sir.  This is a sheet
22 generated from a previous jail
23 program, software program, that was

171

1  incorporated by the software maker.
2  As far as the title of this sheet
3  being a lock down booking sheet,
4  there is no specification between a
5  general booking or a lock down
6  booking.  It's all the same.
7          And I have serious
8  questions as to this even belonging
9  to Mr. Kelly because it states in
10 here that this inmate, whoever it
11 may be, has lung cancer.
12     Q.    This one also shows that
13 he has codeine allergies and that
14 he had been in the hospital six
15 months ago.
16     A.    So I can't say that this
17 even belongs to Mr. Kelly, and why
18 it's in this file, I don't know.
19 Or, if it does belong to Mr. Kelly,
20 it would be consistent in what I've
21 been telling you about inmate
22 claims.  If he told me or the
23 officer at that booking that he had

172

1  lung cancer, certainly his medical
2  record since that time has shown
3  nothing of any lung cancer.
4      Q.    Well, now, the person that
5  booked him in was you, right?
6      A.    On this particular --
7      Q.    Well, the person who
8  booked him into the jail on the
9  13th was you.
10     A.    Well now, I think we're
11 talking about two different booking
12 sheets here.
13     Q.    Well, in this booking
14 sheet that we're looking at,
15 Exhibit Twenty --
16     A.    Let me see what you're
17 looking at.
18         MS. MCDONALD:  Well, she's
19 already told you this doesn't have
20 a date.
21     Q.    It doesn't have a date,
22 but it does --
23         MS. MCDONALD:  She doesn't

43 (Pages 169 to 172)

Daniel Court Reporting, Inc.

173

1   know what -- from what
2   incarceration it was. She's
3   already told you several times, he
4   was admitted -- he's been in and
5   out of this jail -- we don't know
6   -- we don't have a name on this and
7   we don't have a date on it. So we
8   don't know if -- she doesn't know
9   whether she booked him or not on
10  this.
11      Q.    My question --
12          MS. MCDONALD:  She booked
13  him on the 13th. There is a not a
14  date on this, Richard.
15      Q.    My question is, is this
16  your handwriting on Exhibit Twenty?
17      A.    Wait a minute, let me see.
18  No, this is not my handwriting.
19      Q.    Okay. On Exhibit
20  Twenty-one, which is this one
21  (indicating), is that your
22  handwriting?
23      A.    No.

174

1       Q.    Okay. Now --
2       A.    And the reason being, I
3   write in all caps and that's not my
4   handwriting. This one (indicating)
5   is my handwriting in all caps.
6   That (indicating) is not.
7          MR. WILLFORD:  What is
8   this one?
9          MS. MCDONALD:  She's
10  referring to the medical screening
11  form which is, I think, it's been
12  previously marked --
13         MR. STOCKHAM:  Exhibit --
14         THE WITNESS:  It's 11-13.
15         MS. MCDONALD:  The one
16  that we marked as Exhibit One,
17  which is the medical screening
18  form, that's what she's identifying
19  as being her handwriting.
20         MR. STOCKHAM:  Okay.
21         MR. WILLFORD:  I just
22  wanted to make that clear for the
23  record.

175

1          MS. MCDONALD:  Thank you.
2          (Whereupon, an
3          off-the-record
4          discussion was held.)
5          (Whereupon, Plaintiff's
6          Exhibit Twenty-two
7          was marked for
8          identification.)
9       Q.    (By Mr. Stockham)  Next
10  Exhibit -- I'll show you what's
11  marked as Exhibit Twenty-two.
12         Do you see Exhibit
13  Twenty-two, the original?
14      A.    Yes, sir.
15      Q.    It's dated, 12-27-03?
16      A.    Yes.
17      Q.    It says, right tooth is
18  hurting and need to see medical
19  doctor to get stomach pills. That
20  "mediocolic" was keeping my back
21  and tooth pain --
22         MS. MCDONALD:  It says --
23      Q.    -- keeping it down --

