# EXHIBIT I

# Deposition of Terry Wilson

# Transcript of the Testimony of

# Terry Wilson

**Date:** September 25, 2007

## DANIEL B. KELLY
### vs.
## RICKY OWENS

Printed On: October 18, 2007

Daniel Court Reporting, Inc.
Phone: 205-250-7765
Fax: 205-252-6224
Email: danielreporting@aol.com

Daniel Court Reporting, Inc.

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DANIEL BRYAN KELLY,        )
                           )
        Plaintiff,         )
                           )
vs.                        )  Civil Action No.
                           )  2:50-CV-011150-MHT
RICKY OWENS, et al.,       )
                           )
        Defendant.         )

DEPOSITION OF TERRY WILSON

S T I P U L A T I O N S

        IT IS STIPULATED AND AGREED,
by and between the parties through
their respective counsel, that the
deposition of TERRY WILSON may be

**Page 2**

1   taken before Sandra Peebles Daniel,
2   Commissioner, Notary Public, State
3   at Large, at the Coosa County
4   Courthouse, Courthouse, One Main
5   Street, Rockford, Alabama 35136, on
6   the 25th day of September, 2007,
7   beginning at approximately 2:45 p.m.
8          IT IS FURTHER STIPULATED AND
9   AGREED that the reading of and
10  signature to the deposition by the
11  witness is waived, the deposition to
12  have the same force and effect as if
13  full compliance had been had with
14  all laws and rules of Court relating
15  to the taking of depositions.
16         IT IS FURTHER STIPULATED AND
17  AGREED that it shall not be
18  necessary for any objections to be
19  made by counsel to any questions,
20  except as to form or leading
21  questions, and that counsel for the
22  parties may make objections and
23  assign grounds at the time of the

**Page 3**

1   trial, or at the time said
2   deposition is offered in evidence,
3   or prior thereto.
4          IT IS FURTHER STIPULATED AND
5   AGREED that notice of filing of the
6   deposition by the Commissioner is
7   waived.

**Page 4**

1              I N D E X
2   EXAMINATION BY:          PAGE:
3   Mr. Stockham ............... 7-105
4   Ms. McDonald ............... 105-112
5   Mr. Willford ............... 112-119
6   Mr. Stockham ............... 119-120
7
8
9
10             E X H I B I T S
11  No exhibits were marked for
12  identification or offered as
13  exhibits to this deposition.

1 (Pages 1 to 4)

1310 32nd Street S.
Birmingham, Alabama 35205

205-250-7765
danielreporting@aol.com

Daniel Court Reporting, Inc.

Page 5

1    A P P E A R A N C E S
2
3    BEFORE:
4    Sandra Peebles Daniel,
5    Commissioner, Notary Public
6
7    FOR THE PLAINTIFF:
8    Mr. Richard J. Stockham, III
9    STOCKHAM, CARROLL & SMITH, P.C.
10   2204 Lakeshore Drive
11   Suite 114
12   Birmingham, Alabama 35209
13
14   FOR THE DEFENDANT:
15   Ms. Kristi McDonald
16   McDONALD & McDONALD
17   1005 Montgomery Highway
18   Birmingham, Alabama 35216
19
20   Mr. Gary L. Willford
21   WEBB & ELEY
22   7475 Halcyon Pointe Dr.
23   Montgomery, Alabama 36124

Page 6

1        I, Sandra Peebles Daniel, a
2    Court Reporter of Birmingham,
3    Alabama, Notary Public, State at
4    Large, acting as Commissioner,
5    certify that on this date, as
6    provided by Rule 30 of the Alabama
7    Rules of Civil Procedure, and the
8    foregoing stipulation of counsel,
9    there came before me at the Coosa
10   County Courthouse, Courthouse, One
11   Main Street, Rockford, Alabama
12   35136, on the 25th day of September,
13   2007, at or about 2:45 p.m., TERRY
14   WILSON, witness in the above cause,
15   for oral examination, whereupon the
16   following proceedings were had:
17
18       THE COURT REPORTER:  Usual
19   stipulations?
20       MS. McDONALD:  Yeah.
21       MR. STOCKHAM:  Yes.
22
23       TERRY WILSON,

Page 7

1    having first been duly sworn, was
2    examined and testified as follows:
3
4    EXAMINATION BY MR. STOCKHAM:
5        Q.    What's your name, please,
6    sir?
7        A.    Terry Lee Wilson.
8        Q.    And where do you live?
9        A.    Here in Rockford.
10       Q.    How long have you lived
11   here?
12       A.    Twelve years.  Since '95.
13       Q.    Where did you live before
14   that?
15       A.    A short time with my mom
16   in Sylacauga, six months, while I
17   was building my house.  Before that
18   all over the world, military.
19       Q.    How old are you?
20       A.    Fifty-three.
21       Q.    And did you go to high
22   school --
23       A.    Yes, sir.

Page 8

1        Q.    -- here?
2        A.    Graduated from B.B. Comer
3    in Sylacauga.
4        Q.    What year?
5        A.    '72.
6        Q.    Did you go to college?
7        A.    Went off into the military
8    right after graduation from high
9    school and attended college
10   throughout my career through the
11   community college of the Air Force.
12       Q.    You were in the Air Force?
13       A.    Yes, sir.
14       Q.    From when to when?
15       A.    '72 to '95.
16       Q.    And what did you do in the
17   Air Force?
18       A.    Mostly -- my twenty-two
19   years was mostly in command and
20   control and communications.
21       Q.    What is that --
22       A.    Career field.  Command
23   post.  Command center operations.

2 (Pages 5 to 8)

Daniel Court Reporting, Inc.

9

1   Q.   Explain that for me --
2   A.   A nerve center of sorts.
3   Each base has a command post for
4   all communications and dispatching
5   and managing and monitoring all the
6   activities and events that go on
7   for the air wing and staff of that
8   base.  And so you have constant
9   communications coming through the
10  nerve center, command center.  And
11  I was one of those employees that
12  would work in the command post on a
13  console, like a dispatching center.
14  Q.   What rank did you attain?
15  A.   Retired as an E-8, senior
16  master sergeant.
17  Q.   Is that a non-commissioned
18  officer?
19  A.   Non-commissioned officer.
20  Q.   Are you married?
21  A.   Yes, sir.
22  Q.   To whom are you married?
23  A.   Her name is Randi Jo

10

1   Wilson.
2   Q.   And how long have you been
3   married?
4   A.   Tough questions.  Eighteen
5   years.
6   Q.   Do you have kids?
7   A.   I do.  I have one
8   daughter.
9   Q.   How old is she?
10  A.   Thirty.
11  Q.   Prior marriage?
12  A.   Prior marriage.
13  Q.   To whom were you married?
14  A.   Her name was Nell Wilson.
15  Her maiden name was Cain.  Nell
16  Cain.
17  Q.   Is she from here?
18  A.   Sylacauga.
19  Q.   Does she still live here?
20  A.   Lives in Omaha, Nebraska.
21  Q.   What's your daughter's
22  name?
23  A.   Terra.  Was Wilson.  Now,

11

1   she's recently married, three years
2   ago, a Warner.  Terra Warner now.
3   Q.   Where does she live?
4   A.   Omaha, Nebraska.
5   Q.   Did you have any
6   employment while you were in the
7   military outside of working for the
8   government?
9   A.   I did.  I'm trying to
10  think of the couple of different
11  places.  Part-time work only.  The
12  one that sticks in my mind during
13  that twenty-two years of
14  significant value was when I worked
15  part-time security at Sears and
16  Roebuck in Honolulu, Hawaii as a
17  security agent.
18  Q.   In Honolulu?
19  A.   Yes, sir.
20  Q.   How long were you there?
21  A.   Just over four years.
22  Q.   You said that there was a
23  couple.  What was the other?

12

1   A.   Dishwasher at the NCO
2   club.
3   Q.   How long did you work
4   there?
5   A.   A few months.  Trying to
6   make some extra money.
7   Q.   Any other jobs?
8   A.   During the military?
9   Q.   Yes, sir.
10  A.   Not that I recall.  I
11  don't recall anything else there
12  that -- I had another employment --
13  I worked for another employer after
14  I retired.
15  Q.   Who was that?
16  A.   For the ServePro cleaning
17  and restoration business in
18  Birmingham, Alabama.
19  Q.   When did you work there?
20  A.   Upon retirement from
21  January of '95 to July of '95, six
22  months.
23  Q.   And what did you do next?

3 (Pages 9 to 12)

Daniel Court Reporting, Inc.

13

1    A.    I became a deputy sheriff
2  here in Coosa County in July of
3  '95.
4    Q.    Is that when you built
5  your home here?
6    A.    Yes, sir. Moved in my
7  home in September, October here,
8  '95.
9    Q.    And who was the sheriff
10 who hired you?
11   A.    Sheriff William Evans.
12   Q.    And what were you hired
13 as?
14   A.    Deputy sheriff.
15   Q.    To work where?
16   A.    Work the entire county as
17 a deputy sheriff.
18   Q.    You were on the road?
19   A.    Yes, sir. Started out on
20 the road performing deputy sheriff
21 duties.
22   Q.    And have you been working
23 as a full-time employee with the

14

1  Coosa County Sheriff's Department
2  ever since?
3    A.    No, sir. Had a break --
4    Q.    When did you have a break?
5    A.    In August of '04. And I
6  became the sheriff here this year,
7  January of this year.
8    Q.    January, '07?
9    A.    Yes, sir.
10   Q.    So from January -- from
11 August '04 to January '07 what did
12 you do?
13   A.    Took care of honey-dos. I
14 did a little bit of part-time work
15 for ServePro --
16   Q.    Why did you leave?
17   A.    -- for about four or five
18 months -- I mean, for a couple or
19 three months or so. It wasn't a
20 long time.
21   Q.    Why did you leave in
22 August of '04?
23   A.    Dissatisfied with the

15

1  management practices.
2    Q.    What do you mean by that?
3    A.    I became dissatisfied with
4  the way that the department was
5  being managed by the current
6  sheriff.
7    Q.    What does that mean,
8  dissatisfied? What did you --
9    A.    I just -- he was making
10 decisions and things that I just
11 didn't feel like that was -- you
12 know, that I wanted to go in that
13 direction. So --
14   Q.    Give me an example of what
15 you're talking about. I'm having a
16 hard time --
17   A.    Okay. One example would
18 be that he, Sheriff Ricky Owens,
19 announced, I think in July of '04,
20 that he was bringing in a new chief
21 deputy, someone from outside the
22 county, to come in and start
23 running the operation. And I felt

16

1  like that -- I was the lieutenant
2  at the time and I felt like that I
3  should have that opportunity and I
4  didn't get the nod. So that was
5  the primary reason why I left.
6    Q.    Who was given the job of
7  new chief deputy?
8    A.    I can't recall his name.
9  He was a guy not from around here.
10 I think he was from Montgomery
11 County, as I recall.
12   Q.    Other than bringing in a
13 new chief deputy and you not
14 getting the job was there anything
15 else that you didn't like?
16   A.    Well, there was -- it was
17 just -- it was just -- the biggest
18 -- that was the biggest issue, is
19 I, you know, got overlooked. Other
20 things were just small things. I
21 mean, there was nothing -- it was
22 just -- that was the biggest issue
23 with me at that time.

1310 32nd Street S.                205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

17

1    Q.    Well, what other small
2    things were there that --
3        A.    He was -- he had -- in
4    that decision to bring on board
5    this new chief deputy he was asking
6    me to do additional training for
7    other folks and do a lot more work.
8    And so I just felt that that was --
9    wasn't quite right.
10       Q.    Other than bringing
11   someone else in and asking you to
12   do additional training was there
13   anything else that you had an issue
14   with?
15       A.    No, sir.  That was the --
16   those -- that was the issue of me
17   just going ahead and resigning.
18       Q.    So this was something that
19   just came up in July of '04?
20       A.    Yes, sir, as I recall.  It
21   was in July.  It was the month
22   prior.  It -- in fact it was right
23   at the end of July.  And he just

18

1    came in and announced one day at a
2    -- he said, we want to have a staff
3    meeting and he announced it.  And
4    it was pretty abrupt.  I mean, it
5    happened that quick.  Had no idea
6    that it was going to happen.
7        Q.    Tell me -- you say at that
8    time you were the lieutenant.
9        A.    Yes, sir.  I had -- I held
10   the rank of lieutenant then.
11       Q.    Were you -- was there
12   anyone above you between you --
13       A.    Yes, sir.
14       Q.    -- and the sheriff?
15       A.    The chief deputy.
16       Q.    Who was the chief deputy?
17       A.    Chief Brett Oaks.
18       Q.    What happened to Mr. Oaks?
19       A.    He moved on that same day
20   that decision was made.  Went back
21   to work for Wetumpka -- went to
22   work for Wetumpka PD.
23       Q.    As the lieutenant did you

19

1    have duties -- what were your
2    duties?
3        A.    I worked -- I actually --
4    in the beginning when I was --
5    became a lieutenant I had three
6    primary duties.  You'd have to
7    understand that we're a small
8    department and we have to do a lot
9    of things.  I was the D.A.R.E.
10   officer for the entire county at
11   the beginning of the -- my
12   lieutenant promotion.  And so that
13   was a part-time duty.  And then I
14   was asked to become the jail
15   administrator along with the --
16   being the D.A.R.E. officer.  And
17   probably just as important was the
18   day shift deputy.  I shared the day
19   shift duties with the chief, Chief
20   Deputy Brett Oaks.  So basically
21   three duties.
22            Eventually we were able to
23   pass on the D.A.R.E. program to one

20

1    of the other officers.  So then I
2    was -- I only had the two duties,
3    acting jail administrator, but also
4    was the day shift lieutenant
5    deputy.
6        Q.    When were you promoted to
7    the position of lieutenant?
8        A.    In January of '03.
9        Q.    Prior to that time what
10   had your position been?
11       A.    Sergeant.
12       Q.    And what were your duties
13   as a sergeant?
14       A.    Number two man in charge.
15       Q.    Behind?
16       A.    Bill Evans.  And so that
17   -- you know, just in charge of
18   making all -- helping to run the --
19   run everything, deputies and
20   jailers and everything.
21       Q.    You went from being the
22   number two man as the sergeant to
23   becoming the number three person --

5  (Pages 17 to 20)

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

21

1    A.    Yes, sir.
2    Q.    -- as the lieutenant?
3    A.    Yes, sir. That's because
4    there was a shift change in
5    leadership.
6    Q.    When was there a shift
7    change in leadership?
8    A.    Sheriff Bill Evans
9    retired. And so Sheriff Ricky
10   Owens ran and became the sheriff in
11   January.
12   Q.    Of '03?
13   A.    Of '03.
14   Q.    And so he brought in Mr.
15   Oaks above you?
16   A.    Yes, sir.
17   Q.    And at that point he gave
18   you the three duties of -- that
19   you've described --
20   A.    Yes, sir.
21   Q.    -- D.A.R.E. officer, jail
22   administrator and day shift deputy?
23   A.    Yes, sir.

22

1    Q.    Now, were you -- as of
2    January, '03, would you spend most
3    of your time -- where?
4    A.    Most of my time was spent
5    on the road going from call to
6    call, taking care of the folks.
7    Q.    Now, when you were
8    functioning as jail administrator
9    you were on the road?
10   A.    Yes, sir.
11   Q.    How did that work?
12   A.    As far as being the jail
13   administrator I would be notified
14   if there was a problem or had -- if
15   there was a question about
16   something that was -- that had come
17   up that my -- the jail staff
18   couldn't handle. So I would be
19   called and asked about it or asked,
20   you know, what they thought or what
21   I needed to, you know, make a
22   decision about. So I kind of did
23   jail administrator, for the most

23

1    part, via the phone day to day.
2         Now, there was times when
3    I would be in the jail and check on
4    things, you know, do walk-throughs
5    and that sort of thing. But for
6    the most part day to day it was
7    handling the calls.
8    Q.    So was it mostly a day
9    shift job?
10   A.    The day shift deputy, yes,
11   sir.
12   Q.    Yes, sir. But, I mean --
13   I mean, you were -- the three
14   things that you did, did you do
15   them mostly on day shift?
16   A.    Oh, yes, sir. They were
17   all done during daytime, yes, sir.
18   Q.    And your -- who was under
19   you?
20   A.    The deputies, the road
21   deputies were certainly below me as
22   far as on the deputy side of the
23   structure.

24

1    Q.    Sure. And how many
2    deputies were there in 2003?
3    A.    I think there was four
4    additional -- what we call the road
5    deputies. I think there was four
6    out there.
7    Q.    And now there are eight?
8    A.    There's a total of eight
9    of us now, a total of eight
10   deputies total. But that's -- that
11   includes your chief deputy, your
12   investigator and -- total of eight
13   now.
14   Q.    Okay.
15   A.    Yes, sir. There is --
16   Q.    Was that true then --
17   A.    We've got six on the road
18   now.
19   Q.    You have six. And you --
20   A.    Yeah.
21   Q.    But it was four back then?
22   A.    I think it was four, sir.
23   It could have been five. I'm not

6 (Pages 21 to 24)

Daniel Court Reporting, Inc.

