# EXHIBIT J

# Deposition of Wanda Kelley

Part I

Court Reporting * Legal Videography * Trial Services

**Page 1**

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3              NORTHERN DIVISION
 4
 5   CASE NUMBER:  2:05-CV-1150-T        [COPY]
 6   DANIEL BRYAN KELLEY,
 7          Plaintiff,
 8      vs.
 9   RICKY OWENS, ET AL.,
10          Defendants.
11
12          S T I P U L A T I O N
13      IT IS STIPULATED AND AGREED by and
14   between the parties through their respective
15   counsel, that the deposition of Wanda Kelley
16   may be taken before Sara Mahler, CSR, at the
17   Coosa County Courthouse, at 100 Main Street,
18   Rockford, Alabama 35136, on the 4th day of
19   April, 2007.
20
21
22      DEPOSITION OF WANDA KELLEY
23                                          52744
```

**Page 2**

```
 1          IT IS FURTHER STIPULATED AND
 2   AGREED that the signature to and the reading
 3   of the deposition by the witness is waived,
 4   the deposition to have the same force and
 5   effect as if full compliance had been had
 6   with all laws and rules of Court relating to
 7   the taking of depositions.
 8          IT IS FURTHER STIPULATED AND
 9   AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17          IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21      * * * * * * * * * * *
22
23
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

**Page 3**

```
 1      * * * * * * * * * * * *
 2            I N D E X
 3          EXAMINATION
 4                              PAGE
 5   By Ms. McDonald ................... 7
 6   By Mr. Willford .................. 148
 7   By Mr. Stockham .................. 202
 8      EXAMINATION CONTINUED
 9                              PAGE
10   By Mr. Willford .................. 204
11      DEFENDANT'S EXHIBITS
12                              PAGE
13   Ex. 1 - The journal Ms. Kelley
14          kept ................... 138
15   Ex. 2 - Notes written by
16          Ms. Kelley ............. 143
17   Ex. 3 - Article from the
18          newspaper .............. 192
19      * * * * * * * * * * * *
20
21
22
23
```

**Page 4**

```
 1
 2      IN THE UNITED STATES DISTRICT COURT
 3      FOR THE MIDDLE DISTRICT OF ALABAMA
 4              NORTHERN DIVISION
 5
 6   CASE NUMBER:  2:05-CV-1150-T
 7   DANIEL BRYAN KELLEY,
 8          Plaintiff,
 9      vs.
10   RICKY OWENS, ET AL.,
11          Defendants.
12
13   BEFORE:
14          SARA MAHLER, Commissioner.
15   APPEARANCES:
16          RICHARD STOCKHAM, ESQUIRE, of
17   STOCKHAM, CARROLL & SMITH, 2204 Lakeshore
18   Drive, Suite 114, Birmingham, Alabama 35209,
19   appearing on behalf of the Plaintiff.
20          KRISTI MCDONALD, ESQUIRE, of
21   MCDONALD & MCDONALD, 1005 Montgomery
22   Highway, Birmingham, Alabama 35216,
23   appearing on behalf of the Defendants, Wendy
```

Page 5

1  Roberson, Terry Wilson, Al Bradley.
2  APPEARANCES (Continued):
3          GARY L. WILLFORD, JR., ESQUIRE, of
4  WEBB & ELEY, 7475 Halcyon Pointe Road,
5  Montgomery, Alabama 36124, appearing on
6  behalf of the Defendant, Ricky Owens.
7          ALSO PRESENT:  MELVIN KELLEY
8                         BRYAN KELLEY
9                         RICKY OWENS
10                        TERRY WILSON
11                        JEFF TOTHEROW
12              *   *   *   *   *   *
13
14          I, SARA MAHLER, CSR, a Court
15  Reporter of Wetumpka, Alabama, acting as
16  Commissioner, certify that on this date, as
17  provided by the Federal Rules of Civil
18  Procedure and the foregoing stipulation of
19  counsel, there came before me at the Coosa
20  County Courthouse, 100 Main Street,
21  Rockford, Alabama 35136, beginning at 9:30
22  a.m., Wanda Kelley, witness in the above
23  cause, for oral examination, whereupon the

Page 6

1  following proceedings were had:
2          VIDEOGRAPHER:  Here begins
3  videotape number one in the deposition of
4  Wanda Kelley in the matter of Daniel Bryan
5  Kelley versus Ricky Owens, et al., case
6  number 2:05-CV-1150-T.
7          We're on the Record at 9:41
8  a.m. on Wednesday, April 4th, 2007.  This
9  deposition is taking place at the Coosa
10  County Courthouse in Rockford, Alabama.  And
11  the videographer is Jeff Totherow.
12          Will counsel please identify
13  yourselves and state who you represent.
14          MR. STOCKHAM:  I'm Richard
15  Stockham, and I represent the Plaintiff.
16          MS. MCDONALD:  Kristi
17  McDonald.  I represent Defendants Terry
18  Wilson, Al Bradley, and Wendy Roberson.
19          MR. WILLFORD:  I'm Gary
20  Willford.  I represent Defendant Ricky
21  Owens.
22          WANDA KELLEY,
23  being first duly sworn, was examined and

Page 7

1  testified as follows:
2          COURT REPORTER:  Usual
3  stipulations?
4          MR. STOCKHAM:  Yes.  Could we
5  have all the people in attendance identify.
6          MR. KELLEY:  I'm Daniel Bryan
7  Kelley.
8          MR. KELLEY:  I'm Melvin Ray
9  Kelley.
10          MR. WILSON:  I'm Terry Wilson.
11          MR. OWENS:  Ricky Owens.
12              EXAMINATION
13  BY MS. MCDONALD:
14      Q.     Ms. Kelley, I introduced
15  myself to you earlier, and I represent Terry
16  Wilson and Al Bradley and Wendy Roberson in
17  this lawsuit that's been filed by your son,
18  Bryan Kelley.
19      A.     Yes, ma'am.
20      Q.     Have you ever given a
21  deposition before, Ms. Kelley?
22      A.     No, ma'am.
23      Q.     Oh, you were in here yesterday

Page 8

1  when your son was deposed, so you kind of
2  know how it works?
3      A.     Yes, ma'am.
4      Q.     I have the same arrangement
5  with you that I had with him.  If I ask you
6  a question that just doesn't make sense,
7  please tell me.  You will not offend me at
8  all, I promise.
9      A.     Okay.
10      Q.     And if you need to take a
11  break, if you want to just let us know, we'd
12  be happy to stop at any time you need to get
13  up.  Okay?
14      A.     Okay.
15      Q.     How old are you, Ms. Kelley?
16      A.     Fifty-three.
17      Q.     And what is your date of
18  birth?
19      A.     9/30/53.
20      Q.     And you're married; right?
21      A.     Yes, ma'am.
22      Q.     Who is your husband?
23      A.     Melvin Ray Kelley.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 9

```
 1         Q.      How long have you and
 2   Mr. Kelley been married?
 3         A.      Thirty-eight years.
 4         Q.      Okay.  Do you have any other
 5   marriages, other than the one to Mr. Kelley?
 6         A.      No, ma'am.
 7         Q.      And I know you have a son,
 8   Bryan.  Daniel Bryan Kelley.  You also have
 9   another son as well?
10         A.      Yes, ma'am.
11         Q.      Who is your other son?
12         A.      Shannon Ray Kelley.
13         Q.      Does he go by Shannon?
14         A.      Shane.
15         Q.      Shane.  Where does Shane
16   currently live?
17         A.      He has a trailer at Harbor
18   Springs Trailer Park, Sylacauga, Alabama.
19         Q.      And where do you and
20   Mr. Kelley currently reside?
21         A.      800 Pineview Lane, Sylacauga,
22   Alabama.
23         Q.      How long have y'all lived at
```

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 10

```
 1   that address, Ms. Kelley?
 2         A.      Since 19 -- July of 1997.
 3         Q.      And does Bryan live with y'all
 4   at that address?
 5         A.      Yes, ma'am.  Part of the time.
 6         Q.      All right.  How long has he
 7   lived with you at that address?
 8         A.      I can't remember an exact time
 9   period because he was incarcerated part of
10   the time, but at different times since 1997.
11         Q.      And you said he lives with you
12   part of the time now.  Where else does he
13   reside?
14         A.      He lives with me now.
15         Q.      He lives with you full time
16   now?
17         A.      Yes.
18         Q.      Okay.  How long has he lived
19   with you full time?
20         A.      Since August the 21st of 2006.
21         Q.      And would that have been when
22   he was released?
23         A.      Yes.
```

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 11

```
 1         Q.      From. . . Was it Bullock?
 2         A.      Bullock Correctional Facility.
 3         Q.      Is it Bullock?
 4         A.      Uh-huh.
 5         Q.      Do you work, Ms. Kelley?
 6         A.      No, ma'am.
 7         Q.      Have you ever been employed?
 8         A.      Yes, ma'am.
 9         Q.      Where have you been employed?
10         A.      I was employed for about
11   thirty-five years at Sylacauga Hospital, and
12   Mountain View Lake Alzheimer and Dementia
13   Unit.
14         Q.      Where is Mountain View Lake?
15         A.      Oak Grove area in Sylacauga.
16         Q.      What did you do at Sylacauga
17   Hospital?
18         A.      I was a certified nursing
19   assistant.
20         Q.      Did you retire from there?
21         A.      No, ma'am.  I had to come out
22   on disability.
23         Q.      What type of health problems
```

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 12

```
 1   caused you to come out on disability?
 2         A.      I have fibromyalgia, acute
 3   osteoarthritis, and extreme high blood
 4   pressure.
 5         Q.      Well, I know that fibromyalgia
 6   can cause you to have pain, so if you need
 7   to get up and walk or if you need to get up
 8   and stand for any reason today, just let us
 9   know and we'll be glad to accommodate that.
10         A.      Thank you.
11         Q.      Are you on any type of
12   medication this morning?
13         A.      My fibromyalgia medicine.
14         Q.      What type of medicine?
15         A.      It's Vicoprofen.
16         Q.      Is that any type of medicine
17   that would interfere with your ability to
18   testify today?
19         A.      No, ma'am.  No, ma'am.
20         Q.      You don't have any side
21   effects from that medication?
22         A.      No, ma'am.
23         Q.      When did you come out of
```

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 13

1  disability -- out on disability from the
2  hospital?
3      A.    I have just applied for my
4  disability.  We're in the process at this
5  time.
6      Q.    When was the last time you
7  would have worked?
8      A.    I worked a little bit part
9  time last June of 2006.  I had to reduce my
10 hours to three hours a morning because I
11 couldn't handle the eight.
12     Q.    So you haven't worked at all
13 since last June?
14     A.    No, ma'am.
15     Q.    When did you reduce your hours
16 to part time?
17     A.    Somewhere in around the
18 vicinity of June.
19     Q.    You went permanent part time
20 and then just kind of stopped?
21     A.    Yes, ma'am.
22     Q.    You've applied for your
23 disability --

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 14

1      A.    Yes, ma'am.
2      Q.    -- with Social Security?
3  Have you been denied yet?
4      A.    No, ma'am.
5      Q.    Maybe you'll be lucky and you
6  won't be.  It will be the first time.
7      A.    I hope not.
8      Q.    You told me earlier, you've
9  never given a deposition before.  Have you
10 ever been a party to a lawsuit at all,
11 Ms. Kelley?
12     A.    No, ma'am.
13     Q.    Have you ever been sued?
14     A.    No, ma'am.
15     Q.    Have you ever filed for
16 bankruptcy?
17     A.    No, ma'am.
18     Q.    Prior to y'all living at this
19 address here where you live now, where were
20 y'all living?
21     A.    Coosa County.
22     Q.    Okay.  Where did you live here
23 in Coosa County?

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 15

1      A.    We lived at 25 Turnpike Road,
2  Stewartville.
3      Q.    And how long were you at that
4  address?
5      A.    Ten years.  Or somewhere in
6  that general vicinity.
7      Q.    Is there any particular reason
8  why y'all moved over to Sylacauga?
9      A.    We had a farm, and it became
10 too much for me and my husband.  My boys
11 were gone from home at that time.
12     Q.    There was no reason to keep it
13 at anymore, was it?
14     A.    Too much grass cutting.
15     Q.    I understand that.  I know you
16 said you had your CNA.  Did you go to get
17 any other type of education beyond high
18 school?
19     A.    I went to a nontechnical
20 college and received my certified nursing
21 assistant degree.  I also am a certified EMT
22 technician, and I have a degree in brain
23 series.

