# EXHIBIT 1
# DEPOSITION OF WENDY ROBERSON PGS. 65 THROUGH 133

Daniel Court Reporting, Inc.

Page 65

1   A.   If -- if there was record
2 of it it would have been probably
3 verbal between officer to officer
4 as to what we had done. It
5 wouldn't necessarily be something
6 that was written down.
7   Q.   Well, looking through the
8 jail file that was produced to me,
9 I don't see any indication of any
10 such follow up --
11   A.   Well --
12   Q.   -- so --
13   A.   -- there's probably not a
14 written account of our attempts to
15 contact doctors. However, you do
16 see copies in the file of
17 physician's orders and so forth
18 that would indicate that there was
19 an attempt made to collect some
20 kind of medical history on this
21 inmate.
22   Q.   Who would have been
23 responsible for collecting the

Page 66

1 medical history on the inmate?
2   A.   It would have been a
3 collective effort between the
4 officers on shift and myself.
5   Q.   I don't see anything in
6 the file that is any medical record
7 from around the time of November
8 the 13th. The first medical
9 records that I see in the file is
10 in the records from Dr. Weaver, and
11 that would be November twenty -- I
12 think the 26th.
13      Are you aware of any
14 medical record in the file prior to
15 the medical record from Dr. Weaver?
16   A.   Sir, the only thing that I
17 can say for certain is -- is what I
18 can see that's present in the file.
19 I have no personal actual
20 recollection of any of these
21 accounts, and you have to
22 understand that Mr. Kelly was not
23 the only inmate in the jail that

Page 67

1 suffered medical issues. And the
2 turnover in the jail was great as
3 far as inmates being incarcerated
4 and being released, and for me to
5 remember any one specific inmate's
6 medical care would not be
7 reasonable.
8   Q.   Who was Dr. Weaver?
9   A.   Dr. Weaver was to my
10 knowledge a physician here in the
11 county. He had an office located
12 in close proximity to the jail that
13 the county specified that we use
14 for inmate care when possible. We
15 also used Dr. James over in the
16 Alexander City area when Dr. Weaver
17 was not available.
18   Q.   Did you use any other
19 physicians?
20   A.   Not to my knowledge. I
21 believe that there was another
22 doctor in the office with Dr.
23 James, a female doctor, in the same

Page 68

1 building that saw some of our
2 inmates occasionally.
3      MS. MCDONALD: Before I
4 forget about it, let me give you
5 this (indicating).
6   A.   I believe her name was
7 Goldhagan or something of that
8 nature. But I could not say as to
9 whether -- or which doctor Brian
10 Kelly saw.
11   Q.   Now, back to my question,
12 though. Why didn't you sign this
13 intake form?
14   A.   I would imagine, first and
15 foremost, that it was an oversight
16 on my part. I would also imagine,
17 because I have no actual
18 recollection of the event, but I
19 can tell you through just random
20 incidents that if he did appear to
21 be under the influence, I was
22 probably having to deal with him
23 and the paperwork at that moment

Daniel Court Reporting, Inc.

**Page 69**

1 was secondary. I got what I needed
2 to have.
3   Q.  Now, when you got this
4 information that he was suffering
5 from seizures and he was bipolar
6 and had artificial vertebrae in his
7 back, what did you do to pass that
8 information along to the jail
9 staff?
10   A.  I would have orally
11 informed each of the officers on
12 shift. I would have created a
13 medication form if he had any
14 medications and prepared those for
15 day-to-day use as far as his
16 dosaging and actual dispensing of
17 those medications. And would have
18 -- my -- initially it would have
19 been -- my focus would have been on
20 verifying what he had told me.
21   Q.  Now, the -- you said,
22 verifying what he had told you,
23 this is when you called around to

**Page 70**

1 the doctors and --
2   A.  That would be when I would
3 initially start trying to find out
4 if in fact he had these conditions,
5 if he was being currently treated
6 for these conditions, and I can't
7 -- I can't specifically say but I
8 do recall not being able to make
9 contact with -- and I don't
10 remember who the doctors were. I
11 remember we had a great deal of
12 trouble trying to get any
13 information, and, of course, with
14 the HIPAA law he has to sign forms,
15 those forms have to be faxed to
16 those particular doctors, giving
17 them permission to release medical
18 information to us. It's quite a
19 process.
20   Q.  I don't see any of those
21 forms that you would have had him
22 sign in the jail file that was
23 produced. Do you know where they

**Page 71**

1 would be if they're not in this
2 file?
3   A.  If I'm not mistaken, his
4 parents were in charge of
5 delivering those forms. His
6 parents were very active, actively
7 making themselves present in the
8 jail during his incarceration. I
9 don't remember specifically, but I
10 do remember that there was a lot of
11 interaction between his parents and
12 the corrections officers as far as
13 bringing medications, bringing
14 forms, and then trying to verify
15 that he did in fact have these
16 problems.
17   Q.  And you said they were
18 very active. How often would you
19 see his parents?
20   A.  Going back to your
21 question that you did not see
22 anything in the file regarding our
23 attempts for HIPAA forms and so

**Page 72**

1 forth, I have a copy of an
2 authorization for release of
3 medical information before me in
4 this file.
5   Q.  What's the date of that?
6     MS. MCDONALD:  It looks
7 like it's signed November the 10th.
8   A.  Yes, the 10th day of
9 November, 2003.
10     MS. MCDONALD:  But it's
11 been notarized by Joan Ashworth,
12 who's the secretary over in the
13 commission -- I mean, over in the
14 sheriff's office, so --
15   A.  I can assure you that all
16 attempts were made to validate his
17 claims.
18   Q.  (By Mr. Stockham) Let me
19 ask you this. Why would you have a
20 HIPAA request signed November 10th
21 when he wasn't enrolled in the jail
22 until November the 13th?
23   A.  That I cannot answer.

18 (Pages 69 to 72)

1310 32nd Street S.
Birmingham, Alabama 35205
205-250-7765
danielreporting@aol.com

Daniel Court Reporting, Inc.

