IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DANIEL BRYAN KELLY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )Civil Action No. 2:05-cv-01150-MHT-TFM |
| | ) |
| RICKY OWENS, et al. | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT FILED BY DEFENDANTS, OWENS, WILSON, ROBERSON AND BRADLEY

Comes now the Plaintiff, Daniel Bryan Kelly and submits this Opposition to the Motions for Summary Judgment filed by Defendants, Ricky Owens, Terry Wilson, Wendy Roberson, and Al Bradley. Plaintiff files this consolidated response to Defendants' Motions for Summary Judgment, because, upon review and comparison, Defendants' briefs track each other virtually word for word and cite for cite, so it will be more efficient to address the relevant case law as it applies to the overlapping respective facts and law in a consolidated response. Plaintiff submits that the facts in the case create triable issues as to whether Defendants violated Plaintiff's constitutional rights with respect to medical needs, conditions of confinement, excessive force and failing to prevent excessive force.

## STATEMENT OF FACTS

1.      On November 13, 2003, Plaintiff was incarcerated in the Coosa County Jail, (Roberson depo. pg. 59-61, defendant's exhibit C (def.ex.C)) He was a pretrial detainee at the time. Defendant Owens was the Sheriff (Owens Declaration, def. ex. B), Defendant

Wilson was lieutenant and jail administrator (Wilson depo, p.19-21, def. ex.I), Defendant Roberson was sergeant and supervisor over the jail staff (Roberson depo, p. 29-30, def. ex. C) and Defendant Bradley was a jailor and dispatcher. (Bradley depo p.18, def. ex. E)

### Denial of needed medical attention

2.    Plaintiff had three medical issues that arose that Defendants either did not respond to or responded to in an unreasonably delayed manner.  These were: (1) failure to reasonably and timely respond to Plaintiff's request for treatment of his seizures; (2) failure to reasonably and timely respond to Plaintiff's need for dental work on his broken teeth; and (3) failure to reasonably and timely respond to Plaintiff's deteriorating health condition that resulted in his suffering drug induced hepatitis, and hepatic encephalopathy.

### No doctor evaluated Plaintiff for seizures

3.    Not long after the Plaintiff was incarcerated  his mother called Defendant Roberson and told her that she was afraid that Plaintiff was dying because he was going through drug withdrawals from cocaine which he had tested positive for on November 13, 2003. (Wanda Kelley depo. pg. 86-88, def. ex.J).

4.    On or about November 21, 2003, Plaintiff had a seizure and fell injuring his right leg, foot, and knee. ( Wanda Kelley's diary, def. ex.YY, Affidavit of Randall Weaver; Randall Weaver's medical progress notes, def. ex. OO)

5.    On November 25, 2003, Plaintiff was evaluated by Matt Hilyer of Cheaha Mental Health.  Mr. Hilyer's written evaluation stated that he evaluated Plaintiff's complaints of

seizure with episodic memory loss.  His notes say that he needs an evaluation by M.D. to rule out seizure. (Hilyer's evaluation, def. ex. NN)

6.    On November 26, 2003, Plaintiff was taken to Dr. Weaver for treatment of Plaintiff's complaint of pain in his right leg, foot, and knee.  Dr. Weaver did not do any evaluation of Plaintiff with regard to seizures.  (Weaver's affidavit and medical progress notes, def. ex.OO)

7.    Also on November 26, 2003, Plaintiff was taken to the Russell Hospital emergency room for x-rays of his foot.  (Roberson depo. exhibit 11, plaintiff's exhibit 2 (pl. ex. 2)) The Russell Hospital emergency room records reflect that he was treated for his physical injury but nothing was done regarding evaluating him for seizures. (Russell Hospital records, 11-26-03, def. ex.O)

8.    On November 27, 2003, Plaintiff again fell due to a seizure. Defendant Roberson insisted that it was just an alleged fall and an alleged seizure because it was just what Plaintiff reported and there were no witnesses.  (Roberson depo. pg. 122-124, pl. ex. 1)

9.    On  December 9, 2003, Plaintiff again had a seizure and fell.  (Roberson depo. pg. 113, pl. ex. 1; Roberson depo. exhibit 11, pl. ex. 2)  Plaintiff was transported to Russell Hospital emergency room but returned to jail when no injury was substantiated by the doctor. (Roberson depo. exhibit 11, pl. ex.2).  Plaintiff was put in the holding cell when he returned from the hospital.  (Roberson depo. pg. 113-114, pl. ex.1)  The hospital records reflect that on December 9, 2003, Plaintiff was treated for his physical complaints but nothing was done

to evaluate his seizure condition. (Russell Hospital records of 12-9-03, def. ex. X; Roberson depo. exhibit 10, pl.ex. 2)

10.    On December 11, 2003, Plaintiff was taken to see Dr. James at Pri-Care. Dr. James' records reflect that he was treated for complaints of pain to his shoulder, knee, and lower back, but no evaluation of Kelley's seizure condition done. The records reflect that plaintiff had a seizure disorder, under the section of the office notes titled past history. (Dr. James' office notes of 12-11-03, def. ex. AA)

11.    Defendant Roberson never made any appointment with any doctor to evaluate Kelley's seizure condition. In fact, when asked, her response indicated skepticism about Plaintiff's seizure disorder. She testified: "No sir, because I am not a doctor and I am not going to call and make an appointment for a seizure when I don't in fact know that the inmate experienced a seizure." (Roberson depo. pg. 126, pl. ex. 1)

12.    Defendant Owens likewise expressed a similar negative attitude and suspicious attitude of veracity of Kelley's reported seizures. (Owens Declaration, ¶ 23-36, def. ex. B)

13.    On December 16, 2003, Plaintiff fell again and, according to jailor Green's note, Plaintiff was lying on his side and twitching. (Roberson depo. exhibit 16, pl.ex. 2) Plaintiff reported he had a seizure. (Roberson depo. exhibit 14, pl.ex. 2) Asked if the Defendants asked to have Plaintiff evaluated for a seizure disorder after this incident, Defendant Roberson stated that no where in any of the statements did the officers say that Plaintiff had a seizure, and that in her experience she had seen numerous fake seizures and that Plaintiff

was not acting in the way that somebody who had just had a seizure would act. She admits that she did not have Plaintiff evaluated for a seizure disorder. (Roberson depo. pg. 141-143, def. ex. C)

14.    Defendant Roberson testified that there was nothing that medical personnel can do for a seizure. You just have to let the patient ride the seizure out. You just give them space and protect them from injuring themselves, but the jail did not have a practice of transporting inmates who seizures to get medical attention.(Roberson depo. pg. 148-149, def. ex.C)

15.    On December 16, 2003, Plaintiff was placed in a cell known as the hole which was an 6' X 8' foot cell. (Plaintiff depo. pg. 84, def. ex.G) He remained housed in this small cell from that time until January 16, 2004.

16.    Defendant Roberson testified it was apparent and obvious that Plaintiff was having trouble with his balance and falling so he was placed in the hole. (Roberson depo. pg. 150, def. ex.C) Plaintiff complained that the rules of the jail said he was not to be confined in the hole for more than 23 hours. (Roberson depo 159-61, def. ex.C ) Defendant Roberson said that it was different because Plaintiff was placed in the cell for his own well-being (Roberson depo p. 161, def. ex. C) She said he was placed in the cell for medical observation (Roberson depo p. 108, pl. ex. 1)

17    On December 18, 2003, Plaintiff filled out an inmate request form to see a doctor to find out about why he was "falling out." (Roberson depo. exhibit 17, pl. ex. 2)

18.    Plaintiff testified that he had seizures about every other day when he was in

the Coosa County Jail. (Plaintiff depo. pg. 58, def. ex. G)

19.     Plaintiff testified he repeatedly requested to go to the doctor for seizures and other

health issues. (Plaintiff depo. pg. 176-177, def. ex.G)

20.     When he was in the hole, Plaintiff made a request to see a doctor every day that

included among other things that he was sick and that he was having shocking spells all over.