176

1   excuse me. It shows a response of
2   January the 2nd -- no, it doesn't.
3   It shows a response, will make
4   dental appointment and get Robaxin
5   refilled 1-2-04.
6          So it either is a response
7   on January the 2nd or -- that he
8   will get the Robaxin refilled on
9   1-2-04, right?
10      A.    That's correct.
11      Q.    Do you know who wrote
12  that?
13      A.    I can't say.
14      Q.    Who was responsible for
15  making the doctor's appointment and
16  getting the medication?
17      A.    The officer on shift.
18      Q.    Now, can you tell me why
19  it was over two weeks before Mr.
20  Kelly was made a dental
21  appointment?
22      A.    Over two weeks? The
23  request was made on 12-27 and the

44  (Pages 173 to 176)

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205      danielreporting@aol.com

Daniel Court Reporting, Inc.

177

1    latest response on here is January
2    2nd. That's --
3        Q.    Look at your medical
4    summary, Exhibit Eleven.
5            (Witness examining
6            documents.)
7        A.    Okay.
8        Q.    It says he wasn't taken to
9    the dentist until January 14th.
10       A.    He had a tooth pulled on
11   January 14th.
12       Q.    What I'm asking is, why
13   did you wait over two and half
14   weeks before you got him an
15   appointment for his tooth problem?
16       A.    It's very possible that he
17   had to be put on an antibiotic
18   before having that tooth extracted,
19   which would be the case if the
20   tooth was infected, that is what
21   happened in most cases. The
22   dentist would prescribe an
23   antibiotic for the inmate to be on

178

1    for ten days prior to having the
2    extraction.
3        Q.    There's no entry about the
4    dentist making any appointment to
5    see Mr. Kelly before the 14th, is
6    there?
7        A.    No, sir, not that I can
8    see immediately right here in the
9    file.
10       Q.    Your note doesn't reflect
11   it, does it?
12       A.    No, sir.
13           (Whereupon, an
14           off-the-record
15           discussion was held.)
16       A.    I'd also like to add
17   that --
18       Q.    (By Mr. Stockham)  Wait
19   till I ask you a question. I know
20   you just talked with your lawyer
21   and she can ask you questions, but
22   right now just respond to my
23   questions.

179

1        A.    Okay.
2        Q.    I'm looking at an entry in
3    Dr. John James' phone -- his record
4    of a phone conversation. It says,
5    jail called, said patient is acting
6    awful, can't do anything with him
7    and they said mother told them she
8    was incorrect on those Zyprexa. It
9    is supposed to be twenty
10   milligrams.
11           Do you have any
12   recollection about that
13   conversation with Dr. Kelly's --
14           MS. MCDONALD: Does it
15   reflect that it was a conversation
16   with Wendy?
17           MR. STOCKHAM: It says,
18   jail called. That's why I'm
19   asking.
20       A.    No, sir. I have no
21   recollection of that.
22       Q.    Who -- it says, I called
23   FW to confirm his twenty

180

1    milligrams. Do you know who FW
2    would be?
3        A.    I have no idea.
4        Q.    Now, did you have any
5    conversation with anyone about Mr.
6    Kelly needing to have his meds
7    adjusted?
8        A.    No, sir, I don't remember
9    any conversation of that nature. I
10   would have certainly left that to
11   the doctors who are qualified to do
12   that.
13       Q.    Well, did you have any
14   conversation with the jail staff
15   about it?
16       A.    The only -- the only
17   conversation there would have been
18   between myself and the officers was
19   any new medications that were being
20   added to his quite lengthy regimen
21   of medications, and because some of
22   those medications had to be
23   administered at different times,

45  (Pages 177 to 180)

Daniel Court Reporting, Inc.

181

1  trying to make sure that those
2  medications were given to him as
3  directed, at the times directed.
4  But as far as adjusting medications
5  I don't think anybody in the jail
6  was medically qualified to make
7  that decision as to whether his
8  meds needed to be changed or not.
9      Q.   Well, whether you made the
10 decision or not, did you have any
11 conversation about the fact that
12 his mother might have said they
13 need to be changed or anything --
14     A.   Not -- not to my
15 recollection.
16     Q.   -- or that the doctor said
17 anything about changing the meds?
18     A.   Not to my recollection.
19     Q.   Did you have any
20 conversation with anyone about the
21 fact that he was acting awful?
22     A.   Mr. Kelly generally was
23 acting awful.