25

1  sure.
2     Q.   Did you have a chief
3  deputy at that time?
4     A.   Yes, sir, Brett Oaks.
5     Q.   Was that Mr. Oaks?
6     A.   Yes, sir.
7     Q.   And then you as the
8  lieutenant?
9     A.   Yes, sir.
10    Q.   And then there would be
11 four others?
12    A.   Yes, sir.
13    Q.   And now there are two
14 additional?
15    A.   Yes, sir.
16    Q.   Now -- well --
17        (Whereupon, an
18        off-the-record
19        discussion was held.)
20    Q.   (By Mr. Stockham) Now,
21 when -- who was the person
22 responsible at the jail when you
23 were the -- in the position of jail

26

1  administrator?
2     A.   Yes, sir. That would have
3  been Sergeant Wendy Roberson.
4     Q.   From -- when did she
5  become the person responsible for
6  the jail?
7     A.   Oh. When I became the
8  jail administrator that's when we
9  kind of put the rank positions into
10 her effect, her being recognized as
11 a sergeant. And then we also had
12 some of the shift leaders being
13 corporals. And so that all happened
14 in that first few weeks or month or
15 so after becoming the new sheriff
16 with Ricky Owens and myself as the
17 new jail administrator.
18    Q.   Now, Ms. Roberson became
19 the -- I guess the position was
20 what, assistant jail administrator?
21    A.   Assistant jail
22 administrator, yes, sir. We called
23 -- we gave her the rank of sergeant

27

1  so everybody referred to her as a
2  sergeant. But she was the
3  assistant jail administrator in
4  essence.
5     Q.   Did y'all have a captain
6  or anything like that?
7     A.   No, sir.
8     Q.   So the other people below
9  her were called corporal?
10    A.   Corporals.
11    Q.   And those were the lead
12 people on --
13    A.   Yes, sir. They were the
14 shift leaders. The guys that --
15 there was a corporal identified on
16 each shift during that time frame
17 that had a good understanding, had
18 some experience, and they were
19 promoted to the corporal positions,
20 kind of the person in charge of the
21 shift.
22    Q.   How many people were --
23 you told me you had four on the

28

1  road, you and then the chief
2  deputy. How many people were in
3  the jail at that particular time?
4     A.   I don't think that's
5  changed much. There's a standard
6  of eight shift workers, two on each
7  shift. So there's four on days,
8  two working or -- and then there's
9  two off. And there's four on
10 nights, two working and two off.
11 So that was -- that's your -- your
12 core was your eight folks there.
13        In addition to that we had
14 a sergeant and a -- what we called
15 a day shift corporal, too. He was
16 her assistant.
17    Q.   Who would that be?
18    A.   That came a little bit
19 later. I don't think it was
20 initially. I think we may have
21 obtained that later. But that
22 would have been -- and I'm trying
23 to recall if it was somebody before

7 (Pages 25 to 28)

Daniel Court Reporting, Inc.

29

1   him. But I remember Steve Hay
2   being there. Other than that I
3   don't remember if there was anybody
4   else there holding that position or
5   not at the time. Steve hay for
6   sure.
7       Q.    And Mr. Hay was the person
8   who was responsible for -- what? I
9   mean, if he was the day shift --
10      A.    Assisting -- since I was
11  on the road most of the time those
12  two folks, the sergeant and the
13  corporal, kind of managed the jail.
14  He assister her.
15      Q.    In addition to the people
16  who were on the --
17      A.    And they --
18      Q.    -- shift?
19      A.    Yeah, that's right. They
20  would assist the two day shift
21  folks that would -- the one being
22  in the tower and one being down on
23  the floor. Yes, sir.

30

1       Q.    And was there anyone at
2   night?
3       A.    No, sir. We had -- I
4   think -- somewhere in that time
5   period I believe we were able to
6   pick up a -- one part-time
7   dispatching position. And so
8   occasionally we had a part-time
9   person helping some at night but
10  not -- not every much.
11      Q.    Where would the
12  dispatching person be located?
13      A.    Sometimes -- I mean, it
14  would be another third person
15  occasionally.
16      Q.    Okay.
17      A.    But that -- that was --
18  I'm not even sure it happened until
19  later, you know, in life. But I
20  recall that there was a part-time
21  position granted -- a part-time
22  position to be -- person to be --
23  helped out in the dispatching area.

31

1       Q.    And do you -- who made the
2   decision that an additional person
3   would be added?
4       A.    I'm assuming that the
5   sheriff made that decision, you
6   know, and --
7       Q.    Wasn't something you were
8   making the decision about?
9       A.    We were -- you know,
10  certainly -- I can't recall who
11  made the decision. I know it just
12  happened. I mean, you know, it may
13  have been something we talked about
14  and asked the commission to be --
15  to grant us enough salary in our --
16  in the budget to do that with. I
17  mean, you know, it just worked out.
18      Q.    Now, I've noticed in these
19  reports -- we'll look, for example,
20  here, the day shift report in the
21  lower right-hand corner. Is that
22  your signature that's on the --
23      A.    Yes, sir. TW, that would

32

1   be me.
2       Q.    And it's got two others.
3   Who are those signatures?
4       A.    The one on the right, I'm
5   fairly confident that would be
6   Wendy Roberson. I don't have a
7   clue who the other one is.
8       Q.    It looks like a BS. Do
9   you know anybody with the initials
10  BS?
11      A.    BS?
12      Q.    Uh-huh.
13      A.    That would -- that would
14  probably be Brandon Stroud.
15      Q.    Was Brandon Stroud someone
16  who would sign off on these?
17      A.    He worked there.
18      Q.    Was he in a position of
19  supervision?
20      A.    No, sir. I don't recall
21  him being in that position of
22  supervision.
23      Q.    And do you remember what

1310 32nd Street S.                205-250-7765
Birmingham, Alabama 35205          danielreporting@aol.com

Daniel Court Reporting, Inc.

33

1  position he was in?
2      A.   I think he was one of the
3  shift workers. Could have been on
4  day shift. I'm not sure if he was
5  nights or days.
6      Q.   Why was he signing off on
7  these logs?
8      A.   I can't answer that, sir.
9  I don't --
10     Q.   What was the practice of
11  you signing off on the logs?
12     A.   Trying to -- keeping me
13  abreast of what was going on in the
14  jail. That was, you know, a
15  routine that I established with the
16  sergeant, was that she -- when
17  she'd come in in the daytime to go
18  -- to look through everything and
19  she would pass the logs to me. And
20  at some point during the day when I
21  would come into the office I would
22  look through and sign off saying
23  that we knew what was going on.

34

1      Q.   Well, one of the things
2  that I asked about and Mr. Bradley
3  didn't know was the -- apparently
4  there are -- there is a tape of the
5  cameras. Do you have -- do you
6  retain copies of all of those?
7      A.   The system -- as I recall,
8  the system we had then is not the
9  system we have now. And the system
10  we had then was pretty antiquated.
11  It was VHS tapes. And as I recall
12  -- I think we had -- and I am not
13  exactly sure about this because I
14  didn't do the day-to-day operation.
15  But I believe there was a tape for
16  each day, thirty days of tapes or
17  thirty-one days -- tapes. And so I
18  think they rotated that. So that
19  was retained for thirty days.
20     Q.   They would tape over
21  the --
22     A.   Yes, sir. And I -- that's
23  a little fuzzy because that's not

35

1  something I was doing. But I had
2  knowledge of -- at the time how
3  that kind of went.
4      Q.   Who knew how that went?
5      A.   The sergeant and the
6  corporal, the too guys that kind of
7  ran that for me.
8      Q.   Which corporal?
9      A.   Hay would be one of them.
10     Q.   Anyone else other than
11  Wendy Roberson?
12     A.   No, sir. Wendy Roberson
13  would be the primary.
14     Q.   Al Bradley was a corporal
15  but he obviously didn't know about
16  it.
17     A.   Yeah, he was just -- he
18  was the corporal on that day shift,
19  you know, when he was on shift --
20  on the twelve hour shift.
21     Q.   Now, what procedures did
22  you have in the jail at that
23  particular time?

36

1      A.   Shortly after I became the
2  jail administrator I developed --
3  revised the jail policy and
4  procedures manual with the blessing
5  of the -- Sheriff Ricky Owens. And
6  we put that into effect shortly
7  thereafter and that's kind of what
8  we used. That was referred to as
9  the jail bible, the Jail Policy and
10  Procedures book.
11     Q.   And was that something you
12  just came up with or was that
13  something that you took from --
14     A.   Oh, no, sir. I developed
15  it from the jail -- the Alabama
16  jail standards book that the
17  Alabama Sheriff's Association
18  provided to us as a go-by or
19  standard.
20     Q.   Now, what accommodations
21  did you have to deal with patients
22  who had serious health problems?
23     MR. WILLFORD: Patients?

1310 32nd Street S.                   205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

37

1    Q.    Inmates.
2         MS. McDONALD:  Let me --
3    A.    I'm not sure I understand
4    your question.
5    Q.    I noticed when we were
6    over there today you had isolation
7    cells.
8    A.    Yes, sir.
9    Q.    Did you have policies
10   drafted for dealing with -- in the
11   time frame of 2003, 2004, for
12   dealing with patients who had
13   serious health problems?
14        MS. McDONALD:  Define
15   serious.
16   A.    Yeah.  It -- we -- I
17   identified it in the jail policy
18   book of how we would help and take
19   care of those folks that had
20   serious problems.  So I'd have to
21   refer to the jail policy of what we
22   had in writing --
23   Q.    Well, what do you recall

38

1    you were supposed to do if you had
2    someone with a serious health
3    problem?
4    A.    For the most part if they
5    had -- an emergency situation we --
6    the policy was that we always
7    called the jail -- I mean, the EMS
8    community to come in, first
9    responders, to take a look at that
10   and let them help us with that.  We
11   -- our policy, for the most part,
12   was upon intake of an inmate we
13   would make sure that we have a --
14   go through a medical screening
15   process to find out what kind of
16   problems and issues they may have.
17   And that would be documented in
18   their inmate file.  And so that
19   would be identified so -- you know,
20   it was -- have some knowledge of
21   their issues.
22        Then the process would
23   work from that point where if an

39

1    inmate developed a problem that
2    they needed to see a doctor or a
3    nurse about then they had -- it was
4    spelled out to them in the policy
5    book that they would fill out a
6    request form for medical attention.
7    And then we would pursue that
8    medical request form and make
9    themselves -- make them an
10   appointment to see the local
11   doctor.
12   Q.    And the local doctor being
13   whom?
14   A.    Dr. Weaver, at that time.
15   Q.    And who made that
16   arrangement that Dr. Weaver would
17   be the one doing it?
18   A.    That was an agreement made
19   from the county commissioners that
20   we would use Dr. Weaver.
21   Q.    Would Dr. Weaver come into
22   the jail?
23   A.    I don't recall him coming

40

1    into the jail.  We -- most of the
2    time, as I recall, inmates would be
3    taken -- walked across the street
4    or driven across the street to Dr.
5    Weaver's office.  That's the way it
6    usually worked.
7    Q.    I noticed there was an
8    exam room in the jail.  Was that
9    ever -- was that ever used for
10   doctors coming in to examine
11   patients?
12   A.    I don't -- I can't say yes
13   or no about that.  I do recall at
14   some -- some points in times there
15   were -- and I'm not sure what their
16   qualifications were -- come down
17   from Cheaha Mental Health.  And
18   they would interview and talk to
19   inmates sometimes if they needed to
20   and they would use that room
21   occasionally.  But that's about it.
22   Q.    Did you ever have any
23   policies or procedures that you

10  (Pages 37 to 40)

**41**

1 adopted to address patients who
2 suffered from seizures?
3     A.    No, sir, I don't recall
4 that we had a specific policy for
5 someone with seizures.
6     Q.    And you were aware that
7 Mr. Kelly had a problem with
8 seizures when he first came into
9 the jail?
10          MS. McDONALD: Which time?
11    Q.    When he first came into
12 the jail in 2003.
13          MS. McDONALD: November of
14 2003?
15    A.    As I recall -- I don't
16 remember if -- it seems like
17 seizures was mentioned but there
18 was other issues as well. But I
19 don't remember what problems he
20 had.
21    Q.    Now, have you had problems
22 with people having seizures in the
23 jail before?

**42**

1     A.    Yes, sir, there's been
2 inmates that's had seizures before,
3 yes, sir.
4     Q.    Do you have any guidelines
5 set up for inmates who have
6 seizures, what are you going to do
7 about it when they do?
8     A.    No, sir, we don't have a
9 specific policy for seizures that
10 I'm aware of.
11    Q.    Do you have any policy
12 about what do you do when someone
13 has, where do you take them, who
14 will see them?
15    A.    Well, if he has a seizure
16 -- if there is a seizure indicated
17 then the health policy that's in
18 the jail policy book would
19 certainly be implemented by my
20 staff there that -- to call for EMS
21 first responders to assist and then
22 take it from there based on what
23 they suggest.

**43**

1     Q.    So you defer to the EMS
2 decision-makers about whether or
3 not --
4     A.    Yes, sir.
5     Q.    -- the person is having a
6 seizure?
7     A.    Yes, sir.
8     Q.    And who makes the decision
9 about whether they need to go to
10 the hospital?
11    A.    EMS always does. My guys
12 are not schooled or has any
13 knowledge of those kinds of things.
14 They know not to make those kinds
15 of decisions.
16    Q.    And then what instruction
17 do you have for your people when
18 someone requests to see a doctor?
19    A.    The policy would -- is
20 that once you get an inmate request
21 form for a medical attention they
22 certainly take a look -- have to go
23 back and talk with the inmate to

**44**

1 find out if there's more
2 information there that they need to
3 obtain. And then certainly make
4 that appointment with Dr. Weaver as
5 soon as possible that -- based on
6 Dr. Weaver's schedule and then take
7 him over on the prescribed time.
8     Q.    Well, what time frame do
9 you set out for when someone needs
10 to see a doctor?
11    A.    That's a matter of making
12 the phone call to the doctor's
13 office and making that appointment.
14 I mean, really the doctor makes the
15 appointment. We just call to
16 facilitate the appointment and make
17 a note of the schedule based on
18 what the doctor -- when he can see
19 him.
20    Q.    So it's just up to
21 whenever the doctor can see him?
22    A.    Yes, sir.
23    Q.    And if the doctor is not

11 (Pages 41 to 44)

Daniel Court Reporting, Inc.

45

1   available what do you do?
2      A.   And that has come up, I'm
3   sure, over the years. I -- we have
4   also referred inmates to Dr. James
5   in Alexander City and he has seen
6   inmates as well. So --
7      Q.   And who decided on Dr.
8   James?
9      A.   If Dr. Weaver is not
10  available then that -- I would
11  assume that's just automatic, you
12  know, try to make a phone call to
13  Dr. James and see if he can see
14  him.
15     Q.   Is that something that you
16  arranged?
17     A.   Yes, sir. It's pretty
18  much our practice that, you know,
19  we know we've got to have somebody
20  -- if we've got an inmate that
21  needs to see a doctor, so -- and if
22  Dr. Weaver is not available, if
23  he's on vacation or whatever, that

46

1   would be something we'd have to do,
2   is try to refer him to Dr. James.
3      Q.   And is this a policy that
4   you instructed the people in the
5   jail about?
6      A.   I don't know that I made
7   it a written policy or anything
8   like that. It was just kind of
9   understood that we need to make
10  sure that they were taken care --
11  had their medical needs taken care
12  of.
13     Q.   And were you the one
14  responsible for providing that
15  training for your folks, that they
16  needed to call the doctor if
17  someone needed a medical --
18     A.   I was one that kind of put
19  the jail policy into effect with
20  the blessing of the current
21  sheriff, Sheriff Ricky Owens. And
22  then Sergeant Wendy Roberson would
23  ensure that everybody is trained to

47

1   the policy.
2      Q.   So you delegated that
3   to --
4      A.   Yes, sir, for the most
5   part.
6      Q.   -- the sergeants to do?
7      A.   Yes, sir.
8      Q.   Now, with respect to the
9   situation with Bryan Kelly. Did
10  you know him before he came into
11  the jail in November of 2003?
12     A.   Yes, sir.
13     Q.   How did you know him?
14     A.   As a deputy working the
15  road you get to know a lot of
16  folks. And I knew Bryan as well as
17  I know a lot of other folks out
18  there that ride our roads, and
19  family members. And I grew up as a
20  young man knowing some of Bryan's
21  relatives. So -- but I didn't know
22  Bryan per se as a friend or
23  anything. I just knew of him.

48

1      Q.   And when he came into the
2   jail were you made aware of his --
3   were you the person who did the
4   intake with him?
5      A.   I don't think I was the
6   officer that did the intake that
7   day. I don't -- I don't recall. I
8   just don't recall if that was me or
9   -- could have been. I'm not sure.
10  I don't think it was me, though.
11     Q.   Now, any way you could
12  find out?
13     A.   Yes, sir. Some of these
14  records we've got here shows who
15  took him in.
16        MS. McDONALD: Let's look
17  at --
18     A.   Let's see. Is this --
19        MS. McDONALD: That's
20  2004.
21        THE WITNESS: Oh, yeah.
22        MS. McDONALD: He's got
23  numerous arrests in here.

1310 32nd Street S.       205-250-7765
Birmingham, Alabama 35205   danielreporting@aol.com

Daniel Court Reporting, Inc.

49

1    THE WITNESS: Yeah, we've
2  got to go in reverse. Okay.
3    A.   I'd have to look
4  through --
5    MS. McDONALD: Here's
6  2003.
7    A.   -- here but we should be
8  able to find that in here. So June
9  of '03 --
10   MS. McDONALD: There's a
11 bunch.
12   THE WITNESS: Yeah.
13   MS. McDONALD: That's
14 March of '04.
15   THE WITNESS: Yeah. It's
16 not quite in any kind of order.
17   MS. McDONALD: Uh-uh.
18   THE WITNESS: Is that it?
19   MS. McDONALD: Uh-uh.
20   THE WITNESS: There's
21 March.
22   MS. McDONALD: There
23 March. Still more. There we go

50

1  (indicating).
2    THE WITNESS: Okay.
3    MS. McDONALD: Let's see
4  if it's in here.
5    THE WITNESS: November the
6  13th?
7    MS. McDONALD: Yeah.
8  And --
9    THE WITNESS: Yeah.
10   MS. McDONALD: -- it's got
11 the time --
12   THE WITNESS: Yeah.
13   MS. McDONALD: -- on
14 the --
15   A.   The booking officer was
16 Roberson and he was brought over
17 from court, from Judge Rochester's
18 court. So there was no arresting
19 officer for that.
20   Q.   (By Mr. Stockham) So it
21 would have been the sergeant who --
22   A.   Booked him in.
23   Q.   -- booked him in?