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 16

1      Q.    Where did you get that degree?
2      A.    Through my employment.  It was
3  a training on the job.
4      Q.    Help me here.  What does that
5  allow you to do?
6      A.    You have to take classes to
7  determine the Alzheimer and dementia states,
8  what happens as it progresses, how it
9  begins, and then what stages later on in
10 life that eventually end up in death.
11     Q.    And you got that training
12 there at --
13     A.    -- Mountain View Lake assisted
14 living -- I mean, Mountain View Lake
15 Retirement Home.
16     Q.    Did you grow up here in Coosa
17 County?
18     A.    Yes, ma'am.
19     Q.    What was your maiden name?
20     A.    Bailey.
21     Q.    Do you still have relatives
22 here in Coosa County?
23     A.    Yes, ma'am.

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 17

1    Q.    Can you kind of just tell me
2  their last names?
3    A.    I have a sister, Alvie Bailey.
4  I have a niece, Tiffany Pate.  And I have a
5  brother and his wife, Greg and Dana Bailey.
6    Q.    Are those your only relatives
7  that are still here in Coosa County?
8    A.    Yes, ma'am.
9    Q.    Do y'all have family over in
10 Sylacauga, too, other than your sister?
11   A.    My mother.  Evinell,
12 E-V-I-N-E-L-L Bailey.
13   Q.    And then I know that -- or I
14 assume the Kelley's are probably here from
15 Coosa County, too?
16   A.    Ma'am?
17   Q.    Has your husband got relatives
18 here, too, in Coosa County?
19   A.    Yes.
20   Q.    Did you go to high school
21 here, too?
22   A.    Eleventh grade.
23   Q.    Okay.  Do y'all have any other

Page 18

1  children, other than the two boys?
2    A.    No, ma'am.
3    Q.    When Bryan was in school,
4  Ms. Kelley, did you have any type of
5  problems with any classes, or with him
6  getting in any kind of trouble at school?
7    A.    No, ma'am.  Not other than
8  just regular other children, you know.
9    Q.    Did you have any problems with
10 him being suspended or . . .
11   A.    No.
12   Q.    So he was never kicked out of
13 school for any period of time?
14   A.    No, ma'am.
15   Q.    What kind of classes did he
16 take when he was in high school?
17   A.    Rephrase that question.
18   Q.    What type of classes was he
19 taking?  He did take regular classes or --
20   A.    Just basic.  English, math.
21   Q.    Did he have any kind of
22 special education case classes?
23   A.    Trade school.

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legallink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 19

1    Q.    Just trade school.  Was that
2  when he got to high school?
3    A.    Yes.
4    Q.    And did he graduate from high
5  school without any problems?
6    A.    Yes, ma'am.
7    Q.    When was the first time that
8  you can recall that he got in trouble with
9  the Law?
10   A.    Just a minor, little traffic
11 violation probably nineteen, twenty years
12 old.  Somewhere in that -- give or take.
13   Q.    And where would that have
14 been?
15   A.    Coosa County.
16   Q.    Was it just for speeding?
17   A.    The best I can remember, he
18 didn't have his seat belt on was the first
19 one that I can remember.
20   Q.    And that's fine.  I know once
21 they get to be that age, you don't always
22 know everything they're doing.  I just want
23 to know what you can remember.

Page 20

1    All right.  Was he still
2  living with you at the time?
3    A.    Yes, ma'am.
4    Q.    And I know -- Ma'am?
5    A.    We lived on the farm there in
6  Coosa County.
7    Q.    I know that at some point, he
8  got married and later moved out?
9    A.    Yes, ma'am.
10   Q.    Did they live, he and his
11 wife, Marsha, live here in Coosa County when
12 they first got married?
13   A.    Yes, ma'am.
14   Q.    Did they live with y'all at
15 any point in time during their marriage?
16   A.    No, ma'am.
17   Q.    Did you see him regularly,
18 even after he got married?
19   A.    Yes, ma'am.
20   Q.    Okay.  When was the next time
21 that you knew of that he had kind of gotten
22 in trouble with the Law?
23   A.    It was years later with the

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legallink.com
1-800-888-DEPO

Page 21

```
 1   assault case.
 2        Q.     Is that the -- That was the
 3   next time you knew of any trouble that he
 4   had had?
 5        A.     To the best of my
 6   recollection.
 7        Q.     Were you aware that he had had
 8   any DUIs between the time that he first got
 9   that ticket in Coosa County and the time he
10   had that assault case?
11        A.     He had one DUI I know of.
12        Q.     Do you know where about that
13   one occurred?
14        A.     No, ma'am.  I'm not sure if
15   it's Coosa or Sylacauga.
16        Q.     Okay.  But other than that; he
17   had that minor traffic ticket, and then a
18   DUI, then the assault case?
19        A.     Yes, ma'am.
20        Q.     Can you tell me the --
21        A.     To my recollection.
22        Q.     That's fine.  I don't want you
23   to testify to anything that you don't
```

Page 22

```
 1   remember.
 2             Can you tell me what you know
 3   about the assault charge, or what had
 4   happened to cause him to get charged with
 5   assault?
 6        A.     I can tell you what I was
 7   told.
 8        Q.     Okay.  That's fine.  Tell me
 9   what you know -- what you were told.
10        A.     Me and my husband were at
11   home, and we had just laid down.  It was
12   around a quarter to ten, and they decided to
13   go shoot a game of pool.  Paul Logo's had a
14   little poolroom there, in there in Coosa
15   County.
16        Q.     Okay.
17        A.     And they decided to go shoot a
18   little game of pool.  He and my younger son
19   and Bryan's fiance, Patty Gross.  So they
20   went to shoot a game of pool.  And I
21   precisely looked at the clock; it was ten
22   minutes to ten.  And, you know, I thought,
23   well, this is late.  You know how you think.
```

Page 23

```
 1   But, anyway, young children, not like
 2   fifty-three-year-old people.  So at fifteen
 3   minutes after ten, they returned back to the
 4   house and came in and said they had had a
 5   conflict with a nephew, a fight with a
 6   nephew.
 7        Q.     With -- Was it your nephew, or
 8   Mr. Kelley's nephew?
 9        A.     Mr. Kelley's nephew.
10        Q.     Who was it?
11        A.     Rodney Smith.
12        Q.     Had you ever known the two
13   boys to have any problems between them
14   before?
15        A.     Nothing, except just a little
16   knit-picking stuff, joking back and forth.
17   Some people, you know, you can joke with and
18   then they tend to want to get a little bit
19   angry, but nothing outside of that.
20        Q.     Who's -- or I guess it's like
21   Mr. Kelley's brother or sister's child?
22        A.     It's his sister's child.
23        Q.     And who was his sister?
```

Page 24

```
 1        A.     Shirley Barker.
 2        Q.     Barton?
 3        A.     Barker, B-A-R-K-E-R.
 4        Q.     Okay.  Do they live here in
 5   Coosa County?
 6        A.     They live in Sylacauga.
 7        Q.     Sylacauga.  All right.  So
 8   they came in and told you that they kind of
 9   had a little altercation or little fight or
10   disagreement?
11        A.     They said, we've had a fight
12   with Rodney.
13        Q.     Did he tell you what happened?
14        A.     They began to tell the, you
15   know, disturbances that they had had.  And
16   of course, they had knots here and there,
17   you know, him and Shane both did from the
18   scrap.  Not excessive bleeding, but a
19   scratch here and there.
20        Q.     Did he tell you that he had
21   cut Rodney with a knife?
22        A.     Yes, ma'am.
23        Q.     When was it you first found
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 25

1  out that charges had been brought?

2      A.      To my recollection, we

3  received a phone call from Coosa County that

4  said they had a warrant for his arrest.  And

5  Bryan was in Tennessee at that time, and so

6  we contacted him that he had a warrant for

7  his arrest in Coosa County.  And he came

8  home, and came down and checked it out, or

9  turned in and turned himself in.

10     Q.      Okay.  When he turned himself

11 in, did you and Mr. Kelley make bond for him

12 so he could get back out?

13     A.      Yes, ma'am.

14     Q.      Do you recall the amount of

15 the bond?

16     A.      It was a hundred and thirty

17 thousand dollars.

18     Q.      Okay.  Was this the first time

19 y'all had posted a bond for him?

20     A.      To the best of my knowledge.

21     Q.      All right.  So he gets out on

22 bond.  Who was representing him at the time?

23 Did y'all get him a lawyer?

---

Page 26

1      A.      Yes.

2      Q.      Who did -- Did y'all help him

3  get a lawyer, or did y'all hire him a

4  lawyer?

5      A.      We hired him a lawyer.

6      Q.      Who did y'all hire?

7      A.      Robert Rumsey.

8      Q.      And at this point that you can

9  recall, was he on probation for any reason

10 at this time?

11     A.      No, ma'am.

12     Q.      I mean like he as in Bryan?

13     A.      No, ma'am.

14     Q.      Okay.  So y'all get him a

15 lawyer, and then what happens next?

16     A.      We hired Robert Rumsey.  And

17 there was a conflict with Robert Rumsey, and

18 he called me on my job one day and had me to

19 come over and he wanted to talk to me.  And

20 he said:  I've been told that you had some

21 things to say at a church meeting concerning

22 the fight.  And I said:  Mr. Rumsey, I'm not

23 proud of this or neither am I bragging, but

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 27

1  I haven't darkened a church door in two

2  years.  So, apparently, he got angry with me

3  at that point, and so then we -- he shoved

4  the papers out across the desk, and we went

5  to Thomas Radney from that point.

6      Q.      And was Bryan -- After he came

7  back that first time when he came back to

8  turn himself in for the warrant, did he go

9  back to Tennessee, or did he stay here with

10 y'all in Alabama?

11     A.      He stayed here.

12     Q.      And did Tom continue to

13 represent him for those charges?

14     A.      Yes, sir.

15     Q.      Okay.  What happened to cause

16 them to put Bryan in jail?  Did his bond get

17 revoked?

18     A.      Had a preliminary hearing, and

19 he showed up for court that day, and he had

20 a dirty urine.

21     Q.      What does that mean?

22     A.      He tested positive.

23     Q.      Okay.  So they did a drug test

---

Page 28

1  on him and he tested positive?

2      A.      Yes, ma'am.

3      Q.      What did he test positive for?

4      A.      Cocaine.

5      Q.      And this would have been in

6  2003; correct?

7      A.      Somewhere in that general

8  vicinity.

9      Q.      Now, I know Bryan told me

10 yesterday that he had been in rehab for

11 cocaine use at one time?

12     A.      Yes, ma'am.

13     Q.      When was the first time that

14 you recall him being in rehab for his drug

15 use?

16     A.      Oh, it's been years ago.

17     Q.      Was it before he got married?

18     A.      No, ma'am.  It was long after

19 then.  It was probably '97.  Somewhere in

20 that vicinity.

21     Q.      And when he went to rehab in

22 '97, do you recall where he went?

23     A.      Brookwood Medical Center.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 29

```
1        Q.      Did y'all have him put at
2   Brookwood?
3        A.      He chose to go himself.
4        Q.      How did y'all find out that he
5   was using cocaine in '97?
6        A.      He told us.  He was scared to
7   death.
8        Q.      And then he got, I guess, out
9   of rehab there.  Do you know of him being in
10  rehab anywhere else before he was sentenced
11  in Coosa County?
12       A.      No.  Not to my knowledge.
13       Q.      Were you aware that he was
14  using cocaine again in 2003, before he
15  tested positive?
16       A.      No, ma'am.
17       Q.      And then after he tested
18  positive in court, did they take him from
19  the courthouse over to the jail?
20       A.      Yes.
21       Q.      Who was the judge in that
22  case?
23       A.      Judge John Rochester.
```

Page 30

```
1        Q.      Did y'all know Judge Rochester
2   before, prior to --
3        A.      I had just heard the name.
4        Q.      Okay.  You never had any
5   dealings with him for any reason?
6        A.      No, ma'am.
7        Q.      Did y'all talk to Judge
8   Rochester before Bryan left the courtroom
9   that day?
10       A.      No, ma'am.
11       Q.      Did you ever make Judge
12  Rochester aware that Bryan had problems, not
13  take him to the emergency room, mental
14  problems, or medical problems that he might
15  need to consider before putting him in a
16  jail?
17       A.      I did not speak with Judge
18  Rochester personally.  I spoke to William
19  Latham.
20       Q.      Who was William Latham.
21       A.      He's the court referral
22  officer.
23       Q.      Did you speak with Mr. Latham
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 31

```
1   that day?
2        A.      To the best of my knowledge.
3        Q.      What do you recall telling
4   Mr. Latham that day?
5        A.      That I would like for Bryan to
6   be -- to go into rehabilitation, rather than
7   jail, because I did not feel that jail was
8   going to benefit him on that particular
9   situation.
10       Q.      What did he tell you at the
11  time?
12       A.      Mr. Latham said it would be up
13  to the judge, I will discuss it with him.
14       Q.      Okay.  Now, in 2003, Bryan had
15  already had some problems, I guess mentally
16  or emotional problems at that point; am I
17  right?
18       A.      In 2003?
19       Q.      Uh-huh.  Prior to him going to
20  Coosa County jail.  He had had some --
21  already had some problems; correct?
22       A.      Not mentally.  Nothing except
23  bipolar, just a defective disorder.
```