Page 73

1  Q. It doesn't make sense,
2  does it?
3  A. No, sir.
4  Q. Unless that's just the
5  wrong date?
6  A. That's correct.
7  Q. But you don't -- I'm
8  looking for that particular
9  document and I'm not finding it.
10 Oh, I think I did find it, marked
11 as Exhibit Two. Is this the
12 document that you're talking about
13 (indicating)?
14 A. Yes, sir.
15 Q. Do you know -- this is to
16 provide -- for medical authorities
17 to provide the information to --
18 A. His mother.
19 Q. -- his mother.
20 A. And there again I point
21 out that his parents were advocate
22 -- took upon themselves to be
23 advocates for Mr. Kelly during his

Page 74

1  incarceration at which time created
2  a lot of exacerbation for the
3  sheriff's department.
4  Q. Well, apart from this
5  document that was apparently
6  created before he was arrested and
7  put in jail --
8  MS. MCDONALD: Object to
9  the form. The date may be on there
10 before he was actually
11 incarcerated, but that does not
12 mean that the date was incorrect,
13 or that this was created before he
14 ever got there.
15 MR. STOCKHAM: Well, the
16 date is before he ever got there.
17 MS. MCDONALD: I will
18 agree with you, the date is before
19 he was incarcerated on the November
20 the 13th time. He was incarcerated
21 prior to that, but it has been --
22 maybe Ms. Kelly brought it down
23 there to be notarized by Joan and

Page 75

1  it was before he ever got there.
2  Q. (By Mr. Stockham) Other
3  than that document, are you aware
4  of any other documents to obtain
5  medical records for -- that you had
6  the jail issue to any doctors to
7  get medical information?
8  A. I can only testify to what
9  I see in the file.
10 Q. Now, with regard to the
11 medical information, his mother
12 told you that he suffered from
13 seizures, didn't she?
14 A. I don't remember that
15 conversation. I cannot say that
16 she did or did not, but I have no
17 recollection of it.
18 Q. Well, you say that his
19 parents were very active in his --
20 looking after his situation in the
21 jail. How frequently would you see
22 his parents at the jail?
23 A. His father daily.

Page 76

1  Q. And how about his mother?
2  A. Ms. Kelly was not as prone
3  to directly come to the jail but I
4  do remember having frequent phone
5  calls from her.
6  Q. When you say, frequent,
7  how frequent?
8  A. I would say possibly every
9  -- I don't -- I can't say
10 specifically but they were frequent
11 to the point that I felt that it
12 was -- well, for example, if I had
13 eighty inmates in the jail I would
14 probably never hear from the
15 parents of any of them. But in Mr.
16 Kelly's case, I was hearing from
17 his mother probably more than once
18 a week, maybe more than twice a
19 week.
20 Q. Well, now, you didn't have
21 eighty inmates in the jail in this
22 time frame, did you?
23 A. I can't tell you what the

19 (Pages 73 to 76)

1310 32nd Street S.
Birmingham, Alabama 35205
205-250-7765
danielreporting@aol.com

77

1 population was at this time.
2      Q.   Well, you carry in -- the
3 daily shift report and the daily
4 tower log reflects what the
5 population is?
6      A.   What the head count is.
7      Q.   And if that reflects that
8 it's around thirty that would be
9 what the accurate reflection would
10 be?
11      A.   Yes, sir.
12      Q.   What was the capacity of
13 the jail?
14      A.   I believe it was
15 seventy-nine.
16      Q.   So if there were thirty,
17 then it would be less than half
18 full?
19      A.   Half full, yes, sir.
20      Q.   Now, other than collecting
21 the information about doctors, did
22 you post anywhere for the people on
23 successive shifts to know what the

78

1 medical problems were that Mr.
2 Kelly suffered?
3      A.   Other than what was stated
4 on his medical sheet there was --
5 unless there was specific
6 instruction, such as if we had an
7 inmate that had to take certain
8 medications prior to blood tests or
9 something of that nature the next
10 day, then there would be no
11 specific posting other than orally
12 from officer to officer. And there
13 was a period of time designated at
14 the beginning of each shift for the
15 off-going officer to brief the
16 on-coming officer of any pertinent
17 information that they needed to
18 know for the smooth operation of
19 that shift.
20      Q.   Now, in his jail records
21 that have been identified in the
22 deposition of Al Bradley and the
23 deposition of the medical -- excuse

79

1 me, the drug logs that were in the
2 file, would you look at those,
3 please, ma'am.
4           (Witness examining
5            documents.)
6      A.   Yes, sir.
7      Q.   Who is responsible for
8 filling out the drug log?
9      A.   The officer of that shift.
10      Q.   And who originally sets
11 them up?
12      A.   The officer that does the
13 booking of that particular inmate
14 or the officer on shift at the time
15 that that inmate is prescribed
16 medications.
17      Q.   Now, looking at this,
18 there's not a date on any of these
19 med logs, are there?
20      A.   No, sir, there doesn't
21 appear to be.
22      Q.   Would you ever be the
23 person responsible for filling out

80

1 any of these med logs?
2      A.   Not unless -- and
3 actually, just in a random glance
4 through I do not see my handwriting
5 nor my initials on any of these
6 medication logs, I do not believe.
7      Q.   I'm going to show you one
8 that might be.
9      A.   Okay. This one right here
10 (indicating)?
11      Q.   Is there one that looks
12 like under a day fourteen?
13      A.   Yes, sir.
14      Q.   Under the S?
15      A.   Yes, sir.
16      Q.   And under day fourteen
17 opposite your -- beside your
18 initials, whose initials are those?
19      A.   It looks like that could
20 be Dana Harris. I can't tell if
21 that's an H or a K. It looks like
22 a K. I'm not sure.
23      Q.   Okay. Who is Dana Harris?

20 (Pages 77 to 80)

Page 81

1  A. Dana Harris was a
2 corrections officer with the
3 sheriff's department for a period
4 of time.
5  Q. No longer?
6  A. No, sir. It appears,
7 however, that that's a K. So I'm
8 not --
9  Q. Do you know who that would
10 be?
11  A. No, sir, there were
12 several officers that came and went
13 through the sheriff's department
14 during my time there.
15  Q. And who is --
16  A. Yeah, I'm sorry. We're
17 looking at -- that's Daniel Brian
18 Kelly's initials next to mine.
19  Q. And do you know who wrote
20 those initials?
21  A. Well, I -- it would most
22 certainly be him, that he took that
23 medication, that he was given that

Page 82

1 medication.
2  Q. Do you think that he wrote
3 that?
4  A. Yes, sir, I do. That was
5 policy and procedure that the
6 officer sign that they gave the
7 medicine, they observed the inmate
8 taking the medicine, and the inmate
9 was to sign that he did in fact
10 receive the medication.
11  Q. Now, there are a set of
12 jail requests forms. If you will
13 turn to those in there, that
14 section, I'd like to go over those
15 with you.
16  MS. MCDONALD: They're
17 scattered out throughout this --
18 they're not in any order, so --
19  MR. STOCKHAM: Well --
20  MS. MCDONALD: I'm just
21 telling you they're not in order,
22 so she can't just go to --
23  MR. STOCKHAM: I know, I

Page 83

1 hear you, I hear you, and the
2 reason why is the other copy that I
3 have is -- the only copy I have is
4 this right here (indicating).
5 That's why --
6  MS. MCDONALD: Yours may
7 be all together; her's are not, so
8 bear with her, please.
9  MR. STOCKHAM: No problem.
10  Q. (By Mr. Stockham) I have
11 a series of them I wanted to ask
12 you about.
13   I'm looking at one that --
14 first of all, what are these forms?
15  A. These are simply as
16 they're titled, Inmate Request
17 forms.
18  Q. And what is the -- how do
19 they get these forms?
20  A. They -- there are some
21 forms available to them in the cell
22 block or they may request one from
23 a corrections officer.