(Plaintiff depo. pg. 147-148, def. ex.G)

21.     Defendant Roberson said Plaintiff was constantly knocking on the door of the holding

cell. (Roberson depo. pg. 187, def. ex.C). She said Plaintiff was constantly making demands,

constantly complaining. (Roberson depo. pg. 188, def. ex.C)

22.     Between the time that Plaintiff was put in the hole on December 16, 2003, and January

7, 2004, Plaintiff did not see a doctor. On January 7, 2004, Plaintiff was taken to see Dr.

James at Pri-Care. (Dr. James' office records for 1-7-04, def. ex.AA) Dr. James addressed

Plaintiff's complaint of body rash and ran blood tests. Dr. James' records do not reflect any

evaluation for seizure disorder. Dr. James' records do reflect that Plaintiff's liver test was

abnormal. (Dr. James' office records for 1-7-04, def. ex.AA)

23.     Plaintiff continued to complain of shocking spells and seizures but he was not taken

to the doctor. (Plaintiff depo. pg. 176, def. ex.G).

### Unreasonably delayed dental treatment

24.     Plaintiff was kicked in the mouth by Defendant Bradley and broke two teeth and

cracked another. (Plaintiff depo. pg. 134, def. ex.G)

25.    Plaintiff complained to Defendants Roberson and  Wilson and told them that Defendant Bradley had kicked him in the mouth and broken off two teeth, that he needed to go to the dentist, and that he had a bad toothache. (Plaintiff depo. pg. 134, def. ex.G)

26.    Defendants did not give him anything for the toothache. (Plaintiff depo. pg. 134, def. ex.G)

27.    Plaintiff submitted a written request for treatment of his toothache December 27, 2003, but Plaintiff was not taken to the dentist until January 14, 2004. (Roberson depo. exhibit 11, pl. ex. 2)

28.    Roberson explained the two and a half week delay, saying that it was very possible he had to be put on an antibiotic before having that tooth extracted because that would be the case if the tooth was infected which was what happened in most cases. She said the dentist would prescribe the antibiotic. (Roberson depo. pg. 177-178, def. ex.C)

29.    There is no antibiotic reflected on Plaintiff's jail drug record. (Bradley depo. ex 1, pl. ex. 3)

30.    There is no record of any appointment with the dentist prior to January 14, 2004. (Roberson depo. exhibit 11, pl. ex. 2)

### Plaintiff's obviously deteriorating health condition

31.    When Matt Hilyer from Cheaha Mental Health came in and evaluated Plaintiff, Plaintiff told him all of the medications that he had ever been on in his life time. (Plaintiff depo. pg. 149-150, def. Ex. G; Matt Hilyer's evaluation, def. ex.NN)

7

32.    After that Plaintiff was given a large number of drugs, many pills daily, and Plaintiff took them because he was told to. (Plaintiff depo. pg. 150, def. ex.G)

33.    On some occasions when Plaintiff was in the hole , Defendant Bradley would bring one pill to the Plaintiff when he was hollering and say "take this and shut up" and it would make him sleep. (Plaintiff depo. pg. 152, def. ex.G)

34.    There were occasions that he would receive pills that didn't look right. Defendants Bradley and Roberson gave him these pills. (Plaintiff depo. pg. 156-157, def. ex.G)

35.    Plaintiff repeatedly filled out requests to see the doctor. (Plaintiff depo. pg. 147, def. ex.G)

36.    He did this every day in the hole. (Plaintiff depo. pg. 147, def. ex.G)

37.    Plaintiff asked to see the doctor when he found blood in his urine; he asked to see a doctor about his ribs; he told Defendants he was sick and having shocking spells all over. (Plaintiff depo. pg. 147-148, def. ex. G)

38.    Plaintiff was freezing to the point that his legs had numbness in them. Plaintiff was completely dehydrated and was getting really weak. (Plaintiff depo. pg. 176-177, def. ex.G)

39.    Plaintiff was having shocking spells, weak spells, and his urine was almost jet black. His urine stained the cell floor, which he reported. (Plaintiff depo. pg. 177, def. ex.G)

40.    Plaintiff hallucinated that he saw dead people. (Plaintiff depo. pg. 231, def. ex.G) This is after he had been in the hole for a length of time. (Plaintiff depo. pg. 232, def. ex.G)

41.    Wanda Kelley, Plaintiffs mother, made notes close in time to the events that were

occurring to her son in the Coosa County Jail.  (Wanda Kelley depo. pg. 136, def. ex. J)

42.      December 18, 2003, Plaintiff was very weak, confused and begging for help. (W. Kelley's diary, def. ex.YY)

43.      December 19, Plaintiff was very confused and couldn't remember much.(W. Kelley's diary, def. ex.YY)

44.      December 26, Plaintiff was in a bad state of mind, stating he wasn't going to make it because they were keeping him in the hole and laughing at him when he would ask them to clean the toilet facility, saying that they were cruel; it was hard to understand him when he talked.( W. Kelley's diary, def. ex.YY )

45.      December 27, Plaintiff called and call back two minutes later forgetting he had called. (W. Kelley's diary, def. ex.YY)

46.      December 28, Plaintiff said something was wrong with him, he had pain in his right side and they were just giving him another pill to just shut him up. (W. Kelley's diary, def. ex.YY)

47.      December 29, Plaintiff was very confused, crying and begging his parents to do something.  (W. Kelley's diary, def. ex. YY)

48.      December 30, Plaintiff said he had barely anything to drink and the letters he was writing made no sense, was mentally losing it and sick. (W. Kelley's diary, def. ex.YY)

49.      January 1, Plaintiff says he is seeing dead people. (W. Kelley's diary, def. ex. YY)

50.      January 2, Plaintiff called and said he is real sick, asking for a doctor.  (W. Kelley's

diary, def. ex.YY)

51.    January 5, Plaintiff has a rash all over his body, asking to see a doctor, and has shocking feelings. Plaintiff is really ill and upset and says they are trying to kill him.(W. Kelley's diary, def. ex. YY)

52.    January 6, Plaintiff still has a bad rash on his body that is about to drive him crazy. Plaintiff is really depressed and crying a lot. Plaintiff is begging to get somebody to help him because he is cracking up and can't take it anymore. Plaintiff is still having shocking feelings and is very sick. (W. Kelley's diary, def. ex.YY)

53.    January 8, Plaintiff is still confused and depressed. (W. Kelley's diary, def. ex.YY)

54.    January 10, Plaintiff has bad rash and seems to get worse. As Plaintiff talks, he is very nervous and had another spell of shocking all over his body. (W. Kelley's diary, def. ex.YY)

55.    January 13, Plaintiff said he is still in bad shape and broken out all over. (W. Kelley's diary, def. ex.YY)

56.    January 14, Plaintiff sounded very dopey when he spoke with parents around 5:30 p.m. (W. Kelley's diary, def. ex. YY)

57.    January 16, Plaintiff called and said his urine has been badly discolored for two days and his skin and whites of his eyes are very yellow.(W. Kelley's diary, def. ex.YY)

58.    Plaintiff was taken to see Dr. James on January 7 for his rash. At that time Dr. James performed blood and liver function tests and determined Plaintiff's liver function was

abnormal.(Dr. James' office notes of 1-7-04, def. ex. AA)

59.     Plaintiff was returned to the jail to the hole for another nine days until he was taken

to the emergency room at Russell Hospital on January 16 where he was treated and placed

in the ICU and diagnosed with drug induced hepatitis and hepatic encephalopathy, both of

which were serious medical conditions which could result in death.  (Dr. Law depo. pg.74-

75, pl.ex. 4). When Plaintiff was admitted to the hospital, he reported he had had dark urine

for the past week, which Dr. Law testified could be a sign of liver disease/or dehydration,

(Dr. Law depo. pg. 46, pl. ex. 4). Also, Plaintiff reported he had been suffering weakness and

he had been falling a lot. The nurse report said he was somewhat slow to respond and had

slightly slurred speech. Dr. Law testified this correlated with hepatic encephalopathy. (Law

depo. pg. 46-47, pl.ex.4).