182

1      Q.   I guess I'm asking, did
2  you have any conversation with
3  anyone in the jail about that, that
4  he was acting awful?
5      A.   Certainly we would -- we
6  would comment, you know, as to what
7  Mr. Kelly said or what Mr. Kelly
8  did or what he was doing or how
9  many notes he had sent out or the
10 demands that he was making, and so
11 forth and so on. But there was no
12 formal conversation about any one
13 incident.
14     Q.   This is a comment to the
15 doctor about him acting awful. Did
16 you make any comments to anyone
17 else outside the jail about the
18 fact that Mr. Kelly was acting
19 awful?
20     A.   No, sir. No, sir. Inmate
21 records are confidential.
22     Q.   I understand that. I'm
23 not talking about inmate records.

183

1  I'm just asking you if you made any
2  comment to anyone outside the jail
3  about Mr. Kelly acting awful?
4      A.   No, sir, not to my
5  knowledge.
6      Q.   Did you talk to his
7  parents about the fact that he was
8  acting awful?
9      A.   I don't remember speaking
10 with his parents about him acting
11 awful. I do remember speaking with
12 his parents about letting us do our
13 job, trusting our ability to do our
14 job without constant interference.
15 I do remember specifically speaking
16 with them on that.
17     Q.   Who did you speak with
18 about that?
19     A.   Mr. and Mrs. Kelly.
20     Q.   When did you do that?
21     A.   On several occasions. And
22 I could not tell you specific dates
23 because, like I said, if one was

184

1  not there the other one was
2  calling.
3      MR. STOCKHAM:  I need to
4  take about a five minute break.
5      MS. MCDONALD:  Okay.
6      (Whereupon, a brief
7      recess was taken in
8      the deposition.)
9      Q.   (By Mr. Stockham) Ms.
10 Roberson, when -- following up on
11 that Mr. Kelly was acting awful,
12 what things did you mean when you
13 said he was acting awful? I
14 gathered that some of them were
15 that he was filling out a lot of
16 these forms.
17     MS. MCDONALD:  Object to
18 the form.
19     MR. WILLFORD:  Object to
20 the form.
21     Q.   Is that correct?
22     MR. WILLFORD:  Same
23 objection.

46 (Pages 181 to 184)

Daniel Court Reporting, Inc.

185

1     MS. MCDONALD:  Same
2  objection.
3     A.   When an --
4     MS. MCDONALD:  What do you
5  mean by that?
6     A.   Yeah.
7     Q.   Yeah, that's what I'm
8  trying to find out.
9     A.   Okay.  What do I mean by
10  that?  In the sense that there are
11  legitimate inmate requests.  I
12  mean, an inmate will send a request
13  out for something reasonable and
14  within the realms of what we can
15  satisfy, and -- and that's fine.
16     It becomes a nuisance when
17  an inmate is sending out multiple
18  requests for the same thing
19  repeatedly -- up to twelve inmate
20  requests a day for the same thing.
21  He's been told orally by officers.
22  Every effort is being made to meet
23  his request and the inmate

186

1  continues to ask for the same
2  things over and over again, beyond
3  reason.
4     Q.   Okay.  I don't see twelve
5  inmate requests in a day in any of
6  these days.
7     A.   No, sir, but I'm telling
8  you that it does happen.  Mr. Kelly
9  may not have been sending out
10  twelve in a day, but he was
11  certainly, as we've seen from the
12  files, sending out two to three a
13  day after having repeatedly been
14  told that either an appointment was
15  being made for him or that the
16  doctor did not prescribe pain
17  medication for him, and so forth
18  and so on.  And yet he continued to
19  buzz the intercom in the tower to
20  ask these questions over and over
21  again, to send out inmate requests,
22  to constantly --
23     Q.   Well, there wasn't an