51

1    A.   Yes, sir.
2    Q.   And would have taken down
3  the information --
4    A.   Yes, sir.
5    Q.   -- from him?
6    A.   Yes, sir.
7    Q.   Now, were you aware that
8  Mr. Kelly was moved to the holding
9  area on a permanent basis or
10 indefinite basis?
11   A.   I knew that he was up
12 front. I did learn that through --
13 I recall him being up front.
14   Q.   And who made that
15 decision?
16   A.   I don't know that I can
17 tell you who made that decision per
18 se. I would assume that it was
19 based on what was going on at the
20 time and I'm not sure how that
21 would have happened. Could have
22 been Sergeant Roberson. Could have
23 been me. Could have been the

52

1  sheriff. I'm not sure.
2    Q.   Are you aware of anyone
3  else that has been moved up front
4  for such a lengthy period of time?
5    MS. McDONALD: Object to
6  the form.
7    Q.   You can answer.
8    A.   No, sir.
9    Q.   What was the reason that
10 he was -- that you understood he
11 was moved up front for that lengthy
12 period of time?
13   A.   Do I -- what was your
14 question again? I'm not sure.
15   Q.   Yes, sir. What was the
16 reason he was moved up front for
17 such a lengthy period of time?
18   A.   As I recall, there was
19 several problems that he was
20 having. He was falling a lot, as I
21 recall. And so that was -- I'm --
22 I would think that part of the
23 reason why he was moved up front

13  (Pages 49 to 52)

Daniel Court Reporting, Inc.

53

1  was so we could keep a closer eye
2  on him and help him, to keep him
3  closer to where we could tend with
4  him and help him with his medical
5  needs.
6      Q.    Well, did you take him to
7  a doctor to see about him if you
8  moved him up because of --
9      A.    Oh, yes, sir.
10     Q.    -- needing medical
11 observation?
12     A.    Yes, sir.
13     Q.    Which doctor did you take
14 him to?
15     A.    Well, again, I'm assuming
16 -- I didn't personally take him to
17 him. I'm assuming that they took
18 him to Dr. Weaver.
19     Q.    Do you know why he was
20 kept up front after he had been
21 taken to see Dr. Weaver?
22     MS. McDONALD:  If you
23 don't know, don't --

54

1      A.    No, sir, I don't know.
2      Q.    Have you, in preparing for
3  your deposition, looked into the
4  reason why he was kept up front?
5      A.    No, sir. I mean, I don't
6  -- I don't know.
7      Q.    Have you reviewed any of
8  the documents that indicate whose
9  decision it was that he would be
10 kept up front?
11     A.    I've looked at some of
12 these documents but I don't know
13 that -- if it makes a determination
14 of who made that call. I don't
15 recall.
16     Q.    Well, there is a document
17 in here that says that, per two oh
18 one and two oh three he would be
19 kept up front. Do you know who --
20 I mean, excuse me, two two oh one
21 and two two oh thee. Do you know
22 who that would be?
23     A.    Two two oh one at the time

55

1  was Sheriff Ricky Owens. And two
2  two oh three was me.
3      Q.    Do you have any reason to
4  doubt that those were the people
5  involved in making that decision?
6      A.    No, sir.
7      MR. WILLFORD:  Are you
8  looking for the record that --
9      MR. STOCKHAM:  Yeah.
10     MR. WILLFORD:  -- has
11 that, Richard?
12     MR. STOCKHAM:  Yeah, I am.
13     MR. WILLFORD:  Okay. I
14 don't -- I'm just hoping that you
15 would show the witness --
16     MR. STOCKHAM:  That's what
17 I'm --
18     MR. WILLFORD:  -- the
19 document you're --
20     MR. STOCKHAM:  -- trying
21 to do.
22     MR. WILLFORD:  -- talking
23 about.

56

1      MR. STOCKHAM:  Exactly
2  what I'm trying to do.
3      Q.    (By Mr. Stockham)  I'll
4  show you what's --
5      MS. McDONALD:  This is --
6  that's okay.
7      Q.    I misspoke. It says, two
8  two one three and two two oh one.
9      A.    Oh, okay.
10     Q.    Who is two two one three?
11     A.    Okay. Two two one three,
12 I believe that was Wendy.
13     Q.    Okay.
14     A.    Wendy Roberson, Sergeant
15 Roberson.
16     Q.    So it would be, according
17 to the sheriff and per the sheriff
18 and Wendy Roberson he would be kept
19 up front --
20     A.    Yes, sir. That's what --
21     Q.    -- till further notice?
22     A.    That's what that says.
23     Q.    And were you consulted in

14  (Pages 53 to 56)

Daniel Court Reporting, Inc.

57

1  that decision-making?
2  MS. McDONALD: If you
3  remember.
4  A.  Don't -- can't -- don't
5  recall.
6  Q.  Do you recall any
7  discussion about Mr. Kelly having
8  seizures and that was why he was
9  being put there?
10  A.  Well -- I mean, there was
11  discussion about him having medical
12  issues and seizures was probably
13  mentioned. I don't recall. It was
14  -- it's been so long ago.
15  Q.  Now, did you work four or
16  five days a week?
17  A.  As best as I can recall it
18  was a -- kind of a mixed schedule.
19  Because I did have to work weekends,
20  too, on Saturday and Sundays. So
21  sometimes it was four, sometimes it
22  was five, sometimes it was six days
23  in a row. It was -- I was always

58

1  scheduled for forty hours. That
2  forty hours could be made in four
3  days with ten hour shifts or five
4  days with eight hour shifts. It
5  just depends on what -- the needs
6  of the sheriff's office at that
7  time.
8  Q.  Was that something that
9  was done in advance or something
10  that just --
11  A.  Oh, yes, sir. There was
12  always a schedule posted.
13  Q.  Who made that schedule?
14  A.  The chief deputy.
15  Q.  Now, have you ever had
16  anyone make any complaints to you
17  when you were the jail
18  administrator about Al Bradley?
19  A.  Complaints?
20  Q.  Yes, sir.
21  A.  No, sir.
22  Q.  Anyone make any
23  allegations to you that he had a

59

1  drinking problem?
2  A.  No, sir. I know I've
3  heard people talk about it but it
4  mostly generated from a -- would be
5  from inmates, is what we would hear
6  occasionally.
7  Q.  Have you ever had anyone
8  ask you to look into that?
9  A.  I don't recall that
10  anybody asked me to look into it.
11  If they did ask me I would
12  certainly, you know -- you know, do
13  what I could to look into it being
14  the supervisor of sorts. And if I
15  did I would refer it to Sergeant
16  Roberson to kind of, you know, look
17  into it. You know, I'd pass it on
18  down to her.
19  Q.  Have you ever asked her to
20  look into it?
21  A.  If it was -- I don't
22  recall. I mean, if somebody made a
23  comment about it I certainly

60

1  didn't -- you know, wouldn't make a
2  -- I would make sure that I passed
3  it to his supervisor, which would
4  be Sergeant Roberson, to -- you
5  know, if there was something to be
6  done.
7  Q.  Have you ever heard anyone
8  say that Mr. Bradley had come to
9  work intoxicated?
10  A.  I can't say that I've
11  heard anyone specifically. I've
12  heard that -- those kind of
13  comments but nobody has -- you
14  know, I can't tell you who said it
15  or why they said it.
16  Q.  Have you ever seen Mr.
17  Bradley intoxicated?
18  A.  No, sir.
19  Q.  At any time?
20  A.  No, sir. But I don't -- I
21  don't socialize with Mr. Bradley.
22  I -- you know, I wouldn't know his
23  habits or anything.

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205       danielreporting@aol.com

61

1    Q.    You were aware, were you
2   not, that Mr. Kelly was housed in
3   that holding cell for over a month,
4   weren't you?
5        MS. McDONALD:  Object to
6   the form.
7    A.    I was aware he was in the
8   holding cell. I don't recall the
9   dates, how many or anything.
10   Q.    Were you -- you were made
11  aware of it on a daily basis,
12  weren't you?
13   A.    I -- you know, I would
14  review the reports when I could,
15  you know, like I said.
16   Q.    You initialed all the
17  reports, didn't you?
18   A.    Yes, sir. I initialed all
19  the reports that came to me.
20   Q.    And all the reports
21  reflect that he was in the holding
22  cell for that length of time --
23   A.    Could be.

62

1    Q.    -- didn't they?
2    A.    I was -- I don't -- I
3   don't recall --
4        MS. McDONALD:  For how
5   long?
6    A.    -- how many days. I just
7   know that, you know, I would
8   initial the reports to see what was
9   going on in the jail.
10   Q.    And you don't know of
11  anyone in your entire time with
12  Coosa County that spent that long
13  in the holding cell, do you?
14   A.    I don't recall.
15       MS. McDONALD:  How long
16  are we -- what length of time are
17  we referring to?
18       MR. STOCKHAM:  The length
19  of time of Mr. Kelly as reflected
20  in these notes.
21       MS. McDONALD:  From
22  December the 20th until January
23  16th when he was released?

63

1        MR. STOCKHAM:  I believe
2   it's December -- well, it varies
3   depending on the note. But in some
4   it reflects that he has been in
5   there since about the 12th. But --
6        MS. McDONALD:  If you
7   know, you know. If you don't --
8    A.    Yeah, I don't know. I
9   mean, I don't know the --
10   Q.    (By Mr. Stockham) But
11  you --
12   A.    -- number of days.
13   Q.    You reviewed the notes on
14  a daily basis?
15   A.    Yes, sir, I would review
16  the reports on a daily basis about
17  things.
18   Q.    And did you ever look at
19  him while he was in there?
20   A.    I've thought about back --
21  back at it. I don't -- I may have
22  once or twice when I was -- be
23  bringing somebody in for arrest

64

1   or -- and may see him. But I don't
2   recall any specific day or time or
3   anything that I can point a finger
4   to.
5    Q.    Were you there at the time
6   that the sheriff taped a piece of
7   paper over the window in the
8   holding cell?
9        MR. WILLFORD:  Object to
10  the form.
11       MS. McDONALD:  Same
12  objection.
13       MR. WILLFORD:  You can
14  answer.
15   Q.    Sir?
16       MS. McDONALD:  If you
17  know, you know.
18   A.    I don't know. I'm not
19  aware.
20   Q.    Did you see the piece of
21  paper over the window when you
22  would come in there?
23   A.    I don't recall.

16 (Pages 61 to 64)

Daniel Court Reporting, Inc.

---

65

1    Q.    Now, you knew that he was
2  required to sleep on the floor,
3  were you not?
4         MS. McDONALD:  Object to
5  the form.
6    A.    No, sir.
7    Q.    And that he was -- didn't
8  have a toilet to use in that room,
9  didn't you?
10    A.    In the holding cell there
11  is a -- just the waste hole that,
12  you know.  That's all that's in
13  there.
14    Q.    And if he was in there and
15  he had to urinate or defecate he
16  had to urinate or defecate in that
17  hole, didn't he?
18    A.    Well, that or be --
19         MS. McDONALD:  Object to
20  the form.
21    A.    -- or allowed to be going
22  to a restroom.  And --
23    Q.    And there was just one

---

66

1  person downstairs at that time,
2  right?
3    A.    It depends on which day,
4  you know.  There was also people
5  there during the daytime that -- at
6  night mostly was one night person.
7    Q.    And the -- he couldn't
8  flush it from inside, could he?
9    A.    No, sir.  It would have to
10  be flushed from the outside by the
11  corrections officer outside.
12    Q.    And that's likewise true
13  with water.  He couldn't get water
14  in that cell, could he?
15    A.    That's right.  He -- if he
16  wanted water he would request it
17  and we would get it for him.
18    Q.    Well, you're aware that he
19  requested it and didn't get it,
20  aren't you?
21         MS. McDONALD:  Object to
22  the form.
23    A.    I don't know anything

---

67

1  about that.
2    Q.    Well, are you aware of him
3  ever getting it except --
4    A.    I don't have any knowledge
5  of that, sir.
6    Q.    You didn't tell him --
7  tell anyone that they needed to
8  make sure that he had water, did
9  you?
10         MS. McDONALD:  Object to
11  the form.
12    A.    No, sir.
13    Q.    Now, Mr. Kelly asked you
14  when he was -- when you were going
15  to stop Mr. Bradley from hitting
16  him, didn't he?
17         MS. McDONALD:  Object to
18  the form.
19    A.    I don't recall.
20    Q.    Sir?
21    A.    I don't recall that.
22    Q.    You just don't know one
23  way or the other?

---

68

1    A.    I just don't recall him
2  asking me that.
3    Q.    And you're aware that he
4  has made that allegation, are you
5  not?
6    A.    I think that was in the
7  papers that we got sent us to them
8  with the lawsuit.
9    Q.    You sat in this room when
10  he gave his deposition, didn't you?
11    A.    Yes, sir, I did.
12    Q.    And he testified on page
13  one sixty-four of his deposition
14  that -- it says, one time he
15  grabbed me by the neck when I asked
16  him when they was going to stop Al
17  from doing that.  Do you recall him
18  testifying to that?
19    A.    I don't -- it's been a
20  while and I, you know, don't
21  recall.  I mean, he may -- he may
22  have said that.  I don't know.
23    Q.    Did you do anything to

---

17 (Pages 65 to 68)

Daniel Court Reporting, Inc.

69

1  refresh your recollection one way
2  or the other when he made that
3  statement in your presence?
4      A.    No, sir.  I mean, I've got
5  -- we've just got the records here
6  and I've looked at the records, the
7  -- what we've got here.
8      Q.    Now, you knew he had an
9  injury to his back, didn't you?
10          MS. McDONALD:  Object to
11  the form.
12      A.    It may have been one of
13  those issues that he identified
14  when he was brought in or
15  something.  I'm not sure.  Again, I
16  don't know.
17      Q.    You -- he accused you of
18  shoving him into the cell and
19  hurting his lower back.  Do you
20  deny that?
21      A.    I do deny that.
22      Q.    Are you -- you don't have
23  any recollection of it at all?

71

1  says that or that it actually
2  happened?
3      Q.    That it actually happened.
4      A.    I don't recall.
5      Q.    Well, in December and
6  January of 2003, 2004 it was cold,
7  wasn't it?
8          MS. McDONALD:  Inside the
9  jail or outside?
10      Q.    Inside the jail.
11      A.    I'm sure it was a
12  comfortable degree that we had for
13  everybody to be able to work and
14  maintain a good working
15  environment.
16      Q.    And the concrete floor of
17  that jail is cold, isn't it?
18      A.    I would assume the
19  concrete is cold.
20      Q.    And he was required to
21  sleep on a pallet down on that
22  concrete floor, wasn't he?
23      A.    I don't know that.

70

1      A.    No, sir.
2      Q.    Have you ever had any
3  scuffle or grapple with him?
4      A.    No, sir.
5      Q.    Do you remember talking
6  with him when he was in the holding
7  area?
8      A.    I'm sure I probably at
9  least, you know, talked with him
10  occasionally.  But I don't recall
11  any conversation with him or
12  anything.  If I walked through the
13  jail and somebody says something to
14  me I talk -- I stop and talk with
15  them.
16      Q.    And you're aware that he
17  says that he told you he was cold
18  but you told him that he just had
19  to deal with it; is that right?
20      A.    I don't recall.
21          MR. WILLFORD:  Is what
22  right?
23          MS. McDONALD:  That Bryan

72

1      Q.    And he was -- he asked you
2  for toilet paper but you denied it
3  to him; isn't that right?
4      A.    I don't --
5          MS. McDONALD:  Object to
6  the form.
7      A.    I don't recall.
8      Q.    You just don't know one
9  way or the other?
10      A.    I don't know.  I mean --
11      Q.    Well, if --
12      A.    I would like to say this.
13  If he needed toilet paper I would
14  make sure that we got him toilet
15  paper.  I mean, that's a simple,
16  easy request to comply with, to
17  help him with.  I mean, that
18  wouldn't -- I don't know why we
19  wouldn't give him toilet paper.
20      Q.    Well, you know he had said
21  that he asked you several times for
22  toilet paper and you denied it to
23  him.  He says he would bunch it up

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

73

1    and use it because -- to wrap
2    around his feet.
3        A.    I don't recall that.
4        Q.    And he says that he asked
5    you for water on several occasions
6    but you didn't give it to him.  Do
7    you deny refusing to give him
8    water?
9        A.    No, sir.  If he needed
10   water I made -- I -- if he had have
11   asked me for water I would give him
12   water.
13       Q.    So you do remember that he
14   never asked you for water?
15       A.    I don't recall him asking
16   me for water.
17       Q.    He says he asked you for
18   toenail clippers but you refused to
19   give him that; is that right?
20       A.    I don't recall.  I mean --
21       Q.    If he had a problem --
22       A.    Sir, you're asking me to
23   try to remember something that was

74

1    three or four years ago for -- I
2    just don't recall him asking me for
3    these things.
4        Q.    Well, you just told me
5    that you've never had anyone else
6    spend that long in that front
7    holding cell.
8            MS. McDONALD:  I don't
9    think that's what he said.
10       A.    That's not what I said.
11       Q.    Oh.  Have you had someone
12   else --
13       A.    I said --
14       Q.    -- spend that long --
15       A.    I said I don't recall
16   anybody being up there for any
17   length of time.  I don't know.
18       Q.    Do you remember anyone
19   being longer than a week in the
20   holding cell other than Mr. Kelly?
21       A.    No, sir, I don't recall.
22   I mean, I don't think there's
23   anything that I can tell you of a

75

1    certain person or anybody that's
2    been up there for any length of
3    time.  I just don't know.
4        Q.    How long did you keep Ms.
5    Hawkins in the front holding cell?
6        A.    I -- Ms. Hawkins?
7        Q.    Yes.
8        A.    I don't -- I don't know
9    who Ms. Hawkins is.
10       Q.    She's reflected in some of
11   these notes as being placed in the
12   front holding cell.
13       A.    I don't remember Ms.
14   Hawkins, sir.
15       Q.    Now, you witnessed Mr.
16   Bradley in the cell with Mr. Kelly,
17   did you not?
18       A.    Ask --
19       Q.    You saw Mr. Bradley when
20   he was in the cell with Mr. Kelly,
21   did you not, on more than one
22   occasion?
23           MS. McDONALD:  Object to

76

1    the form.
2        A.    No, sir.
3        Q.    In fact, you heard when
4    Mr. Kelly testified that you saw
5    Mr. Bradley trying to kick him in
6    the testicles, didn't you?
7        A.    No, sir.
8        Q.    Well, you heard him
9    testify to that, didn't you?
10       A.    I heard him testify to
11   that.
12       Q.    And he testified that you
13   laughed at him when that was going
14   on.  You heard him say that?
15       A.    I may have.  I don't know.
16           MS. McDONALD:  Are you
17   just wanting to know what he heard
18   your client testify to?
19           MR. STOCKHAM:  Well, I
20   want to know his reaction to that.
21           MS. McDONALD:  Well,
22   you're not asking that.  You're
23   asking --

1310 32nd Street S.
Birmingham, Alabama 35205          205-250-7765
                          danielreporting@aol.com

Daniel Court Reporting, Inc.