Page 32

```
1        Q.      When was he diagnosed as being
2   bipolar?
3        A.      Oh, ten years ago.
4        Q.      Ten years from now -- I mean,
5   like in 1997?
6        A.      Somewhere in that general
7   vicinity.
8        Q.      Was he diagnosed as being
9   bipolar before he was in rehab for the
10  cocaine use in 1997?
11       A.      Yes.
12       Q.      He had already been diagnosed?
13       A.      Yes.
14       Q.      Who diagnosed him as being
15  bipolar?
16       A.      Dr. Howard Strickler.
17       Q.      Where is Dr. Strickler
18  located?
19       A.      He's a doctor at Brookwood.
20  He's at Brookwood Hospital.
21       Q.      How did Bryan come to see
22  Dr. Strickler as a patient?
23       A.      He became real nervous and
```

Page 33

1  upset and was having some, a lot of crying
2  spells and that type thing, so he chose,
3  himself, to go in to Brookwood to
4  Dr. Strickler.
5      Q.    He was in the psychiatric unit
6  at Brookwood?
7      A.    Yes, ma'am.
8      Q.    And this was before the rehab;
9  right?
10     A.    Yes, ma'am.  He moved him
11 later to the rehab.
12     Q.    Did you talk to Dr. Strickler
13 about Bryan?
14     A.    Yes, ma'am.
15     Q.    What did he tell you when
16 y'all first saw him?
17     A.    He told me that Bryan was
18 suffering from a bipolar defective disorder;
19 that it could have developed at a younger
20 age.  Some children are born with bipolar
21 defective disorder.  It could be an
22 inherited-type thing that he would have
23 inherited from a parent.

Page 34

1      Q.    Are you or Mr. Kelley, either
2  one, bipolar?
3      A.    Not to our knowledge.
4      Q.    Did he diagnose him with
5  anything else at that time?
6      A.    No.
7      Q.    In 2003, before Bryan went
8  over to the Coosa County jail, to your
9  knowledge, other than the bipolar defective
10 disorder, was Bryan suffering from anything
11 else?
12     A.    Yes, ma'am.
13     Q.    What else was he suffering
14 from?
15     A.    He was suffering from
16 extensive back surgery.  He has an
17 artificial L4, L5, and S1.  He has
18 artificial cages in his back.
19     Q.    So it's the back surgery and
20 the bipolar defective disorder?
21     A.    Yes, ma'am.
22     Q.    Anything else that you were
23 aware of?

Page 35

1      A.    No, ma'am.
2      Q.    And Bryan had told me about
3  the back surgery yesterday.  He had surgery
4  at Baptist Montclair in Birmingham?
5      A.    Yes, ma'am.
6      Q.    Did he just have one back
7  surgery, or more than one?
8      A.    One.
9      Q.    To your knowledge, what type
10 of medication was Bryan taking in 2003?
11     A.    In 2003, he was taking Zyprexa
12 for the bipolar defective disorder, and he
13 was taking Lorcet Plus for his back pain.
14     Q.    And those were the only two
15 medications that he was on, to your
16 knowledge?
17     A.    To my knowledge.
18     Q.    Okay.  And I know you said he
19 had been living with y'all since August of
20 2003.  Did I get that right, August or
21 September when the assault happened?
22     A.    When the assault happened,
23 yes.

Page 36

1      Q.    Okay.  and then he would have
2  returned to Tennessee after the assault?
3      A.    Yes.
4      Q.    How long was he up there
5  before he came back and lived with you?
6      A.    He didn't go back to
7  Tennessee.
8      Q.    Okay.  So after the assault he
9  stayed here, and he lived with you until he,
10 I guess, went to the Coosa County jail?
11     A.    Yes.  Because he had the
12 charges here.
13     Q.    Was he already on disability
14 at this time?
15     A.    Yes, ma'am.
16     Q.    Would you ever go and get his
17 medications filled for him, or pick them up
18 from the pharmacy for him?
19     A.    Occasionally.
20     Q.    Where would y'all have his
21 prescriptions filled at that time?  What
22 pharmacy did you use?
23     A.    Food World.

Page 37

```
1        Q.      There in Sylacauga?
2        A.      Yes, ma'am.
3        Q.      And in 2003, who was
4   prescribing Bryan with the Zyprexa?
5        A.      Dr. Howard Strickler.
6        Q.      All right.  And who prescribed
7   the Lorcet?
8        A.      Dr. Howard Strickler.
9        Q.      Were there any other doctors
10  that Bryan was seeing at the time?
11       A.      He saw a regular M.D.
12       Q.      Who was that?
13       A.      Dr. Aldehart -- No.  Excuse
14  me.  Let me back up.  Alkier.
15       Q.      How do you spell his last
16  name?
17       A.      That's why it's so confusing.
18  A-K-I-E-R, or A-L-K-I-E-R.  Something to
19  that general effect.
20       Q.      What is his first name, do you
21  know?
22       A.      I have no idea.
23       Q.      Okay.  And he's there in
```

Page 38

```
1   Sylacauga; correct?
2        A.      Yes, ma'am.
3        Q.      All right.  What would he see
4   Dr. Alkier for?
5        A.      I need to correct my
6   statement.  Dr. Howard Strickler prescribed
7   his Zyprexa; however, he was a psychiatrist,
8   so he saw Dr. Alkier for his pain
9   medication.
10       Q.      Okay.  Were there any other
11  physicians that he was seeing, that you're
12  aware of?
13       A.      No, ma'am.
14       Q.      Just Strickler and Alkier?
15       A.      Yes, ma'am.
16       Q.      Between the time that Bryan
17  was diagnosed with being bipolar and when he
18  went to the jail in 2003, are you aware of
19  any other psychiatrists or psychologists
20  that he saw over -- during that period of
21  time?
22       A.      From what period of time,
23  ma'am?
```

Page 39

```
1        Q.      From 1997, when he would have
2   been diagnosed, to 2003?
3        A.      No, ma'am.
4        Q.      Were you aware of any other
5   hospitalizations that he had during that
6   period of time?
7        A.      He was in the hospital, I
8   believe, at one time for strep throat and
9   dehydration.
10       Q.      Where would that have been,
11  Ms. Kelley?
12       A.      Coosa Valley.
13       Q.      Was he in any other mental
14  facilities?
15       A.      No, ma'am.
16       Q.      And to your knowledge, he was
17  not seeing any other doctors?
18       A.      No, ma'am.
19       Q.      All right.  After he got over
20  to the jail, and I think it was November
21  the -- Do you know the date?  November the
22  13th, maybe, of 2003?
23       A.      Somewhere in the general
```

Page 40

```
1   vicinity.
2        Q.      Okay.
3        A.      I'm not sure about the date.
4        Q.      All right.  Sometime in
5   November of 2003; right?
6        A.      Yes.
7        Q.      Okay.  When was the first time
8   you had any communication whatsoever with
9   anybody at the jail once Bryan got over
10  there?
11       A.      It was shortly after he was
12  incarcerated; I won't say that day.  It
13  could have been that day, or it could have
14  been the next day, but it was shortly.
15       Q.      All right.  And who did you
16  talk to over there?
17       A.      I believe at that time, I
18  talked to Sergeant Wendy Roberson.
19       Q.      Did you call Sergeant
20  Roberson, or did you go down to the jail?
21       A.      I called her.
22       Q.      What made you call her?
23       A.      I called her to tell her that
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 41

1    Bryan was on medication; he did not have any
2    of his medication, and that he could not do
3    without it; that Dr. Strickler said it was a
4    necessity that he take it.  Otherwise, that
5    he would have seizures and a possibility of
6    cardiac arrest, and that he was very sick.
7         Q.    Had Bryan ever had a seizure
8    before, to your knowledge?
9         A.    I've never witnessed a
10   seizure.
11        Q.    Had Bryan ever told you that
12   he had had a seizure prior to November of
13   2003?
14        A.    No, ma'am.
15        Q.    Any of the doctors ever told
16   you that he had had a seizure?
17        A.    No.
18        Q.    Okay.  And what did
19   Ms. Roberson tell you when you talked to
20   her?
21        A.    I told her that he had to have
22   his medication.  And she said, well, we have
23   our own jail doctor, who is Dr. Weaver.  And

Page 42

1    I said, but he's got to have his medication.
2    And so my husband went to Food World and got
3    him a couple of pills, because it was my
4    understanding that she would make an
5    appointment with their jail doctor, shortly,
6    to get his medication; however, she didn't.
7         Q.    Okay.  So Mr. Kelley went to
8    Food World to get some of his medicine?
9         A.    Zyprexa.
10        Q.    Did he not have any there at
11   the house?
12        A.    No.
13        Q.    Is there any particular reason
14   why he didn't have his medicine there?
15        A.    He just, at that particular
16   time, was out of his medication.
17        Q.    Were the prescription bottles
18   at the house?
19        A.    They had it on record at Food
20   World.
21        Q.    Okay.  Do you know whether he
22   had taken it that morning?
23        A.    No, ma'am, I don't.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 43

1         Q.    You just know he didn't have
2    it while he was at the jail?
3         A.    That's right.
4         Q.    Did Ms. Roberson tell you you
5    could bring the medication to the jail?
6         A.    To my understanding, they took
7    it.  My husband carried it in there.
8         Q.    But did she tell you that;
9    that you could bring his medication to the
10   jail?
11        A.    To my recollection.
12        Q.    She did tell you that.
13        A.    Yes.
14        Q.    Was she nice to you at the
15   time?
16        A.    Yes.
17        Q.    All right.  When was the next
18   time you had any communication with anybody
19   at the jail?
20        A.    Okay.  I called Ricky Owens,
21   and I told him the same circumstances; that
22   Bryan was sick, and he had to have his
23   medication.

Page 44

1         Q.    Was this the same day, or a
2    different day?
3         A.    It was give or take.  I
4    couldn't say.  It was -- within a few days.
5    He went several days without any medication.
6         Q.    How do you know that,
7    Ms. Kelley?
8         A.    Bryan told me.
9         Q.    How many days did he tell you
10   he went without his medicine?
11        A.    It was approximately four or
12   five.
13        Q.    When did your husband take his
14   medication to the jail?
15        A.    After we found out that they
16   were not going to take him to the doctor to
17   get his medication, then I would say a
18   couple days or so, give or take.
19        Q.    So the day he went over to the
20   jail, y'all knew he didn't have his
21   medicine.  It was four or five days before
22   you took any down there?
23        A.    Not four or five days before

Page 45

```
1    he took any.  He took him only two pills,
2    but it was four or five days before they got
3    his medication started.
4         Q.    Is there any particular
5    reason, that you're aware of, that his
6    prescription was not filled when Mr. Kelley
7    went to Food World to get it?
8         A.    He was just out of it.
9         Q.    But if there was a
10   prescription on record, was the prescription
11   not filled for a thirty-day period or a
12   fifteen-day period?
13        A.    To be honest with you, it cost
14   ten dollars a pill, and so he only got two
15   pills.
16        Q.    Who was paying for his
17   medicine?
18        A.    I was.
19        Q.    Who bought his medicine before
20   you purchased these two pills?
21        A.    I did.
22        Q.    You always bought his --
23        A.    Me or my husband.
```

Page 46

```
1         Q.    Y'all always bought his
2    prescription medication?
3         A.    Uh-huh.
4         Q.    How long had you been buying
5    his prescription medication?
6         A.    For quite some time.  For
7    several, I couldn't say exactly, but
8    probably four to six months, or something
9    like that.
10        Q.    When he was in Tennessee, how
11   would he get the medication?
12        A.    He would use his check, his
13   disability check, to purchase his medicine.
14        Q.    Would he get it filled here at
15   the pharmacy, or would he get it filled in
16   Tennessee?
17        A.    He usually got it filled here.
18   Because he would only be gone a short period
19   of time.
20        Q.    So he would pay for his
21   prescriptions?
22        A.    His medicine was costing
23   basically more than his check.
```

Page 47