Page 84

1  Q. And what are the purpose
2 of these forms?
3  A. For communication between
4 and the inmate and the officer to
5 document an inmate's request.
6  Q. So you won't respond to an
7 inmate without him filling out one
8 of the forms?
9  A. We do. However, if an
10 inmate wants to do an official
11 written request they may. Officers
12 are not always available to speak
13 personally with an inmate. You
14 have to understand, when a cell
15 block door is open you
16 automatically have a security
17 breach. It is not the officer's --
18 it is not in the officer's best
19 safety interest to stand in an open
20 doorway with fifteen inmates. We
21 open cell block doors when
22 necessary to serve meals, to give
23 medications, to pass out razors, to

85

1  pass out laundry and so forth. But
2  those periods of time are minimal,
3  they're for a specific purpose, and
4  the inmates have access to an
5  intercom system that goes directly
6  to the tower. So a written request
7  would be an assurance for an inmate
8  that his request would not be
9  forgotten or overlooked.
10     Q.  I'm looking at one that is
11 dated -- at the bottom you date it,
12 12-15-03. I'm going to show you
13 what it looks like.
14        MS. MCDONALD: Here it is
15 (indicating).
16        THE WITNESS: Okay.
17     Q.  I'm going to mark it as
18 the next Exhibit.
19        (Whereupon, Plaintiff's
20         Exhibit Three
21         was marked for
22         identification.)
23     Q.  This is a -- appears to be

86

1  a medical request that's dated,
2  10-13-03. He wasn't in the jail on
3  10-13-03, was he?
4     A.  I don't know.
5     Q.  Well, the intake form that
6  we looked at indicates that he was
7  in the jail on November --
8     A.  Mr. Kelly was in our jail
9  quite frequently. So for me to,
10 from memory, state when he was or
11 was not I could not do.
12     Q.  Now, looking at this it
13 says, need to see a real doctor for
14 right arm rotor "cuff" is tore, in
15 pain twenty-four seven. And you
16 wrote the response on the bottom;
17 is that right?
18     A.  Yes, sir.
19     Q.  Why did you write the
20 response on this form?
21     A.  I would assume that that
22 was the information that I had.
23     Q.  But, I mean, what was the

87

1  purpose of you writing the
2  response?
3     A.  I wrote the response to
4  justify the answer to his request.
5  He had already been seen by a
6  doctor for that and, you know, it
7  -- one of Mr. Kelly's problems as I
8  remember was that he had an
9  addiction to prescription
10 medication. He was asking
11 essentially for pain medication.
12 He wanted to see another doctor in
13 hopes of getting additional pain
14 medication. I felt that he had
15 been to a doctor. That doctor had
16 done, through his training and
17 knowledge, what needed to be done
18 to bring Mr. Kelly some relief, and
19 anything in addition to that was
20 not necessary.
21     Q.  So that was just a
22 decision that you made without
23 consulting a doctor?

88

1     A.  No, sir, that was a
2  decision I made after consulting a
3  doctor.
4     Q.  Which doctor did you
5  consult?
6     A.  That would be Dr. James.
7     Q.  So you consulted Dr. James
8  after Dr. James had injected him
9  with --
10    A.  Apparently, if I wrote
11 that, I had knowledge that he had
12 had recent treatment for that
13 injury. And I'm certainly not a
14 doctor. I'm not a nurse. I'm
15 looking at an inmate medical
16 summary where he was taken to
17 Pri-care for that medical
18 treatment. If a doctor who is
19 trained and certified says that
20 this is the treatment for this
21 injury and they give that, then
22 it's my position that the problem
23 has been solved.

22 (Pages 85 to 88)

Daniel Court Reporting, Inc.

**89**

1  Q. Now, you say you were
2  looking at an entry that he had
3  been taken to Pri-care?
4  A. Yes, sir.
5  Q. Which -- is this the entry
6  that you're talking about
7  (indicating)?
8  A. No, sir.
9  Q. Okay. You're looking at a
10 summary that you did --
11 A. Back in November.
12 Q. -- inmate medical summary?
13     MS. MCDONALD: If that's
14 the same date, 12-11, that should
15 be the same. It should be in the
16 file.
17     MR. STOCKHAM: Mark this
18 as the next --
19     (Whereupon, Plaintiff's
20     Exhibit Four
21     was marked for
22     identification.)
23 Q. Looking at Exhibit Four --

**90**

1  if you'd look at that record.
2  A. Yes, sir.
3  Q. Is the entry that you've
4  written here on 12-15 related to
5  when he was taken to the doctor on
6  12-11-03?
7     (Whereupon, an
8     off-the-record
9     discussion was held.)
10 A. Yes, sir. It would be in
11 reference to this particular
12 doctor's visit.
13 Q. (By Mr. Stockham) So your
14 response was -- after he'd come
15 back and he said he was hurting,
16 you said that the doctor had
17 already treated him?
18 A. Yes, sir. And my position
19 on that is when I go to the dentist
20 for a toothache and he prescribes
21 me medication, and my tooth still
22 hurts, some of it I just have to
23 endure. I mean, a doctor is not

**91**

1  going to overmedicate me and he's
2  hopefully not going give me
3  medications that I do not actually
4  need or would be adverse in the
5  recuperation process.
6     So if Dr. James treated
7  him and gave him cortisone shots in
8  each shoulder for what he was
9  suffering, then as I had to
10 presume, not being a doctor, that
11 the doctor knew what he was doing
12 and certainly knew more as far as
13 Mr. Kelly's health overall than --
14 in his good judgment than Mr. Kelly
15 did.
16 Q. But Mr. Kelly was telling
17 you after he had been to the doctor
18 he was still hurting?
19 A. Yes, sir. And we would
20 have been glad to have given him
21 Ibuprofen.
22 Q. But you didn't schedule
23 him to see another doctor, did you?