## Defendants knew of Plaintiff's health issues

60.     Defendant Roberson testified that Plaintiff constantly complained about his medical

problems so everyone knew about them.  (Roberson depo. pg. 185-7, 190-192, pl. ex. 2)

61.     There was a lot of oral correspondence with the Plaintiff that was very repetitive.

(Roberson depo. pg. 132, pl. ex. 1)

62.     Roberson had frequent conversations with Owens discussing Plaintiff's medical

condition and interaction with his parents updating Owens on the incidents that occurred,

medications that Plaintiff was taking, phone calls from Plaintiff's mother and frequent visits

from Plaintiff's father. (Roberson depo. pg. 153-154, def. ex.C)

63.    Defendant Roberson said that Plaintiff was constantly misconstruing information to his parents and causing unfounded concerns which in turn caused his parents to completely inundate the jail staff with visits and calls.  (Roberson depo. pg. 188, def. ex.C)

64.    Defendant Roberson characterized the Plaintiff as being awful.  By being awful Roberson said that Plaintiff was making the same requests over and over.  (Roberson depo. pg. 184-185, def. ex. C)

65.    Defendant Roberson and jail staff had frequent conversations about how awful Plaintiff was, as to what Plaintiff said or did, or how many notes he had sent out and what demands he was making.  (Roberson depo. pg. 182, def. ex. C)

66.    Defendant Roberson said that Plaintiff's complaints were common knowledge among all of the officers.  (Roberson depo. pg. 190, def. ex. C)

67.    Defendant Roberson said the officers were getting exhausted with trying to meet Plaintiff's demands.  (Roberson depo. pg. 191-192, def. ex.C)

68.    Defendant Roberson said that everyone was aware of Plaintiff making excessive complaints.  (Roberson depo. pg. 190, def. ex. C) She said it  appeared from Plaintiff's jail request form that his perceptions of what was happening to him were not accurate (Roberson depo. pg.162, def. ex. C)

69.    Defendant Roberson said that the officers were becoming weary with Plaintiff's complaints. (Roberson depo. pg. 192, def. ex.C) She said Plaintiff made a ream  of written requests.  (Roberson depo. pg. 194, def. ex.C) She said she didn't know if Plaintiff had a

memory problem or if he was just persistent with what he was doing. (Roberson depo. pg. 195, def. ex.C)

## Unconstitutional jail conditions

70.    On December 16, Plaintiff was put in the hole. (Plaintiff depo. pg. 84, def. ex.G) It was a 6x8 concrete room with a little slab on the side to put a mat on to sleep about ten to twelve inches off the floor.  There was a hole in the center of the floor with a metal grate over it and a light in the ceiling. There was no sink in the room and no toilet. (Plaintiff depo. pg. 84-86, def. ex. G)  There was a window in the door.  (Plaintiff depo. pg. 85, def. ex.G) Owens put the cardboard over the window after Plaintiff had been in the hole for about a week and a half.  When Plaintiff asked Owens why, he told him it was because he was tired of all of Plaintiff's hollering.  Plaintiff asked Owens when he was going to let him out of the hole and Owens told him he was going to stay there as long as he was in the jail for Owens' protection. Owens laughed and told him it was to keep him from accidently falling. (Plaintiff depo. pg. 125-126, def. ex. G) The hole was flushed from outside and long periods of time passed before it was flushed (Plaintiff depo p.146, def. ex. G)

71.    The mat in the floor was thinner than the mat in the regular cell. (Plaintiff depo. pg. 86, def. ex. G)   Plaintiff was made to sleep on the ground where the feces and urine were. (Plaintiff depo. pg. 112, def. ex. G)

72.    Plaintiff was only given a little blanket that wouldn't cover both his head and his feet at the same time.  (Plaintiff depo. pg. 112, def. ex. G)  Plaintiff had to wrap toilet paper

around his feet because he was cold and at one point his toilet paper was taken away from him. (Plaintiff depo. pg. 112-113, def. ex. G)

73.     Plaintiff was taken once or twice a week to get showers. (Plaintiff depo. pg. 121, def. ex. G) Plaintiff asked Roberson, Bradley and Wilson many times to take him to get a shower and they refused. (Plaintiff depo. pg. 122, def. ex. G)

74.     Plaintiff was never taken out to exercise the entire time that he was in the hole. (Plaintiff depo. pg. 123, def. ex. G)

75.     There were two occasions he went two or three days using the restroom on the grate in the floor of the hole and had to wipe himself with candy wrappers because he was not taken out of the hole. (Plaintiff depo. pg. 123, def. ex.G)

76.     Some jailers would take him to use the restroom outside of the hole. (Plaintiff depo. pg. 123, def. ex. G)

77.     There were bugs in the hole with him all of the time, running around where the urine and feces were. (Plaintiff depo. pg. 140, def. ex. G) Plaintiff complained about the bugs in his cell many times to all of the jailers but they would never do anything about it. (Plaintiff depo. pg. 141, def. ex.G)

78.     During the time from December 16 to January 16 the hole was only washed out two times and that was because the feces was stacked up so badly around the hole. (Plaintiff depo. pg. 142, def. ex. G)

79.      For the first two weeks Plaintiff was in the hole they took his socks and his

14

underwear away. He just had the regular jumper suit with short sleeves. (Plaintiff depo. pg. 142-143, def. ex.G)

80.    Plaintiff would ask all day long to go to the restroom and for a cup of water. (Plaintiff depo. pg. 146, def. ex. G)

81.    Sometimes they would tell him to wait until the next shift would come on and sometimes they wouldn't answer. (Plaintiff depo. pg. 146-147, def. ex. G)

82.    When Plaintiff was in the hole, toilet paper was first given to him by Roberson to use to wipe himself inside the cell but after a week the toilet paper was taken away. (Plaintiff depo. pg. 162-163, def. ex. G)

83.    There were many times that Plaintiff complained to Roberson, Owens, Bradley, and everyone  that it was really cold in his cell - that it was freezing - and asked for an extra blanket, but they wouldn't give it to him. (Plaintiff depo. pg. 165, def. ex.G)  The cold was so bad that his legs had numbness in them. (Plaintiff depo. pg. 176-177, def. ex.G) Plaintiff complained to Wanda Kelley that he was very cold. (Wanda Kelley depo. pg. 82, def. ex. J)

84.     Plaintiff did not get water and became dehydrated and became very weak and his urine became almost jet black. (Plaintiff depo. pg. 177, def. ex. G)  Plaintiff told Defendants all of these things. (Plaintiff depo. pg. 177, def. ex. G) Plaintiff would get a small styrofoam cup of water for breakfast, lunch, and dinner. Plaintiff asked repeatedly for water. Most of the time Defendants laughed about it and would hardly ever give it to him. (Plaintiff depo. pg. 166, def. ex. G)  Plaintiff asked Wilson for water on a number of occasions but he never

gave it to him. (Plaintiff depo. pg. 166, def. ex. G) Plaintiff claims that he was very seldom given water outside of meal times, maybe once or twice a week. (Plaintiff depo. pg. 181, def. ex.G) Plaintiff would holler when he heard the Sheriff's voice, asking for water, that he had not had water since breakfast, but the Sheriff would never respond or bring water to him.