187

1  intercom for him to buzz in the --
2     A.   No, sir.  But when he was
3  in the holding cell he certainly
4  had the ability to knock on the
5  door, which he did quite
6  frequently.
7     Q.   Now, other than sending
8  out requests, what else did he do
9  that -- was what you categorized as
10  being acting awful?
11     MS. MCDONALD:  Object to
12  the form.
13     A.   Well, I did not write that
14  notation, so I cannot say what
15  these -- the corrections officer
16  was referring to.
17     Q.   No, I understand that.
18  But you told me here that he was
19  acting awful.
20     A.   He did act awful.  He
21  was --
22     Q.   And that's what I'm asking
23  --

188

1     A.   -- he was constantly
2  making demands.  He was constantly
3  complaining.  He was constantly
4  misconstruing information to his
5  parents, causing unfounded concerns
6  in his parents, which, in turn,
7  caused his parents to completely
8  inundate us with visits and calls
9  when there was no need for that.
10     Q.   Okay.  Anything else that
11  he did that you thought was awful?
12     A.   And, again, awful would be
13  that officer's term in that note --
14     Q.   No, I'm just talking about
15  yours.  You said he was acting
16  awful and that's why I'm asking
17  what you thought was awful.
18     A.   Constantly complaining
19  about one thing or another, never
20  being able to satisfy Mr. Kelly.
21  No matter what was done, no matter
22  what steps were being taken to meet
23  his needs, never being satisfied

47  (Pages 185 to 188)

Daniel Court Reporting, Inc.

189

1  with those actions and constantly
2  demanding more.
3      Q.    Anything else?
4      A.    No, sir.
5      Q.    At what point did you --
6  did he become awful, in your
7  opinion?
8      A.    I would say from the time
9  of his last incarceration that
10 reflects these falls and these
11 medications and doctor visits and
12 so forth.
13     Q.    So from the very beginning
14 of that incarceration?
15     A.    Yes, sir.
16     Q.    So from 11-13-03 onward?
17     A.    Whenever that
18 incarceration began, yes, sir.
19     Q.    Well, look at Exhibit One,
20 the intake document of 11-13-03.
21     A.    Yes, sir.
22     Q.    Is that when it began?
23     A.    Yes, sir. He came in, as

190

1  I stated, to appear to be under the
2  influence of drugs or alcohol and
3  making demands from the time he got
4  there.
5      Q.    Now, did you discuss with
6  the other officers who were in the
7  jail the fact that Mr. Kelly was
8  complaining excessively?
9      A.    No, sir, I didn't have to
10 discuss it with them. Everyone was
11 aware of it.
12     Q.    But did y'all have any
13 conversations about him?
14     A.    No, sir, other than
15 somebody might say, got another
16 request form from Mr. Kelly. You
17 know, it was -- it was common
18 knowledge among the officers
19 because they were all experiencing
20 it.
21     Q.    And that's what I'm
22 asking, did you have any
23 conversations about that?

191

1      A.    No, sir, no conversations
2  in particular, just do your job and
3  treat him the same as you treat any
4  other inmate in this situation.
5  So --
6      Q.    Why would you say that to
7  them?
8      A.    Because the officers were
9  getting exhausted with trying to
10 meet his demands. You have to
11 understand that there are other
12 inmates in the jail that have
13 needs, legitimate needs. You have
14 the county communications that the
15 officer is responsible for. You
16 have other bookings. You have
17 other -- you have meals that have
18 to be served. You have other
19 medications that have to be given.
20 There are many duties during the
21 course of the day of a corrections
22 officer. Part of their job is
23 meeting the needs of the inmates,

192

1  but when you have an inmate who is
2  excessively exhausting those --
3  those attempts, then, yes, your
4  officers become weary of that
5  situation.
6      Q.    How do you know the
7  officers were getting exhausted?
8      A.    Just simply through
9  fluctuations in voice and tone and
10 body language.
11     Q.    What do you mean, body
12 language?
13     A.    Well, just, got something
14 else from Mr. Kelly. Mr. Kelly
15 wants meds. Mr. Kelly wants this
16 -- just exhaustion, just being
17 tired of it. In the same manner
18 that you become tired with anybody
19 that excessively calls you about a
20 matter that you're representing
21 them on. You know, you tell them
22 what you can tell them, you do what
23 you can for them, but beyond that,

48 (Pages 189 to 192)

Daniel Court Reporting, Inc.