77

1    THE WITNESS: Yeah.
2    MS. McDONALD: -- whether
3  he heard Bryan testify to that --
4    MR. STOCKHAM: That's
5  what --
6    MS. McDONALD: -- at his
7  deposition.
8    MR. STOCKHAM: Exactly.
9    MS. McDONALD: Are you
10 going to ask him whether or not it
11 occurred?
12   MR. STOCKHAM: Well,
13 that's going to be my next
14 question.
15   Q.    (By Mr. Stockham) So when
16 you heard him make those
17 allegations did you -- did that
18 evoke any memories in your --
19   A.    No, sir.
20   Q.    Anything --
21   A.    There's --
22   Q.    -- like that at all?
23   A.    There is nothing that

78

1  would come to my mind that would
2  indicate that any of that happened.
3    Q.    Did you ever see Mr.
4  Bradley in any situation that might
5  have been -- might have looked like
6  that?
7    A.    No, sir.
8    Q.    Now, I wanted to ask you
9  about these records that you have
10 initialed. Are there any of these
11 records that are still on the
12 computer that -- these day shift
13 tower log --
14   A.    I don't --
15   Q.    -- or night shift tower
16 log?
17   A.    I don't know that. I
18 would probably -- if I was guessing
19 I'd say --
20   MS. McDONALD: Don't
21 guess. If you don't know, you
22 don't --
23   A.    Don't know.

79

1    MS. McDONALD: -- know.
2  We're not guessing.
3    Q.    Who would you go to to
4  find out?
5    A.    I would ask my secretary
6  who produced these for us. Those
7  were record copies that we have in
8  the record files.
9    Q.    Do you have a computer
10 backup for these?
11   A.    I don't know.
12   Q.    And is there a -- do you
13 have an IT or a computer person
14 that runs your computers for you?
15   A.    No, sir. I mean, just my
16 jail staff. There is no specific
17 position for anybody that has
18 computer skills or knowledge or
19 anything. I mean, we all have to
20 work on -- use computers for our
21 job and that's about as far as it
22 goes.
23   Q.    Who in your staff would be

80

1  the one who would be -- you would
2  look to to find a backup log of
3  these entries?
4    A.    Joan -- you know, my
5  secretary is who I'd have ask and
6  -- that's all I know. I mean,
7  that's where I go to to get all the
8  records. She --
9    Q.    Where would you --
10   A.    -- has knowledge of
11 records.
12   Q.    Where would you keep the
13 -- where would she keep those, on a
14 hard drive or do you have a backup
15 storage that you --
16   A.    Don't know any of that.
17   MS. McDONALD: These
18 were --
19   A.    Filing cabinets is all I
20 know as to what she gets that out
21 of.
22   MS. McDONALD: Hold on a
23 second. These records would have

20 (Pages 77 to 80)

1310 32nd Street S.                    205-250-7765
Birmingham, Alabama 35205         danielreporting@aol.com

Daniel Court Reporting, Inc.

81

1 been generated at a time when he
2 was not the sheriff. Just --
3      THE WITNESS: Right, yeah.
4      MS. McDONALD: He's the
5 sheriff now but he was not at
6 the --
7      MR. STOCKHAM: I
8 understand.
9      THE WITNESS: Yeah.
10     MS. McDONALD: -- time.
11 So --
12     Q.   (By Mr. Stockham) But --
13 and the reason I'm asking is that
14 they're in -- within your custody
15 right now.
16     A.   Well --
17     Q.   So what I'm asking is what
18 -- if you were going to go now what
19 would you go and do, and you said
20 you'd ask your secretary.
21     A.   Right.
22     Q.   Is she the person who was
23 the secretary at that time in 2003,

82

1 2004?
2      A.   Yes, sir. She's been
3 there a long time.
4      Q.   So she would be the one
5 who would know?
6      A.   She may, I don't know.
7         (Whereupon, an
8         off-the-record
9         discussion was held.)
10     Q.   (By Mr. Stockham) Who is
11 Mike Rudd?
12     A.   Mike Rudd is a police
13 officer -- was a deputy sheriff
14 here a short period of time, as I
15 recall.
16     Q.   And was he a road deputy
17 or was he --
18     A.   Yes, sir.
19     Q.   -- one working the jail?
20     A.   One of the deputies, road
21 deputy.
22     Q.   Where is he now?
23     A.   He's over at Goodwater

83

1 Police Department.
2      Q.   Now, did you have any
3 conversation with Mr. Owens about
4 his -- Mr. Owens -- with -- yeah,
5 with Mr. Owens about Mr. Kelly's
6 broken teeth?
7      A.   I don't recall.
8      Q.   Well, you were aware that
9 he broke his teeth in the jail?
10     MS. McDONALD: I object to
11 the form.
12     Q.   Well, you were aware that
13 he went to the dentist?
14     A.   I think I've seen in one
15 of these records where he went to
16 the dentist, yes, sir.
17     Q.   And --
18     MR. WILLFORD: Sheriff, if
19 I can just interject. You need to
20 answer out loud.
21     THE WITNESS: Oh, yes,
22 sir.
23     MR. WILLFORD: The

84

1 question before last you shook your
2 head side --
3      THE WITNESS: Okay.
4      MR. WILLFORD: -- to side
5 and didn't say anything.
6      MS. McDONALD: I didn't
7 see you. Sorry.
8      THE WITNESS: Okay. I'm
9 sorry. I don't recall the
10 question.
11     MS. McDONALD: She'll kick
12 you in a minute.
13     THE WITNESS: Let me know
14 if I didn't answer.
15     Q.   (By Mr. Stockham) And you
16 were aware that when he went to the
17 dentist his reason for going to the
18 dentist was that his teeth were
19 broken, were you not?
20     MS. McDONALD: Object to
21 the form.
22     A.   No, sir. Don't recall
23 that.

21 (Pages 81 to 84)

85

1    Q.    Mr. Kelly told you that he
2    was -- Mr. Bradley had broken his
3    teeth, didn't he?
4         MS. McDONALD:  Object.
5    Q.    Sir?
6    A.    What was your question
7    again?
8    Q.    Mr. Kelly told you that
9    Mr. Bradley had broken his teeth,
10   didn't he?
11   A.    Told me that?
12   Q.    Yes, sir.
13   A.    No, sir.  I don't -- he
14   didn't tell me that.  If I may,
15   based on that question you just
16   asked me, I've got an inmate
17   medical request here from Mr. Kelly
18   that says his tooth is hurting and
19   that he needs to see a medical
20   doctor to get -- something for
21   pain, I think.
22   Q.    That's for his stomach,
23   isn't it?

86

1    A.    No, sir.  He's talking
2    about a tooth is hurting.  And --
3    Q.    Let me see that.
4    A.    We made a mental -- a
5    dental appointment for him.
6    Q.    He --
7    A.    Yeah.  And according to
8    the --
9    Q.    It says he went on
10   12-27-03?
11   A.    Yes, sir.
12   Q.    Is that the entry?
13   A.    Yes, sir.
14   Q.    That says, right tooth is
15   hurting and need to see medical
16   doctor to get stomach pills.
17   A.    Okay.  I couldn't read the
18   stomach pills.  I just saw the
19   tooth is hurting.
20   Q.    It says, that "Medicalic"
21   was keeping my back and toothache
22   down.
23   A.    Yes, sir.

87

1    Q.    Is that what it says?
2    A.    Yes, sir.
3    Q.    Whose handwriting is that
4    on the bottom?
5    A.    I have no idea.  I
6    don't --
7    Q.    You don't --
8    A.    I don't see an initial or
9    anybody to indicate which one --
10   who wrote it.
11   Q.    So, will make doctor's
12   appointment and get Robaxin
13   refilled 1-2-04?
14   A.    Yes, sir.
15   Q.    So the response is on the
16   2nd of January?
17   A.    Yes, sir, that's what's
18   indicated.
19   Q.    That's not your
20   handwriting, is it?
21   A.    No, sir.
22   Q.    Now, you're familiar with
23   the fact that the reason given for

88

1    moving Mr. Kelly to the front was
2    for medical evaluation?
3    A.    I recall that the -- most
4    of the time when he was brought up
5    front was for medical observation,
6    yes, sir.
7    Q.    You didn't have any doctor
8    observing him, though, did you?
9    A.    No, sir.
10   Q.    And you didn't have anyone
11   performing medical observation of
12   him?
13   A.    Oh, no, sir.  We --
14   there's nobody certified to do
15   anything like that.
16   Q.    So why did you call it a
17   medical observation?
18   A.    To -- just to keep a --
19   you know, it makes it -- when you
20   bring somebody up front and you've
21   got a person down there on the
22   floor up front there at the booking
23   station you've got somebody that's

22  (Pages 85 to 88)

Daniel Court Reporting, Inc.

89

1    closer to them and you could kind
2    of watch them and observe them and
3    see if they're getting better or
4    worse so that if we -- you know,
5    you need some immediate medical
6    care it's -- it makes it a lot
7    easier.
8        Q.    Why would that differ from
9    someone who is just in the
10   population?
11       A.    Well, it depends on what
12   -- you know, it depends on whether
13   or not their medical request
14   indicates that there was a problem
15   or something. You know, it all
16   starts with the inmate complaining
17   of a problem. And so we try to
18   help them and do what we can for
19   them.
20       Q.    Well, the person in the
21   tower can see them in the
22   population, can't they?
23       A.    He can, for the most part.

90

1    It just -- by bringing them up
2    front you've got a direct
3    connection with the person there
4    that's there to help them if there
5    is a medical need where you can
6    tend to them a lot closer. You're
7    way detached from a tower person
8    versus down in the cell block.
9        Q.    Well, you can directly
10   observe them if you're in the
11   tower, can't you?
12          MR. WILLFORD: Observe
13   them where?
14       Q.    In --
15       A.    Well, you can see them.
16       Q.    In the population.
17       A.    Yeah.
18       Q.    You can't directly observe
19   them when you're in the -- when
20   they're in the holding cell, can
21   you?
22       A.    Well, in the holding cells
23   we also have cameras and they --

91

1    they were being watched both ways.
2        Q.    Well, the person watching
3    in the camera would be in the
4    tower, right?
5        A.    Yes, sir.
6        Q.    So they would be no closer
7    to the tower person either way,
8    would they?
9        A.    For the tower person it's
10   the same. But by bringing them up
11   front you've got a person that can
12   render, you know, first aid if
13   necessary. And they can certainly
14   pay attention to their medical
15   needs a lot closer and quicker.
16       Q.    How would they do that?
17       A.    By being right there next
18   to them by the booking station.
19       Q.    Well, the door is closed.
20       A.    Yes, sir.
21       Q.    And they had taped over
22   the window, hadn't they?
23       A.    I don't recall any tape

92

1    over a window.
2        Q.    Well, if he taped over the
3    window how is he going to observe
4    him? The only person that could
5    observe him would be someone in the
6    tower, right?
7        A.    Right. And the person in
8    the tower, if he sees something
9    then he can radio the person down
10   on the floor to render assistance
11   there immediately by being up
12   front.
13       Q.    Unless the person up front
14   is actually in the jail?
15       A.    Yes, sir. I mean, that's
16   a limiting factor that we have
17   with a limited number of staff
18   members.
19       Q.    In fact, if he were in
20   population you have other people
21   there that could help him.
22       A.    Other inmates?
23       Q.    Yeah.

23 (Pages 89 to 92)

Daniel Court Reporting, Inc.

93

1    A.    I don't know about that.
2    Q.    Well, y'all have trustees
3  help people all the time, don't
4  you?
5    A.    Trustees help us in moving
6  mop buckets around and things like
7  that.
8        MS. McDONALD:  They clean.
9    Q.    They serve people food?
10    A.    They do.  They help serve
11  the trays.
12    Q.    And they cook the food?
13    A.    Yes, sir.
14        MS. McDONALD:  Can we take
15  a break real quick?
16        MR. STOCKHAM:  Yeah.
17        (Whereupon, an
18        off-the-record
19        discussion was held.)
20        (Whereupon, a brief
21        recess was taken in
22        the deposition.)
23    Q.    (By Mr. Stockham)  Have

94

1  you ever had an inmate in the Coosa
2  County jail since you have been
3  deployed here who you have
4  transferred to another facility
5  because you weren't able to attend
6  to their medical needs?
7    A.    I don't -- I don't recall
8  that.  It's -- you know.  I just
9  don't recall a specific name or
10  anything like that.
11    Q.    Do you have any procedure
12  that you have for determining
13  whether or not that you need to
14  transfer an inmate to another
15  facility who has -- a facility that
16  has better -- capable of dealing
17  with --
18    A.    I don't -- I can't recall
19  us ever doing that.  I can't
20  imagine why another sheriff would
21  want for us to pawn off one of our
22  inmates on them for a medical need.
23    Q.    Well, are you -- you're

95

1  not able to treat patients with
2  severe heart problems, are you?
3        MS. McDONALD:  Object to
4  the form.  He doesn't treat
5  anybody.
6    A.    I don't treat anybody.
7    Q.    Sir?
8    A.    No, sir.
9    Q.    And can you house inmates
10  with -- who've suffered heart
11  attacks and have heart problems?
12    A.    Yes, sir.
13    Q.    And people who are
14  suffering convulsions or seizures?
15    A.    We've had some sick
16  inmates in the jail, yes, sir.
17    Q.    And you don't transfer
18  them?
19    A.    No, sir.  I mean, I don't
20  know where I'd send them to.
21        MS. McDONALD:  That's all.
22  Just --
23    A.    That's all there is to it.

96

1    Q.    And who --
2        MS. McDONALD:  --
3  answer --
4    Q.    Who do you determine --
5  who in your chain of command makes
6  the decision about whether someone
7  is to be sent to a hospital?
8    A.    Do you want me to answer
9  that as I am now, the current
10  sheriff, or how I was back as a
11  lieutenant?
12    Q.    Back in 2003.
13    A.    Okay.  Back in 2003.  Say
14  the question again.
15    Q.    Who in the chain of
16  command determines when an inmate
17  needs to go to a hospital?
18    A.    Oh.  The medical request
19  form is filled out and then we
20  facilitate them to the doctor.  If
21  the doctor refers him to the
22  hospital or if it's an emergency
23  call the EMS community first

24  (Pages 93 to 96)

97

1  responders that come there do. We
2  refer, you know, all of those
3  situations with them.
4      Q.    Who in the EMS community
5  makes --
6      A.    That would be the
7  paramedic that responds to the jail
8  for that need.
9      Q.    Who is that?
10      A.    Oh. We dial an ambulance
11  up and they come to the jail and
12  it's left up to them, you know, for
13  them to look at and see what they
14  need to do.
15      Q.    If they determine that
16  someone needs to go to a hospital
17  then you defer to that?
18      A.    Yes, sir.
19      Q.    It's not a determination?
20      A.    I --
21      Q.    It's not a determination
22  that someone in the jail makes?
23      A.    Oh, no, sir. No, sir.

98

1      Q.    And what do you do if
2  someone determines -- an EMS person
3  determines that a person needs to
4  go to the hospital?
5      A.    Then it's a matter of
6  determining transport. If the
7  inmate needs to be transported by
8  ambulance then the ambulance takes
9  them. If there is not a need for a
10  transport but they suggest that
11  maybe the inmate needs to be taken
12  then we may even sometimes have a
13  transport officer or a deputy to
14  transport, depending on the
15  situation that occurred.
16      Q.    Is a seizure an occasion
17  that you would call an EMS?
18      A.    Yes, sir. If there is a
19  seizure we call EMS.
20      Q.    On every occasion?
21      MS. McDONALD: If they see
22  it --
23      A.    If they --

99

1      MS. McDONALD: -- or if
2  they --
3      A.    If they see the seizure,
4  yes, sir.
5      Q.    Yes, sir.
6      A.    Yes, sir.
7      Q.    And what training have you
8  provided your staff -- your jail
9  staff to identify a seizure?
10      A.    I don't have a -- I don't
11  train my officers to be -- to treat
12  inmates at all or to do any of that
13  stuff. So I don't have a seizure
14  policy per se.
15      Q.    Well, your jail manual
16  policies and procedures
17  specifically identifies seizures as
18  an example of a medical emergency,
19  doesn't it?
20      A.    Yes, sir. I'm assuming
21  that's identified as an example of
22  a medical need to call the EMS
23  community.