```
1         Q.    You don't have any drug
2    coverage for that?
3         A.    I later on got him on drug
4    coverage.
5         Q.    When did you get him on drug
6    coverage?
7         A.    About two years ago, I got him
8    on some that helped, a certain drug coverage
9    that helped.  But then a little bit later on
10   from that, they offered another plan which
11   was better, and I applied for it.
12        Q.    Who was his drug coverage
13   through?
14        A.    United Healthcare.
15        Q.    And did you and Mr. Kelley pay
16   for the drug coverage through United
17   Healthcare?
18        A.    It came out of his check.
19        Q.    But at the time, in November
20   of 2003, he did not have any drug coverage;
21   correct?
22        A.    No.
23        Q.    And you and Mr. Kelley were
```

Page 48

```
1    buying his medicines?
2         A.    Yes, ma'am.
3         Q.    What prescription did y'all
4    get the two pills for?
5         A.    What prescription?
6         Q.    Uh-huh.  Was it for the
7    Zyprexa?
8         A.    Zyprexa.
9         Q.    Not the Lorcet?
10        A.    No.
11        Q.    And did he have any of the
12   Lorcet with him?
13        A.    No.
14        Q.    How often did he take the
15   Zyprexa at this time?
16        A.    Oh, one in the morning and one
17   at night, I believe.
18        Q.    So he only had enough to get
19   him through one day?
20        A.    Yes.
21        Q.    Now, let me make sure I
22   understand.  You did not go down to the
23   jail, your husband did?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 49

```
1        A.      My husband carried it.
2        Q.      When did you talk to Bryan
3   after he got down to the jail?  How long was
4   it?
5        A.      Of course, they get a phone
6   call, you know, shortly after they're
7   arrested.  And he called and said that he'd
8   been locked up, you know, but it was just a
9   short conversation at that time.
10       Q.      Were y'all with him at the
11  courthouse the day that they sent him over
12  to the jail?
13       A.      His fiance was.
14       Q.      Okay.  How did you find out
15  that he had been taken to the jail?
16       A.      She called me.
17       Q.      And that would have been
18  Patty?
19       A.      Yes.  Patty Gross.
20       Q.      And when was it that you
21  talked to Mr. Latham about him being over --
22  going to the jail.
23       A.      Rephrase that question.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 50

```
1        Q.      When did you talk to
2   Mr. Latham, the drug court officer?  Did you
3   talk to him the same day that he went over
4   to the jail, or was it later?
5        A.      It was later.  I'm not sure
6   exactly when later.  It could have been a
7   few days, or maybe a week or so.
8        Q.      But Bryan called you the day
9   he got over to the jail?
10       A.      To let me know that he had
11  been incarcerated.
12       Q.      All right.  Did he tell you
13  anything other than that on that day?
14       A.      No.
15       Q.      And then you talked to
16  Sergeant Roberson, was it that day or the
17  next day?
18       A.      It was -- I believe it was the
19  next morning, give or take.  I'm not sure.
20  It could have been that afternoon, but I
21  think it was the next morning.
22       Q.      And when was the next time you
23  talked to Bryan?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 51

```
1        A.      Bryan was in population at
2   that time, so he could have -- he called me
3   within two or three days after then.
4        Q.      And when he called you, did he
5   call you collect, Ms. Kelley?
6        A.      Yes, ma'am.
7        Q.      What was the phone number that
8   you had at the time, that he would have
9   called you collect on?
10       A.      256-249-8067.
11       Q.      Is that the same number you
12  have today?
13       A.      Yes, ma'am.
14       Q.      Who do you have service
15  through?
16       A.      BellSouth.
17       Q.      Was that phone number listed
18  in both your's and Mr. Kelley's name, or
19  just Mr. Kelley?
20       A.      It's listed under Kelley's
21  Roofing and Construction.
22       Q.      And that's the number there at
23  y'all's house, though?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 52

```
1        A.      Yes, ma'am.  My husband worked
2   out of our home until he got disabled.
3        Q.      Okay.  So he called you a few
4   days later at some point?
5        A.      Uh-huh.
6        Q.      And he was in general
7   population at the time?
8        A.      Uh-huh.
9        Q.      You got to answer yes out
10  loud.
11       A.      Yes.
12       Q.      I'm sorry.  It's just that she
13  takes it down, too.
14       A.      I'm sorry.
15       Q.      It's okay for the
16  videographer.
17       A.      I'm sorry.  Yes.
18       Q.      You're not the only one that
19  has done it.
20               What did he tell you when he
21  first called you?
22       A.      Bryan?
23       Q.      Yes, ma'am.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 53

```
1        A.     Oh, I don't remember exactly
2   what he said, except for the fact that he
3   was in with these other inmates at that
4   time, and he had come in contact with some
5   guys that he'd previously known.  Other than
6   that, I don't remember.
7        Q.     Did he tell you anybody that
8   he was in the jail with?
9        A.     Scotty Holly.
10       Q.     Did you know Scotty Holly?
11       A.     No, ma'am.
12       Q.     Did he tell you how he was
13  feeling when you talked to him?
14       A.     At that time, of course, he
15  was upset, you know, being incarcerated.
16  But outside of that, there was nothing
17  different.
18       Q.     Did he tell you he was having
19  any problems there at the jail?
20       A.     No.
21       Q.     You said earlier, when you
22  called Wendy Roberson that you told her
23  Bryan was very sick.  What did you mean by
```

Page 54

```
1   that?
2        A.     I meant -- What I meant by
3   that, I should have corrected myself.  What
4   I meant by that was, it was very important
5   that he take the medication for the bipolar
6   defective disorder; that he could not stay
7   off of that medication.
8        Q.     Earlier, you said that she
9   mentioned something to you that they had
10  their own doctor.  Did you tell her at the
11  time that Bryan had an appointment to see a
12  doctor?
13       A.     No, ma'am.
14       Q.     What did she tell you about
15  taking Bryan to the doctor?
16       A.     She said that she would try to
17  get him an appointment that next week.  I
18  believe she said that he wouldn't be in
19  until after Tuesday.
20       Q.     Dr. Weaver would not be in?
21       A.     Yes, ma'am.
22       Q.     Do you recall what day of the
23  week it was when Bryan was incarcerated?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 55

```
1        A.     No, ma'am, I don't.
2        Q.     And you said you had a
3   conversation with Ricky Owens four or five
4   days later?
5        A.     Yes, ma'am.
6        Q.     And you told Mr. Owens that he
7   needed his medicine?
8        A.     Uh-huh.
9        Q.     Did Mr. Owens tell you that
10  y'all could bring his medicine to him?
11       A.     No, ma'am.
12       Q.     What did he tell you?
13       A.     I just told him he --
14  Basically, he didn't say anything.  I told
15  him that Bryan had to have his medication,
16  and that he had had extensive back surgery
17  and he suffered much pain from that, but he
18  really didn't comment anything.
19       Q.     When was the next time you
20  talked to anybody over at the jail?
21       A.     Probably, a couple of days
22  later.  I called on a regular basis.
23       Q.     How often would you say you
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 56

```
1   called?
2        A.     I called at least three times
3   a week, if not more.
4        Q.     Would you call from your home
5   phone?
6        A.     Yes, ma'am.
7        Q.     The next time you called, who
8   did you talk to?
9        A.     I'm not sure who answered the
10  phone, but I would usually ask for Sergeant
11  Wendy Roberson because I had previously
12  known her.
13       Q.     How did you know Sergeant
14  Roberson?
15       A.     Me and her worked together at
16  the Coosa County Newspaper.
17       Q.     When did y'all work together?
18       A.     Somewhere in the vicinity of
19  twelve years ago.
20       Q.     Were you working as a CNA at
21  the time?
22       A.     She was a writer, and I was
23  sales representative.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 57

```
1      Q.    Okay.  And you were working
2  two jobs at that time?
3      A.    Yes.  I worked from my home as
4  a sales rep.
5      Q.    Okay.  How long did you work
6  for the Coosa County Newspaper?
7      A.    About three years.
8      Q.    From what time to what time
9  period?
10     A.    It's hard to remember back
11 then.  Probably, from 2000 -- I mean,
12 probably from 1998 to 2001.  Something like
13 that.
14     Q.    And did Wendy work with you
15 the entire time you were there?
16     A.    I don't remember.  I know she
17 took another job, but I don't remember what
18 point in time.
19     Q.    But you knew her from the
20 newspaper?
21     A.    Uh-huh.
22     Q.    Had you ever had any problems
23 with her before?
```

Page 58

```
1      A.    No, ma'am.
2      Q.    When you called back and
3  talked to her, what was it regarding?
4      A.    Bryan's sickness.  He still
5  needed his medication.  He still needs to
6  see a doctor.
7      Q.    When did he need to see a
8  doctor?
9      A.    To make sure that he was on
10 the right medication.
11     Q.    Was there a concern before he
12 went to the jail that he was not on the
13 right medication?
14     A.    Not before he went to the
15 jail.
16     Q.    What did she tell you when you
17 talked to her?
18     A.    We have our own jail doctor,
19 and I run this damn jail.
20     Q.    Did she say anything else to
21 you?
22     A.    No, ma'am.  I think she got
23 upset with me.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 59

```
1      Q.    Were you upset with her when
2  you were talking to her?
3      A.    No, ma'am.
4      Q.    Were you upset about Bryan
5  being in jail?
6      A.    Well, any mother's upset when
7  their child's in jail.
8      Q.    When you called, were you
9  upset on the phone?
10     A.    No, ma'am.
11           MR. STOCKHAM:  Do you need to
12 take that?
13           MS. MCDONALD:  I'm not sure
14 who it is.
15     A.    Are you through with that?
16     Q.    Yes.
17     A.    No, ma'am.  Other than the
18 fact that I wasn't upset or mad.  I was
19 irritated that they wasn't taking him on to
20 the doctor and having him checked out and
21 make sure he was on the right medication and
22 get his medication started and this type
23 thing, but I wasn't mad with her.
```