**92**

1  A. No, sir.
2     (Whereupon, Plaintiff's
3     Exhibit Five
4     was marked for
5     identification.)
6  Q. Let me show you this entry
7  of November 30th. That's a request
8  to see Dr. James because his foot's
9  still hurting, isn't it?
10 A. Yes, sir.
11 Q. And the response at the
12 bottom is what?
13 A. Well, it's not my
14 handwriting, but it says or appears
15 to say, Dr. Michelle Goldhagen did
16 not advise inmate Brian Kelly that
17 he needed to go see Dr. James. She
18 advised him that his foot was
19 sprained and that he needed to
20 elevate it at night and they did
21 put a wrap on it. She also advised
22 him to take Tylenol for any pain.
23 Q. And this entry request was

1310 32nd Street S.
Birmingham, Alabama 35205
205-250-7765
danielreporting@aol.com

**Page 93**

1  after he had come back and he was
2  still hurting?
3    A.   Yes, sir.
4        MS. MCDONALD:  Wait a
5  minute.  After a request for what,
6  from the doctor, from Dr.
7  Goldhagen?
8    Q.   After he'd come back from
9  the hospital and he was still
10 hurting, right?
11   A.   I would -- I don't know.
12       MR. WILLFORD:  Object to
13 the form.
14   Q.   Now, who is that person
15 that wrote the entry at the bottom,
16 KSH?
17   A.   I'm not certain.
18   Q.   Was it Mr. Hay?
19   A.   Kenneth S. Hay, yes, sir.
20   Q.   Who is Kenneth S. Hay?
21   A.   He was a corrections
22 officer.
23   Q.   And was he just a

**Page 94**

1  corrections officer, or what rank
2  did he have?
3    A.   He was a -- well, his rank
4  changed over time, but --
5    Q.   In this time frame.
6    A.   I'm not certain.  He could
7  have been a corporal at that time,
8  and he did a lot of transport to
9  inmate visits.  So I would assume
10 that if he wrote this he was
11 present with the inmate when the
12 inmate was seen by Dr. Goldhagen.
13   Q.   And you had an -- Mr. Hay
14 was your assistant?
15   A.   Yes, sir, for a time.
16   Q.   Now, when Mr. Hay would
17 write these responses on here,
18 would he give them back to the
19 inmate or what would he do with it?
20   A.   I can't say what Mr. Hay
21 did.
22   Q.   Well, what would he do
23 with this document?  What was the

**Page 95**

1  purpose of writing a written
2  response here on the bottom?
3    A.   It was a reply to the
4  inmate's request.  In most cases,
5  because of paper becoming a fire
6  hazard in the cell blocks, we tried
7  to eliminate any unnecessary paper,
8  and in most cases the officer would
9  approach the inmate and answer them
10 orally.  And then the request would
11 actually be kept on file unless the
12 inmate specifically requested a
13 copy of it.
14   Q.   Now, this that you
15 physically wrote out an answer to,
16 was it something for the other
17 officers to review?
18   A.   Certainly.
19   Q.   Was it posted for them all
20 to come see what the responses
21 were?
22   A.   It was placed in the file.
23   Q.   In the jail file?

**Page 96**

1    A.   In the inmate's file.
2    Q.   It wasn't posted for --
3  put in a position for you or the
4  jail administrator or for the
5  sheriff to look at?
6    A.   No, sir.
7        (Whereupon, Plaintiff's
8         Exhibit Six
9         was marked for
10        identification.)
11   Q.   I'm going to show you next
12 -- this is another document dated
13 the next day --
14   A.   Yes, sir, I'm looking at
15 it in the file.
16   Q.   Okay.  And this document
17 pretty much asks the same thing,
18 doesn't it?
19   A.   Well, to some degree, but
20 I -- I would be surprised to know
21 that -- that Mr. Kelly has medical
22 experience in the capacity to know
23 that he has torn ligaments.

Page 97

Q. It says, it hurts all night long; that's what it says, isn't it?
A. Yes, sir. Well, actually -- yes, sir.
    MS. MCDONALD: You can read it.
Q. And the response is that -- well, he didn't get to go see the doctor, right?
A. Yes, sir. And it also states that his foot had been X-rayed and that the doctor found no damage to his foot.
    What I see in these requests is somebody that's looking for pain medication, that's what I see. He's been to a doctor, the doctor has advised us as to what the problem is. Did it hurt or not? Mr. Kelly only knows that. But based on what the doctor was telling us, it appears to me that

Page 98

Mr. Kelly is looking for a way to get pain medication.
Q. Did the doctor tell you anything about whether or not he should get pain medication?
A. If the doctor felt that he needed pain medication, the doctor would have certainly prescribed him that medication. What I see in the notes of the officers is that the doctor advised him to take Tylenol.
Q. You didn't call the doctor -- any doctor, after you received this request, did you?
A. I don't recall.
Q. No entry about that, is there?
A. Without having fully looked at the file I don't know.
    (Whereupon, Plaintiff's
    Exhibit Seven
    was marked for
    identification.)

Page 99

Q. I'll show you what's marked as the next Exhibit, Seven. That's another request to see the doctor.
A. Yes, sir.
Q. There's no response to that one, is there?
A. No, sir.
Q. Why would there be no response to that?
A. Well, it appears that two days in a row Mr. Kelly had been advised of what the jail position was on his request. At this point it became repetitive and -- you know, pretty much unnecessary to continue responding to them. We have inmates issue as many as fifteen inmate requests in a day for the same thing.
Q. Well, he was still hurting, wasn't he?
    MR. WILLFORD: Object to

Page 100

the form.
A. I don't know if he was still hurting or not.
Q. That's what he was saying, wasn't it?
A. I see that he -- to me, what I see is that he's wanting pain medication.
Q. It doesn't say pain medication, does it? It says, the lower back and foot hurts.
A. Yes, sir, both of which he had been to a doctor for.
    (Whereupon, Plaintiff's
    Exhibit Eight
    was marked for
    identification.)
Q. I'll show you what's marked as Exhibit Eight. This is a further request to see the doctor, isn't it?
    MS. MCDONALD: Wait a minute. I have more than one

25 (Pages 97 to 100)

Daniel Court Reporting, Inc.

101

1  marked December 3rd, so hold on.
2  There are two.
3     A.   Okay. On -- there are
4  actually two on that date and on
5  the second one an appointment made
6  -- was made with Dr. James.
7     Q.   The one that reflects an
8  appointment was made, what date
9  does it reflect?
10    A.   December 3rd also, same
11 day.
12       (Whereupon, an
13       off-the-record
14       discussion was held.)
15    Q.   (By Mr. Stockham) The one
16 that I'm looking at looks like that
17 the entry that an appointment was
18 made was 12-9-03; is that right?
19    A.   That was the date of the
20 appointment, correct.
21    Q.   Okay. It doesn't indicate
22 the time that that entry was
23 entered, does it?