85.    Plaintiff was allowed to use the phone by jailers Harris and Lipscomb whenever they would carry him to the restroom and when Owens, Bradley, Wilson and Roberson were not watching. They would sit at the desk and let him dial home. (Plaintiff depo. pg. 182, def. ex. G) Roberson, Wilson, or Bradley would not let Plaintiff use the phone. (Plaintiff depo. pg. 182-183, def. ex. G)

### Unconstitutional beating and failure to stop beating

86.    Plaintiff was subjected to beatings by Defendant Bradley. He was struck twice when he was still in general population. (Plaintiff depo. pg. 88, def. ex. G) Defendant Bradley slapped Plaintiff in the face, but Plaintiff did not report this because he wanted to keep the conflict down. (Plaintiff depo. pg. 89-90, def. ex. G) The second time was when he was going to visitation with his father and Defendant Bradley grabbed his lip and snatched it when he was going to visitation because he had not shaved his mustache off. He then slapped him across the left side of his face and said "one damn word and you won't see that son-of-a-bitch" referring to Plaintiff's father. (Plaintiff depo. pg. 90-91, def. ex. G)

87.    When Plaintiff was in a hole on a permanent basis, Defendant Bradley, accompanied by another officer Plaintiff did not know, would come in quite a few times and beat him. The

16

officer never beat him but Bradley did.  (Plaintiff depo. pg. 96, def. ex.G)

88.    On one incident the other officer held his leg and Defendant Bradley kicked him in his manhood twice.  This caused Plaintiff to urinate blood for a couple of days.  (Plaintiff depo. pg. 96, def. ex. G) On that occasion Plaintiff turned his head and saw Defendant Wilson standing at the edge of the doorway laughing.  (Plaintiff depo. pg. 99, def. ex. G)

89.    On another occasion Defendant Bradley grabbed his pants and had a broom he tried to stick it in Plaintiff's rectum but Plaintiff was able to wiggle enough where Defendant Bradley didn't succeed.  Defendant Bradley hit him in the lower part of his back behind his cheeks causing Plaintiff pain.  (Plaintiff depo. pg. 98-99,def. ex. G)

90.    Twice Defendant Bradley fist whipped him in the face. (Plaintiff depo. pg. 99, def. ex. G). On another occasion, Bradley hit Plaintiff in the face and Bradley and Roberson had to come in and get him and carry Plaintiff to the bathroom. Bradley and Robertson made Plaintiff clean his face so no one would see it.  (Plaintiff depo. pg. 100, def. ex. G)

91.    Defendants Roberson and Bradley were dragging Plaintiff under his arms when Ray Kelley, Plaintiff's father, saw them.  Plaintiff begged him not to let him go back into the hole. Bradley yelled at Ray Kelley to get the hell out.  (Ray Kelley depo. pg. 171, def. ex.KK)

92.    Ray Kelley asked Defendant Owens if he was aware that Bradley was an alcoholic. Owens said that he was aware that Bradley had a drinking problem but that they were working on it. (Ray Kelley depo. pg. 72, def. ex. KK)

93.    Several times when Ray Kelley went to put money on the jail books for Plaintiff he

17

smelled alcohol on Defendant Bradley's breath.  (Ray Kelley depo. pg. 72, def. ex. KK)

94.    On a couple of occasions Plaintiff was hit by Defendant Bradley with the hose pipe.

At the time Plaintiff was hit with the hose pipe he was being so overdosed that he could not

fight back.  Plaintiff could not say exactly say how many times it was that Bradley came in

but it was quite a few.  There were times when it was every day and there were times when

it was two or three days when he would come in.  It was according to when he came in that

he could smell alcohol on Bradley.  (Plaintiff depo. pg. 103-104, def. ex. G)

95.    Plaintiff told Defendants Wilson and  Roberson that Bradley had broken two of his

teeth.  (Plaintiff depo. pg. 134-135, def. ex. G)

96.    On one occasion when Plaintiff was returning from the restroom, Plaintiff asked

Wilson when he was going to stop Bradley from beating him. At that point Wilson grabbed

Plaintiff by the back of the neck and slung him in the cell and closed the door. (Plaintiff

depo. pg. 168-169, def. ex. G)

97.    On one occasion Plaintiff asked Defendant Owens when he was going to stop Bradley

from beating him but all Owens did was laugh and walk away.  (Plaintiff depo. pg. 174-175,

def. ex. G)

## ARGUMENT

Plaintiff Daniel Bryan Kelley submits that for the reasons set out below summary

judgment is not appropriate for any of these defendants. Defendants are sued here in their

individual capacities. Defendants were jail officials at the Coosa County Jail at the time the

Plaintiff was a pretrial detainee there. Defendants have asserted that they were acting within their discretionary capacity in their positions as officials of the Coosa County Jail. Plaintiff does not dispute this. Defendants assert that they are entitled to qualified immunity from suit. As detailed below, these Defendants are not entitled to qualified immunity because the constitutional violations Plaintiff complains of were clearly established in the Eleventh Circuit at the time they occurred, and these Defendants acted with deliberate indifference to Plaintiff's constitutional rights. Thus, they are to be held liable in their individual capacities.

## STANDARD OF REVIEW

The Defendants have moved this Court to enter Summary Judgment in this case. Summary Judgment may be granted only when there are no genuine issues of material facts and Summary Judgment is appropriate as a matter of law. Fed. R. Civ. P. 56©). In ruling on Motions for Summary Judgment the Court must view all evidence and all factual inferences in the light most favorable to the Plaintiff. *Miller v King*, 384 F.3d 1248, 1258-59 (11th Cir. 2004). Issues of credibility, and the weight to be afforded evidence are determinations that are only appropriate for the fact finder and are not for a Court to decide on Summary Judgment. *Miller* at 1259. Summary Judgment should only be granted if pleadings, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to Judgment as a matter of law. *Miller* at 1259.

Here Defendants urge the Court to expand the limited situation identified by the U.S.

Supreme Court in *Scott v Harris*, 127 S. Ct. 1769 (2007) where disputed facts may nevertheless be subject to summary disposition.. Defendants suggest that this has changed the standard on Summary Judgment. Whether it has or not is not relevant here. In *Scott* a lawsuit resulted out of a car chase. The Plaintiff and Defendant told two different stories. A video contradicted the Plaintiff's version of the story.

The *Scott* Court reaffirmed that at the Summary Judgment stage the facts were reviewed in the light most favorable to the non-moving party where there was a genuine in dispute as to material facts. *Scott* at 1776. The Court held that the video tape of the chase so utterly discredited the Plaintiff's claims that no reasonable jury could believe it. *Scott* at 1776. Justice Breyer in his concurrence points to the limited nature of this kind of evidence. He says "the video makes clear the highly fact-dependent nature of this constitutional determination." *Scott* at 1780. Under the *Scott* decision, only where the record so overwhelmingly contradicts the Plaintiff, to the degree of specificity of a video tape of a car chase, is summary judgment appropriate where the opposing parties tell two different stories

The Eleventh Circuit recently in *Felder v Howerton*, 240 Fed. App. 440, 2007 WL 2669505 (11th Cir. 2007) reaffirmed that in addressing Summary Judgment the Plaintiff's version must be believed. *Felder* at 406. It went on to say that at Summary Judgment it is not the Court's role to weigh conflicting evidence or make credibility determinations, citing, *Mize v Jefferson County Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996). There is no videotape in this case, so at Summary Judgment the question of whether there is a dispute

with regard to material facts is the only deciding issue. Plaintiff has offered sufficient evidence to support each of his claims.