193

1　how many times do you have to be
2　repetitive before it becomes
3　somewhat of an exhaustion.
4　　　Q.　When did the officers
5　indicate to you they had become
6　exhausted?
7　　　　MR. WILLFORD: Object to
8　the form.
9　　　　MS. MCDONALD: Same
10　objection.
11　　　A.　No particular time.
12　　　Q.　Well, what time frame
13　after Mr. Kelly was --
14　　　A.　I would say probably about
15　into the second week of his being
16　there. In dealing with his parents
17　and dealing with Mr. Kelly, it was
18　a constant ongoing thing in
19　addition to the officers' other
20　duties and operation of the jail.
21　It became a separate duty all and
22　of its own.
23　　　Q.　Did any officers complain

194

1　to you about the fact that Mr.
2　Kelly was excessive in his demands?
3　　　A.　Not in particular and they
4　didn't have to state the obvious.
5　　　Q.　What do you mean by, state
6　the obvious?
7　　　A.　Well, the obvious is is
8　that most inmates during their stay
9　at the jail, if they're there for
10　three months, on average you might
11　receive a request a month from them
12　-- at the most, a request a week.
13　I would say that Mr. Kelly probably
14　went through a ream of paper a
15　month.
16　　　Q.　Well, I'm sitting here
17　looking at these request forms and
18　I don't see anything close to a
19　ream. Are there others that were
20　not retained?
21　　　A.　I don't know, sir.
22　　　Q.　You think, though, that
23　there was a ream of them at one

195

1　time and they've been lost somehow?
2　　　A.　A ream may be an
3　exaggeration, but what I'm trying
4　to get across to you is that it was
5　extremely in excess. If they had
6　been separate issues that he was
7　addressing on those requests, it
8　would have been a different
9　situation. But these were the same
10　issues over and over again. He was
11　being explained to orally what the
12　status was of his situation. He
13　was having it written to him on the
14　request forms and there was nothing
15　else we could do -- I mean, as far
16　as making him understand. And I'm
17　not sure if Mr. Kelly had a memory
18　problem or if he just was
19　persistent in what he was doing.
20　　　Q.　I see seven, eight,
21　nine -- I see nine request forms.
22　Do you think there were more than
23　the nine that I'm -- ten, eleven,

196

1　twelve, thirteen, fourteen,
2　fifteen, sixteen, seventeen,
3　eighteen -- I see eighteen request
4　forms; do you think there are more
5　than eighteen request forms?
6　　　A.　I can only attest to
7　what's in the file.
8　　　Q.　He was there from the 13th
9　of November to the 16 of January.
10　　　A.　Yes, sir.
11　　　Q.　But you think there may be
12　more than the sixteen that are in
13　the file?
14　　　A.　All I can say is what's in
15　the file.
16　　　　MS. MCDONALD: I count
17　twenty.
18　　　Q.　All right. Do you think
19　there are more than the twenty that
20　your lawyer counted in the file?
21　　　A.　If there are twenty in the
22　file, then that's how many he
23　submitted.

49 (Pages 193 to 196)

Daniel Court Reporting, Inc.

197

1    Q.    But you think that's an
2    excessive number?
3    A.    I think it was an
4    excessive number of written
5    requests based on the same request.
6    Q.    Now, are you the person
7    who decided that Mr. Kelly was not
8    -- let me back up a second -- let
9    me ask this.
10        Do you remember being
11    present when the sheriff told Mr.
12    Kelly that he was going to stay in
13    the hole as long as he was in the
14    jail?
15        MR. WILLFORD:  Object to
16    the form.
17        MS. MCDONALD:  Same
18    objection.
19    A.    No, sir, I do not.
20    Q.    You're saying it didn't
21    happen or you just don't recall it?
22        MS. MCDONALD:  You asked
23    her if she was present.