100

1      Q.    And that's something that
2  puts on the corporal to determine
3  if a seizure is occurring?
4      A.    Yes, sir.
5      Q.    And what I'm asking is
6  what training do you provide the
7  corporal for him to be able to
8  identify if a seizure is occurring?
9      A.    Observation. You know,
10  that's all you can do as a corporal
11  out there or as a corrections
12  officer. If you see that there is
13  an emergency medical need the
14  policy is you call an ambulance.
15      Q.    Well, in the case of Mr.
16  Kelly, he was falling down a lot.
17  You --
18      MS. McDONALD: Object to
19  the form.
20      Q.    -- were aware of that --
21  you've already testified that you
22  were aware that he was falling
23  down.

Daniel Court Reporting, Inc.

101

1    A.    I recall he had --
2    Q.    And --
3    A.    -- times when he fell.
4    Q.    And do you know whether or
5    not he was having seizures on each
6    of those occasions?
7    A.    I wouldn't know.
8    Q.    Did anyone make any
9    determination that he was having
10   seizures on each of those
11   occasions?
12   A.    Not that I recall. I
13   don't know.
14   Q.    Who would be responsible
15   for making that determination, that
16   each -- whether or not his falls
17   were seizure related or not?
18   A.    Observation based on the
19   corrections officer, what he saw or
20   what he heard, what was said. And
21   if there's a -- there is a seizure
22   in action then obviously that would
23   be something that you would --

102

1    alert to his attention to call
2    emergency medical. But if it's
3    after the fact and they don't see
4    it, don't know it and -- you know,
5    how do you know?
6    Q.    Well, if another inmate
7    reports that someone was having a
8    seizure would you call an emergency
9    medical person then?
10       MS. McDONALD:  A report
11   that he had it or he's having one?
12   Q.    He's had it.
13   A.    I don't know -- you know,
14   I don't know if an inmate -- you
15   can't -- you know, you can't always
16   go with what other inmates say.
17   You have to kind of just look into
18   it yourself and you have to take it
19   at face value.
20   Q.    Well, if someone has had a
21   seizure would you call the EMS if
22   the seizure is over?
23   A.    Again, based on the

103

1    observation of the officer that's
2    on duty, what he saw.
3    Q.    If a person reported they
4    had just had a seizure would you
5    call the EMS to follow up with them
6    to see whether they were having any
7    further complications from the
8    seizure?
9        MR. WILLFORD:  Object to
10   the form.
11       MS. McDONALD:  Same
12   objection.
13   Q.    You can answer.
14       MS. McDONALD:  If you --
15   Q.    You have to answer.
16   A.    I don't -- I don't have an
17   answer. I mean, I don't know what
18   -- you know, I don't know how to
19   answer your question. I mean --
20   Q.    Do you have a policy for
21   pursuing if someone says they've
22   had a seizure --
23   A.    No, sir, don't have a

104

1    policy.
2    Q.    The policy and procedure
3    manual that I have been given
4    today, has this been changed since
5    the time that Mr. Owens was there?
6    A.    Yes, sir. I have revised
7    it with some updates under my
8    direction.
9    Q.    What updates have you
10   added?
11   A.    I don't recall specifics.
12   Q.    Have you added any updates
13   with regard to the medical
14   attention that inmates are given?
15   A.    Again, I don't recall. I
16   mean, it's been revised but I'm not
17   sure if there is anything changed
18   in the medical section.
19   Q.    Do you still refer them to
20   Dr. Weaver?
21   A.    Yes, sir.
22   Q.    Do you still refer them to
23   Dr. James?

26  (Pages 101 to 104)

1310 32nd Street S.                     205-250-7765
Birmingham, Alabama 35205    danielreporting@aol.com

Daniel Court Reporting, Inc.

105

1    A.    Yes, sir.
2         MR. STOCKHAM: I believe
3    that's all.
4         MS. McDONALD: I have a
5    couple of questions.
6
7    EXAMINATION BY MS. McDONALD:
8    Q.    Sheriff Wilson, in
9    November of 2003 you were, I think
10   what you said, the day shift
11   deputy?
12   A.    Yes, sir. Yes, ma'am.
13   Q.    As a day shift deputy how
14   much time would you spend on the
15   road versus in the jail?
16   A.    There were days where I
17   was on the road all day long.
18   Q.    That you never went in the
19   jail?
20   A.    That I never went in the
21   jail. Depending on the call
22   volume. There were days where I
23   might be in the SO doing paperwork

106

1    back in the office. To give a
2    percentage, a high percentage of it
3    was on the road or in the office
4    doing things, not in the jail.
5    Q.    And when you reviewed the
6    reports, the shift reports, would
7    you review those to determine how
8    long somebody may have been in a
9    particular cell?
10   A.    No, ma'am. What I was
11   looking for was to kind of look at
12   the overall picture of things, what
13   was going on in the jail, and look
14   for any significant big problems,
15   big issues, serious issues that I
16   need to -- might need to help with
17   in --
18   Q.    Okay.
19   A.    -- the management area.
20   Q.    And the record from --
21   let's see -- where Mr. Kelly
22   requested that he be taken to a
23   dentist because his right tooth was

107

1    hurting on December 27th of '03, is
2    there also a record that shows that
3    he was taken to a dentist and what
4    the dentist did?
5    A.    I believe there was a --
6    when they go to the dentist they
7    have to fill out a form. Let me
8    see here.
9         (Witness examining
10            documents.)
11         (Whereupon, an
12            off-the-record
13            discussion was held.)
14   A.    There is a doctor visit
15   form here in the file that
16   indicates that on January the 14th
17   Bryan Kelly had a tooth pulled.
18   Q.    (By Ms. McDonald) Okay.
19   A.    By Dr. Curry.
20   Q.    Is he the dentist that
21   y'all take them to if they need to
22   see a dentist?
23   A.    Right. At that time that

108

1    was the dentist who we took them
2    to.
3    Q.    And on Mr. Kelly's request
4    to see a dentist is there anything
5    about his teeth on the right side
6    being cracked or broken?
7    A.    No, ma'am. It just
8    indicates that his tooth is hurting
9    -- teeth are hurting.
10   Q.    To your knowledge after
11   looking at some of these records
12   today did Mr. Kelly ever tell
13   anybody at the jail that he was
14   going to save up all his pills and
15   take them so he could commit
16   suicide?
17   A.    I think there is something
18   in one of the records.
19         Here on December the 19th
20   on the night shift report at
21   eighteen hundred and eleven hours
22   he -- twenty-two fifty-six --
23   that's going to be either Taylor or

27 (Pages 105 to 108)

Daniel Court Reporting, Inc.

109

1 Harris or Green. Those three were
2 on duty. Advised that Kelly told
3 him that he's been saving up his
4 pills for a while, up to twenty, so
5 that he could take them all at
6 once, not to hurt himself but to
7 get all the good out of them, get
8 messed up. And said he knows how
9 to hide them so that we can't find
10 them. And that --
11    Q.    Is there indication that
12 they searched his cell?
13    A.    It does not say anything
14 about that.
15    Q.    Is there mention of him
16 trying to commit suicide any other
17 way?
18    A.    It said that Kelly also
19 states that he wanted -- wanted to
20 do so to -- he could remove the
21 lights from the fixture and kill
22 himself or a corrections officer if
23 he wanted to do so.

110

1    Q.    On December the 16th, '03,
2 the night shift report, does that
3 indicate where Mr. Kelly is
4 currently being housed, on December
5 the 16th of 2003?
6    A.    At nineteen fifty hours
7 loud noise is coming from the B
8 block, according to this report
9 from the folks that was on shift.
10 It says that Kelly fell down and
11 knocked the mop bucket over and he
12 is lying on the floor. He said he
13 hit his head and hurt his back,
14 also that one leg was becoming
15 numb. And according to this report
16 EMS Two and Rockford Fourteen,
17 which are first responders, came to
18 check him out. They did not think
19 it was necessary for him to go to
20 the hospital. He was taken to the
21 holding cell for medical
22 observation.
23    Q.    If the EMS had indicated

111

1 he needed to be taken to a hospital
2 would y'all have taken him?
3    A.    Yes. No question.
4    Q.    Do the day shift tower
5 logs or night shift tower logs
6 indicate when someone is taken from
7 a holding cell to get a shower?
8    A.    As I recall looking
9 through some of them then and
10 certainly now, there are
11 indications that they are removed
12 and taken back and forth when
13 they're moved around.
14    Q.    So the log should indicate
15 when he was taken out to get a
16 shower, correct?
17    A.    Yes, ma'am.
18    Q.    Now, what he chose to do
19 when he got to the shower or got in
20 a shower was strictly up to him,
21 whether he bathed or not, was it
22 not?
23    A.    That's right.

112

1        MS. McDONALD: I don't
2 have anything else.
3
4 EXAMINATION BY MR. WILLFORD:
5    Q.    Sheriff, we took a tour of
6 the jail earlier today, correct?
7    A.    Yes, sir.
8    Q.    And while we were up there
9 in what I believe was the tower I
10 noticed that there was one guard on
11 duty. Was that pretty much
12 standard practice in 2003, 2004 as
13 well?
14    A.    Yes, sir.
15    Q.    That you would have one
16 guard in the tower?
17    A.    Correct.
18    Q.    And, again, based on the
19 observations that I made today it
20 appeared that that tower guard has
21 control over the electronic doors
22 in the jail; is that correct?
23    A.    That's right, sir. That

28  (Pages 109 to 112)

Daniel Court Reporting, Inc.

113

1　tower guard is the one that allows
2　people to come and go through the
3　electronic doors.
4　　Q.　We also saw some monitors
5　in there that were tied to some
6　cameras in the jail; is that
7　correct?
8　　A.　Yes, sir.
9　　Q.　Was that the same way in
10　2003?
11　　A.　Yes, sir. I think the --
12　there is maybe some more cameras
13　been added since then and certainly
14　a more updated system now.
15　　Q.　Right. But in 2003, 2004
16　there was a monitor in the tower to
17　look at the cameras that were in
18　the jail at the time --
19　　A.　Yes, sir.
20　　Q.　-- is that right?
21　　A.　That's correct.
22　　Q.　The guard that is assigned
23　to the tower -- and I want to have

114

1　the same understanding between you
2　and me that you had with Richard,
3　and that is that we're talking
4　about the 2003, 2004 --
5　　A.　Right.
6　　Q.　-- time frame in my
7　questions here.
8　　　Would that guard have been
9　able to leave the tower without
10　being relieved?
11　　A.　No, sir. That guard has
12　to be there in order to control the
13　comings and goings of all the
14　electronic doors. And has the sole
15　responsibility of kind of watching
16　over the inmates.
17　　Q.　Would it be fair to say
18　that that tower guard has control
19　of the entire jail?
20　　A.　Yes, sir.
21　　Q.　We also were able to see
22　from the tower inside the
23　individual cell blocks. Are there

115

1　cameras inside of the cell blocks?
2　　A.　No, sir, not inside the
3　cell blocks.
4　　Q.　And is that because you
5　can actually see into the cell
6　blocks --
7　　A.　Yes, sir.
8　　Q.　-- from the tower?
9　　A.　Yes, sir. There are some
10　-- in 2003 there was no cameras in
11　the cell block.
12　　Q.　I'm sorry. Yeah. That's
13　-- again, that's what I'm asking --
14　　A.　Yeah.
15　　Q.　-- is 2003 --
16　　A.　Right.
17　　Q.　-- and 2004.
18　　A.　Right.
19　　Q.　Would there have been
20　cameras in the individual cells in
21　the cell blocks?
22　　A.　No, sir, no cameras.
23　　Q.　In the booking area of the

116

1　jail how many officers would you
2　have had up there in 2003, 2004?
3　　A.　Difference of day shift
4　versus night shift.
5　　Q.　Let's start with the day
6　shift. How many officers would you
7　have had on duty during the day in
8　the booking area?
9　　A.　Okay. On a normal day
10　shift you've got one assigned.
11　That's your twelve hour shift
12　person. In addition to that you
13　have the -- you -- we had the
14　sergeant and her assistant. They
15　would be in and out throughout the
16　entire facility, but would be
17　available to help.
18　　Q.　So at any one time there
19　would have been from one to --
20　　A.　Three.
21　　Q.　-- three people --
22　　A.　Yes, sir.
23　　Q.　-- present in the booking

29 (Pages 113 to 116)

Daniel Court Reporting, Inc.

117

1  area?
2      A.    During daytime Monday
3  through Friday.
4      Q.    All right.
5      A.    At nighttime --
6      Q.    Night shift.
7      A.    -- only one person by
8  themselves, twelve hour shift.
9      Q.    That person stays in the
10 booking area or stayed in the
11 booking area; is that correct?
12     A.    No, sir. That person is
13 the, what you call, the downstairs
14 corrections officer. And that
15 person's duties take them -- well,
16 whatever needs to be done on the
17 bottom floor, to include booking,
18 to include assisting inmates in the
19 rear, to -- you know, dispensing
20 medicine and meals to the inmates.
21     Q.    If they worked -- if the
22 downstairs person at night weren't
23 doing some other tasking in the

118

1  jail where would that officer's
2  duty station be?
3      A.    Primarily there in the
4  dispatch area because that -- they
5  were -- they also assist with
6  dispatching. That's what they do
7  there.
8      Q.    And just so I'm clear --
9  and this was kind of touched off by
10 a question that Richard asked you.
11 Was the policy in 2003, 2004 that
12 an inmate could request medical
13 care for any reason at all?
14     A.    I mean, yes, sir. They --
15 we didn't deny them to fill out a
16 medical request form and take a
17 look at it.
18     Q.    And that's what I was
19 getting at.
20     A.    Yes.
21     Q.    They could fill out a
22 medical --
23     A.    Oh, yes, sir.

119

1      Q.    -- request form?
2      A.    Any time.
3      Q.    So if an inmate had come
4  to, say, any correction officer and
5  said, I've had a medical problem, I
6  need to see a doctor, they would
7  have been given an opportunity to
8  fill out --
9      A.    Right.
10     Q.    -- a form?
11     A.    Yes, sir.
12     Q.    And could have gotten
13 medical attention then?
14     A.    Yes, sir. That's the way
15 it is.
16         MR. WILLFORD: That's all
17 I have. Thank you.
18         MS. McDONALD: Nothing
19 else.
20
21 REEXAMINATION BY MR. STOCKHAM:
22     Q.    The only follow-up I have
23 based upon what he asked, was --

120

1  you say in the daytime you'd have
2  one to three people in the booking
3  area?
4      A.    Could be in the booking
5  area. There was other -- two
6  people. There's the sergeant and
7  the corporal and they were in and
8  out throughout the entire building,
9  if you will.
10     Q.    Well, the daytime person
11 downstairs has to go and tend to
12 the jail also, don't -- doesn't he?
13     A.    Yes, sir.
14     Q.    So there would be times
15 when no one would be in the booking
16 area during the daytime?
17     A.    That's correct. It can
18 be. It depends on what was going
19 on.
20         MR. STOCKHAM: That's all
21 I have.
22
23 FURTHER THE DEPONENT SAITH NOT

30  (Pages 117 to 120)

Daniel Court Reporting, Inc.

121

1    C E R T I F I C A T E
2
3    STATE OF ALABAMA   )
4    JEFFERSON COUNTY   )
5
6        I hereby certify that the above
7    and foregoing deposition was taken
8    down by me in stenotype, and the
9    questions and answers thereto were
10   reduced to typewriting under my
11   supervision, and that the foregoing
12   represents a true and correct
13   transcript of the deposition given
14   by said witness upon said hearing.
15       I further certify that I am
16   neither of counsel nor kin to the
17   parties to the action, nor am I in
18   anywise interested in the result of
19   said cause.
20
21       _____
22       Sandra Peebles Daniel
23       Commissioner

1310 32nd Street S.
Birmingham, Alabama 35205

205-250-7765
danielreporting@aol.com

Daniel Court Reporting, Inc.