Page 60

```
1      Q.    Was there any particular
2  reason why y'all had not taken him his
3  medicine, other than the fact that it was
4  ten dollars a pill?
5      A.    We couldn't afford it.
6      Q.    But you had been purchasing it
7  up until the time he went into the jail;
8  correct?
9      A.    With the help of his check.
10     Q.    Okay.  Did he continue to get
11 checks while he was in jail?
12     A.    Yes.
13     Q.    Did y'all ever notify Social
14 Security that he was in jail?
15     A.    No, ma'am.  I didn't know I
16 was supposed to.
17     Q.    Did you ever call
18 Dr. Strickler to get him to fax a
19 prescription over to the jail?
20     A.    No, ma'am.  You said
21 Dr. Weaver?
22     Q.    Dr. Strickler.
23     A.    No, ma'am.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 61

1    Q.    What about Dr. -- I can't say
2  his name, for the Lorcet.  Did you ever call
3  him to get him to fax a prescription over to
4  the jail.
5    A.    Oh, no, ma'am.  They don't
6  normally don't give narcotics at the jail
7  anyway.
8    Q.    How do you know that?
9    A.    He was never allowed to have
10 anything.
11   Q.    Did Ms. Roberson ever tell you
12 that they would not give him a narcotic?
13   A.    No, ma'am.
14   Q.    Did anybody at the jail ever
15 tell you they would not give him his
16 medicine if it was brought?
17   A.    No, ma'am.  Clay County did.
18 It didn't have anything to do with Coosa
19 County, but Clay County did tell me that he
20 could not have any pain medication.
21   Q.    Did anybody at Coosa County?
22   A.    No, ma'am.  We're talking
23 about Coosa County right now?

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 62

1    Q.    Yes, ma'am.  Just Coosa
2  County.  Now, when Bryan was at Coosa
3  County, had he ever spent any time in any
4  other jail, to your knowledge?
5    A.    About a week in Sylacauga.
6    Q.    What was that for?
7    A.    It was some just little minor
8  tickets and things.  I'm not sure exactly
9  what they were, but he gave them time
10 served.
11   Q.    And when he was at the jail in
12 Sylacauga, did you have any problems with
13 them over there?
14   A.    No, ma'am.
15   Q.    Did y'all take his medicine
16 down to the Sylacauga jail?
17   A.    No, ma'am.
18   Q.    How did he get his medication
19 while he was in Sylacauga?
20   A.    I take that back.  We carried
21 his medication to the Sylacauga jail, and
22 then they picked up from there.
23   Q.    When you say they picked up

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 63

1  from there, what do you mean by that?
2    A.    They furnished it.
3    Q.    Do you know whether they ever
4  had to go get his prescription refilled, or
5  whether there was enough in the bottle when
6  y'all took it?
7    A.    There was enough.  Probably
8  enough for a week in there.  That's my
9  guesstimation.
10   Q.    All right.  After you and
11 Wendy had this conversation on the phone
12 when you said she kind of got mad at you,
13 who did you talk to next down at the jail?
14   A.    Like I said, I called on a
15 regular basis.  I talked to Wendy again.  It
16 was the second time.  I talked to Wendy
17 again.
18   Q.    Okay.  What was it about this
19 time?
20   A.    What it was about this time
21 was Bryan had managed to get to a phone and
22 call me that morning, and he said he had
23 fell and hurt his foot.  And so I called

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 64

1  Wendy after me and him hung up, and asked
2  her what was going on with him.  And she
3  said, well, he has apparently seizured all
4  night.  But, however, I have just come on,
5  so I'm not aware of the circumstances.
6           It was early in the morning.
7  It was around seven, give or take.  But it
8  was early in the morning.  But she said he
9  had seizured all night; apparently, seizured
10 all night.
11   Q.    Did she tell you how she knew
12 that?
13   A.    No.  I assume she was -- Well,
14 I won't assume.
15   Q.    Did you or Mr. Kelley go down
16 to the jail that day after having that
17 conversation with her?
18   A.    No.
19   Q.    Did she call you back after
20 she went and checked on Bryan?
21   A.    No.
22   Q.    Had you gone down to the jail
23 at all during the time you were having these

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 65

1  conversations with Wendy?

2      A.    No, ma'am.  Oh, Saturdays.  We

3  had visitation on Saturdays, and I would go

4  for fifteen minutes on Saturday.

5      Q.    Did you see him the first

6  Saturday he was there?

7      A.    Yes, ma'am.  To my knowledge.

8      Q.    When y'all went in to

9  visitation, did you sign in?  Did they make

10  y'all sign in something, or sign a log?

11      A.    Yes.

12      Q.    How long were you allowed to

13  stay?

14      A.    Fifteen minutes.

15      Q.    Okay.  Did you see him every

16  Saturday he was in jail, Ms. Kelley?

17      A.    Yes, ma'am.

18      Q.    I figured as a mama, you

19  probably did.  What did he tell you that

20  first Saturday?

21      A.    Everything was going so-so, is

22  the way he put it.  He was in population at

23  that time.  Hadn't had any problems, other

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 66

1  than being disturbed that he was

2  incarcerated, you know.

3      Q.    He appeared to be fine

4  otherwise; right?

5      A.    At that time.

6      Q.    Okay.  How long was it after

7  he got in jail that you had this

8  conversation with Bryan about the seizures

9  and him hurting his foot?

10      A.    That Bryan had a conversation

11  with me?

12      Q.    Yes.  That Bryan had called

13  you.

14      A.    This particular Saturday that

15  I just was speaking about that we went and

16  visited him, he had fell just prior to.

17      Q.    That Saturday morning?

18      A.    I failed to mention this.  He

19  had fell just prior to, and his foot was

20  real, real swollen.

21      Q.    Which foot was it?

22      A.    The right one.  And it had a

23  bone sticking up on the top.  He was

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 67

1  complaining of his foot hurting.

2      Q.    Okay.  What time of day was it

3  that y'all would go visit?

4      A.    We would go around eight

5  o'clock.  Somewhere in that general

6  vicinity.

7      Q.    That morning?  In the morning?

8      A.    Yes, ma'am.

9      Q.    You said Bryan had called you

10  and told you he had hurt his foot.  Did he

11  call you before you got there on that

12  Saturday morning?

13      A.    I think he called me the day

14  before.

15      Q.    So it would have been on a

16  Friday?

17      A.    Uh-huh.  Or somewhere in that

18  vicinity.  Not just specifically.

19      Q.    All right.  And then you

20  called Wendy right after the conversation

21  you had with him?

22      A.    Yes, ma'am.

23      Q.    And then y'all saw him on that

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 68

1  Saturday?

2      A.    Yes, ma'am.

3      Q.    Did he mention anything to you

4  about the seizures?

5      A.    No, ma'am.

6      Q.    Did you ask him about it?

7      A.    Not to my recollection.  He

8  just said he had fell.

9      Q.    Do you know whether they took

10  him to the doctor about his foot?

11      A.    Five days later.

12      Q.    Who was he taken to, do you

13  know?

14      A.    Dr. Weaver.

15      Q.    Do you know what was done for

16  him?

17      A.    There was an Ace bandage

18  wrapped around it.

19      Q.    Is that all?

20      A.    That's all.

21      Q.    Did he tell you whether

22  Dr. Weaver had x-rayed his foot?

23      A.    He didn't tell me.

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 69

1  Q.   When was the next time you
2  talked to anybody at the jail?
3  A.   Probably a couple days later.
4  Because I called on a regular basis to check
5  on him. And about him being hurt, I called
6  to check on him.
7  Q.   Who'd you talk to?
8  A.   I believe at that time I spoke
9  to Mr. Harris.
10  Q.   And did you know Mr. Harris
11  before Bryan got over to the jail.
12  A.   No, ma'am.
13  Q.   Do you know his first name, by
14  chance?
15  A.   No, ma'am.
16  Q.   What did Mr. Harris tell you?
17  A.   Mr. Harris said, outside of
18  his foot, complaining with his foot, and the
19  seizures that he had previously had, that he
20  was doing as well as could be expected. Or
21  something to that affect.
22  Q.   Okay. Did you talk to
23  Mr. Harris about anything else?

Page 70

1  A.   No, ma'am.
2  Q.   And then when did you see
3  Bryan again?
4  A.   The next Saturday.
5  Q.   How was he doing, then?
6  A.   He was still complaining with
7  his foot. Bryan didn't look right for some
8  reason that day.
9  Q.   This would have been the
10  second Saturday he was there?
11  A.   Yes, ma'am. He didn't look
12  right for some reason that day. And I told
13  my husband after we left, I said, he's
14  either gaining a lot of weight or he's
15  swollen one because his stomach was real,
16  real huge. But outside of his foot being
17  swollen and his stomach swollen, you know,
18  everything was normal.
19  Q.   Was he complaining about
20  anything at that time?
21  A.   He was complaining about being
22  nauseated on his stomach.
23  Q.   Was he still in general

Page 71

1  population at this time?
2  A.   I don't even remember what day
3  this was.
4  Q.   To the best of your
5  recollection, how long was it that he stayed
6  in general population once he got there?
7  A.   He stayed until December the
8  5th, when he was put in the hole
9  permanently.
10  Q.   That second Saturday when you
11  saw him, was he getting his medicine at that
12  time?
13  A.   Yes, ma'am. It was my
14  understanding that they had ordered it from
15  Crews Drug Store, or somewhere. I don't
16  know that it's even open now.
17  Q.   So he was taking his Zyprexa
18  and Lorcet?
19  A.   Yes, ma'am.
20  MS. MCDONALD: Can we take a
21  break, please?
22  VIDEOGRAPHER: This is the end
23  of tape number one. We're off the Record.

Page 72

1  The time is 10:41 a.m.
2  (Recess taken.)
3  VIDEOGRAPHER: This is the
4  beginning of tape number two in the
5  deposition of Wanda Kelley. Back on the
6  Record. The time is 10:59 a.m.
7  Q.   (By Ms. McDonald) Ms. Kelley,
8  how often did you talk to Bryan while he was
9  at the jail?
10  A.   When he was in population, I
11  talked to him a good bit. Every
12  two-to-three days.
13  Q.   You didn't talk to him every
14  day?
15  A.   Not every day.
16  Q.   Okay. Would you talk to him
17  more than one time a day?
18  A.   Oh, sometimes he would call
19  back.
20  Q.   And then you saw him every
21  Saturday?
22  A.   Yes, ma'am.
23  Q.   When he went in jail in 2003,

Page 73

1  did he have an Alabama driver's license at

2  that time?

3       A.    No, ma'am.

4       Q.    How long has he been without a

5  driver's license, to your knowledge?

6       A.    I would say '97.

7       Q.    It's been that long?

8       A.    Something like that.

9       Q.    What is your understanding of

10  the reason?

11      A.    DUI.  Now, that's give or

12  take.  I not --

13      Q.    Yeah, I know.  And I

14  understand that he's an adult, and you're

15  just telling me what you know as the mother.

16      A.    I can't keep up with both of

17  them all the time.

18      Q.    So it's your understanding

19  that he hasn't had a driver's license since

20  1997?

21      A.    It could have been a little

22  later than that.  It could have been 2000.

23  Between '97 and 2000.  Somewhere in that

Page 74

1  vicinity.

2       Q.    Since 2000, he has not had one

3  for sure?

4       A.    Yes.

5       Q.    And does he drive without his

6  license?

7       A.    No, ma'am.

8       Q.    The automobile accident that

9  he had back in November, he was driving

10  without a license?

11      A.    Yes, ma'am.

12      Q.    Whose vehicle was he in?

13      A.    He was in mine without my

14  permission.

15      Q.    He told me yesterday that he

16  would drive down to the store to get

17  cigarettes.  Whose vehicle would he go in?

18      A.    He has an automobile.

19      Q.    What kind of automobile does

20  he have?

21      A.    It's about a '97 S10

22  chocolate, small truck.

23      Q.    Does he drive that truck

Page 75

1  regularly?

2       A.    It just set in the yard.  My

3  husband bought it for him when he went to

4  prison, and that was a gift when he came out

5  on good behavior from prison.

6       Q.    So that was something he got,

7  what, a year ago, in 2006?

8       A.    Uh-huh.

9       Q.    Is that a yes?

10      A.    Yes, ma'am.  I'm sorry.

11      Q.    That's okay.  All right.  You

12  were telling me you had talked to Wendy and

13  then you talked to Mr. Harris.  Tell me

14  about other conversations you had with

15  anybody down at the jail while Bryan was

16  there.

17      A.    From time to time, Brandon

18  Stroud would answer the phone, and I would

19  ask him how Bryan was.  And Al Bradley would

20  answer the phone; I would ask him.  But

21  mostly -- Like I said, mostly Wendy would --

22  I would ask personally for her because I

23  knew her.

Page 76

1       Q.    All right.  You talked to

2  Harris and Brandon Stroud and Bradley and

3  Roberson.  Is there any -- And I know you

4  talked to Sheriff Owens at one time.  Is

5  there anybody else while Bryan was

6  incarcerated at the Coosa County jail that

7  you would have had a conversation with?

8       A.    Not to my knowledge.

9       Q.    How many times did you talk to

10  Sheriff Owens?

11      A.    Three.

12      Q.    Now, you told me about the

13  first time you talked to him.  Can you tell

14  me about the other two times that you talked

15  to him?

16      A.    Okay.  The second time that I

17  talked to him, me and my sister married two

18  brothers and they were double first cousins,

19  Bryan and Troy are, and he and his wife both

20  were killed in an automobile accident in a

21  head-on collision in Robertsdale.  And I

22  called Sheriff Owens and asked him if Bryan

23  could attend the grave-side service, and he

Page 77

1 told me no.

2          Q.      Okay.  Did he tell you why?

3          A.      It was against regulations.

4          Q.      Were you aware that a judge

5 would have to let him out in order for him

6 to go -- to be let out of the jail?

7          A.      No, ma'am.

8          Q.      And then, when was the next

9 time you talked to him?

10         A.      Okay.  The next time I talked

11 to him, me and my husband went down and

12 talked to him.

13         Q.      All right.  The first time you

14 talked to him was on the phone; right?

15         A.      Yes.

16         Q.      All right.

17                 Then we went down there.

18         Q.      Was that about Troy's death,

19 when you went down there the second time you

20 talked to him?

21         A.      No.  We went to talk to him

22 about Bryan's condition at that time.

23         Q.      Okay.  So you talked to him on

Page 78

1 the phone and then you went down there?

2          A.      Yes.

3          Q.      All right.  When you went down

4 there, did you meet with him?

5          A.      Yes, ma'am.

6          Q.      Who else was present?  Anybody

7 else?

8          A.      No, ma'am.  It was just me and

9 him.

10         Q.      And your husband?

11         A.      And my husband.

12         Q.      Where did y'all meet?

13         A.      He came out of his office, and

14 we were standing between his office and the

15 dispatcher's desk.

16         Q.      And what did y'all go to talk

17 to him about?

18         A.      Bryan being sick.

19         Q.      Do you remember when this was?

20         A.      Sometime, give or say, the

21 latter November.

22         Q.      And what did y'all talk to

23 Sheriff Owens about?

Page 79

1          A.      We talked to him about Bryan

2 being sick, and why he was having to sleep

3 on the concrete floor with his back in the

4 condition it was in.  He has the artificial

5 L4, L5 and S1 cages, and he was sleeping on

6 a small mat on the floor.  And why he could

7 not sleep on the bed like, you know, that

8 was up off of the floor.  And he said:  I

9 keep him on the floor for my own protection.

10         Q.      Okay.  Did you ever see the

11 cell where Bryan was being housed?

12         A.      Yes, ma'am.  Yes, ma'am.

13         Q.      How did you come to see that

14 cell?

15         A.      We were allowed to go into a

16 side room with Mr. Harris one day and talk

17 with Bryan, and I saw the cell that he was

18 in, which was directly behind the

19 dispatcher's desk.  The door was open.  To

20 my sorrow, I saw it.

21         Q.      And what did you see?

22         A.      I saw only a concrete hole,

23 meaning hole, a square.  And I'm no

Page 80

1 carpenter, but I'll guess, give or take a

2 six by eight, something in that vicinity.

3 No water, no bathroom, and there was only a

4 drain pipe in the center.  The concrete sort

5 of sloped off to this drain pipe in the

6 center about the size of a saucer.  And it

7 had slits in it, and this is where he had to

8 urinate and defishiate (SIC).

9          Q.      Did you see it?

10         A.      It was dark, oh, not dark,

11 dark with the door open to where you

12 couldn't see what was inside the cell, but

13 that was all that was in there.

14         Q.      Did you see anything else that

15 was in there?

16         A.      No, ma'am.  Very cold.

17         Q.      Did you go in that cell at

18 all?

19         A.      No, ma'am.  Looking in was

20 enough.

21         Q.      When was this that you saw the

22 cell?

23         A.      It was latter part of

Page 81