102

1     A.   No, sir. But I would
2  assume that it was on the 3rd.
3     Q.   But it doesn't say it was,
4  does it?
5     A.   No, sir, it does not.
6     Q.   In fact, the entry on the
7  Exhibit that I've given you, which
8  is Exhibit Eight, indicates that
9  the entry was handwritten in there
10 when?
11    A.   On 12-8.
12    Q.   On the 8th.
13    A.   I would have to see a
14 calendar. If this occurred close
15 to the weekend there would be no
16 way to make Mr. Kelly an
17 appointment on the weekend, which
18 may account for the space between
19 the actual receipt of the request
20 and the actual appointment date.
21    Q.   Between the 3rd and the
22 9th?
23    A.   Yes, sir. Well, between

103

1  the 3rd and the 8th. If he turned
2  this request in at the end of the
3  week, then it would have been a
4  Monday before any follow-up could
5  have been done. But I don't know
6  what the days were.
7        And that, of course, is
8  assuming that Mr. Kelly had the
9  correct date at the top, which
10 apparently we've realized that
11 there's been a lot of discrepancies
12 on the dates that he has placed in.
13       (Whereupon, an
14       off-the-record
15       discussion was held.)
16    Q.   (By Mr. Stockham) Now,
17 the next document that I want to --
18    MS. MCDONALD:  Wait, I've
19 got --
20    MR. STOCKHAM:  Huh?
21    MS. MCDONALD:  I've got
22 the --
23    THE WITNESS:  I want to

104

1  look into trying to establish what
2  days of the week that was
3  concerning.
4        Okay, the 3rd would have
5  been on a Thursday. So if he
6  turned that in Thursday night --
7     MS. MCDONALD:  It's a
8  Wednesday.
9     THE WITNESS:  Okay,
10 Wednesday. So -- and his
11 appointment was made for the 9th,
12 which would have been a Tuesday.
13 So if that request was received on
14 Wednesday, then I am assuming that
15 the officer either made that
16 appointment some time between the
17 3rd and the 5th, which is Wednesday
18 through Friday, and his appointment
19 was for that Monday, which to me is
20 a reasonable period of time.
21    Q.   (By Mr. Stockham) The 9th
22 is a Tuesday.
23    MS. MCDONALD:  It's this

26 (Pages 101 to 104)

1310 32nd Street S.
Birmingham, Alabama 35205
205-250-7765
danielreporting@aol.com

**Page 105**

1 one up here (indicating).
2   A.   That's correct.
3   Q.   Okay. Now --
4        MR. STOCKHAM: Mark this,
5 please.
6        (Whereupon, Plaintiff's
7        Exhibit Nine
8        was marked for
9        identification.)
10   Q.   I'll show you what is
11 marked as Exhibit Nine. That
12 reflects that an appointment was
13 made for 12-11-03, right?
14   A.   Yes, sir.
15        MS. MCDONALD: Give her
16 just a minute, please, so she can
17 look at this.
18        (Witness examining
19        documents.)
20   A.   Here again I would note
21 that apparently there is a
22 discrepancy and apparently Mr.
23 Kelly's not sure what day it is

**Page 106**

1 because he has it dated, 12-7 but
2 it's in reference to the incident
3 that actually took place on 12-11.
4 So with the -- or on 12-9. So with
5 the inconsistencies of Mr. Kelly's
6 dates, you know, I don't -- it's
7 hard to know or comment on exactly
8 what he is referring to, but
9 regarding the incident on the
10 9th --
11   Q.   Well, before you say --
12 you say that this refers to the
13 incident that occurred on the 9th?
14   A.   On 12-9.
15   Q.   Then why would Mr. Hay
16 have responded to it on the 8th of
17 December?
18   A.   I can't say. That's not
19 my handwriting.
20   Q.   Well, the response from
21 the jail personnel is dated the
22 8th, isn't it?
23   A.   That's correct.

**Page 107**

1   Q.   And it indicates that Mr.
2 Kelly was seen by EMS personnel,
3 all of his vital signs were in
4 perfect condition. Since the call
5 he took inmate Kelly was not -- has
6 not complained of --
7   A.   Okay.
8   Q.   -- since his fall --
9   A.   I think I can explain
10 that.
11   Q.   -- he took.
12   A.   Or possibly explain it.
13 If Mr. Hay was working night shift,
14 that may explain the -- the date
15 that he has placed on this
16 document. However, according to
17 the records that we -- the inmate
18 medical summary and so forth, that
19 this incident actually happened on
20 the 9th.
21   Q.   Mr. Kelly's note of
22 12-7-03 at eleven oh seven says, I
23 want to know why when I fell and

**Page 108**

1 hurt my back they put me in the
2 holding pen but sent Teague -- is
3 it Teague, is there an inmate named
4 Teague?
5   A.   I have no idea, sir.
6   Q.   The black guy to the
7 hospital.
8   A.   I have no idea of what
9 reference he's making, so I can't
10 comment on that.
11   Q.   Well, evidently Mr. Kelly
12 was put in the holding cell?
13   A.   For observation, medical
14 observation.
15   Q.   And this entry was
16 responded to by -- at least in the
17 place where Mr. Hay signed it, on
18 12-8-03?
19   A.   That's what I see.
20   Q.   And below it it says,
21 appointment made for inmate Kelly.
22 Do you know whose handwriting that
23 is?

Daniel Court Reporting, Inc.