## DELIBERATE INDIFFERENCE

Plaintiff was a pre-trial detainee at the Coosa County Jail. Plaintiff has alleged that Defendants Owens, Wilson, Roberson and Bradley engaged in actions, and failed to act, and that this conduct was done with deliberate indifference to Plaintiff's constitutional rights. A pretrial detainee's constitutional rights are protected under the due process clause of the Fourteenth Amendment. See, *Cottone v Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). Due process requires that jail officials provide people in custody such basic human needs as health care, minimum conditions of confinement and protection from excessive force. In regard to providing pre-trial detainees with such basic necessities, the minimum standards required by the due process clause are the same required by the Eighth Amendment for convicted persons. See, *Hamm v DeKalb County*, 774 F.2d 1567, 1574 (11th Circ. 1985).

Jail officials may be liable under the Eighth Amendment for denying an inmate humane conditions of confinement if they know that the inmate faces a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to avoid it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). To demonstrate that a jail official acted with deliberate indifference to a Plaintiff's medical needs, the Plaintiff must offer evidence that he had an objectively serious medical need and that the jail official ignored it. *Farrow v West*, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is one that is so obvious

21

that even a lay person would easily recognize the necessity for a doctor's attention. *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994).

The Eight Amendment also applies to conditions of confinement that are not formally imposed as a part of a sentence. *Wilson v Seiter*, 501 U.S. 294 (1991). Establishing a violation involves a two prong test: one objective, the other subjective. First, the Plaintiff must show that the conditions of confinement were objectively so serious as to amount to the denial of a basic human need. *Wilson,* 501 U.S. at 298. Second, Plaintiff must show that the official acted with deliberate indifference. *Farmer v Brennen*, U.S. at 834. The *Farmer* Court defined what constitutes "deliberate indifference." It adopted "subjective recklessness" as it is used in criminal law as a "familiar and workable standard that is consistent with the cruel and unusual punishment clause." *Farmer* at 839-840. The Court said "deliberate indifference" is shown when a Plaintiff proffers evidence that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. *Farmer* at 842.

This objective component requires that the official knew and disregarded an excessive risk to inmate health and safety. The official must have been aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he must have drawn the inference. Farmer at 837. The official, however, need only have been aware of the risk of harm, as opposed to being aware of actual harm. *Hope v Pelzer*, 240 F.3d 975, 978 (11th Cir. 2001). A fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Farmer* at 842.

22

In the excessive force context, the Supreme Court in *Hudson v McMillian*, 503 U.S. 1 (1992) held that society's expectations are different from the analysis in the denial of medical treatment and conditions of confinement context. It said that when jail officials "maliciously and sadistically used force to cause harm, contemporary standards of decency are always violated." This is true whether or not significant injury is evident. *Hudson* at 9 With regard to supervisory liability, the Eleventh Circuit has held that supervisory liability under §1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the action of a supervising official and the alleged constitutional deprivation. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). The causal connection may be established when a supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them. *Cottone* at 1361.

Here, Plaintiff's claims for constitutional deprivations of medical attention, of unconstitutional conditions of confinement, beatings and the failure to prevent beatings were all clearly established in this Circuit when the violations occurred. Plaintiff offers sufficient evidence that the Defendants were aware of the risk of harm such that a jury could conclude Defendants knew of the risk from the very fact that the risk was obvious.

## PLAINTIFF'S RIGHTS WERE CLEARLY ESTABLISHED

The violations of constitutional rights alleged in Plaintiff's Complaint were clearly

23

established under this Circuit's case law at the time of Plaintiff's constitutional deprivations. Plaintiff's claims against Defendants, Owens, Wilson, and Roberson, fall into three categories: (1) denial or unreasonable delay in addressing of his serious medical needs violated his constitutional rights; (2) conditions of confinement violated his constitutional rights; and (3) that Defendants' knowing failure to stop physical abuse violated his constitutional rights. Plaintiff's claims against Defendant Bradley were likewise clearly established. These were: (1) denial or unreasonable delay of treatment for his serious medical needs; (2) jail conditions violated his constitutional rights; and (3) beating the Plaintiff violated his constitutional rights.

With respect to what constitutes clearly established law for purposes of overcoming a defense of qualified immunity in a §1983 case, the Supreme Court has recently criticized the way the Eleventh Circuit used the "materially similar" standard as "rigorous gloss on the qualified immunity standard" that was not consistent with Supreme Court precedent. *Hope v Pelzer*, 536 U.S. 730, 739 (2002). The *Hope* Court explained that the "clearly established" standard for §1983 liability was identical to "fair warning" requirement under the criminal law found at 18 U.S.C. §242. The *Hope* Court pointed out that it had affirmed convictions under §242 despite notable factual distinctions between precedents relied upon in the cases before the court. See, *Hope* at 739. The *Hope* Court specifically criticized the Eleventh Circuit's failure to recognize circuit precedent in *Ort v. Wright*, 813 F.2d 318 (11th Cir. 1987) and *Gates v Collier*, 501 F.2d 1291 (5th Cir. 1974) in addressing qualified immunity of the

officers who chained the Plaintiff to a hitching post and denied him drinking water.

The *Hope* Court said that the situation in *Gates* which identified several forms of impermissible conduct did not lessen the force of any one of the instances for purposes of clearly establishing the violation.  It said:

> The facts that *Gates* found several forms of punishment impermissible does not, as respondents suggest, lessen the force of its holding with respect to handcuffing inmates to cells or fences for long periods of time.  Nor, for the purpose of providing fair notice to reasonable officers administering punishment for past misconduct, is there any reason to draw a constitutional distinction between the practice of handcuffing an inmate to a fence for prolonged periods, and handcuffing them to a hitching post for seven hours. The Court of Appeals' conclusion to the contrary exposes the danger of a rigid over reliance on factual similarity.  *Hope* at 742.

Similarly,  the *Hope* Court analyzed the *Ort* case and found that even though the facts were significantly different, the reasoning gave sufficient "fair warning" to clearly establish the violation.  It said:

> In *Ort v Wright*, 813 F.2d 318 (11th Cir. 1987), the Court of Appeals held that an officer's temporary denials of drinking water to an inmate who repeatedly refused to do his share of the work assigned to a farm squad "should not be viewed as punishment in the strict sense but instead as necessary coercive measures undertaken  to obtain compliance with a reasonable prison rule, i.e., the requirement that all inmates perform their assigned farm squad duties." Id. at 325 "The officer's clear motive was to encourage Ort to comply with the rules and to do the work required of him, after which he would receive the water like everyone else. Id. at 325." The Court cautioned, however, that a constitutional violation might have been present "if later, once back at the prison, officials had decided to deny [Ort] water as punishment for his refusal to work." Id. at 326.  So too would a violation have occurred if the method of coercion reached a point of severity such that the recalcitrant prisoner's health was at risk.  Ibid.  Although the facts in the case are not identical, *Ort's* premise is that "physical abuse directed at [a] prisoner *after* he terminate[s] his resistance to authority would

25

constitute an actionable eighth amendment violation." Id. at 324. This premise has clear applicability in this case. Hope was not restrained at the worksite until he was willing to return to work. Rather, he was removed back to the prison and placed under conditions that threatened his health. *Ort* therefore gave fair warning to respondents that their conduct crossed the line of what is constitutionally permissible. *Hope* at 743. (Emphasis added)

The Eleventh Circuit has since held that while officials must have fair warning that their acts are unconstitutional there may not be a case "on all fours" with materially identical facts. *Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004). The *Holloman* Court went on to point out that the *Hope* opinion abrogated several Eleventh Circuit rules with regard to when a law is clearly established. *Holloman* says: "we need no longer focus on whether the facts of a case are materially similar to prior precedent." *Holloman* at 1278. The Court also noted that it is no longer appropriate to just compare facts of an instant case to prior cases to determine if a right is clearly established, but that the Court is also to assess whether the facts fall within statements of general principle from existing precedents. *Holloman* at 1278. *Holloman*, following *Hope*, said that now the salient question is whether "the state of the law at the time of the event in question gave respondents fair warning that their alleged treatment of the Plaintiff was unconstitutional." *Holloman* at 1278, quoting *Hope* at 2516. In light of this standard, Plaintiff submits that the case law and legal principles set out below clearly establish the constitutional violations alleged.