198

1    A.    I was not present for any
2    conversation of that nature.
3    Q.    Now, did you ever provide
4    Mr. Kelly with water when he was in
5    the holding cell?
6    A.    I don't recall.
7    Q.    There was no way for him
8    to get water without a jailer
9    providing it to him, was there?
10    A.    That's correct.
11    Q.    Did you ever instruct
12    anyone to provide Mr. Kelly with an
13    opportunity to exercise when he was
14    in the holding cell?
15    A.    I don't recall.
16    Q.    The only way for Mr. Kelly
17    to get exercise would be for a
18    jailer to let him out into the
19    exercise area?
20    A.    That's correct.
21    Q.    Do you know whether or not
22    Mr. Kelly received any exercise the
23    entire time he was in the holding

199

1    cell?
2        MS. MCDONALD:  Exercise
3    outside?
4    Q.    Exercise at all?
5    A.    I can't -- I can't
6    specifically recall.
7    Q.    Who would be the one to
8    decide whether or not Mr. Kelly got
9    exercise?
10    A.    It was policy of the jail,
11    weather permitting, and, of course,
12    there had to be enough officers on
13    duty, that on Saturdays or Sundays,
14    depending on which day there were
15    enough officers and the weather was
16    permitting, that the inmates as a
17    whole were able to go out on the
18    exercise yard.
19        During the winter months
20    there was very little of that
21    simply because of the weather.  But
22    as to whether Mr. Kelly
23    participated in that, I can't say.

200

1    Q.    Well, you know he wasn't
2    -- he wasn't allowed to have any
3    exercise when he was being held in
4    the hold?
5        MR. WILLFORD:  Object to
6    the form.
7    A.    Well, he could exercise in
8    the hold.  He can do sit-ups, he
9    can do push-ups, he can do squats.
10    Q.    Now, who was the person
11    who decided that he was going to
12    have to sleep on the floor in the
13    hold?
14        MR. WILLFORD:  Object to
15    the form.
16        MS. MCDONALD:  Same
17    objection.
18    A.    Nobody, to my knowledge,
19    told Mr. Kelly that he had to sleep
20    on the floor.  At one point, it was
21    suggested to him by myself, Bryan,
22    why don't you put your mat on the
23    floor so that if you fall, you will

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

201

1 not fall from the platform. It was
2 up to Mr. Kelly where he slept.
3 Nobody made him sleep in one place
4 or another.
5      Q.    In fact, when people were
6 held in the holding cells, they
7 were not allowed to put their mats
8 up on the --
9      A.    That's not true.
10         MS. MCDONALD: Let him
11 finish his question.
12      Q.    -- up on the shelf?
13      A.    That's not true.
14      Q.    In fact, if someone put
15 their mat up on the shelf, they
16 were instructed to take it down.
17      A.    No, sir.
18      Q.    That never happened?
19      A.    Not to my knowledge, no,
20 sir.
21      Q.    Who was the person
22 responsible for seeing that toilet
23 paper was provided to Mr. Kelly

202

1 when he was in the holding cell?
2      A.    The officer on duty.
3 However, Mr. Kelly would have been
4 provided with a roll of toilet
5 paper at the same time that the
6 other inmates are issued their
7 rolls of toilet paper.
8      Q.    In fact, Mr. Kelly was not
9 provided toilet paper because he
10 was using it to wrap around his
11 feet; isn't that right?
12         MS. MCDONALD: Object to
13 the form.
14      A.    I have no recollection of
15 that.
16      Q.    Who was responsible for
17 regulating the temperature in the
18 holding cell?
19      A.    The temperature was set at
20 an economic and necessary
21 temperature for general operations
22 and comfort of inmates and officers
23 for proper ventilation, but it was

203

1 not something randomly changed.
2      Q.    Where was the temperature
3 regulated in the holding cell?
4      A.    I believe that thermostat
5 is located in the booking portion
6 of the jail.
7      Q.    And who regulates that
8 temperature?
9      A.    It stays -- depending on
10 whether it's summer or winter, it
11 stays between sixty-five and
12 seventy-five, in between those
13 temperatures. And it's not a
14 separate -- it's not a separate
15 thermostat for the holding cell, it
16 is for the entire booking area.
17      Q.    Just for the booking area?
18      A.    So far as I can recall.
19      Q.    Mr. Kelly complained to
20 you about being cold, didn't he?
21         MS. MCDONALD: Object to
22 the form.
23      A.    Not -- not that I