Page 122

**A**

**able** 19:22 30:5
   49:8 71:13 94:5
   95:1 100:7 114:9
   114:21
**abreast** 33:13
**abrupt** 18:4
**accommodations**
   36:20
**accused** 69:17
**acting** 6:4 20:3
**action** 1:9 101:22
   121:17
**activities** 9:6
**added** 31:3 104:10
   104:12 113:13
**addition** 28:13
   29:15 116:12
**additional** 17:6,12
   24:4 25:14 31:2
**address** 41:1
**administrator**
   19:15 20:3 21:22
   22:8,13,23 26:1,8
   26:17,20,22 27:3
   36:2 58:18
**adopted** 41:1
**advance** 58:9
**Advised** 109:2
**agent** 11:17
**ago** 11:2 57:14 74:1
**AGREED** 1:20 2:9
   2:17 3:5
**agreement** 39:18
**ahead** 17:17
**aid** 91:12
**air** 8:11,12,17 9:7
**al** 1:12 35:14 58:18
   68:16
**Alabama** 1:2 2:5
   5:12,18,23 6:3,6
   6:11 12:18 36:15
   36:17 121:3
**alert** 102:1

**Alexander** 45:5
**allegation** 68:4
**allegations** 58:23
   77:17
**allowed** 65:21
**allows** 113:1
**ambulance** 97:10
   98:8,8 100:14
**announced** 15:19
   18:1,3
**answer** 33:8 52:7
   64:14 83:20 84:14
   96:3,8 103:13,15
   103:17,19
**answers** 121:9
**antiquated** 34:10
**anybody** 29:3 32:9
   59:10 74:16 75:1
   79:17 87:9 95:5,6
   108:13
**anywise** 121:18
**apparently** 34:3
**appeared** 112:20
**appointment** 39:10
   44:4,13,15,16
   86:5 87:12
**approximately** 2:7
**area** 30:23 51:9
   70:7 106:19
   115:23 116:8
   117:1,10,11 118:4
   120:3,5,16
**arranged** 45:16
**arrangement** 39:16
**arrest** 63:23
**arresting** 50:18
**arrests** 48:23
**asked** 19:14 22:19
   22:19 31:14 34:2
   59:10,19 67:13
   68:15 72:1,21
   73:4,11,14,17
   85:16 118:10
   119:23

**asking** 17:5,11 68:2
   73:15,22 74:2
   76:22,23 81:13,17
   100:5 115:13
**assign** 2:23
**assigned** 113:22
   116:10
**assist** 29:20 42:21
   118:5
**assistance** 92:10
**assistant** 26:20,21
   27:3 28:16 116:14
**assister** 29:14
**assisting** 29:10
   117:18
**Association** 36:17
**assume** 45:11 51:18
   71:18
**assuming** 31:4
   53:15,17 99:20
**attacks** 95:11
**attain** 9:14
**attend** 94:5
**attended** 8:9
**attention** 39:6
   43:21 91:14 102:1
   104:14 119:13
**August** 14:5,11,22
**automatic** 45:11
**available** 45:1,10
   45:22 116:17
**aware** 41:6 42:10
   48:2 51:7 52:2
   61:1,7,11 64:19
   66:18 67:2 68:3
   70:16 83:8,12
   84:16 100:20,22

**B**

**B** 4:10 110:7
**back** 18:20 24:21
   43:23 63:20,21
   69:9,19 86:21
   96:10,12,13 106:1
   110:13 111:12

**backup** 79:10 80:2
   80:14
**base** 9:3,8
**based** 42:22 44:5
   44:17 51:19 85:15
   101:18 102:23
   112:18 119:23
**basically** 19:20
**basis** 51:9,10 61:11
   63:14,16
**bathed** 111:21
**becoming** 20:23
   26:15 110:14
**beginning** 2:7 19:4
   19:11
**believe** 30:5 34:15
   56:12 63:1 105:2
   107:5 112:9
**best** 57:17
**better** 89:3 94:16
**bible** 36:9
**big** 106:14,15
**biggest** 16:17,18,22
**Bill** 20:16 21:8
**Birmingham** 5:12
   5:18 6:2 12:18
**bit** 14:14 28:18
**blessing** 36:4 46:20
**block** 90:8 110:8
   115:11
**blocks** 114:23
   115:1,3,6,21
**board** 17:4
**book** 36:10,16
   37:18 39:5 42:18
**booked** 50:22,23
**booking** 50:15
   88:22 91:18
   115:23 116:8,23
   117:10,11,17
   120:2,4,15
**bottom** 87:4 117:17
**Bradley** 34:2 35:14
   58:18 60:8,17,21

**backup** 67:15 75:16,19
   76:5 78:4 85:2,9
**Brandon** 32:14,15
**break** 14:3,4 93:15
**Brett** 18:17 19:20
   25:4
**brief** 93:20
**bring** 17:4 88:20
**bringing** 15:20
   16:12 17:10 63:23
   90:1 91:10
**broke** 83:9
**broken** 83:6 84:19
   85:2,9 108:6
**brought** 21:14
   50:16 69:14 88:4
**Bryan** 1:5 47:9,16
   47:22 70:23 77:3
   107:17
**Bryan's** 47:20
**BS** 32:8,10,11
**bucket** 110:11
**buckets** 93:6
**budget** 31:16
**building** 7:17 120:8
**built** 13:4
**bunch** 49:11 72:23
**business** 12:17
**B.B** 8:2

**C**

**C** 5:1 121:1,1
**cabinets** 80:19
**Cain** 10:15,16
**call** 22:5,6 24:4
   42:20 44:12,15
   45:12 46:16 54:14
   88:16 96:23 98:17
   98:19 99:22
   100:14 102:1,8,21
   103:5 105:21
   117:13
**called** 22:19 26:22
   27:9 28:14 38:7
**calls** 23:7

camera 91:3
cameras 34:5 90:23
  113:6,12,17 115:1
  115:10,20,22
capable 94:16
captain 27:5
care 14:13 22:6
  37:19 46:10,11
  89:6 118:13
career 8:10,22
CARROLL 5:9
case 100:15
cause 6:14 121:19
cell 61:3,8,22 62:13
  64:8 65:10 66:14
  69:18 74:7,20
  75:5,12,16,20
  90:8,20 106:9
  109:12 110:21
  111:7 114:23
  115:1,3,5,11,21
cells 37:7 90:22
  115:20
center 8:23 9:2,10
  9:10,13
certain 75:1
certainly 23:21
  31:10 42:19 43:22
  44:3 59:12,23
  91:13 111:10
  113:13
certified 88:14
certify 6:5 121:6,15
chain 96:5,15
change 21:4,7
changed 28:5 104:4
  104:17
charge 20:14,17
  27:20
Cheaha 40:17
check 23:3 110:18
chief 15:20 16:7,13
  17:5 18:15,16,17
  19:19,19 24:11

25:2 28:1 58:14
chose 111:18
City 45:5
Civil 1:9 6:7
clean 93:8
cleaning 12:16
clear 118:8
client 76:18
clippers 73:18
closed 91:19
closer 53:1,3 89:1
  90:6 91:6,15
club 12:2
clue 32:7
cold 70:17 71:6,17
  71:19
college 8:6,9,11
come 15:22 22:16
  33:17,21 38:8
  39:21 40:16 45:2
  60:8 64:22 78:1
  97:1,11 113:2
  119:3
Comer 8:2
comfortable 71:12
coming 9:9 39:23
  40:10 110:7
comings 114:13
command 8:19,22
  8:23 9:3,10,12
  96:5,16
comment 59:23
comments 60:13
commission 31:14
Commissioner 2:2
  3:6 5:5 6:4
  121:23
commissioners
  39:19
commit 108:15
  109:16
communications
  8:20 9:4,9
community 8:11

38:8 96:23 97:4
  99:23
complaining 89:16
complaints 58:16
  58:19
compliance 2:13
complications
  103:7
comply 72:16
computer 78:12
  79:9,13,18
computers 79:14
  79:20
concrete 71:16,19
  71:22
confident 32:5
connection 90:3
console 9:13
constant 9:8
consulted 56:23
control 8:20 112:21
  114:12,18
conversation 70:11
  83:3
convulsions 95:14
cook 93:12
Coosa 2:3 6:9 13:2
  14:1 62:12 94:1
copies 34:6 79:7
core 28:12
corner 31:21
corporal 27:9,15
  27:19 28:15 29:13
  35:6,8,14,18
  100:2,7,10 120:7
corporals 26:13
  27:10
correct 111:16
  112:6,17,22 113:7
  113:21 117:11
  120:17 121:12
correction 119:4
corrections 66:11
  100:11 101:19

109:22 117:14
counsel 1:22 2:19
  2:21 6:8 121:16
county 2:3 6:10
  13:2,16 14:1
  15:22 16:11 19:10
  39:19 62:12 94:2
  121:4
couple 11:10,23
  14:18 105:5
court 1:1 2:14 6:2
  6:18 50:17,18
Courthouse 2:4,4
  6:10,10
cracked 108:6
current 15:5 46:20
  96:9
currently 110:4
Curry 107:19
custody 81:14

### D

D 4:1
daily 61:11 63:14
  63:16
Daniel 1:5 2:1 5:4
  6:1 121:22
date 6:5
dates 61:9
daughter 10:8
daughter's 10:21
day 2:6 6:12 18:1
  18:19 19:18,18
  20:4 21:22 23:1,1
  23:6,6,8,10,15
  28:15 29:9,20
  31:20 33:4,20
  34:16 35:18 48:7
  64:2 66:3 78:12
  105:10,13,17
  111:4 116:3,5,7,9
days 28:7 33:5
  34:16,17,19 57:16
  57:22 58:3,4 62:6
  63:12 105:16,22

daytime 23:17
  33:17 66:5 117:2
  120:1,10,16
day-to-day 34:14
deal 36:21 70:19
dealing 37:10,12
  94:16
December 62:22
  63:2 71:5 107:1
  108:19 110:1,4
decided 45:7
decision 17:4 18:20
  22:22 31:2,5,8,11
  43:8 51:15,17
  54:9 55:5 96:6
decisions 15:10
  43:15
decision-makers
  43:2
decision-making
  57:1
defecate 65:15,16
Defendant 1:14
  5:14
defer 43:1 97:17
Define 37:14
degree 71:12
delegated 47:2
denied 72:2,22
dental 86:5
dentist 83:13,16
  84:17,18 106:23
  107:3,4,6,20,22
  108:1,4
deny 69:20,21 73:7
  118:15
department 14:1
  15:4 19:8 83:1
depending 63:3
  98:14 105:21
depends 58:5 66:3
  89:11,12 120:18
deployed 94:3
DEPONENT

120:23
deposition 1:16,23
  2:10,11 3:2,6 4:13
  54:3 68:10,13
  77:7 93:22 121:7
  121:13
depositions 2:15
deputies 20:19
  23:20,21 24:2,5
  24:10 82:20
deputy 13:1,14,17
  13:20 15:21 16:7
  16:13 17:5 18:15
  18:16 19:18,20
  20:5 21:22 23:10
  23:22 24:11 25:3
  28:2 47:14 58:14
  82:13,16,21 98:13
  105:11,13
described 21:19
detached 90:7
determination
  54:13 97:19,21
  101:9,15
determine 96:4
  97:15 100:2 106:7
determines 96:16
  98:2,3
determining 94:12
  98:6
developed 36:2,14
  39:1
dial 97:10
differ 89:8
Difference 116:3
different 11:10
direct 90:2
direction 15:13
  104:8
directly 90:9,18
discussion 25:19
  57:7,11 82:9
  93:19 107:13
Dishwasher 12:1

dispatch 118:4
dispatching 9:4,13
  30:7,12,23 118:6
dispensing 117:19
dissatisfied 14:23
  15:3,8
DISTRICT 1:1,2
DIVISION 1:3
doctor 39:2,11,12
  43:18 44:10,14,18
  44:21,23 45:21
  46:16 53:7,13
  85:20 86:16 88:7
  96:20,21 107:14
  119:6
doctors 40:10
doctor's 44:12
  87:11
document 54:16
  55:19
documented 38:17
documents 54:8,12
  107:10
doing 35:1 39:17
  68:17 94:19
  105:23 106:4
  117:23
door 91:19
doors 112:21 113:3
  114:14
doubt 55:4
downstairs 66:1
  117:13,22 120:11
Dr 5:22 39:14,16
  39:20,21 40:4
  44:4,6 45:4,7,9,13
  45:22 46:2 53:18
  53:21 104:20,23
  107:19
drafted 37:10
drinking 59:1
drive 5:10 80:14
driven 40:4
duly 7:1

duties 13:21 19:1,2
  19:6,19,21 20:2
  20:12 21:18
  117:15
duty 19:13 103:2
  109:2 112:11
  116:7 118:2
D.A.R.E 19:9,16,23
  21:21

————————

E
E 4:1,10 5:1,1
  121:1,1
earlier 112:6
easier 89:7
easy 72:16
effect 2:12 26:10
  36:6 46:19
eight 24:7,8,9,12
  28:6,12 58:4
eighteen 10:4
  108:21
either 91:7 108:23
electronic 112:21
  113:3 114:14
eleven 108:21
ELEY 5:21
emergency 38:5
  96:22 99:18
  100:13 102:2,8
employee 13:23
employees 9:11
employer 12:13
employment 11:6
  12:12
EMS 38:7 42:20
  43:1,11 96:23
  97:4 98:2,17,19
  99:22 102:21
  103:5 110:16,23
ensure 46:23
entire 13:16 19:10
  62:11 114:19
  116:16 120:8
entries 80:3

entry 86:12
environment 71:15
essence 27:4
established 33:15
et 1:12
evaluation 88:2
Evans 13:11 20:16
  21:8
events 9:6
Eventually 19:22
everybody 27:1
  46:23 71:13
evidence 3:2
evoke 77:18
exactly 34:13 56:1
  77:8
exam 40:8
examination 4:2
  6:15 7:4 105:7
  112:4
examine 40:10
examined 7:2
examining 107:9
example 15:14,17
  31:19 99:18,21
excuse 54:20
exhibits 4:11,13
experience 27:18
Explain 9:1
extra 12:6
eye 53:1
E-8 9:15

————————

F
F 121:1
face 102:19
facilitate 44:16
  96:20
facility 94:4,15,15
  116:16
fact 17:22 76:3
  87:23 92:19 102:3
factor 92:16
fair 114:17
fairly 32:5

falling 52:20
  100:16,22
falls 101:16
familiar 87:22
family 47:19
far 22:12 23:22
  79:21
feel 15:11
feet 73:2
fell 101:3 110:10
felt 15:23 16:2 17:8
field 8:22
fifty 110:6
fifty-six 108:22
Fifty-three 7:20
file 38:18 107:15
files 79:8
filing 3:5 80:19
fill 39:5 107:7
  118:15,21 119:8
filled 96:19
find 38:15 44:1
  48:12 49:8 79:4
  80:2 109:9
finger 64:3
first 7:1 26:14 38:8
  41:8,11 42:21
  91:12 96:23
  110:17
five 14:17 24:23
  57:16,22 58:3
fixture 109:21
floor 29:23 65:2
  71:16,22 88:22
  92:10 110:12
  117:17
flush 66:8
flushed 66:10
folks 17:7 22:6
  28:12 29:12,21
  37:19 46:15 47:16
  47:17 110:9
follow 103:5
following 6:16

follow-up 119:22
food 93:9,12
force 2:12 8:11,12
  8:17
foregoing 6:8 121:7
  121:11
form 2:20 39:6,8
  43:21 52:6 61:6
  64:10 65:5,20
  66:22 67:11,18
  69:11 72:6 76:1
  83:11 84:21 95:4
  96:19 100:19
  103:10 107:7,15
  118:16 119:1,10
forth 111:12
forty 58:1,2
four 11:21 14:17
  24:3,5,21,22
  25:11 27:23 28:7
  28:9 57:15,21
  58:2 74:1
Fourteen 110:16
frame 27:16 37:11
  44:8 114:6
Friday 117:3
friend 47:22
front 51:12,13 52:3
  52:11,16,23 53:20
  54:4,10,19 56:19
  74:6 75:5,12 88:1
  88:5,20,22 90:2
  91:11 92:12,13
full 2:13
full-time 13:23
functioning 22:8
further 2:8,16 3:4
  56:21 103:7
  120:23 121:15
fuzzy 34:23

——— G ———
Gary 5:20
generated 59:4
  81:1

getting 16:14 67:3
  89:3 118:19
give 15:14 72:19
  73:6,7,11,19
  106:1
given 16:6 87:23
  104:3,14 119:7
  121:13
go 7:21 8:6 9:6
  15:12 33:17 38:14
  43:9,22 49:2,23
  79:3 80:7 81:18
  81:19,20 96:17
  97:16 98:4 102:16
  107:6 110:19
  113:2 120:11
goes 79:22
going 17:17 18:6
  22:5 33:13,23
  42:6 51:19 62:9
  65:21 67:14 68:16
  76:13 77:10,13
  81:18 84:17 92:3
  106:13 108:14,23
  120:18
goings 114:13
good 27:17 71:14
  109:7
Goodwater 82:23
gotten 119:12
government 11:8
go-by 36:18
grabbed 68:15
Graduated 8:2
graduation 8:8
grant 31:15
granted 30:21
grapple 70:3
Green 109:1
grew 47:19
grounds 2:23
guard 112:10,16,20
  113:1,22 114:8,11
  114:18

guess 26:19 78:21
guessing 78:18 79:2
guidelines 42:4
guy 16:9
guys 27:14 35:6
  43:11

——— H ———
H 4:10
habits 60:23
Halcyon 5:22
handle 22:18
handling 23:7
handwriting 87:3
  87:20
happen 18:6
happened 18:5,18
  26:13 30:18 31:12
  51:21 71:2,3 78:2
hard 15:16 80:14
Harris 109:1
Hawaii 11:16
Hawkins 75:5,6,9
  75:14
hay 29:1,5,7 35:9
head 84:2 110:13
health 36:22 37:13
  38:2 40:17 42:17
hear 59:5
heard 59:3 60:7,11
  60:12 76:3,8,10
  76:14,17 77:3,16
  101:20
hearing 121:14
heart 95:2,10,11
held 18:9 25:19
  82:9 93:19 107:13
help 37:18 38:10
  53:2,4 72:17
  89:18 90:4 92:21
  93:3,5,10 106:16
  116:17
helped 30:23
helping 20:18 30:9
hide 109:9

high 7:21 8:8 106:2
Highway 5:17
hired 13:10,12
hit 110:13
hitting 67:15
Hold 80:22
holding 29:4 51:8
  61:3,8,21 62:13
  64:8 65:10 70:6
  74:7,20 75:5,12
  90:20,22 110:21
  111:7
hole 65:11,17
home 13:5,7
honey-dos 14:13
Honolulu 11:16,18
hoping 55:14
hospital 43:10 96:7
  96:17,22 97:16
  98:4 110:20 111:1
hour 35:20 58:3,4
  116:11 117:8
hours 58:1,2
  108:21 110:6
house 7:17 95:9
housed 61:2 110:4
hundred 108:21
hurt 109:6 110:13
hurting 69:19
  85:18 86:2,15,19
  107:1 108:8,9