```
 1   November.
 2        Q.     Had you ever been in a jail
 3   before this time?
 4        A.     No, ma'am.  I've never been in
 5   jail, thank God.
 6        Q.     But you've never had an
 7   occasion to go into a jail before?
 8        A.     Yes.
 9        Q.     When had you been in a jail?
10        A.     My nephew that got killed, I
11   had visited him on various occasions.
12        Q.     At what jail facility?
13        A.     Talladega.
14        Q.     Had you actually been in and
15   seen where he was being housed?
16        A.     No, ma'am.  We met in a room
17   like a big auditorium like thing, and you
18   met around a table and talked to whoever you
19   were visiting that day.
20        Q.     Did you see the mat that Bryan
21   was sleeping on?
22        A.     The mat was not there.
23        Q.     The mat was not in the cell at
```

Page 82

```
 1   the time?
 2        A.     No, ma'am.
 3        Q.     How did y'all find out that
 4   Bryan was sleeping on a mat on the floor?
 5        A.     He told me.
 6        Q.     Did he tell you anything about
 7   the mat?
 8        A.     He told me it was very thin,
 9   and it was very, very cold in there.  And I
10   know that from experience, because I almost
11   froze going in to visit him.  It was a very,
12   very thin.  And he had a small blanket, not
13   a full-sized blanket that would cover a
14   man's body.  He could cover himself halfway.
15   But other than that -- Neither one of those
16   were in that room when I looked in.
17        Q.     And you a never saw the
18   blanket or the mat; correct?
19        A.     No, ma'am.
20        Q.     All right.  And you said that
21   Sheriff Owens told you that he was sleeping
22   on the floor for his protection, or Bryan's?
23        A.     For his protection.  Sheriff
```

Page 83

```
 1   Owens' protection.
 2        Q.     Did y'all have any other
 3   conversation at that time?
 4        A.     Not to my knowledge.
 5        Q.     Did he tell you anything else
 6   at that time?
 7        A.     Not that I recollect.
 8        Q.     Okay.  When was the next time
 9   you talked to Sheriff Owens?
10        A.     Christmas day.
11        Q.     Where were you when you had a
12   conversation with Sheriff Owens that time?
13        A.     I was at home.
14        Q.     You called?
15        A.     Yes, ma'am.
16        Q.     Had anything happen to cause
17   you to call him?
18        A.     Yes, ma'am.
19        Q.     What happened?
20        A.     I mean, not an incident
21   happened.  But it was Christmas day, and, of
22   course, I cried myself to sleep every night,
23   and it was Christmas day, and I called him
```

Page 84

```
 1   and I asked him, I said:  By any chance,
 2   Sheriff Owens, will you allow Bryan to come
 3   out of the hole into the other blocks with
 4   the other guys today, because it's Christmas
 5   day?  I said:  From a mother's standpoint of
 6   view, can he just mix and mingle with the
 7   other guys today?  He said:  I'm not making
 8   you any promises.  And he didn't.
 9        Q.     He did not allow him to come
10   out?
11        A.     No, ma'am.
12        Q.     How do you know that?
13        A.     Bryan told me.
14        Q.     Did you have anymore
15   conversations was Sheriff Owens?
16        A.     No, ma'am.
17        Q.     You never went to the jail and
18   talked to him, or talked to him on the
19   phone, either one?
20        A.     No, ma'am.
21        Q.     What about Terry Wilson.  Did
22   you ever have any conversations with him
23   about Bryan?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 85

```
 1        A.      I spoke just briefly with
 2   Terry on the phone and would ask him, you
 3   know, sometimes Terry would answer the
 4   phone, and I would ask him how Bryan was or
 5   various things.  And I would explain to him
 6   that Bryan was very sick, and had a lot of
 7   medical problems.  But nothing major.  I
 8   mean, our conversation was nothing major.
 9        Q.      Was he nice to you when you
10   had conversations with him?
11        A.      Yes, ma'am.
12        Q.      How many conversations would
13   you say you had with Mr. Wilson?
14        A.      I would say one or two at the
15   most.
16        Q.      And you said you had talked to
17   Al Bradley on the phone?
18        A.      Yes, ma'am.
19        Q.      Approximately, how many times
20   did you talk to Mr. Bradley?
21        A.      It's sort of hard to -- give
22   or take five or six times.
23        Q.      And were all those
```

Page 86

```
 1   conversations about how Bryan was doing?
 2        A.      About how he was doing.
 3        Q.      Was he nice to you when you
 4   talked to him on the phone?
 5        A.      Al's never nice to anybody.
 6        Q.      Okay.  What would he say to
 7   you on the phone?
 8        A.      He's okay.
 9        Q.      Anything else?
10        A.      No, ma'am.
11        Q.      Now, I know you told me you
12   had talked to Wendy Roberson.  What other
13   conversations did you have with Wendy while
14   Bryan was incarcerated?
15        A.      I called Wendy on another
16   occasion, and this particular morning I was
17   just really upset and crying.  I'd been up
18   most of the night, and I was crying, and I
19   called her.  And I was crying when I called
20   her, and she could tell I was very upset.
21              And I said:  Wendy, Bryan is
22   dying.  I can tell by the way he was
23   looking.  He's dying in that jail cell.  Can
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 87

```
 1   you please do something to help me?  And she
 2   said:  We have our own jail doctor.  And I
 3   said:  But, Wendy, we're going to lose him.
 4   He's going through withdrawals.
 5   Dr. Strickler has already said that he could
 6   go under cardiac arrest from withdrawals,
 7   severe withdrawals.
 8        Q.      Withdrawals of what?
 9        A.      Cocaine.  This was earlier on.
10   I can't give you a specific time of this.
11   But, anyway, I was crying, and Wendy
12   proceeded to tell me, I know similar
13   something what you're going through.  I have
14   a son that was messed up.  And blah, blah,
15   you know, just a general conversation.
16              And I said:  Wendy, please do
17   something to help me.  He's going to die in
18   Rockford jail.  And she said:  I will see if
19   I can get him an appointment with the doctor
20   next week.
21        Q.      Had y'all -- Had you notified
22   anybody at the jail that he could have
23   cocaine withdrawals, prior to this
```

Page 88

```
 1   conversation with Wendy?
 2        A.      I did not.  Dr. Howard
 3   Strickler did.  He called Mr. William
 4   Latham, and also faxed him a letter.
 5        Q.      Mr. Latham who is the --
 6        A.      -- Court Referral Officer.
 7        Q.      But I'm talking about over at
 8   the jail.  Did y'all notify anybody at the
 9   Coosa County jail that Bryan suffered from
10   withdrawals from not having cocaine?
11        A.      Yes.  I told Wendy.
12        Q.      When did you tell her?
13        A.      In one of our phone
14   conversations.  I can't remember.
15        Q.      And I thought you told me
16   earlier, I may have misunderstood, in
17   November of 2003, were you aware that Bryan
18   was using cocaine again?
19        A.      I wasn't aware of it.
20        Q.      When did you become aware of
21   it?
22        A.      I became aware of it when he
23   tested positive when he went to court that
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 89

```
 1   day.
 2        Q.      How did you know he could have
 3   withdrawals from cocaine use if he wasn't
 4   using regularly?
 5        A.      Well, he was incarcerated that
 6   day.
 7        Q.      But do you know whether he was
 8   regularly using cocaine?
 9        A.      No, he did not regularly use
10   it.
11        Q.      What made you think he'd have
12   withdrawals from cocaine if he wasn't
13   regularly using it?
14        A.      Well, any time you use
15   something -- that's like an alcoholic,
16   you're going to have withdrawals if you
17   drink for a few days, you know.  I don't
18   know how many days that he had used it, but
19   it wasn't a long period of time.
20        Q.      How long was it after he was
21   incarcerated that you talked to
22   Dr. Strickler about him?
23        A.      Oh, I would say two-to-three
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 90

```
 1   days.
 2        Q.      And what did you call
 3   Dr. Strickler for at that time?
 4        A.      I called him to tell him that
 5   he had been incarcerated, and that they had
 6   cut everything off.  They was giving him
 7   nothing.  He said:  Ms. Kelley, he can not
 8   live like this.  He said, he will die.
 9        Q.      Did you talk to him about
10   Bryan using cocaine again?
11        A.      He had -- Bryan had already
12   been in DDU because of the cocaine with
13   Mr. Strik -- with Dr. Howard Strickler.
14        Q.      And that was in 1997?
15        A.      So he was familiar with that.
16        Q.      That was in 1997, though;
17   correct?
18        A.      He had used cocaine since
19   1997, because he tested positive the morning
20   of court.
21        Q.      Was he just -- That's my
22   question.  To your knowledge, was he
23   regularly using cocaine?
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 91

```
 1        A.      He did not regularly use
 2   cocaine, no.
 3        Q.      How often was he using
 4   cocaine?
 5        A.      Very seldom.
 6        Q.      Did Dr. Strickler tell you he
 7   could have withdrawals from not getting
 8   cocaine, even though he was just seldom
 9   using it?
10        A.      I don't remember that.
11        Q.      Was he using powder cocaine,
12   or was he using crack cocaine?
13        A.      Crack cocaine.  The only way I
14   knew this, he told me.
15        Q.      Any other conversations that
16   you remember having with Ms. Roberson?
17        A.      I called Wendy all the time.
18   In fact, she probably got very irritated
19   with me.  But I called her all the time to
20   check on him.  As I said, two-to-three times
21   a week.  At least, two-to-three times a
22   week.
23        Q.      Do you remember anything else
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 92

```
 1   that she would have said back to you when
 2   you would call her to check on Bryan?
 3        A.      Her favorite comment was, I
 4   run this damn jail.
 5        Q.      Were you trying to get them to
 6   take him to his doctors?
 7        A.      Dr. Howard Strickler requested
 8   that he be brought by ambulance to Brookwood
 9   Medical Center, and that he would treat him.
10   And Mr. Latham said he would contact the
11   judge.  He contacted Judge John Rochester,
12   and he said no.
13        Q.      So to the best of your
14   understanding, that was something that was
15   outside of the control of anybody at the
16   jail?
17        A.      That was up to the judge.
18        Q.      Okay.  Not anybody at the
19   jail?
20        A.      No.
21        Q.      Did you understand that they
22   could not move Bryan or take him out of jail
23   without a court order?
```

Page 93

```
1        A.      Right.  Right.  Nothing
2   without the judge's order.
3        Q.      And was Mr. Radney still
4   representing Bryan?
5        A.      Yes.
6        Q.      Did y'all ever talk to
7   Mr. Radney about any of this?
8        A.      Yes, ma'am.
9        Q.      What did y'all talk to him
10  about?
11       A.      Well, we told him the whole
12  story, you know.
13       Q.      Did he ever file anything
14  trying to get Bryan released from the jail,
15  to get him moved?
16       A.      He filed a writ of habeas
17  corpus.
18       Q.      And what was the result of
19  that?
20       A.      Oh, Judge Rochester denied it.
21       Q.      How long was Bryan in jail
22  before he started getting his medication
23  regularly?
```

Page 94