109

1  A. No, sir, I can't say.
2  Q. Can you tell me why you
3  would have made an appointment for
4  Mr. Kelly for 12-11-03 on 12-8-03
5  if he had an appointment already
6  scheduled for 12-9?
7  A. I cannot. I would assume
8  that my record is correct when it
9  states that this incident happened
10 on 12-09, which would be --
11 indicate that it was after his
12 appointment on 12-09, which would
13 indicate the need for an
14 appointment on 12-11.
15 Q. Now, you say, your record.
16 A. On the inmate medical
17 summary, or -- it indicates that
18 this incident occurred at eighteen
19 ten p.m., which would be six ten
20 p.m., which would mean that his
21 doctor's appointment had already
22 taken place earlier that day. That
23 would make him falling that night,

110

1  which would then account for
2  another appointment being initiated
3  on the 12 -- or the 12-11 date.
4  Q. Now, the inmate medical
5  summary that you're referring to,
6  who prepared that document?
7  A. I did.
8  Q. And why did you prepare
9  that document?
10 A. As documentation on the
11 incident.
12 Q. Well, now, this is not a
13 document of a single incident.
14 This has one, two, three, four --
15 A. Yes, sir --
16 Q. -- five, six, seven.
17 A. -- it says -- it's titled
18 -- it's a summary of his medical
19 care while there.
20 Q. While where?
21 A. Incarcerated in the Coosa
22 County jail.
23 Q. And is this something you

111

1  perform for every inmate?
2  A. No, sir. This is
3  something I perform for an inmate
4  who continually is having
5  incidents, that is continually
6  sending out requests, which
7  indicates to me that this may turn
8  into a problem.
9  Q. In fact, do you know the
10 date that you prepared this
11 document?
12 A. It is dated on one, 12-11,
13 and another is dated 11 -- well,
14 12-11. The other date is his
15 actual booking date that I noted.
16 Q. My question, though, is,
17 what date did you prepare this
18 summary?
19 A. It would have been --
20 MS. MCDONALD: This one
21 (indicating)?
22 Q. Either one that you're
23 looking at. Which one are you

112

1  looking at right now?
2  A. I am looking at this one
3  (indicating).
4  MR. WILLFORD: Can we do
5  something to indicate for the
6  record what it is that we're
7  talking about?
8  MR. STOCKHAM: I'm trying
9  to find out which one she's talking
10 about so I can enter them into the
11 record.
12 A. One is titled, inmate
13 summary, and the other one is
14 titled, inmate medical summary.
15 Q. (By Mr. Stockham) All
16 right. Let's mark as Exhibit Ten
17 the inmate summary.
18         (Whereupon, Plaintiff's
19         Exhibit Ten
20         was marked for
21         identification.)
22 Q. And this is something that
23 you wrote?

28 (Pages 109 to 112)

**Page 113**

1  A. Yes, sir.
2  Q. And why did you write this
3  on 12-11-03?
4  A. Any time that we have an
5  incident in the jail that may
6  result in repercussions later, any
7  time an inmate is injured or claims
8  to be injured, I would prepare
9  something like this to document the
10 incidents and the actions of the
11 officers in response to the
12 incident in order to make for my
13 recollection any disputes that may
14 arise later.
15 Q. And in this case, Mr.
16 Kelly was transported to the
17 hospital on --
18 A. 12-9.
19 Q. -- 12-9-03?
20 A. Yes, sir.
21 Q. And he was put in the
22 holding cell when he returned from
23 the hospital?

**Page 114**

1  A. Yes, sir.
2  Q. Now, is there -- so at
3  least he -- by your record he's had
4  at least one fall by 12-9, and by
5  the record of Exhibit Eight or Nine
6  he appears --
7  MR. STOCKHAM: Hand me
8  Nine.
9  Q. By Nine, Exhibit Nine, it
10 appears he had a fall on the 7th as
11 well?
12 MS. MCDONALD: Object to
13 the form.
14 A. This --
15 MS. MCDONALD: I think
16 we've already established that
17 there is a question as to whether
18 this date is correct.
19 A. I believe this --
20 MS. MCDONALD: And this
21 says nothing about a fall.
22 A. -- is in regard -- I
23 believe -- I believe that this

**Page 115**

1  (indicating) is in regard to this
2  12-9 incident.
3  Q. (By Mr. Stockham) Well,
4  Mr. Hay certainly signed it on
5  12-8, though, didn't he?
6  A. Yes, sir, but I -- despite
7  the inconsistencies and the dates I
8  do believe to my recollection that
9  it is involving the December 9th
10 incident.
11 Q. Could be two, though?
12 MS. MCDONALD: Object to
13 the form.
14 A. No recollection of two.
15 Q. This Exhibit Nine says, I
16 want to know why when I fell I hurt
17 my back and they put me in the
18 holding pen. So, at least
19 according to his request, it
20 indicates that he fell on the 7th
21 and he was put in the holding pen.
22 A. Well, with no way of
23 knowing the actual -- the actual

**Page 116**

1  date of what incident he's
2  referring to, all I can agree to is
3  what he has written on the paper.
4  Q. And what Mr. Hay has
5  written on the bottom?
6  A. Correct.
7      (Whereupon, Plaintiff's
8      Exhibit Eleven
9      was marked for
10     identification.)
11 Q. Now, I'm going to show you
12 what I marked as the next Exhibit,
13 which I believe is Eleven. And
14 that's a summary --
15 A. Yes, sir.
16 Q. Do you have that?
17 A. I have that right here.
18 Q. Who prepared that summary?
19 A. I did.
20 Q. And when did you prepare
21 that summary?
22 A. I would imagine I prepared
23 it the same time that I prepared

**117**

1 the inmate summary.
2   Q. Well, the inmate summary
3 -- at least it appears to have been
4 prepared on December 11th?
5   A. Correct.
6   Q. This document, though,
7 Exhibit Eleven, reflects an entry
8 for January 14th, 2003.
9   A. Actually I think that's a
10 typo on my part. I think it should
11 have been January '04.
12   Q. And that entry for January
13 '04, 2003 -- you have a -- that
14 certainly would not have been
15 something that you prepared by
16 December 11th?
17   A. No, sir. Well, after
18 review it would indicate that this
19 document (indicating) was prepared
20 sometime after this document
21 (indicating). This document
22 (indicating) was prepared regarding
23 a specific incident. This

**118**

1 (indicating) shows a -- a
2 collective chronological account of
3 each of the incidents and the steps
4 taken to resolve those incidents
5 from a period of November 23rd
6 through January 14th of '04.
7   Q. Now, why did you prepare
8 this document, Exhibit Eleven, from
9 the 23rd through January 14th?
10   A. Because of Mr. Kelly's
11 parents, their continual activity
12 and -- and accusations. They were
13 claiming that we weren't doing
14 anything to help Mr. Kelly during
15 his incarceration. This is the
16 result of something that I was
17 taught in jail management school,
18 to document every incident,
19 document everything you do for just
20 such a situation as we're in today.
21   Q. And you documented it to
22 put it in his file or for what
23 other reason?