## DEFENDANTS SUBJECTED PLAINTIFF TO CONSTITUTIONAL DEPRIVATIONS WITH REGARD TO HIS MEDICAL CARE

Defendants, Owens, Roberson, Bradley and Wilson violated Plaintiff's constitutional

rights with regard to Plaintiff's need for medical attention when they failed to reasonably and timely respond to his seizure, his broken teeth, and his deteriorating health condition which resulted in his suffering drug induced hepatitis and hepatic encephalopathy.   It is well established in this Circuit that jail officials' deliberate indifference to prisoners' serious medical needs give rise to constitutional claims. *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994).   It was clearly established law at the time of Plaintiff's incarceration that a jail official's knowledge of the need for medical care and intentional refusal to provide that care constituted deliberate indifference.   See, *Harris v. Coweta County* at 393.   Similarly delay in treatment of serious and painful injuries was also clearly recognized as rising to the level of constitutional claim. *Harris v. Coweta County* at 393.

With  respect to Plaintiff's seizures, on  November 21, Plaintiff fell and reported having a seizure to Defendants.   On November 25, Matt Hilyer, an official from Cheaha Mental Health, came to the jail to evaluate Plaintiff.   Hilyer informed Defendants in his evaluation that Plaintiff needed to have a medical doctor evaluate Plaintiff for seizures. Defendants each knew about this.    Roberson said that she regularly discussed Plaintiff's medical condition with Owens and informed other jail staff members.

Prison officials have an obligation to take action or to inform competent authorities once those officials have knowledge of a prisoner's need for medical or psychiatric care. *Waldrop v. Evans*, 871 F.2d 1030-1036 (11th Cir. 1989); citing *Estelle v Gamble*, 97 S. Ct. 285 (1976). Here, Defendants were well aware of Plaintiff's need for evaluation procedures

because Hilyer had told them so. But they did not follow the recommendations. Roberson testified that she would not call a doctor for a seizure evaluation when she did not know that the Plaintiff actually had a seizure. Defendants took this position despite Plaintiff's report of seizure and Hilyer's evaluation that Plaintiff needed to be evaluated by a doctor for seizures. It was clearly established at the time that Plaintiff was incarcerated that the right medical care included diagnostic tests known to be necessary, not just medicinal and surgical care. *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994); citing *H.C. by Hewett v Jarrard*. 786 F.2d 1080, 1086 (11th Cir. 1986). And failure to administer physician prescribed medication to a prisoner demonstrates deliberate indifference to the prisoner's rights. See, *Aldridge v Montgomery*, 753 F.2d 970, 972-973 (11th Cir. 1985)

Instead of addressing Plaintiff's problems with seizures Defendants only addressed Plaintiff's physical injuries that resulted from the falls he had when he had seizures. They sent him to Dr. Weaver on November 26, and to Russell Hospital emergency room on November 26. They called the county EMT's on December 9, and sent him to Dr. James on December 11, 2003. But defendants did not inform any of these medical authorities of Kelley's need to be evaluated for seizures. These medical authorities merely addressed the physical consequences of the falls when he had the seizures.

It is significant that all the Defendants knew that Plaintiff's seizures posed an obvious serious risk to the Plaintiff. That was the reason they gave for putting him in the hole, because he was unsteady and a fall risk. It was obvious that he could injure himself because

28

he already had. Roberson and Owens say that it was discussed among the staff. But instead of having him evaluated for seizures Defendants chose to follow the easier, but less efficacious course of putting Plaintiff in a 6' X 8' cell.

Roberson  expressed the opinion that there was nothing any medical professional could do when someone had seizures.  At the same time she and Owens expressed doubts that Plaintiff actually suffered from seizures, but thought he was faking it. When this is taken together with her statement that all the jail staff were exhausted with Plaintiff's awful behavior, a jury could conclude that the decision to put Plaintiff in the tiny cell was punitive in nature.  As a consequence of defendants' decision to not get Plaintiff evaluated for seizures as recommended by Hilyer, Plaintiff continued to have numerous seizures while he continued to be confined in the jail.

Grossly incompetent medical care, or a choice of an easier but less efficacious course of treatment, can constitute deliberate indifference. *Waldrop v. Evans*, 871 F.2d at 1035; *Rogers v Evans*, 792 F.2d 1052, 1058, (11th Cir. 1986). Grossly inadequate care can constitute deliberate indifference. *Waldrop* at 1033.  Likewise, medical treatment so grossly incompetent, inadequate or excessive as to shock the conscience constitutes deliberate indifference.  *Waldrop* at 1033.  From December 16 until Plaintiff was taken to the emergency room on January 16 the only medical doctor who he saw was Dr. James on January 7.  Plaintiff did not see Dr. James for an evaluation of his seizure problem, he saw him for a rash and Dr. James did lab tests to check on his liver.  In the intervening twenty-

two days, Plaintiff had been under what Defendants referred to as medical observation, though no doctor had seen the Plaintiff and though Plaintiff continued to have seizures.

It was clearly established at the time Plaintiff was incarcerated in the Coosa County Jail that if an inmate's medical condition was either life threatening or urgent, and would be significantly exacerbated by delaying treatment until after the first seizure then, Defendants should have known that their decision to withhold treatment until Plaintiff had a seizure amounted to deliberate indifference. *Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1425 (11th Cir. 1997). Here, it was obviously life threatening or urgent. It was obvious that the risk of a seizure was not simply a injury from a fall, but also a choking hazard from swallowing his tongue. Jailor Green noted that he checked for this when Plaintiff fell on December 16 (Roberson depo, ex. 16, pl.ex. 2)

Similarly, it is clearly established law that removal of a seriously ill patient from the hospital and confining him in a jail with no medical facilities to be under observation of untrained personnel amounts to deliberate indifference. See, *Lancaster* at 1426; citing *Morrison v Washington County, Alabama*, 700 F.2d 678, 686 (11th Cir. 1983). Here, Defendants, knowing that Plaintiff was continuing to have seizures, elected to confine him in the hole with no medical facilities and under the observation of untrained personnel instead of having him evaluated for seizures by a doctor. This constituted deliberate indifference regarding Plaintiff's health and subjected him to unconstitutional amount of pain and risk of injury. In light of the well established case law when Plaintiff's serious medical

30

condition was obvious enough for all Defendants to put the plaintiff in the hole for 'medical observation' due to the serious risk of seizures, so leaving him there rather than having him evaluated for seizures was deliberate indifference of clearly established constitutional rights..

With respect to Plaintiff's complaint of broken teeth. Plaintiff informed Defendants in writing on December 27 he had a toothache. He also testified that he told Defendants Roberson and Wilson that Bradley had broken his teeth. Roberson also testified that she kept Owens informed of Plaintiff's medical complaints on an ongoing basis. Inadequacy of dental care has been held to constitute a serious medical condition. See *Farrow v. West*, 320 F.3d 1235, 1243-44 (11th Cir. 2003). The Eleventh Circuit held that a serious medical need is considered one diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Hill v DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994).

Here, Roberson testified that she understood that people who had broken teeth often had infections that went along with them that required antibiotic treatment. In fact, she said that is usually the case. So under the present facts it was obvious that Plaintiff's broken teeth were a serious medical situation. Moreover, cases stating a constitutional claim for immediate or emergency medical treatment concern medical needs that are obvious even to a lay person because they involve life threatening conditions or situations where it is apparent that delay will exacerbate the medical problem. See, *Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1425 (11th Cir. 1997).