204

1 recollect.
2      Q.    Mr. Kelly complained to
3 you that he was not being allowed
4 to get a shower, didn't he?
5         MS. MCDONALD: Object to
6 the form.
7      A.    No, sir, I don't recall
8 him complaining to me about not
9 getting a shower.
10      Q.    Did you ever take him to
11 the bathroom?
12      A.    If I was in the booking
13 area and he tapped on the door that
14 he needed to go to the bathroom,
15 and the other officers were busy,
16 then certainly I would allow him to
17 use the restroom.
18      Q.    My question is, did you
19 ever take him to the bathroom?
20      A.    I answered you. If he --
21 if I was in the area and he needed
22 to go, yes, I would take him.
23      Q.    I don't know what, would

51 (Pages 201 to 204)

Daniel Court Reporting, Inc.

205

1  be.  Do you have any recollection
2  of taking him to the bathroom?
3      A.    No, I do not.
4      Q.    Do you have any
5  recollection of giving Mr. Kelly
6  water?
7      A.    No, I do not, not
8  specifically, no.
9      Q.    Do you have any
10  recollection of taking Mr. Kelly to
11  get a bath?
12      A.    No, sir, I would not.  I'm
13  a female officer; he is male.
14      Q.    Do you have any
15  recollection of making arrangements
16  for Mr. Kelly to get a bath?
17      A.    It was standard, sir, that
18  -- that he be allowed to take a
19  bath daily.
20      Q.    Did you have any
21  complaints about Al Bradley when he
22  was -- when you were the jail
23  supervisor?

206

1      A.    I had generalized
2  complaints about all the officers
3  from the inmates.
4      Q.    I want to begin right now
5  with Al Bradley.
6      A.    Okay.
7      Q.    Did you have any
8  complaints about Al Bradley from
9  the inmates?
10      A.    Sure.
11      Q.    What complaints did you
12  have?
13      A.    Anything from Al having
14  disciplined them for having their
15  razor when they weren't supposed
16  to.  They didn't feel that the
17  discipline was fair, even though it
18  was jail policy.  That Al was -- I
19  can't tell you in specific, but I
20  can tell you that I occasionally
21  got complaints on every officer
22  when -- at one time or another
23  because they didn't do what an

207

1  inmate wanted them to do.
2      Q.    Did you ever have
3  complaints from anyone that Al
4  Bradley came to work intoxicated?
5      A.    No.
6      Q.    Inside or outside of the
7  jail?
8      A.    No, sir, not to me.
9      Q.    Did you ever have
10  complaints -- or did you ever
11  observe Mr. Bradley intoxicated?
12      A.    Never, not on duty.
13      Q.    Did you ever observe him
14  intoxicated when he wasn't on duty?
15      A.    Not intoxicated, no, sir.
16      Q.    Did you ever observe him
17  under the influence of alcohol?
18      A.    I have -- I have been at
19  social events where I have myself
20  had a drink with Mr. Bradley.
21      Q.    Have you ever had any
22  conversations with Sheriff Owens
23  about Mr. Bradley's drinking on

208

1  duty?
2      A.    No, sir.
3      Q.    Mr. Owens -- excuse me.
4  Mr. Kelly has said that at times
5  that you would give him pills that
6  were -- that were not on his
7  regular regimen.  Did you do that?
8      A.    No, sir.
9      Q.    Other than the one
10  instance that you saw where you had
11  given Mr. Kelly pills, do you have
12  any recollection of giving him any
13  pills of any kind?
14      A.    No, sir.  The only time
15  that I have given Mr. Kelly any
16  kind of medication would have been
17  reflected on the medical --
18  medication chart.
19      Q.    Was it your determination
20  that Mr. Kelly would have to go to
21  the bathroom in the hole in the
22  middle of the floor in the holding
23  cell?

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com