——— I ———
idea 18:5 87:5
identification 4:12
identified 27:15
  37:17 38:19 69:13
  99:21
identifies 99:17
identify 99:9 100:8
III 5:8
imagine 94:20
immediate 89:5
immediately 92:11
implemented 42:19

important 19:17
include 117:17,18
includes 24:11
indefinite 51:10
indicate 54:8 78:2
  87:9 110:3 111:6
  111:14
indicated 42:16
  87:18 110:23
indicates 89:14
  107:16 108:8
indicating 50:1
indication 109:11
indications 111:11
individual 114:23
  115:20
information 44:2
  51:3
initial 62:8 87:8
initialed 61:16,18
  78:10
initially 28:20
initials 32:9
injury 69:9
inmate 38:12,18
  39:1 43:20,23
  45:20 85:16 89:16
  94:1,14 96:16
  98:7,11 102:6,14
  118:12 119:3
inmates 37:1 40:2
  40:19 42:2,5 45:4
  45:6 59:5 92:22
  94:22 95:9,16
  99:12 102:16
  104:14 114:16
  117:18,20
inside 66:8 71:8,10
  114:22 115:1,2
instructed 46:4
instruction 43:16
intake 38:12 48:4,6
interested 121:18
interject 83:19

interview 40:18
intoxicated 60:9,17
investigator 24:12
involved 55:5
isolation 37:6
issue 16:18,22
   17:13,16
issues 38:16,21
   41:18 57:12 69:13
   106:15,15

**J**

J 5:8
jail 19:14 20:3
   21:21 22:8,12,17
   22:23 23:3 25:22
   25:23 26:6,8,17
   26:20,21 27:3
   28:3 29:13 33:14
   35:22 36:2,3,9,9
   36:15,16 37:17,21
   38:7 39:22 40:1,8
   41:9,12,23 42:18
   46:5,19 47:11
   48:2 58:17 62:9
   70:13 71:9,10,17
   79:16 82:19 83:9
   92:14 94:2 95:16
   97:7,11,22 99:8
   99:15 105:15,19
   105:21 106:4,13
   108:13 112:6,22
   113:6,18 114:19
   116:1 118:1
   120:12
jailers 20:20
James 45:4,8,13
   46:2 104:23
January 12:21 14:7
   14:8,10,11 20:8
   21:11 22:2 62:22
   71:6 87:16 107:16
JEFFERSON
   121:4
Jo 9:23

Joan 80:4
job 16:6,14 23:9
   79:21
jobs 12:7
Judge 50:17
July 12:21 13:2
   15:19 17:19,21,23
June 49:8

**K**

keep 53:1,2 75:4
   80:12,13 88:18
keeping 33:12
   86:21
Kelly 1:5 41:7 47:9
   51:8 57:7 61:2
   62:19 67:13 74:20
   75:16,20 76:4
   85:1,8,17 88:1
   100:16 106:21
   107:17 108:12
   109:2,18 110:3,10
Kelly's 83:5 108:3
kept 53:20 54:4,10
   54:19 56:18
kick 76:5 84:11
kids 10:6
kill 109:21
kin 121:16
kind 22:22 26:9
   27:20 29:13 35:3
   35:6 36:7 38:15
   46:8,18 49:16
   57:18 59:16 60:12
   89:1 102:17
   106:11 114:15
   118:9
kinds 43:13,14
knew 33:23 35:4
   47:16,23 51:11
   65:1 69:8
knocked 110:11
know 15:12 16:19
   20:17 22:20,21
   23:4 30:19 31:6,9

31:11,12,17 32:9
33:14 34:3 35:15
35:19 38:19 43:14
45:12,18,19 46:6
47:10,13,15,17,21
51:16 53:19,23
54:1,6,12,19,21
59:2,12,12,16,17
60:1,5,14,22,22
61:13,15 62:7,7
62:10 63:7,7,8,9
64:17,17,18 65:12
66:4,23 67:22
68:20,22 69:16
70:9 71:23 72:8
72:10,18,20 74:17
75:3,8 76:15,17
76:20 78:17,21,23
79:1,11 80:4,6,16
80:20 82:5,6
84:13 88:19 89:4
89:12,15 91:12
93:1 94:8 95:20
97:2,12 100:9
101:4,7,13 102:4
102:4,5,13,13,14
102:15 103:17,18
103:18 117:19
knowing 47:20
knowledge 35:2
   38:20 43:13 67:4
   79:18 80:10
   108:10
knows 109:8
Kristi 5:15

**L**

L 1:18 5:20
Lakeshore 5:10
Large 2:3 6:4
laughed 76:13
laws 2:14
lawsuit 68:8
lead 27:11
leaders 26:12 27:14

leadership 21:5,7
leading 2:20
learn 51:12
leave 14:16,21
   114:9
Lee 7:7
left 16:5 97:12
leg 110:14
length 61:22 62:16
   62:18 74:17 75:2
lengthy 52:4,11,17
let's 48:16,18 50:3
   106:21 116:5
lieutenant 16:1
   18:8,10,23 19:5
   19:12 20:4,7 21:2
   25:8 96:11
life 30:19
lights 109:21
likewise 66:12
limitating 92:16
limited 92:17
little 14:14 28:18
   34:23
live 7:8,13 10:19
   11:3
lived 7:10
Lives 10:20
local 39:10,12
located 30:12
log 78:13,16 80:2
   111:14
logs 33:7,11,19
   111:5,5
long 7:10 10:2
   11:20 12:3 14:20
   57:14 62:5,12,15
   74:6,14 75:4 82:3
   105:17 106:8
longer 74:19
look 31:19 33:18,22
   38:9 43:22 48:16
   49:3 59:8,10,13
   59:16,20 63:18

80:2 97:13 102:17
106:11,13 113:17
118:17
looked 54:3,11 69:6
   78:5
looking 55:8
   106:11 108:11
   111:8
looks 32:8
lot 17:7 19:8 47:15
   47:17 52:20 89:6
   90:6 91:15 100:16
loud 83:20 110:7
lower 31:21 69:19
lying 110:12

**M**

maiden 10:15
Main 2:4 6:11
maintain 71:14
making 15:9 20:18
   31:8 44:11,13
   55:5 101:15
man 20:14,22
   47:20
managed 15:5
   29:13
management 15:1
   106:19
managing 9:5
manual 36:4 99:15
   104:3
March 49:14,21,23
marked 4:11
marriage 10:11,12
married 9,20,22
   10:3,13 11:1
master 9:16
matter 44:11 98:5
ma'am 105:12
   106:10 108:7
   111:17
McDonald 4:4 5:15
   5:16,16 6:20 37:2
   37:14 41:10,13

48:16,19,22 49:5
49:10,13,17,19,22
50:3,7,10,13 52:5
53:22 56:5 57:2
61:5 62:4,15,21
63:6 64:11,16
65:4,19 66:21
67:10,17 69:10
70:23 71:8 72:5
74:8 75:23 76:16
76:21 77:2,6,9
78:20 79:1 80:17
80:22 81:4,10
83:10 84:6,11,20
85:4 93:8,14 95:3
95:21 96:2 98:21
99:1 100:18
102:10 103:11,14
105:4,7 107:18
112:1 119:18
**meals** 117:20
**mean** 14:18 15:2,7
16:21 18:4 23:12
23:13 29:9 30:13
31:12,17 38:7
44:14 54:5,20
57:10 59:22 63:9
68:21 69:4 72:10
72:15,17 73:20
74:22 79:15,19
80:6 92:15 95:19
103:17,19 104:16
118:14
**medical** 38:14 39:6
39:8 43:21 46:11
46:17 53:4,10
57:11 85:17,19
86:15 88:2,5,11
88:17 89:5,13
90:5 91:14 94:6
94:22 96:18 99:18
99:22 100:13
102:2,9 104:13,18
110:21 118:12,16

118:22 119:5,13
**Medicalic** 86:20
**medicine** 117:20
**meeting** 18:3
**members** 47:19
92:18
**memories** 77:18
**mental** 40:17 86:4
**mention** 109:15
**mentioned** 41:17
57:13
**messed** 109:8
**MIDDLE** 1:2
**Mike** 82:11,12
**military** 7:18 8:7
11:7 12:8
**mind** 11:12 78:1
**minute** 84:12
**misspoke** 56:7
**mixed** 57:18
**mom** 7:15
**Monday** 117:2
**money** 12:6
**monitor** 113:16
**monitoring** 9:5
**monitors** 113:4
**Montgomery** 5:17
5:23 16:10
**month** 17:21 26:14
61:3
**months** 7:16 12:5
12:22 14:18,19
**mop** 93:6 110:11
**moved** 13:6 18:19
51:8 52:3,11,16
52:23 53:8 111:13
**moving** 88:1 93:5

**N**

**N** 1:18 4:1 5:1
**name** 7:5 9:23
10:14,15,22 16:8
94:9
**NCO** 12:1
**Nebraska** 10:20

11:4
**necessary** 2:18
91:13 110:19
**neck** 68:15
**need** 43:9 44:2 46:9
83:19 86:15 89:5
90:5 94:13,22
97:8,14 98:9
99:22 100:13
106:16,16 107:21
119:6
**needed** 22:21 39:2
40:19 46:16,17
67:7 72:13 73:9
111:1
**needing** 53:10
**needs** 44:9 45:21
46:11 53:5 58:5
85:19 91:15 94:6
96:17 97:16 98:3
98:7,11 117:16
**neither** 121:16
**Nell** 10:14,15
**nerve** 9:2,10
**never** 73:14 74:5
105:18,20
**new** 15:20 16:7,13
17:5 26:15,17
**night** 30:2,9 66:6,6
78:15 108:20
110:2 111:5 116:4
117:6,22
**nights** 28:10 33:5
**nighttime** 117:5
**nineteen** 110:6
**nod** 16:4
**noise** 110:7
**non-commissioned**
9:17,19
**normal** 116:9
**Notary** 2:2 5:5 6:3
**note** 44:17 63:3
**notes** 62:20 63:13
75:11

**notice** 3:5 56:21
**noticed** 31:18 37:5
40:7 112:10
**notified** 22:13
**November** 41:13
47:11 50:5 105:9
**numb** 110:15
**number** 20:14,22
20:23 63:12 92:17
**numerous** 48:23
**nurse** 39:3

**O**

**O** 1:18
**Oaks** 18:17,18
19:20 21:15 25:4
25:5
**object** 52:5 61:5
64:9 65:4,19
66:21 67:10,17
69:10 72:5 75:23
83:10 84:20 85:4
95:3 100:18 103:9
**objection** 64:12
103:12
**objections** 2:18,22
**observation** 53:11
88:5,11,17 100:9
101:18 103:1
110:22
**observations**
112:19
**observe** 89:2 90:10
90:12,18 92:3,5
**observing** 88:8
**obtain** 44:3
**obtained** 28:21
**obviously** 35:15
101:22
**occasion** 75:22
98:16,20
**occasionally** 30:8
30:15 40:21 59:6
70:10
**occasions** 73:5

101:6,11
**occurred** 77:11
98:15
**occurring** 100:3,8
**October** 13:7
**offered** 3:2 4:12
**office** 33:21 40:5
44:13 58:6 106:1
106:3
**officer** 9:18,19
19:10,16 21:21
48:6 50:15,19
66:11 82:13 98:13
100:12 101:19
103:1 109:22
117:14 119:4
**officers** 20:1 99:11
116:1,6
**officer's** 118:1
**off-the-record**
25:18 82:8 93:18
107:12
**oh** 23:16 26:7 36:14
48:21 53:9 54:17
54:18,20,21,23
55:2 56:8,9 58:11
74:11 83:21 88:13
96:18 97:10,23
118:23
**okay** 15:17 24:14
30:16 49:2 50:2
55:13 56:6,9,11
56:13 84:3,8
86:17 96:13
106:18 107:18
116:9
**old** 7:19 10:9
**Omaha** 10:20 11:4
**once** 43:20 63:22
109:6
**operation** 15:23
34:14
**operations** 8:23
**opportunity** 16:3

Daniel Court Reporting, Inc.

119:7
oral 6:15
order 49:16 114:12
outside 11:7 15:21
  66:10,11 71:9
overall 106:12
overlooked 16:19
Owens 1:12 15:18
  21:10 26:16 36:5
  46:21 55:1 83:3,4
  83:5 104:5

P

P 1:18 5:1,1
page 4:2 68:12
pain 85:21
pallet 71:21
paper 64:7,21 72:2
  72:13,15,19,22
papers 68:7
paperwork 105:23
paramedic 97:7
part 23:1,6 38:4,11
  47:5 52:22 89:23
particular 28:3
  35:23 106:9
parties 1:21 2:22
  121:17
part-time 11:11,15
  14:14 19:13 30:6
  30:8,20,21
pass 19:23 33:19
  59:17
passed 60:2
patients 36:21,23
  37:12 40:11 41:1
  95:1
pawn 94:21
pay 91:14
PD 18:22
Peebles 2:1 5:4 6:1
  121:22
people 27:8,12,22
  28:2 29:15 41:22
  43:17 46:4 55:4

59:3 66:4 92:20
  93:3,9 95:13
  113:2 116:21
  120:2,6
percentage 106:2,2
performing 13:20
  88:11
period 30:5 52:4,12
  52:17 82:14
permanent 51:9
person 20:23 25:21
  26:5 27:20 29:7
  30:9,12,14,22
  31:2 43:5 48:3
  66:1,6 75:1 79:13
  81:22 88:21 89:20
  90:3,7 91:2,7,9,11
  92:4,7,9,13 98:2,3
  102:9 103:3
  116:12 117:7,9,12
  117:22 120:10
personally 53:16
person's 117:15
phone 23:1 44:12
  45:12
pick 30:6
picture 106:12
piece 64:6,20
pills 86:16,18
  108:14 109:4
placed 75:11
places 11:11
Plaintiff 1:7 5:7
please 7:5
point 21:17 33:20
  38:23 64:3
Pointe 5:22
points 40:14
police 82:12 83:1
policies 37:9 40:23
  99:16
policy 36:3,9 37:17
  37:21 38:6,11
  39:4 41:4 42:9,11

42:17,18 43:19
  46:3,7,19 47:1
  99:14 100:14
  103:20 104:1,2
  118:11
population 89:10
  89:22 90:16 92:20
position 20:7,10
  25:23 26:19 29:4
  30:7,21,22 32:18
  32:21 33:1 79:17
positions 26:9
  27:19
possible 44:5
post 8:23 9:3,12
posted 58:12
practice 33:10
  45:18 112:12
practices 15:1
preparing 54:2
prescribed 44:7
presence 69:3
present 116:23
pretty 18:4 34:10
  45:17 112:11
Primarily 118:3
primary 16:5 19:6
  35:13
prior 3:3 10:11,12
  17:22 20:9
probably 19:17
  32:14 57:12 70:8
  78:18
problem 22:14 38:3
  39:1 41:7 59:1
  73:21 89:14,17
  119:5
problems 36:22
  37:13,20 38:16
  41:19,21 52:19
  95:2,11 106:14
procedure 6:7
  94:11 104:2
procedures 35:21

36:4,10 40:23
  99:16
proceedings 6:16
process 38:15,22
produced 79:6
program 19:23
promoted 20:6
  27:19
promotion 19:12
provide 100:6
provided 6:6 36:18
  99:8
providing 46:14
Public 2:2 5:5 6:3
pulled 107:17
pursue 39:7
pursuing 103:21
put 26:9 36:6 46:18
  57:9
puts 100:2
P.C 5:9
p.m 2:7 6:13

Q

qualifications
  40:16
question 22:15 37:4
  52:14 77:14 84:1
  84:10 85:6,15
  96:14 103:19
  111:3 118:10
questions 2:19,21
  10:4 105:5 114:7
  121:9
quick 18:5 93:15
quicker 91:15
quite 17:9 49:16

R

R 5:1 121:1
radio 92:9
ran 21:10 35:7
Randi 9:23
rank 9:14 18:10
  26:9,23

reaction 76:20
read 86:17
reading 2:9
real 93:15
really 44:14
rear 117:19
reason 16:5 52:9,16
  52:23 54:4 55:3
  81:13 84:17 87:23
  118:13
recall 12:10,11
  16:8,11 17:20
  28:23 30:20 31:10
  32:20 34:7,11
  37:23 39:23 40:2
  40:13 41:3,15
  48:7,8 51:13
  52:18,21 54:15
  57:5,6,13,17 59:9
  59:22 61:8 62:3
  62:14 64:2,23
  67:19,21 68:1,17
  68:21 70:10,20
  71:4 72:7 73:3,15
  73:20 74:2,15,21
  82:15 83:7 84:9
  84:22 88:3 91:23
  94:7,9,18 101:1
  101:12 104:11,15
  111:8
recess 93:21
recognized 26:10
recollection 69:1
  69:23
record 55:8 79:7,8
  106:20 107:2
records 48:14 69:5
  69:6 78:9,11 80:8
  80:11,23 83:15
  108:11,18
reduced 121:10
REEXAMINATI...
  119:21
refer 37:21 46:2