```
1        A.      I would probably say, give or
2   take, a couple of weeks.
3        Q.      When you would see Bryan on
4   Saturdays, did you ever ask him what
5   medication he was taking?
6        A.      Yes, ma'am.
7        Q.      What would he tell you?
8        A.      That they had started his
9   Zyprexa.
10       Q.      Did he tell you about any
11  other medications he was on?
12       A.      Oh, he said -- and the way he
13  would put it was, some of the pills, I don't
14  know what they are.
15       Q.      Did he tell you how many pills
16  he was taking?
17       A.      Several, five or six.
18       Q.      Did you ever inquire as to
19  what other medication he was on?
20       A.      No, ma'am.  But I had the jail
21  med sheet.
22       Q.      Who gave you the jail med
23  sheet?
```

Page 95

```
1        A.      Dr. Weaver.
2        Q.      When did you get that from
3   him?
4        A.      I went and requested his
5   medical records, and he turned them over to
6   me.
7        Q.      How long was it after Bryan
8   had been in that you did this?
9        A.      Shortly after that time, about
10  three weeks.
11       Q.      Okay.  Do you recall what
12  medications were being prescribed for Bryan
13  at the time?
14       A.      Prolixin, Neurontin, Zyprexa,
15  Phenabarbatol.  There was six of them, if
16  I'm not mistaken.  Klonopin.  There was six
17  of them all together.
18       Q.      Was Bryan taking these
19  medications, to your knowledge, when he went
20  into the jail.
21       A.      No.
22       Q.      Do you know whether
23  Dr. Strickler ever contacted Dr. Weaver
```

Page 96

```
1   regarding Bryan's medications?
2        A.      No, ma'am.  I don't know.
3        Q.      Did you ever ask him to?
4        A.      No.  Because they always
5   stressed to me that we have our own jail
6   doctor.
7        Q.      Did you ever talk to
8   Dr. Weaver about the medication that Bryan
9   was being prescribed?
10       A.      No, ma'am.  I never saw
11  Dr. Weaver, except when I went to pick up
12  the medical records.
13       Q.      Did you talk to him at that
14  time?
15       A.      No, ma'am.
16       Q.      Did Bryan tell you he was
17  having any side effects from the medications
18  he was being given?
19       A.      Yes, ma'am.
20       Q.      What did he tell you?
21       A.      Itching, breaking out in big
22  whelps all over, shocking.  As the way he
23  put it, it's like you're sticking your
```

Page 97

1   finger in a 110-volt electrical unit.  It's
2   causing shocking treatments all up and down
3   my back and into my mind.  He broke out in
4   big beads of sweat; big red whelps all under
5   his hair, all over his entire body, even
6   between his toes in his feet.
7          Q.      Did you ever see any of these?
8          A.      I saw this.
9          Q.      What did you see, Ms. Kelley?
10         A.      He and my husband went to
11  visit him on a Saturday.  When he first came
12  in and sat down and started talking to us, I
13  would say within two-to-three minutes after
14  he started to talk to us, he broke out in
15  big beads of sweat to start off with, all
16  across his forehead.  We just thought he was
17  extremely hot.
18              And then big, huge whelps
19  started breaking out all across his
20  forehead.  And he started itching, and he
21  said: Mother, I'm having those shocking
22  feelings again.
23         Q.      How long had he been in jail

Page 98

1   when this happened?
2          A.      This was sometime around the
3   middle of December.
4          Q.      Did you talk to anybody about
5   this after you had seen that?  Did you go
6   talk to the Sheriff or Wendy about it?
7          A.      Yes, ma'am.
8          Q.      Who did you talk to?
9          A.      To the best of my knowledge, I
10  told Wendy.
11         Q.      Did you -- In person, or . . .
12         A.      I called her.
13         Q.      What did she tell you?
14         A.      They carried him to Dr. James.
15  That they'd take care of him to see
16  Dr. James at Temple Medical Clinic.
17         Q.      And do you know what the
18  result of that was?
19         A.      Dr. James said that he was
20  unaware.  He was hit -- Oh, I also picked up
21  all of his medical reports.  He said he was
22  unaware of what was causing it, but it
23  seemed to be secondary to his meds and a

Page 99

1   reaction secondary to his meds.
2          Q.      To your knowledge, was any of
3   the medication changed?
4          A.      Yes, ma'am.
5          Q.      What about his medication
6   changed after that?
7          A.      After that point?
8          Q.      Yes, ma'am.
9          A.      I mean, I thought you was
10  talking about from the time he entered.
11         Q.      No.  After that point, did
12  they -- Did Dr. James change any of his
13  medications?
14         A.      No, ma'am.  He didn't change
15  it; he added one to it.
16         Q.      What did he add to it?
17         A.      Something for itching, but I
18  can't tell you the name of it.
19         Q.      Okay.  Do you have any
20  knowledge as to how many times Bryan would
21  have been taken to the doctor during his
22  incarceration at Coosa County?
23         A.      He was carried to Dr. Weaver

Page 100

1   one time.  He was carried to Russell
2   Hospital one time, and then he was carried
3   the last time to ICU.
4          Q.      Tell me --
5          A.      Now, that's to my knowledge.
6          Q.      Yes, ma'am, I understand that.
7              Can you tell me, Ms. Kelley,
8   that last time when he was at Russell
9   Hospital in ICU, tell me what you know about
10  that.
11         A.      Okay.  He called me in the --
12  Bryan called me.  If Mr. Harris or Mr. Tim
13  was up front, they would allow him to come
14  out of the hole to use the phone for just a
15  minute, if no one else was looking.  If
16  Ricky wasn't looking, or Wendy wasn't up
17  there or Al.  They let him use the phone.
18  He called me briefly.  He said: Mother, I'm
19  very sick.  And I said: Baby, what's wrong?
20  And he said: I'm so weak I can't stand up.
21  I've got to go back and lay down.  And so he
22  hung up the phone.
23         Q.      Do you know what day this was,

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 101

```
 1   Ms. Kelley?
 2        A.     No, ma'am.
 3        Q.     Had you seen him on that
 4   Saturday?
 5        A.     Yes, ma'am.
 6        Q.     Okay.  Had you noticed
 7   anything different about him on the Saturday
 8   you saw him?
 9        A.     That's when the whelps were so
10   bad.
11        Q.     And then after that --
12        A.     And also in addition to the
13   whelps, his skin was turning color.  He was
14   real yellow.  The whites of his eyes were
15   yellow.  His skin tone was yellow.
16        Q.     Did you tell anybody about
17   that?
18        A.     And his stomach was real
19   swollen.
20        Q.     Did you tell anybody about
21   that?
22        A.     I told Sergeant Wendy.  But
23   you asked me another question, and I didn't
```

Page 102