**119**

1   A. Yes, sir, to have in his
2 file, for reference and, such as I
3 said, as the situation is today.
4   Q. Now, noting on the 9th, it
5 reflects that he was transported to
6 Russell Hospital. It doesn't say
7 anything about going to Dr. James
8 on the 9th, does it?
9   A. Which document are you
10 referring to?
11   Q. I'm looking at this inmate
12 medical summary, Exhibit Eleven.
13   A. Okay. 12-9, summoned for
14 alleged fall; transported to ER;
15 returned to jail, no injuries
16 substantiated by a doctor.
17     And then on 12-11, two
18 days later, he was taken to
19 Pri-care for a medical exam.
20   Q. But prior to that, on the
21 9th, when he had previously had --
22 at least allegedly had an
23 appointment on the 9th for going to

**120**

1 Dr. James, it doesn't reflect that
2 he went there, does it?
3   A. No, sir, it does not.
4   Q. And that certainly would
5 have been something that you would
6 have wanted to put on the summary
7 if he had in fact gone to Dr. James
8 on the 9th --
9     MS. MCDONALD: Object to
10 the form.
11   Q. You can answer.
12   A. I don't know. Without
13 looking at actual jail -- sheriff's
14 department medical receipts as to
15 payment for when Mr. Kelly was seen
16 by the doctor I cannot actually
17 substantiate when his doctors'
18 appointments were actually visited
19 by him. However, for whatever
20 reason, on 12-9, it was important
21 to me at that time that I state
22 that EMS was summoned and that he
23 was transported to the hospital for

Page 121

1 the injuries that he claimed he
2 had.
3    I would also note that I
4 also included the fact that no
5 injury substantiated by a doctor.
6    Q. Now, you didn't ask for
7 Mr. Kelly to be evaluated for
8 seizures when you had him
9 transported, did you?
10    A. If I recall, when Mr.
11 Kelly -- prior to Mr. Kelly coming
12 into the jail he had no seizure
13 history other than what he claimed
14 he had. We could not substantiate
15 through any doctor that he was
16 being treated for seizures. And
17 therefore, unless I witness a
18 seizure or I have documentation
19 that states this inmate has
20 seizures and is being treated for
21 seizures, I have to assume that the
22 inmate is either telling me an
23 untruth, or he is experiencing a

Page 122

1 medical problem that has not yet
2 been diagnosed by a doctor. But
3 until I witness that incident, or
4 an officer witnesses that incident,
5 then it is basically, he says he
6 has this, without any proof.
7    Q. Well, look up on Exhibit
8 Eleven, again, on the 11-27-03
9 incident.
10    A. Okay. Wait just a minute.
11 We've got exhibits scattered
12 everywhere.
13    Q. No, this is this, your
14 inmate medical summary.
15    A. Oh, okay.
16    MS. MCDONALD: Hers is not
17 marked, so she doesn't know which
18 one you're referring to when you
19 say, 11.
20    MR. STOCKHAM: I'm
21 referring to it for the record.
22    Q. It says, brought up front
23 for medical observation following

Page 123

1 alleged seizure.
2    A. Alleged.
3    Q. When you say, brought up
4 front, do you mean put him in the
5 hole?
6    A. Brought them up --
7    MS. MCDONALD: Object to
8 the form.
9    A. -- to the observation --
10    MS. MCDONALD: Wait a
11 minute. You're referring to the
12 hole -- it's a holding cell. Are
13 you going to refer to it what -- as
14 what the inmates refer to it as or
15 what it's actually called?
16    A. It's actually a holding
17 cell that has a camera in it so
18 that the inmate can be supervised
19 at all times for any -- any falls,
20 any medical conditions, can make
21 gestures to the camera that he is
22 in need of assistance, and so
23 forth.

Page 124

1    Q. (By Mr. Stockham) Now,
2 the first note that you have here
3 about his needing -- a seizure was
4 11-27, right?
5    A. Yes, sir.
6    Q. But it shows that he had a
7 fall back on 11-23?
8    A. Correct.
9    Q. But as of --
10    MS. MCDONALD: Object to
11 the form. Actually it says an
12 alleged fall and an alleged
13 seizure. Let's -- if we're going
14 to put it in here, let's put it in
15 accurately as to what it states.
16    A. And when it says, alleged,
17 that is my indication that no
18 officer witnessed his fall, alleged
19 fall, and no inmate witnessed his
20 alleged fall. He said he fell.
21    Q. Well, in fact, the
22 documentation reflects that he had
23 reported seizures when he checked

31 (Pages 121 to 124)

1310 32nd Street S.
Birmingham, Alabama 35205
205-250-7765
danielreporting@aol.com

**125**

1 into the jail?
2   A.   Certainly, he did.
3   Q.   And that he had incidents
4 that were at least consistent with
5 seizures on the 23rd, the 27th, and
6 according to your note the 9th?
7       MS. MCDONALD: Object to
8 the form.
9   A.   I can't say what is
10 consistent with seizures. All I
11 can say is that Mr. Kelly claimed
12 that he had a seizure, though no
13 one witnessed him have a seizure,
14 and he claimed that he fell, though
15 no one witnessed him fall.
16   Q.   But at any point did you
17 ask the doctors to evaluate him for
18 that seizure?
19   A.   If he was taken to the
20 doctor --
21       MS. MCDONALD: Object to
22 the form.
23   A.   If he was taken to the

**126**

1 doctor for a fall, the doctor would
2 certainly have been advised as to
3 the conditions of that fall, as
4 according to what the inmate
5 claims, and certainly it's my
6 experience when visiting the doctor
7 that he asks me questions that I as
8 a patient answer, which I would
9 assume Mr. Kelly did as well.
10   Q.   So you didn't make any
11 arrangements for him to be
12 evaluated for seizures?
13   A.   No, sir, because I'm not a
14 doctor and I'm not going to call
15 and make an appointment with a
16 doctor for a seizure when I don't
17 in fact know that that inmate
18 experienced a seizure.
19       MS. MCDONALD: Can we take
20 a break?
21       MR. STOCKHAM: Sure, yes.
22 Absolutely.
23       (Whereupon, a brief

**127**

1 recess was taken in
2 the deposition.)
3   Q.   (By Mr. Stockham) Looking
4 at Exhibit Eleven, the last -- and
5 that's the -- your inmate medical
6 summary.
7   A.   Yes, sir.
8   Q.   That is -- the last entry
9 on that is January 14th?
10   A.   Correct.
11   Q.   And the -- it doesn't
12 reflect the transport to the
13 hospital on January the 16th.
14   A.   All I see entered on
15 January 16th is that EMS came to
16 the jail and that no transport was
17 necessary.
18   Q.   January 16th?
19   A.   No, sir, this -- this ends
20 January 14th.
21   Q.   So if it doesn't have the
22 January --
23       MR. STOCKHAM: I'll mark

**128**

1 this as the next Exhibit.
2       (Whereupon, Plaintiff's
3       Exhibit Twelve
4       was marked for
5       identification.)
6   Q.   I'll show you what's
7 marked as Exhibit Twelve, if you'll
8 look at that. That reflects that
9 Mr. Kelly was taken to Russell ER,
10 doesn't it?
11       (Witness examining
12       documents.)
13   A.   Well, what I see is that
14 it was advised by Dr. James that he
15 should be transported to Russell
16 ER, and that Chief Deputy Brad
17 Oakes actually arrived to transport
18 Kelly to Russell ER.
19   Q.   So he was transported to
20 Russell ER on the 16th?
21   A.   Correct.
22   Q.   But that was not reflected
23 on your --

Daniel Court Reporting, Inc.