31

If necessary medical treatment were delayed for non-medical reasons a case of deliberate indifference has been made out . *Ancata v Prison Health Services, Inc.*,769 F.2d 700, 704 (11th Cir. 1985). Delay in access to medical attention can violate an inmate's constitutional rights when it is tantamount to unnecessary and wanton inflection of pain. *Hill v DeKalb Regional Youth Detention Center* at 1187. Failure to provide prompt attention to serious medical needs by delaying medical treatment for non-medical reasons constitutes deliberate indifference. See *Thomas v Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988). Even if medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying treatment for serious medical needs even for hours. See, *Harris v Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994). Here, the Defendants' failure to address Plaintiff's broken teeth for two and a half weeks, without any medical explanation, and no pain medication in the intervening time, will permit an inference of deliberate indifference for Plaintiff's serious medical condition.

After Defendants put Plaintiff in the hole December 16, Plaintiff continually and on a daily basis complained that he was sick, along with a variety of complaints including that he was cold, that he was suffering shocking feelings, that he was suffering weak spells, that he was experiencing numbness, that he was hallucinating, that he was dehydrated, that his urine was turning black, and that he had blood in his urine. Plaintiff's mother's diary records a situation of steady decline in plaintiff's health. Defendant Roberson confirmed he complained all of the time, making the same complaints over and over. She kept Owens

apprized of Plaintiff's medical developments and Plaintiff's continuing complaints were known by all jail staff.

Despite Plaintiff's ongoing complaints, he was not evaluated for these complaints until January 7, 2004, a twenty-three day period. Plaintiff was then treated for a rash and liver tests were done that showed he had abnormal liver values. Plaintiff was returned to the hole until taken to the emergency room on January 16, where he was diagnosed as suffering from a life threatening advanced state of hepatitis and hepatic encephalopathy and transferred to the ICU. Hepatic encepalophaty is an advanced stage of hepatitis where one's mental facilities are compromised because of the liver toxins. (Dr. Law depo. pg. , pl. ex. 4) This is a condition that, together with the drug induced hepatitis, if left untreated can be fatal. (Dr. Law depo. pg. , pl. ex. 4)

In this Circuit it has been held that an inmate's constant complaining about pain he was having is sufficient to bring a jury question as to whether prison official was aware of substantial risk of harm to the Plaintiff. See, *McElliott v Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999). A Plaintiff's constant complaint about pain has been held to create a jury question as to whether jail officials were aware that the Plaintiff was in need of medical treatment to address the pain. *McElliott v Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999). It was clearly established at that time that when one takes insufficient action that is tantamount to taking no action. See, *McElliott v Foley*, at 1258-9. When prison guards ignore, without explanation, a prisoner's serious medical condition that is known or obvious to them, then deliberate

indifference may be incurred. *Bozeman v Orum*, 422 F.3d 1265, 1274 (11th Cir. 2005). A jury could find that this describes how Defendants responded to Plaintiff's constant complaints.

Similarly, in *Carswell v. Bay County*, 854 F.2d 454 (11th Cir. 1988) the Plaintiff over the course of eleven weeks repeatedly requested medical treatment, complaining of rash, constipation and weight loss. He also made numerous written and oral requests for medication and medical attention. He was labeled a complainer and on some occasions he was given Milk of Magnesia and on some occasions he was ignored. The Eleventh Circuit held that the jail administrator and the physician's assistant were properly found guilty of deliberate indifference. They had knowledge of the plaintiff's need for medical care but did virtually nothing. Here, Defendants were aware of Plaintiff's need for medical care and his declining condition, but delayed providing him any medical attention until he had abnormal liver values and then the only medical attention he was provided was treatment for a rash. Plaintiff continued to be kept without medical attention for an additional nine days until he was suffering from advanced hepatitis and hepatic encephalopathy where he had to be rushed to the emergency room and admitted to the hospital ICU. Because Defendants knew but did almost nothing for Plaintiff's serious medical conditions concerning his seizures, his broken teeth, and his declining physical health, Defendants violated Plaintiff's constitutional rights. For this reason Summary Judgment is not appropriate.

## DEFENDANTS SUBJECTED PLAINTIFF TO CONSTITUTIONAL DEPRIVATIONS WITH REGARD TO THE JAIL CONDITIONS

In this case Plaintiff has alleged jail conditions that injured him and that Defendants, Owens, Wilson, Roberson, and Bradley were aware of. These were clearly established as being constitutional violations at the time Plaintiff was incarcerated.. Various conditions "alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency." *Rhodes v Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399 (1981).   W i t h regard to Plaintiff's jail conditions claim the District Court should expressly consider the claims together, using a totality of conditions test. *Hamm v. DeKalb County*, 774 F.2d 1567, 1576 (11th Cir. 1985).

Defendants  were aware that Plaintiff was in the solitary cell called the hole.  Plaintiff was required to sleep on the concrete floor on a thin plastic mat even though Defendants knew Plaintiff had back surgery and had recently injured his back again when he had fallen. The hole did not have running water or a toilet.  Urinating and defecating was done in a drain hole in the center of the floor beside the plastic mat where Plaintiff was required  to sleep. He could not flush the drain hole. Only jail staff outside  could flush it and it was not flushed for hours and on some occasions for days leaving urine feces accumulated where Plaintiff was forced to sleep.

Plaintiff had toilet paper taken away from him.  Plaintiff was not given water for hours at a time when he was constantly thirsty and calling to the Defendants for a drink of water.  He became dehydrated and his urine turned black.  Plaintiff was denied access to a

shower or means to perform personal hygiene for extended periods and on at least two occasions for three or four days at a time. Defendant Owens covered the window with card board and Plaintiff was denied toilet paper. Plaintiff was required to wipe himself with candy wrappers.

Plaintiff was repeatedly cold and freezing and complained to the Defendants that he was cold but nothing was done about it. There were bugs on the floor of the hole . He was not let out for exercise and his deteriorating heath was exacerbated by his being confined to such a small place. Plaintiff complained that he was bi-polar and he could not take being confined to the hole. (Roberson depo. exhibit 18, pl. ex. 2)

A situation similar to the present one has been held to be unconstitutional. In *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974). The court found the following situation to be unconstitutional.

> In addition, each side has one 6' X 6' cell, known as the dark hole, with no lights, commode, sink or other furnishings. A hole in the concrete floor is located in the middle of the cell and is approximately 6' in diameter that will flush to dispose of body wastes. A heavy metal door without a window closes the cell. For solitary confinement at Parchman the inmates are placed in the dark hole, naked, without any hygienic material, without any bedding, and often without adequate food. It is customary to cut the hair of an inmate confined in the dark hold by means of heavy-duty clippers. Inmates have frequently remained [sic] 7968 also expressly discourages corporal [sic] `and may be confined there for up to seventy-two hours. While an inmate occupies the dark hole, the cell is not cleaned, nor is the inmate permitted to wash himself. Even under the restrictive standards for determining cruel and unusual punishment enunciated in Novak, this solitary confinement in the dark hole at Parchman undoubtedly meets the test as found by the district court. It is unassailable that the solitary confinement of naked persons in MSU's dark hole, without any hygienic materials, any bedding, adequate food or heat,

36

without opportunity for cleaning either themselves or the cell, and for longer than twenty-four hours continuously, is constitutionally forbidden under the Eighth Amendment.
*Gates* at 1305.

The facts in this case similar to those in *Gates* are that Plaintiff was held in a solitary cell with no commode, sink or other furnishings. There was a hole in the middle of the cell that would flush to dispose bodily waste. The door was without a window (because Defendant Owens covered it). Plaintiff was in the cell without any hygienic material after Owens directed the Plaintiff's toilet paper to be removed. The cell was only cleaned two times in the thirty-one days Plaintiff was in it. There were two occasions which Plaintiff went for three or four days without being permitted to wash himself. The differences are that in *Gates* there were no lights, inmates were put in the "dark hole" naked and without any bedding and often without adequate food. Inmates in the "dark hole" often had their hair cut.