59:15 97:2 104:19 104:22
referred 27:1 36:8 45:4
referring 62:17
refers 96:21
refilled 87:13
reflect 61:21
reflected 62:19 75:10
reflects 63:4
refresh 69:1
refused 73:18
refusing 73:7
regard 104:13
related 101:17
relating 2:14
relatives 47:21
released 62:23
relieved 114:10
remember 29:1,3 32:23 41:16,19 57:3 70:5 73:13 73:23 74:18 75:13
remove 109:20
removed 111:11
render 91:12 92:10
report 31:20 102:10 108:20 110:2,8,15
reported 103:3
Reporter 6:2,18
reports 31:19 61:14 61:17,19,20 62:8 63:16 102:7 106:6 106:6
represents 121:12
request 39:6,8 43:20 66:16 72:16 85:17 89:13 96:18 108:3 118:12,16 119:1
requested 66:19 106:22

requests 43:18
required 65:2 71:20
resigning 17:17
respect 47:8
respective 1:22
responders 38:9 42:21 97:1 110:17
responds 97:7
response 87:15
responsibility 114:15
responsible 25:22 26:5 29:8 46:14 101:14
restoration 12:17
restroom 65:22
result 121:18
retain 34:6
retained 34:19
retired 9:15 12:14 21:9
retirement 12:20
reverse 49:2
review 61:14 63:15 106:7
reviewed 54:7 63:13 106:5
revised 36:3 104:6 104:16
Richard 5:8 55:11 114:2 118:10
Ricky 1:12 15:18 21:9 26:16 36:5 46:21 55:1
ride 47:18
right 8:8 17:9,22 29:19 32:4 66:2 66:15 70:19,22 72:3 73:19 81:3 81:15,21 86:14 91:4,17 92:6,7 106:23 107:23 108:5 111:23

112:23 113:15,20 114:5 115:16,18 117:4 119:9
right-hand 31:21
road 13:18,20 22:5 22:9 23:20 24:4 24:17 28:1 29:11 47:15 82:16,20 105:15,17 106:3
roads 47:18
Robaxin 87:12
Roberson 26:3,18 32:6 35:11,12 46:22 50:16 51:22 56:14,15,18 59:16 60:4
Rochester's 50:17
Rockford 2:5 6:11 7:9 110:16
Roebuck 11:16
room 40:8,20 65:8 68:9
rotated 34:18
routine 33:15
row 57:23
Rudd 82:11,12
Rule 6:6
rules 2:14 6:7
run 20:18,19
running 15:23
runs 79:14

_____
S

S 1:18,18 4:10 5:1
SAITH 120:23
salary 31:15
Sandra 2:1 5:4 6:1 121:22
sat 68:9
Saturday 57:20
save 108:14
saving 109:3
saw 75:19 76:4 86:18 101:19 103:2 113:4

saying 33:22
says 54:17 56:7,22 68:14 70:13,17 71:1 72:23 73:4 73:17 85:18 86:9 86:14,20 87:1 103:21 110:10
schedule 44:6,17 57:18 58:12,13
scheduled 58:1
school 7:22 8:9
schooled 43:12
screening 38:14
scuffle 70:3
se 47:22 51:18 99:14
searched 109:12
Sears 11:15
second 80:23
secretary 79:5 80:5 81:20,23
section 104:18
security 11:15,17
see 39:2,10 42:14 43:18 44:10,18,21 45:13,13,21 48:18 50:3 53:7,21 62:8 64:1,20 78:3 84:7 85:19 86:3,15 87:8 89:3,21 90:15 97:13 98:21 99:3 100:12 102:3 103:6 106:21 107:8,22 108:4 114:21 115:5 119:6
seen 45:5 60:16 83:14
sees 92:8
seizure 42:15,16 43:6 98:16,19 99:3,9,13 100:3,8 101:17,21 102:8 102:21,22 103:4,8

103:22
seizures 41:2,5,8,17 41:22 42:2,6,9 57:8,12 95:14 99:17 101:5,10
send 95:20
senior 9:15
sent 68:7 96:7
September 2:6 6:12 13:7
sergeant 9:16 20:11 20:13,22 26:3,11 26:23 27:2 28:14 29:12 33:16 35:5 46:22 50:21 51:22 56:14 59:15 60:4 116:14 120:6
sergeants 47:6
serious 36:22 37:13 37:15,20 38:2 106:15
serve 93:9,10
ServePro 12:16 14:15
set 42:5 44:9
severe 95:2
shared 19:18
sheriff 13:1,9,11,14 13:17,20 14:6 15:6,18 18:14 21:8,9,10 26:15 31:5 36:5 46:21 46:21 52:1 55:1 56:17,17 64:6 81:2,5 82:13 83:18 94:20 96:10 105:8 112:5
sheriff's 14:1 36:17 58:6
she'd 33:17
She'll 84:11
shift 19:18,19 20:4 21:4,6,22 23:9,10 23:15 26:12 27:14

Case 2:05-cv-01150-MHT-TFM    Document 105-15    Filed 11/30/2007    Page 42 of 44
Daniel Court Reporting, Inc.

Page 130

27:16,21 28:6,7
28:15 29:9,18,20
31:20 33:3,4
35:18,19,20 78:12
78:15 105:10,13
106:6 108:20
110:2,9 111:4,5
116:3,4,6,10,11
117:6,8
shifts 58:3,4
shook 84:1
short 7:15 82:14
shortly 36:1,6
shoving 69:18
show 55:15 56:4
shower 111:7,16,19
111:20
shows 48:14 107:2
sick 95:15
side 23:22 84:2,4
108:5
sign 32:16 33:22
signature 2:10
31:22
signatures 32:3
significant 11:14
106:14
signing 33:6,11
simple 72:15
sir 7:6,23 8:13 9:21
11:19 12:9 13:6
13:19 14:3,9
17:15,20 18:9,13
21:1,3,16,20,23
22:10 23:11,12,16
23:17 24:15,22
25:4,6,9,12,15
26:2,22 27:7,13
29:23 30:3 31:23
32:20 33:8 34:22
35:12 36:14 37:8
41:3 42:1,3,8 43:4
43:7 44:22 45:17
47:4,7,12 48:13

51:1,4,6 52:8,15
53:9,12 54:1,5
55:6 56:20 58:11
58:20,21 59:2
60:18,20 61:18
63:15 64:15 65:6
66:9 67:5,12,20
68:11 69:4 70:1,4
73:9,22 74:21
75:14 76:2,7
77:19 78:7 79:15
82:2,18 83:16,22
84:22 85:5,12,13
86:1,11,13,23
87:2,14,17,21
88:6,9,13 91:5,20
92:15 93:13 95:7
95:8,12,16,19
97:18,23,23 98:18
99:4,5,6,20 100:4
103:23 104:6,21
105:1,12 112:7,14
112:23 113:8,11
113:19 114:11,20
115:2,7,9,22
116:22 117:12
118:14,23 119:11
119:14 120:13
situation 38:5 47:9
78:4 98:15
situations 97:3
six 7:16 12:21
24:17,19 57:22
sixty-four 68:13
skills 79:18
sleep 65:2 71:21
small 16:20 17:1
19:7
SMITH 5:9
socialize 60:21
sole 114:14
somebody 28:23
45:19 59:22 63:23
70:13 88:20,23

106:8
soon 44:5
sorry 84:7,9 115:12
sort 23:5
sorts 9:2 59:14
SOUTHERN 1:3
specific 41:4 42:9
64:2 79:16 94:9
specifically 60:11
99:17
specifics 104:11
spelled 39:4
spend 22:2 74:6,14
105:14
spent 22:4 62:12
staff 9:7 18:2 22:17
42:20 79:16,23
92:17 99:8,9
standard 28:5
36:19 112:12
standards 36:16
start 15:22 116:5
Started 13:19
starts 89:16
State 2:2 6:3 121:3
statement 69:3
states 1:1 109:19
station 88:23 91:18
118:2
stayed 117:10
stays 117:9
stenotype 121:8
Steve 29:1,5
sticks 11:12
STIPULATED
1:20 2:8,16 3:4
stipulation 6:8
stipulations 6:19
Stockham 4:3,6 5:8
5:9 6:21 7:4
25:20 50:20 55:9
55:12,16,20 56:1
56:3 62:18 63:1
63:10 76:19 77:4

77:8,12,15 81:7
81:12 82:10 84:15
93:16,23 105:2
119:21 120:20
stomach 85:22
86:16,18
stop 67:15 68:16
70:14
storage 80:15
street 2:5 6:11 40:3
40:4
strictly 111:20
Stroud 32:14,15
structure 23:23
stuff 99:13
suffered 41:2 95:10
suffering 95:14
suggest 42:23 98:10
suicide 108:16
109:16
Suite 5:11
Sundays 57:20
supervision 32:19
32:22 121:11
supervisor 59:14
60:3
supposed 38:1
sure 24:1 25:1 29:6
30:18 33:4 34:13
37:3 38:13 40:15
45:3 46:10 48:9
51:20 52:1,14
60:2 67:8 69:15
70:8 71:11 72:14
104:17
sworn 7:1
Sylacauga 7:16 8:3
10:18
system 34:7,8,9,9
113:14

————————
T
T 1:18,18 4:10
121:1,1
take 37:18 38:9

42:13,22 43:22
44:6 53:6,13,16
93:14 102:18
107:21 108:15
109:5 117:15
118:16
taken 2:1 40:3
46:10,11 51:2
53:21 93:21 98:11
106:22 107:3
110:20 111:1,2,6
111:12,15 121:7
takes 98:8
talk 40:18 43:23
59:3 70:14,14
talked 31:13 70:9
talking 15:15 55:22
70:5 86:1 114:3
tape 34:4,15,20
91:23
taped 64:6 91:21
92:2
tapes 34:11,16,17
tasking 117:23
Taylor 108:23
teeth 83:6,9 84:18
85:3,9 108:5,9
tell 18:7 51:17
60:14 67:6,7
74:23 85:14
108:12
ten 58:3
tend 53:3 90:6
120:11
Terra 10:23 11:2
Terry 1:16,23 6:13
6:23 7:7
testicles 76:6
testified 7:2 68:12
76:4,12 100:21
testify 76:9,10,18
77:3
testifying 68:18
Thank 119:17

Case 2:05-cv-01150-MHT-TFM    Document 105-15    Filed 11/30/2007    Page 43 of 44
Daniel Court Reporting, Inc.

Page 131

| | | | | |
|---|---|---|---|---|
| thee 54:21 | 81:10,23 82:3,14 | trial 3:1 | **V** | week 57:16 74:19 |
| thereto 3:3 121:9 | 88:4 93:3 104:5 | true 24:16 66:12 | vacation 45:23 | weekends 57:19 |
| thing 23:5 | 105:14 107:23 | 121:12 | value 11:14 102:19 | weeks 26:14 |
| things 15:10 16:20 | 113:18 114:6 | trustees 93:2,5 | varies 63:2 | Wendy 26:3 32:6 |
| 16:20 17:2 19:9 | 116:18 119:2 | try 45:12 46:2 | versus 90:8 105:15 | 35:11,12 46:22 |
| 23:4,14 34:1 | times 23:2 40:14 | 73:23 89:17 | 116:4 | 56:12,14,18 |
| 43:13 63:17 74:3 | 72:21 101:3 | trying 11:9 12:5 | VHS 34:11 | went 8:7 18:20,21 |
| 93:6 106:4,12 | 120:14 | 28:22 33:12 55:20 | visit 107:14 | 20:21 35:3,4 |
| think 11:10 15:19 | today 37:6 104:4 | 56:2 76:5 109:16 | volume 105:22 | 83:13,15 84:16 |
| 16:10 24:3,5,22 | 108:12 112:6,19 | TW 31:23 | vs 1:9 | 86:9 105:18,20 |
| 28:4,19,20 30:4 | toenail 73:18 | twelve 7:12 35:20 | | weren't 61:4,12 |
| 33:2 34:12,18 | toilet 65:8 72:2,13 | 116:11 117:8 | **W** | 94:5 117:22 |
| 48:5,10 52:22 | 72:14,19,22 | twenty 109:4 | waived 2:11 3:7 | Wetumpka 18:21 |
| 68:6 74:9,22 | told 27:23 70:17,18 | twenty-two 8:18 | walked 40:3 70:12 | 18:22 |
| 83:14 85:21 105:9 | 74:4 85:1,8,11 | 11:13 108:22 | walk-throughs | we'll 31:19 |
| 108:17 110:18 | 109:2 | twice 63:22 | 23:4 | we're 19:7 79:2 |
| 113:11 | tooth 85:18 86:2,14 | two 20:2,14,22 | want 18:2 76:20 | 114:3 |
| third 30:14 | 86:19 106:23 | 25:13 28:6,8,9,10 | 94:21 96:8 113:23 | we've 24:17 45:19 |
| thirty 10:10 34:16 | 107:17 108:8 | 28:10 29:12,20 | wanted 15:12 66:16 | 45:20 48:14 49:1 |
| 34:19 | toothache 86:21 | 32:2 54:17,18,20 | 78:8 109:19,19,23 | 69:5,7 95:15 |
| thirty-one 34:17 | total 24:8,9,10,12 | 54:20,21,21,23,23 | wanting 76:17 | who've 95:10 |
| thought 22:20 | touched 118:9 | 55:1,2 56:7,8,8,8 | Warner 11:2,2 | Willford 4:5 5:20 |
| 63:20 | Tough 10:4 | 56:10,10,11,11 | wasn't 14:19 17:9 | 36:23 55:7,10,13 |
| three 11:1 14:19 | tour 112:5 | 110:16 120:5 | 31:7 71:7,22 | 55:18,22 64:9,13 |
| 19:5,21 20:23 | tower 29:22 78:13 | typewriting 121:10 | waste 65:11 | 70:21 83:18,23 |
| 21:18 23:13 54:18 | 78:15 89:21 90:7 | | watch 89:2 | 84:4 90:12 103:9 |
| 55:2 56:8,10,11 | 90:11 91:4,7,9 | **U** | watched 91:1 | 112:4 119:16 |
| 74:1 109:1 116:20 | 92:6,8 111:4,5 | U 1:18 | watching 91:2 | William 13:11 |
| 116:21 120:2 | 112:9,16,20 113:1 | Uh-huh 32:12 | 114:15 | Wilson 1:16,23 |
| tied 113:5 | 113:16,23 114:9 | Uh-uh 49:17,19 | water 66:13,13,16 | 6:14,23 7:7 10:1 |
| till 56:21 | 114:18,22 115:8 | understand 19:7 | 67:8 73:5,8,10,11 | 10:14,23 105:8 |
| time 2:23 3:1 7:15 | train 99:11 | 37:3 81:8 | 73:12,14,16 | window 64:7,21 |
| 14:20 15:16 16:2 | trained 46:23 | understanding | way 15:4 40:5 | 91:22 92:1,3 |
| 16:23 18:8 20:9 | training 17:6,12 | 27:17 114:1 | 48:11 67:23 69:1 | wing 9:7 |
| 22:3,4 25:3 27:16 | 46:15 99:7 100:6 | understood 46:9 | 72:9 90:7 91:7 | witness 2:11 6:14 |
| 28:3 29:5,11 30:4 | transcript 121:13 | 52:10 | 109:17 113:9 | 48:21 49:1,12,15 |
| 35:2,23 37:11 | transfer 94:14 | UNITED 1:1 | 119:14 | 49:18,20 50:2,5,9 |
| 39:14 40:2 41:10 | 95:17 | updated 113:14 | ways 91:1 | 50:12 55:15 77:1 |
| 44:7,8 50:11 | transferred 94:4 | updates 104:7,9,12 | Weaver 39:14,16 | 81:3,9 83:21 84:3 |
| 51:20 52:4,12,17 | transport 98:6,10 | urinate 65:15,16 | 39:20,21 44:4 | 84:8,13 107:9 |
| 54:23 58:7 60:19 | 98:13,14 | use 39:20 40:20 | 45:9,22 53:18,21 | 121:14 |
| 61:22 62:11,16,19 | transported 98:7 | 65:8 73:1 79:20 | 104:20 | witnessed 75:15 |
| 64:2,5 66:1 68:14 | trays 93:11 | Usual 6:18 | Weaver's 40:5 44:6 | work 9:12 11:11 |
| 74:17 75:3 81:1 | treat 95:1,4,6 99:11 | usually 40:6 | WEBB 5:21 | 12:3,19 13:15,16 |

14:14 17:7 18:21
18:22 22:11 38:23
57:15,19 60:9
71:13 79:20
**worked** 11:14
12:13 19:3 31:17
32:17 40:6 117:21
**workers** 28:6 33:3
**working** 11:7 13:22
28:8,10 47:14
71:14 82:19
**world** 7:18
**worse** 89:4
**wouldn't** 60:1,22
72:18,19 101:7
**wrap** 73:1
**writing** 37:22
**written** 46:7
**wrote** 87:10

### X

**X** 4:1,10

### Y

**yeah** 6:20 24:20
29:19 35:17 37:16
48:21 49:1,12,15
50:7,9,12 55:9,12
63:8 77:1 81:3,9
83:4 86:7 90:17
92:23 93:16
115:12,14
**year** 8:4 14:6,7
**years** 7:12 8:19
10:5 11:1,13,21
45:3 74:1
**young** 47:20
**y'all** 27:5 93:2
107:21 111:2

### 0

**03** 20:8 21:12,13
22:2 49:9 107:1
110:1
**04** 14:5,11,22 15:19

---

17:19 49:14
**07** 14:8,11

### 1

**1-2-04** 87:13
**1005** 5:17
**105-112** 4:4
**112-119** 4:5
**114** 5:11
**119-120** 4:6
**12th** 63:5
**12-27-03** 86:10
**13th** 50:6
**14th** 107:16
**16th** 62:23 110:1,5
**19th** 108:19

### 2

**2nd** 87:16
**2:45** 2:7 6:13
**2:50-CV-011150-...**
1:10
**20th** 62:22
**2003** 24:2 37:11
41:12,14 47:11
49:6 71:6 81:23
96:12,13 105:9
110:5 112:12
113:10,15 114:4
115:10,15 116:2
118:11
**2004** 37:11 48:20
71:6 82:1 112:12
113:15 114:4
115:17 116:2
118:11
**2007** 2:6 6:13
**2204** 5:10
**25th** 2:6 6:12
**27th** 107:1

### 3

**30** 6:6
**35136** 2:5 6:12
**35209** 5:12

---

**35216** 5:18
**36124** 5:23

### 7

**7-105** 4:3
**72** 8:5,15
**7475** 5:22

### 9

**95** 7:12 8:15 12:21
12:21 13:3,8