```
 1   get to finish it.  I don't remember what it
 2   was.
 3        Q.     He called you that morning and
 4   told you he was sick, very sick?
 5        A.     He called me and told me he
 6   was very sick, and he talked to me briefly.
 7   They would let him slip out and use the
 8   phone.  Mr. Harris or somebody that was --
 9   if Ricky, Al, and Wendy wasn't up front,
10   they'd let him use the phone.  They'd slip
11   him out and let him use the phone and dial
12   me right quick.
13        He said:  I'm so sick I can't
14   set up.  He went back into the -- I mean, he
15   hung up the phone.  And I could tell by the
16   tone of his voice that he was disoriented,
17   and I could tell that he was very sick.
18        Q.     How could you tell he was
19   disoriented on the phone?
20        A.     He was crying and saying,
21   mother, I'm so sick.  I'm so sick.  I can't
22   set up.  I can't set up.  I'm sick.  And so
23   I called.  I hung right up, and I called to
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 103

```
 1   the jail.  Aaron Green answered the phone.
 2   And I said:  Aaron, what's going on with
 3   Bryan?  And he said:  Ms. Kelley, I don't
 4   know.  He said:  Bryan's eyes are gold.  He
 5   said:  He is swollen, and he is broke out
 6   from the top of his head to the bottom of
 7   his feet.  He said:  I don't know what's
 8   wrong with him.  And I said:  Can you take
 9   him to a doctor?  And he said:  There's no
10   one here but me, and I can't.  And I said:
11   Well, Aaron, please try to get some help;
12   he's dying in the jail cell.
13        I didn't hear anything else.
14   I hung up the phone.  And, of course, mother
15   like, I sat down and cried my eyes out.  At
16   five o'clock that afternoon, Thomas Radney
17   called me, who was our attorney.  He said:
18   Ms. Kelley, this is Thomas Radney, quote end
19   quote.  Bryan is in intensive care at
20   Russell Hospital in Alex City in critical
21   condition.  You and your husband go to the
22   hospital.  Administer to whatever needs that
23   he might have.  And we went immediately.
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 104

1    Q.    What time of day did Bryan
2  call you?
3    A.    Oh, he called me -- Let's see,
4  give or take, I can't remember, but
5  somewhere about nine or ten o'clock.
6  Something like that.
7    Q.    That morning?
8    A.    Uh-huh.
9    Q.    Do you know what time he got
10  to the hospital in Alex City?
11    A.    No, ma'am.
12    Q.    You were not called until he
13  was already in ICU?
14    A.    Ma'am?
15    Q.    At five o'clock when you got
16  the call from Mr. Radney, he was in ICU at
17  that time?
18    A.    He said he was in ICU, but
19  when we got down there he was still in the
20  emergency room.  Evidently, Mr. Radney had
21  been given the information that he was going
22  to ICU.
23    Q.    Okay.  When y'all got to the

Page 105

1  ER?
2    A.    When we got to the ER, he was
3  still in the ER.
4    Q.    Okay.  Was this the only
5  conversation you had had with Aaron Green
6  about Bryan?
7    A.    Yes.
8    Q.    Any other conversations you
9  had with anybody else that worked at the
10  jail about Bryan while he was there?
11    A.    Not to my knowledge.
12    Q.    Now, it's my understanding
13  that he left Russell Hospital and went to a
14  rehab program.  Am I right about that?
15    A.    Yes, ma'am.
16    Q.    Where did he go?
17    A.    Judge Rochester furloughed him
18  to a rehab program in York, Alabama.  Don't
19  hold me to that, but I think I'm correct on
20  that.
21    Q.    At some point, did he come
22  back home before he went back to jail?
23    A.    Yes.  He had in-house arrest.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 106

1    Q.    How long did that --
2    A.    Two months.
3    Q.    Two months.  And he lived with
4  you and Mr. Kelley at that time?
5    A.    Yes, ma'am.
6    Q.    And then, when did he go back
7  to Coosa County to jail?
8    A.    Okay.  Can I back up for just
9  a second?
10    Q.    Yes, ma'am.
11    A.    Judge Rochester furloughed him
12  to the Caradale Lodge in Sylacauga.  I went
13  and picked him up and carried him straight
14  back to Rockford jail.  They told me at
15  Caradale Lodge that he has a strep throat,
16  and he needs to go see a doctor before he
17  goes back to jail.
18          But I didn't know what to do,
19  because I knew he was on a furlough.  And
20  once he was released into my custody, then
21  he was to go back to the jail.  So I carried
22  him back to the jail.  No -- I'm getting
23  confused again.  I'm sorry.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 107

1    Q.    Oh, it's okay.  I know it's
2  been a long time.
3    A.    I'm having to think and I'm
4  getting confused again.
5          I picked him up at Caradale
6  Lodge.  I did take him by a Dr. Law's
7  office.  He gave him a shot for the strep
8  throat.  Then I carried him straight to
9  Rockford jail, to Wendy.  Dr. Law gave me
10  two prescriptions.  It was not for
11  medication, but it said:  Do not
12  reincarcerate this patient due to medical
13  reasons.  If he is reincarcerated, Coosa
14  County jail will be held responsible for
15  whatever might take place concerning this
16  patient.  And I have a copy of those.
17    Q.    Did you give those to your
18  attorney, or take those to Judge Rochester?
19    A.    I gave them to my attorney.
20    Q.    All right.  Did he tell you
21  that the judge would have to be the one to
22  make the decision as to whether your son
23  could be released?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 108

1    A.    No, ma'am.

2    Q.    Did you understand that that

3  was something that would have to be done by

4  the judge?

5    A.    Not that particular thing, I

6  didn't.  I mean, coming from a doctor, you

7  know, I didn't understand that.

8    Q.    Did you think the doctor could

9  override the judge?

10    A.    No.  According to law, nobody

11  overruns the judge.

12    Q.    So you took him back to Coosa

13  County to the jail?

14    A.    Yes, ma'am.

15    Q.    And how long was he there this

16  next time?

17    A.    He wasn't there very long,

18  maybe two-to-three weeks or so.  And they

19  transferred him to Clay County.  They housed

20  him in Clay County.

21    Q.    And after that, did he return

22  to Coosa County jail at any time?

23    A.    After that time?

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 109

1    Q.    After he got out of Clay

2  County?

3    A.    No, ma'am.

4    Q.    Okay.  And the two-to-three

5  weeks that he was there that second time,

6  did you see him on those Saturdays as well,

7  again?

8    A.    Yes, ma'am.

9    Q.    Did he tell you he was having

10  any problems during those two-to-three

11  weeks?

12    A.    No, ma'am.

13    Q.    When he went over to Clay

14  County, do you recall who the sheriff was

15  over there?

16    A.    The sheriff?

17    Q.    Yes, ma'am.  Well, let me ask

18  you this.

19    A.    I know Ms. Shannon, but I

20  don't know the sheriff's name.

21    Q.    That's okay.  Who did you deal

22  with while Bryan was incarcerated at the

23  Clay County jail?

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 110

1    A.    Mainly, Ms. Shannon.

2    Q.    When Bryan was taken over to

3  Clay County jail, do you know whether his

4  medications were taken over there with him?

5    A.    No, ma'am.  They had him --

6  They had carried him to Cheehaw Mental

7  Health.

8    Q.    After he got to Clay County?

9    A.    Not Cheehaw, I'm sorry.  They

10  carried him to Lineville Mental Health,

11  which is the closest to Clay County.  And he

12  saw Dr. Castro.

13    Q.    That two- to three-week period

14  that Bryan was back at --

15    A.    That's give or take.  I can't

16  remember, so it's give or take.

17    Q.    I understand.  When you took

18  him back over to Coosa County jail after he

19  got released from jail, did y'all take his

20  medications with you at that time?

21    A.    Now, I don't remember.

22    Q.    Did he complain to you at any

23  time that he was not receiving his

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 111

1  medications during this period?

2    A.    No, ma'am.

3    Q.    Did he have any problems when

4  he was at Clay County in the jail?

5    A.    No, ma'am.  They have their

6  own doctor and nurses on staff.

7    Q.    Did you go to see him every

8  time you could visit him?

9    A.    Yes, ma'am.

10    Q.    How often were you allowed to

11  visit him at Clay County?

12    A.    Once every two weeks.

13    Q.    Was it on Saturdays?

14    A.    Yes, ma'am.

15    Q.    Did he call you from there, as

16  well?

17    A.    Did he call me from Clay

18  County?

19    Q.    Yes, ma'am.

20    A.    Yes ma'am.

21    Q.    How often would you talk to

22  him while he was at Clay County?

23    A.    Not a whole lot.  Every two or

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 112

1  three days.  It's so expensive.  Those phone
2  calls are so expensive, and he was better at
3  that time.
4        MS. MCDONALD:  Y'all want to
5  take a break?
6        MR. STOCKHAM:  Yes.
7        THE WITNESS:  Please.
8        VIDEOGRAPHER:  Off the Record.
9  The time is 11:39 a.m.
10       (Recess taken.)
11       VIDEOGRAPHER:  Back on the
12  Record.  The time is 12:44 p.m.
13       Q.    (By Ms. McDonald) Ms. Kelley,
14  at any time, have you or your husband had
15  power of attorney over anything to do with
16  Bryan, any of his medical care or decisions?
17       A.    I had medical care.
18       Q.    Okay.  When did you have a
19  power of attorney?
20       A.    I've had it for about five
21  years.
22       Q.    Do you still have it?
23       A.    Yes.  Not power of attorney

Page 113

1  over him, but just his information can be
2  given, released to me because of the HIPPA
3  law in the State of Alabama.
4        Q.    Okay.  So you just have
5  permission to obtain copies of his medical
6  records?
7        A.    Right.  Right.
8        Q.    You don't actually have
9  control of his money or anything else?
10       A.    No, ma'am.
11       Q.    Okay.  After he got out of
12  Clay County jail, he was taken to Kilby?
13       A.    Yes, ma'am.
14       Q.    To prison.  Did y'all see him
15  while he was at Kilby?
16       A.    Yes, ma'am.
17       Q.    How often were you allowed to
18  see him while he was at Kilby?
19       A.    We could have seen him every
20  two weeks, but we only went once a month
21  because my husband had had two heart
22  attacks.
23       Q.    And then once he was at

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 114

1  Bullock, how often were you allowed to see
2  him?
3        A.    We were allowed twice every
4  two weeks, but we only went once a month
5  because the trip was so long on my husband.
6        Q.    Okay.  How was he doing while
7  he was at Kilby?
8        A.    Fine.
9        Q.    Did he report having any
10  problems to you?
11       A.    No.  He said he had no
12  disciplinary problems.
13       Q.    What about any other problems?
14  Were you made aware of any other problems he
15  was having?
16       A.    No, ma'am.
17       Q.    Were you aware of any medical
18  problems he was having?
19       A.    No, ma'am.
20       Q.    When you saw him while he was
21  at Kilby, did he appear to you to be fine?
22       A.    Fine.
23       Q.    What about while he was at

Page 115

1  Bullock?
2        A.    Fine.
3        Q.    He didn't appear to have any
4  problems?
5        A.    No, ma'am.
6        Q.    Did he tell you he was having
7  any problems?
8        A.    No, ma'am.
9        Q.    Did he tell you that he was
10  experiencing any problems whatsoever?
11       A.    No, ma'am.
12       Q.    When he got out of Bullock,
13  where -- did he come home after he got out
14  of Bullock?
15       A.    Yes, ma'am.
16       Q.    And that was in, when did you
17  tell me, August of 2006?
18       A.    Yes.
19       Q.    And he has been living with
20  y'all since that time?
21       A.    Yes, ma'am.
22       Q.    Since he's been home, since
23  August of 2006, can you tell me the doctors

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 116

1   that he has been seeing or treated by?

2        A.      Dr. David Faber, who is his

3   psychiatrist.

4        Q.      Anybody else?

5        A.      Dr. Alkier, who is his M.D.

6        Q.      Anybody else, to your

7   knowledge, that he has been seeing?

8        A.      No, ma'am.

9        Q.      Is there any particular reason

10  why he did not go back to see Dr. Strickler?

11       A.      He didn't need him.  He was

12  seeing Dr. Faber, Dr. David Faber.

13       Q.      Is there any particular reason

14  why he switched psychiatrists?

15       A.      Ma'am?

16       Q.      Is there any particular reason

17  why he switched psychiatrists?

18       A.      Oh, he just liked Dr. Faber

19  better.

20       Q.      When did he start seeing

21  Dr. Faber for the first time?

22       A.      When he was in Brookwood

23  Hospital.  I'm not sure what -- And I don't

Page 117

1   remember the year.

2        Q.      Okay.  To your knowledge, what

3   medications is Bryan currently taking?

4        A.      He takes Seroquel, six hundred

5   milligrams at bedtime, and he takes Tegretol

6   for seizures.

7        Q.      Anything else?

8        A.      That's all.  Lorcet Plus,

9   excuse me.

10       Q.      And when those prescriptions

11  are filled, they're filled at Food World

12  pharmacy?

13       A.      Yes, ma'am.

14       Q.      Since he has been released

15  from Bullock, has he had any problems with

16  the Law at all?

17       A.      Not any problems with the Law.

18  I had to dial 911 on an occasion that he

19  went hysterical with the PTSD.

20       Q.      When was that?

21       A.      He had had a blackout and

22  didn't know what he was doing, and he

23  attempted suicide.  I had no other

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 118

1   alternative than to call -- dial 911.

2        Q.      You said he attempted suicide.

3   Did he actually try to commit suicide?

4        A.      He got -- He kept telling us

5   he was going to kill himself.  If I can get

6   my hands on a gun, I'm going to kill myself.

7   We couldn't get him to settle down.  And so

8   the cops were very understanding with him

9   and began to talk to him and settle him

10  down.

11       Q.      Did he have a gun?

12       A.      No, ma'am.  I didn't see a

13  gun.

14       Q.      Okay.  Since 2006, that's the

15  only thing you're aware of?

16       A.      Yes, ma'am.  Other than the

17  night terror.

18       Q.      Was he charged with DUI in

19  November in relation to that car wreck that

20  he had?

21       A.      No, ma'am.

22       Q.      Does he have any criminal

23  charges pending against him right now, that

Page 119

1   you're aware of?

2        A.      No, ma'am.

3        Q.      Has there been a lawsuit filed

4   as a result of that accident?

5        A.      Yes, ma'am.

6        Q.      Do you know when it was filed?

7        A.      Probably, a month and a half

8   ago.

9        Q.      Do you know where it's filed?

10       A.      No, ma'am.

11       Q.      And was Bryan named as the

12  defendant in that lawsuit?

13       A.      Yes, ma'am.

14       Q.      I'm assuming that somebody

15  else got hurt in that wreck?

16       A.      Yes, ma'am.

17       Q.      Okay.  Where did that accident

18  happen?

19       A.      Right below our house on

20  Highway 280.  He'd just been to Hardy's.

21       Q.      Do you know what time of day

22  it was?

23       A.      5:19 was on the impact.

Page 120

```
 1        Q.    Had Bryan been at home that
 2   afternoon?
 3        A.    Most of the day he'd been at
 4   home.  They had just left and went to shoot
 5   a game of pool.
 6        Q.    Who was he with?
 7        A.    My brother -- My other son,
 8   Shane.
 9        Q.    Was Shane in the car at the
10   time of the accident?
11        A.    Shane was driving -- I mean,
12   not at the time of the accident, excuse me.
13   Shane left driving the car from home.  Bryan
14   was driving the car at the time of the
15   accident.
16        Q.    Had they already been to the
17   place to play pool and on the way home?
18        A.    No, ma'am.  They were fixing
19   to shoot a game of pool.  And Bryan
20   previously, two weeks prior to, had had a GI
21   bleed.  And according to the guys at the
22   poolroom, they were just fixing to start a
23   game of pool, and he grabbed his chest, and
```

Page 121

```
 1   he threw up a mouthful of blood, and he
 2   broke and ran out the door.
 3              And one of the guys ran to
 4   follow him out to the car, and he -- by then
 5   he had already jumped into my car.  And he
 6   said:  Wait a minute, Bryan, hold up.  And
 7   he said about that time, blood sprayed
 8   against the passenger side of the car.  He
 9   vomited more blood.  He said he spun out of
10   the driveway before he could stop him.
11        Q.    What poolhall were they at?
12        A.    It's called the Red Barn.
13        Q.    Let me make sure I understand.
14   To your knowledge, there were no criminal
15   charges brought from that accident, and he
16   hasn't had any criminal charges since then?
17        A.    There was a second-degree
18   assault charge brought from that accident.
19        Q.    What is the current standing
20   on that?
21        A.    Pending.
22        Q.    Who is representing him on
23   that?
```

Page 122

```
 1        A.    A lawyer, David Luker.
 2        Q.    From Birmingham?
 3        A.    From Birmingham.
 4        Q.    Has there been a preliminary
 5   hearing on that?
 6        A.    No, ma'am.
 7        Q.    And do you know if it's set?
 8        A.    No, ma'am.  We're just now
 9   beginning to get information.
10        Q.    Okay.  And that's the only
11   criminal charge that he's got pending at
12   this time?
13        A.    Yes, ma'am.
14        Q.    You said something about he
15   had blacked out.  Have you witnessed him
16   blacking out?
17        A.    Yes, ma'am.
18        Q.    Can you describe to me what
19   happens when he blacks out?
20        A.    The first blackout that he
21   had, I may be repeating myself, but he let
22   out a shrill scream about two clock in the
23   morning.  He hollered daddy as loud as he
```

Page 123

```
 1   could scream, and he broke and run.  And me
 2   and Ray met him in the hallway.  And he fell
 3   to the floor in the living room, and he was
 4   pounding on the floor.  He said:  I'm going
 5   to kill Al, you son of a bitch.  I'm going
 6   to kill you.  I'm not a queer.  I'm going to
 7   kill you.  I'm not a queer.
 8              He didn't know us.  He didn't
 9   know where he was.  And this went on for
10   about two hours.  And my husband was
11   speaking to him very -- in a very soft
12   voice.
13              And, finally, after about two
14   hours time, they were setting in the floor
15   with their legs crossed in an Indian style.
16   And Ray was holding his hand.  And he looked
17   up at him as if he just woke up out of a
18   sleep.  And he said:  Daddy, can I ask you a
19   question?  He said:  Sure.  He said:  Why
20   the hell are me and you sitting on the floor
21   and holding each other's hands?  And he
22   said:  Can't I hold your hand?  And he said:
23   Sure.  But I'm just wondering why we're
```