**129**

1  A. No, sir. On the day --
2  Q. -- inmate medical summary?
3  A. -- no, sir. On the day
4  that that inmate medical summary
5  was recorded, the last incident as
6  of that time was January 14th.
7  Q. So you had prepared this
8  before --
9  A. Prior to the 16th.
10  Q. -- the 16th?
11  So it was either the 14th
12  or the 15th?
13  A. Yes, sir.
14  Q. Now, on the 16th -- before
15  I --
16  MR. STOCKHAM: I'll mark
17  this as the next Exhibit.
18  (Whereupon, Plaintiff's
19  Exhibit Thirteen
20  was marked for
21  identification.)
22  Q. On the 10th -- I'll show
23  you what's marked as Exhibit

**130**

1  Thirteen.
2  On the 10th of December
3  Mr. Kelly asked to see Sheriff
4  Owens and the doctor.
5  MS. MCDONALD: Which --
6  hang on a second. I've got another
7  one that's -- because I've got two
8  dates or two requests on that same
9  date. Actually there are three
10  requests on that date that I can
11  find right now. Let's be sure
12  you've got the right one.
13  Q. You've got the --
14  A. Yes, sir.
15  Q. The request that I'm
16  looking at is dated, December 10,
17  2003, time, eleven fifteen. Is
18  that your signature at the bottom?
19  A. Yes, it is.
20  Q. And you've dated it,
21  12-11-03?
22  A. Yes, sir.
23  Q. And in it you respond --

**131**

1  in your response you don't address
2  his request to see a doctor, do
3  you?
4  A. No, sir.
5  Q. Why not?
6  A. Well, I think over that
7  period of time he had been to the
8  hospital on the 9th and -- which
9  would have been the day before.
10  MS. MCDONALD: Where is
11  that --
12  (Whereupon, an
13  off-the-record
14  discussion was held.)
15  A. All right. He had been to
16  the hospital the night before on
17  the 9th. He was taken again on the
18  11th, the next day after the 10th,
19  for a medical exam.
20  Q. (By Mr. Stockham) Well,
21  when you responded on the 11th you
22  don't say anything about the fact
23  that he was going to the doctor

**132**

1  that day, do you?
2  A. No, sir. In between all
3  of these inmate requests you have
4  to understand that there was a lot
5  of oral correspondence with Mr.
6  Kelly. Most of what we were doing
7  at this point was repetitive with
8  him. He was sending them out one
9  after the other. Now, you tell an
10  inmate what the status is and you
11  don't have time to go back to this
12  inmate over and over and over
13  again. I believe that our response
14  to him had been satisfaction -- I
15  mean, we gave him satisfaction. We
16  were aware of his requests, we were
17  making appointments, he was getting
18  medical care. But anything beyond
19  that becomes frivolous.
20  Q. The fact, all you say in
21  this response, Exhibit Thirteen, is
22  that if he has a problem that he
23  needs to speak to someone about,

33 (Pages 129 to 132)

1310 32nd Street S.
Birmingham, Alabama 35205

205-250-7765
danielreporting@aol.com

**Page 133**

1 then the sergeant or the lieutenant
2 will be glad to speak with him?
3     A.   In fact, that is correct,
4 and which I did speak with him.
5 The officers, the other corrections
6 officers spoke with him and as I
7 was addressing in that his constant
8 request to see the sheriff. It is
9 not a common incidence for the
10 sheriff to speak with the inmates.
11 That is what he has the lieutenant,
12 myself and the other corrections
13 officers for. There is a grievance
14 policy that if the situation cannot
15 be resolved between the officers,
16 the sergeant and the lieutenant,
17 then certainly that inmate would
18 take his grievance to the sheriff.
19 But at this point there was
20 nothing -- his demands were being
21 met. He was getting medical care.
22 He was getting medication according
23 and prescribed by a doctor. And

**Page 134**

1 beyond that, I believe that the
2 officers as well as myself, and
3 Lieutenant Wilson, met everything
4 within the state required legal
5 standards for medical care.
6     Q.   Now, on the 16th of
7 December Mr. Kelly had another
8 fall, did he not?
9         MS. MCDONALD: Object to
10 the form.
11     A.   Not to my knowledge.
12 Well, alleged fall.
13     Q.   Well, an alleged fall?
14     A.   An alleged fall.
15     Q.   Well, let me show you what
16 I'm going to mark as Exhibit
17 Fourteen.
18         (Whereupon, Plaintiff's
19          Exhibit Fourteen
20          was marked for
21          identification.)
22     Q.   This is a statement signed
23 by Kay Taylor. Who is Kay Taylor?

**Page 135**

1         Ma'am?
2     A.   Sir?
3     Q.   Who's Kay Taylor?
4     A.   Kay Taylor was a
5 corrections officer at the jail.
6     Q.   Do you have that document
7 there in your file?
8     A.   I do.
9     Q.   Why don't you look at that
10 so we can go over it together.
11         Did you instruct Kay
12 Taylor to write out this statement?
13     A.   No, sir, I did not. I
14 don't know -- well, I'll say that I
15 don't recall. She may have called
16 me. I may have said, be sure you
17 write it down, but I don't
18 necessarily know that I did.
19         Officers knew that when
20 they had an incident that they were
21 required to write a statement of
22 what they saw and heard.
23     Q.   Now, in addition to Mr.

**Page 136**

1 Kelly reporting that he had a
2 seizure, a correction officer had
3 seen him flopping around on the
4 ground.
5         MS. MCDONALD: Object to
6 the form. Let her read over this
7 but I don't --
8     Q.   Have you reviewed that
9 document?
10         MS. MCDONALD: Kay
11 Taylor's --
12         MR. STOCKHAM: Yes.
13         MS. MCDONALD: -- report?
14 I don't -- does it say what --
15         (Witness examining
16          documents.)
17     A.   Yes, sir.
18         MS. MCDONALD: Wait a
19 minute. What was the question,
20 Richard?
21         MR. STOCKHAM: Have you
22 read the document?
23     A.   Yes, sir.

34 (Pages 133 to 136)