On the other hand, here, while Plaintiff was given a plastic mat to lie on it was insufficient against the cold. Several factors made the Plaintiff's situation worse than in *Gates*. Unlike in *Gates,* there were bugs on the walls. Unlike *Gates*, Plaintiff was in the hole for thirty-one days instead of the twenty-four to seventy-two hours. While it was true that Plaintiff was taken out to shower once or twice a week, allowed to go to the restroom outside the hole, it is undisputed that the overwhelming amount of Plaintiff's time was spent locked in the confines of the six by eight cell without any way to see out. Unlike <u>Gates</u>, here urine and feces were not flushed for extended periods of time, on several occasions for days and Plaintiff was forced by lie beside the hole filled with human waste. Unlike *Gates*, Plaintiff

here was sick, and his health was obviously declining. Plaintiff was suffering from a serious medical condition, both physically and mentally and he was hallucinating and having seizures.

One of the things the Supreme Court in *Hope v. Pelzer*, 536 U.S. 730 (2002), identified as previously established by *Gates* was depriving inmates of hygienic materials constituted a constitutional violation. See, *Hope* at 742 referencing *Gates* at 1306. Plaintiff's deprivation of water and toilet paper therefore clearly establishes a constitutional violation. Plaintiff went for hours at a time without receiving clean drinking water. The Supreme Court in *Hope* citing Eleventh Circuit precedent of *Ort v Wright* held that the denial of drinking water to an inmate without some legitimate reason violates clearly established constitutional law. In *Ort*, the plaintiff was denied drinking water for as much as two hours. The Supreme Court in *Gates* held that such physical abuse directed at a prisoner when he was not resisting authority violates constitutional rights. So it was clearly established that deprivation of drinking water for several hours would constitute a constitutional violation.

Other Eleventh Circuit cases have held that the treatment that Owens, Roberson, Wilson, and Bradley subjected Plaintiff to is clearly established as violating Plaintiff's constitutional rights. In *Chandler v. Baird* 926 F.2d 1057 (11th Cir. 1991), the Court held that conditions of a cell in which a plaintiff was forced to sleep on the floor, was deprived of running water for two days, was deprived of toilet paper for three days, and where there was filth on the cell floor was sufficient to make out a constitutional violation with regard to cell

temperature and denial of hygiene. The *Chandler* Court said:

> [P]laintiff's description of sleeping on the floor with only underclothes and a mattress with a plastic cover in 60-degree "real cold" temperature was graphic, and his question, "What kind of effect would that have on you?" was sufficient to preserve the issue of harm. Moreover, he later unambiguously stated: "As far as being in solitary confinement or administrative confinement... I'm sure I was depressed from it. *Chandler* at 1066

The *Chandler* Court held that this is evidence of a constitutional violation. The Plaintiff here, among other things suffered from exposure to very cold conditions. Plaintiff has testified that he had repeatedly complained to Defendants that he was cold. When the conditions of cold are taken together with Plaintiff's declining health, sickness, seizures and denial of water, Plaintiff presents a jury question as to whether jail conditions that Defendants subjected him to obviously posed a substantial risk to Plaintiff 's basic human needs and so violated his constitutional rights.

### DEFENDANTS SUBJECTED PLAINTIFF TO CONSTITUTIONAL DEPRIVATION WITH REGARD TO PHYSICAL ABUSE AND/OR FAILURE TO PREVENT PHYSICAL ABUSE

Plaintiff testified that he was subjected to beating by Defendant Bradley and that Defendants Owens, Wilson, and Roberson were aware of it, but they failed to stop Bradley. At the time Plaintiff was subjected to the beatings by Bradley it was clearly established that "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. This is true whether or not significant injury is evident" *Hudson v McMillan*, 503 U.S. 1, 9 (1992). In *Hudson*, the Plaintiff was beaten up by guards while the supervisor watched the beating and told the officers not to have too much

39

fun. Hudson suffered minor bruises and swelling of his face, mouth and lips. The Court held that this was sufficient to establish a constitution of violation not only against the guards McMillan and Woods, but also against the supervisor. Likewise in *Gates v Collier*, 501 F.2d 1291, 1306 (5th Cir. 1994) the Fifth Circuit held that whipping inmates and instances of physical brutality and abuse which was acquiesced in by prison officials violated Plaintiff's constitutional rights.

Supervisor liability under §1983 occurs when a supervisor personally participates in the unconstitutional conduct or there is a causal connection between his action or inaction and the alleged constitutional deprivation. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). A causal connection may be established when there is a history of widespread abuse which puts the responsible superior on notice and he fails to correct the problem, or where a supervisor's custom or policy results in deliberate indifference to constitutional rights, or when facts support an inference that the supervisor directed the subordinate to act unlawfully, or knew that the subordinate would act unlawfully and failed to stop him from doing so. See, *Cottone* at 1360. Similarly, an official can be held liable for failing to intervene when another officer uses excessive force. *Ensley v Soper* 142 F.3d 1402, 1407-8 (11th Cir.1998)

Here Plaintiff spoke to Owens about stopping Bradley from beating him. Owens also knew that Bradley had a drinking problem. Plaintiff also spoke to Wilson about stopping Bradley from beating him, and he reported to Wilson and Roberson that Bradley had kicked him and broken his teeth. Plaintiff also testified that Wilson witnessed Bradley beating him

but did nothing to stop it and Roberson helped Bradley carry him to the bathroom when he had blood on him from a beating. This is sufficient evidence that Defendants Wilson, Owens, and Roberson knew Bradley was beating the Plaintiff but failed to stop him.

Likewise, evidence of Owens laughing and walking away when Plaintiff spoke to him about Bradley beating him is evidence from which a jury could find a custom or policy of deliberate indifference to Plaintiff's constitutional rights. The same applies to Roberson and Wilson when they did not respond to plaintiff's reports of beating and did not stop the beatings which they saw and were made aware were happening. For these reasons Plaintiff's claims for excessive force and failure to prevent excessive force should be allowed to be submitted to a jury.

## CONCLUSION

Plaintiff submits that he has set forth sufficient facts to establish that he has been subjected to constitutional deprivations with regard to medical treatment, jail conditions, excessive force and failure to prevent excessive force. He has identified Circuit precedent that clearly established these rights and he has proffered sufficient evidence that Defendants knew that Plaintiff was at substantial risk of harm because of these deprivations. For these reasons, Plaintiff submits that he is entitled to present his claims to a jury and so Summary Judgment should be denied.

Respectfully submitted,

s/Richard J. Stockham III
State Bar No.STO034
Attorney for the Plaintiff

41

Stockham, Carroll, & Smith P.C.
2204 Lakeshore Drive, Suite 114
Birmingham, Alabama 35209
Telephone (205) 879-9954
Fax: (205) 879-9990
E-Mail: rjs@stockhampc.com

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DANIEL BRYAN KELLY,                  )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )Civil Action No. 2:05-cv-01150-MHT-DRB
                                     )
RICKY OWENS, et al.                  )
                                     )
        Defendants.                  )

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorneys of record:

**Counsel for Ricky Owens:**

Gary L. Willford, Jr.
Email: gwillford@webbeley.com
Kendrick E. Webb
Email: kwebb@webbeley.com

**Counsel for Wendy Roberson,
Terry Wilson, Al Bradley:**

Kristi A. Dowdy
Email: felalaw@bellsouth.net

s/Richard J. Stockham III
State Bar No.STO034
Attorney for the Plaintiff
Stockham, Carroll, & Smith P.C.
2204 Lakeshore Drive, Suite 114
Birmingham, Alabama 35209
Telephone (205) 879-9954
Fax: (205) 879-9990
E-Mail: rjs@stockhampc.com