**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **DANIEL BRYAN KELLY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION NO.: 2:05-cv-1150-T** |
| | ) |
| **RICKY OWENS, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**DEFENDANTS TERRY WILSON, WENDY ROBERSON AND AL BRADLEY'S
REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COME NOW Terry Wilson, Wendy Roberson and Al Bradley, Defendants in the above-styled cause, and submit this Reply Brief in support of their Motion for Summary Judgment.

**INTRODUCTION**

In his Opposition to the Defendants' summary judgment motions, the Plaintiff has identified five claims against these Defendants. First, the Plaintiff alleges that they were deliberately indifferent to Plaintiff's seizure condition by apparently failing to tell the Plaintiff's physicians what the Plaintiff failed to tell them himself. Second, the Plaintiff alleges deliberate indifference on the part of these Defendants to his need for dental treatment because it took 2 1/2 weeks – the beginning of which was over the New Year's holiday – to get him to a dentist. Third, the Plaintiff alleges that Terry Wilson, Wendy Roberson and Al Bradley were deliberately indifferent to his "deteriorating health condition" that resulted in him being hospitalized for apparent drug-induced hepatitis. Fourth, the Plaintiff alleges that the Defendants subjected him to unconstitutional conditions of confinement. Finally, the Plaintiff asserts that Al Bradley used

1

excessive force against him and that Terry Wilson and Wendy Roberson were deliberately indifferent to the risk posed by Al Bradley's alleged assaults upon him. (Doc. 112 at p. 2).

The Plaintiff argues that each of his claims should go to the jury on little more than his self-serving testimony, despite the United States Supreme Court's recent pronouncements on the subject in <u>Scott v. Harris</u>, 127 S. Ct. 1769, 1776 (2007) (stating, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") When the record is taken as a whole – the view of the evidence the Supreme Court mandated in <u>Scott</u> – no reasonable jury could find in the Plaintiff's favor. Accordingly, for the reasons stated in these Defendants' principal brief, and as further elaborated upon below, the Court should grant these Defendants' Motion for Summary Judgment.

## FACTS

The Plaintiff's Statement of Facts requires a brief response. As an initial matter, any discrepancy between the parties' respective facts statement must be viewed in light of the detailed stipulations contained in the Pre-trial Order recently issued by the Court. (Doc. 109 at pp. 7-11 ). The parties are bound by the following stipulations:[1]

(a)     The Plaintiff was incarcerated in the Coosa County Jail on Thursday, November 13, 2003, after failing a drug test in Court, in violation of his probation.

(b)     The Plaintiff remained in the Coosa County Jail until January 16, 2004, when he was transported to Russell Medical Center.

(c)     At all relevant times, the Sheriff of Coosa County was Ricky Owens.

---

[1] For ease of reference, the same numbering contained in the Pre-trial Order is retained here.

(d)     At all relevant times, Terry Wilson was a Coosa County deputy sheriff serving as the jail administrator of the Coosa County Jail.

(e)     At all relevant times, Wendy Roberson was a jailer with the rank of sergeant in the Coosa County Jail.

(f)     The Coosa County Jail has two holding cells located in the booking/dispatch area of the jail.

(g)     The holding cells do not have a sink, shower or standard toilet located within them.  There is, however, a flushable in-ground toilet located in the middle of the floor.  The in-ground toilet is primarily used for urination although it could be used for defecation.  The in-ground toilet cannot be flushed from inside the cell. There is button on the outside of the holding cells that flushes the in-ground toilet.

(h)     The holding cells have a concrete bench wide enough for an average sized person to lay down upon.

(i)     There are no telephones in the holding cells.

(j)     Each cell has a camera mounted within it so the inmate(s) in the cell can be monitored from the tower at all times.

(k)     Upon incarceration at the Coosa County Jail, inmates are provided with a copy of the Coosa County Jail Inmate Rules and Regulations.

(l)     The Plaintiff was provided with a copy of the Rules and Regulations.

(m)     On the date the Plaintiff was incarcerated he was taking only two medications: Zyprexa and Lorcet Plus.

(n)     The Plaintiff was out of his medication on the date he was incarcerated.

(o)     The Plaintiff's mother was made aware by Defendant Roberson that the jail would administer any medications brought to the jail pursuant to the jail policy.

3

(p)    On November 25, 2003, the Plaintiff was evaluated by Matt Hillyer from Cheaha Mental Health.    The Plaintiff reported to Mr. Hillyer that he was taking the following medications: Clonazepam – 2mg; Neurontin – 300 mg; Zyprexa – 5 mg; Phenobarbital – 60 mg; and Seroquel – 200 mg.    Mr. Hillyer's note was faxed to Dr.  Weaver and an appointment was made for the Plaintiff to see Dr. Weaver on the following day.

(q)    Dr. Weaver was the doctor that was used by Coosa County Jail for inmate care. When Dr. Weaver was unavailable, Dr. James in Alexander City was the doctor that was used for inmate medical care.

(r)    On November 26, 2003, the Plaintiff was seen by Dr. Weaver for medication check and to check for a possible fracture to the Plaintiff's foot.

(s)    The Plaintiff was taken to Russell Medical Center Emergency Room on November 26, 2003, to have his foot x-rayed.

(t)    The Plaintiff's foot was x-rayed and the radiology report indicates there was no fracture or dislocation.  The impression was that there was no evidence of acute right ankle injury.  The Plaintiff's foot was wrapped with an ace bandage and he was told to use Tylenol for pain.  No prescriptions were given to the Plaintiff.

(u)    The records from Crew Drug Store in Rockford, Alabama, indicate the following medications were filled for the Plaintiff:

**November 26, 2003**:
Zyprexa – 5 mg (14 tablets)
Clonazepam (28 tablets)
Neurontin (42 tablets)
Seroquel (42 tablets)
Phenobarbital (28 tablets)

**December 9, 2003:**
Zyprexa (14 tablets)
Clonazepam (28 tablets)
Neurontin (42 tablets)
Seroquel (42 tablets)

4

Phenobarbital (28 tablets)

**December 12, 2003:**
Methocarbamol 28 tablets

**December 26, 2003:**
Zyprexa – (16 tablets)
Clonazepam – (32 tablets)
Neurontin – (48 tablets)
Seroquel – (48 tablets)
Phenobarbital (32 tablets)

**January 2, 2004**
Methocarbamol (28 tablets)
Zyprexa – 10 mg (28 tablets)

**January 6, 2004**
Clonazepam – (14tablets)
Neurontin – (42 tablets)
Seroquel – (42 tablets)
Phenobarbital (28 tablets)

**January 7, 2004**
Hyproxyzine – (40 tablets)

**January 12, 2004**
Methocarbamol (28 tablets)

**January 15, 2004**
Zyprexa – 10 mg (28 tablets)

(v)     On December 9, 2003, an inmate called the front and advised that the Plaintiff had fallen down the stairs.  The officer in the tower noted that he did not see this fall. The Plaintiff was transported to Russell Medical Center Emergency Room by ambulance.  The Plaintiff was released and returned to the jail where he was placed back in a holding cell for medical observation.

(w)     At the time of the Plaintiff's alleged December 9, 2003 fall, the Plaintiff was being housed on the upper tier of the block. He was reassigned to a cell on the lower level of the block and advised that he was not to use the stairs at all.

(x)    On December 10, 2003, the Plaintiff filled out an Inmate Request Form asking to see a doctor to get his right knee checked and to get his Zyprexa refilled.  An appointment was made for him to see Dr. James on December 11, 2003.

(y)    The Plaintiff was taken to see Dr. James on December 11, 2003. The Plaintiff reported to Dr. James that his shoulder, knee and lower back were hurting.  The Plaintiff's shoulder was injected with two cortisone shots. His other medications remained unchanged.

(z)    On December 16, 2003, the Plaintiff claimed that he fell over a mop bucket and had problems with his head, back and one leg.

(aa)    An ambulance was summoned.  Upon arrival, the EMS determined it was not necessary for the Plaintiff to be transported to the hospital.   EMS advised to place Kelley under medical observation.

(bb)    The Plaintiff was placed in a holding cell.  The Plaintiff remained assigned to a holding cell until he was taken to Russell Medical Center on January 16, 2004.

(cc)    On December 18, 2003, Sheriff Owens met with his jail supervisors and issued orders to the jail staff that the Plaintiff was allowed to have a bath every night and to use the telephone occasionally. Sheriff Owens also ordered that the Plaintiff be allowed to use the restroom in the medical examination room, which was a room located between the two holding cells.  Sheriff Owens also ordered that the Plaintiff be observed by camera continuously and his activities documented.

(dd)    The examination room had its own toilet facilities.

(ee)    On January 2, 2004, Dr. James' records indicate they had received a phone call asking that the Plaintiff's Zyprexa be changed from 5mg to 20mg.  The records indicate that the Plaintiff's mother had initially been incorrect as to the dosage the Plaintiff had been receiving.

The records further indicate that Food World Pharmacy had been contacted to confirm that the Plaintiff had been receiving 20mg of Zyprexa. The Plaintiff's prescription was then changed.

(ff)     An appointment was made for the Plaintiff with Dr. David Currie, a dentist in Sylacauga, and the Plaintiff was taken to see Dr. Currie on January 14, 2004.

(gg)     The Plaintiff was taken to see Dr. John James on January 7, 2004, where the records indicate his present illness as "body rash". Dr. James wrote a prescription for Atarax for the Plaintiff and, in addition, did blood work, which included a CBC with Platelet and a Comprehensive Metabolic Panel.

(hh)     Dr. James records also indicate that the Plaintiff's liver tests on 01/07/04 were abnormal and that the Plaintiff should follow up in 2 weeks.

(ii)     The Plaintiff's incarceration at the Coosa County Jail from November 13, 2003 to January 16, 2004 was for a total of 65 days.

(jj)     Prior to the Plaintiff's incarceration at the Coosa County Jail, the Plaintiff had been hospitalized at Brookwood Hospital in Birmingham, Alabama. The hospitalizations were in July and September of 2003. On both admissions, the Plaintiff was admitted for alcohol abuse, prescription drug abuse and illicit drug abuse. The History and Physical done on both occasions specifically states the Plaintiff has no history of seizures.

(Doc. 109 at pp.7-11).

## FACTS NOT STIPULATED TO BY THE PARTIES

(kk)     The Plaintiff's mother, Wanda Kelley, testified that at the time the Plaintiff was incarcerated that he was not using cocaine regularly. (Exhibit G, p. 89, ll. 7-10; p. 90, ll. 21-23; p. 91, ll. 1-5).

(ll)     On November 23, 2003, the Plaintiff complained that he had slipped and that his back was hurting. The Plaintiff did not report that he had a seizure, only that he had been having

symptoms which he associated with past seizures.  He was brought to the front and placed in one of the holding cells where his blood pressure was taken and where he could be observed.  One of the officers noted that the Plaintiff was observed bending, stretching and walking which contradicted the pain the Plaintiff had reported he was having in his back.  (Exhibit F, part II - November 23, 2003 shift logs).

(mm)   On November 25, 2003, after the Plaintiff met with Matt Hillyer from Cheaha Mental Health, Mr. Hillyer's notes were faxed to Dr. Weaver.  (Exhibit NN).

(nn)    Dr. Weaver testified that the Plaintiff told him that he had a seizure in jail and suffered a fall.  Dr. Weaver does **NOT** state that the Plaintiff had a seizure. (Exhibit OO at ¶ 6).

(oo)    Dr. Weaver's notes indicate the Plaintiff told him that he had been having seizures for 2 ½ years. (Exhibit OO).

(pp)    The Plaintiff testified that he does not recall having seizures prior to his incarceration at the Coosa County Jail.  (Exhibit G, p. 57, ll. 7-17).

(qq)    On July 28, 2003, the Plaintiff was seen by Dr. Ammar Aldaher at Coosa Valley Medical Center for dehydration and a urinary tract infection.  Dr. Aldaher's notes specifically state that the Plaintiff does not have a seizure disorder.  (See Exhibit AAA, July 28, 2003 records of Coosa Valley Medical Center).

(rr)    The Plaintiff was seen at Russell Medical Center on November 26, 2003, following his visit to Dr. Weaver.  The notes from Russell Medical Center state that the Plaintiff reported injuring his ankle when he slipped on jail steps.  There is no mention of the Plaintiff reporting that he had a seizure.  The historian of the information provided is listed as the patient. The records do, however, reflect the Plaintiff reported having seizures in his past medical history. In addition, there is no mention of any abuse being reported by the Plaintiff or of there being any finding of any abuse by any physician who examined the Plaintiff.  (Exhibit O).

(ss)    On the evening of November 27, 2003, the Plaintiff did not come out of his cell for headcount.  An officer went up to his cell and found the Plaintiff asleep.  The Plaintiff advised that he did not need his bedtime medication and not to come to his cell and bother him again.  The Plaintiff was put on a semi-suicide watch and taken to a holding cell for medical observation.  (Exhibit F, November 27, 2003 shift logs).

(tt)    After being placed in a holding cell, the Plaintiff fell on the floor and claimed he had a seizure.  The fall was noted from one of the officers in the tower, indicating the fall was witnessed.  The Plaintiff was placed on a mattress on the floor and his blood pressure was taken.  Within an hour, the Plaintiff was sleeping soundly.  Several hours later, the Plaintiff was up beating on the door asking to be returned to B-Block.  He advised that he would not have another "seizure" for at least another week. (Exhibit F, November 27 -28, 2003 shift logs).

(uu)    The medical records from Russell Medical Center of December 9, 2003, indicate the Plaintiff fell landing on the concrete floor.  There is no indication that the Plaintiff told the nurse/doctor at the hospital that he had had a seizure.  Likewise, there is no mention of any abuse being reported by the Plaintiff or of there being any finding of any abuse by a physician who examined the Plaintiff.  (Exhibit X).

(vv)    On November 10, 2003, the Plaintiff saw Dr. John James, advising that he had just moved back from Tennessee and needed a doctor.  There is no indication in Dr. James' notes from this date that the Plaintiff advised him that he suffered from seizures or a seizure disorder. (Exhibit AA).

(ww)   On November 13, 2003 (the same day the Plaintiff was incarcerated), Dr. James' records indicate that the Plaintiff's father came to the office stating that the Plaintiff's car had been stolen with his medication in it and the Plaintiff was "beat up too bad to come to office".  The Plaintiff's father was requesting refills on the Plaintiff's medications.  (Exhibit AA).

9

(xx)     On December 11, 2003, when the Plaintiff saw Dr. James, he advised him that he had a history of seizures.  Dr. James notes that the Plaintiff was complaining about his shoulder, knee and lower back hurting.  Dr. James did a physical examination of the Plaintiff.  There is no mention of the Plaintiff reporting any abuse or of any finding of abuse by Dr. James when he examined the Plaintiff.  (Exhibit AA).

(yy)     The Plaintiff testified that when he has a seizure, they just keep him from hitting his head or swallowing his tongue and then he calms down.  (Exhibit G, p. 58, ll. 9 - 13).

(zz)     On December 27, 2003, the Plaintiff filled out an Inmate Request Form requesting to see a dentist because his right tooth was hurting.  There is no indication on the Request Form that he had teeth that were broken or that he believed it was urgent that he see a dentist.  (Exhibit CC).

(aaa)     There was only one dentist in Coosa County during the time the Plaintiff was incarcerated.  If that dentist was not available to see inmates, the inmates had to be taken to Sylacauga for dental care.  The appointments are based primarily on when the dentist can take a patient.  There is no indication the Plaintiff was not taken to the first available appointment with the dentist. (Exhibit C, p. 230, ll. 17-23; p. 231, ll. 1-23; p. 232, ll. 1-9).

(bbb)     The Plaintiff was taken to Dr. Currie, a dentist in Sylacauga, on January 14, 2004. (Exhibit DD).

(ccc)     The Plaintiff completed a medical history form while at Dr. Currie's office.  The Plaintiff marked that he did not suffer from seizures/epilepsy on the form; that he was not suffering from any other medical condition that he felt Dr. Currie needed to be aware; and that he was only under the care of a physician for his back problems.  (Exhibit DD).

(ddd)     The Plaintiff saw Dr. James again on January 7, 2004, for a rash.  There is no mention in Dr. James' records that the Plaintiff complained to him of any pain in his mouth or

any pain in any of his teeth. Dr. James does not note that the Plaintiff was dehydrated, crying, or depressed. Again, there is no mention of Dr. James being told of any abuse by the Plaintiff or of any finding of abuse by Dr. James following his physical examination of the Plaintiff. (Exhibit AA).

(eee) While the Plaintiff was in a holding cell, he was monitored by a camera at all times. (Exhibit B).

(fff) The Plaintiff testified that Defendant Bradley cracked two of his ribs and that this was confirmed by Dr. Vincent Law at Russell Medical Center when he was taken on January 16, 2004. (Exhibit G, p. 129, ll. 10-23).

(ggg) Dr. Law testified that he performed a physical examination of the Plaintiff on January 16, 2004, and that he did not find any broken ribs. Dr. Law did not find any indication of physical abuse and the Plaintiff did not report any abuse to him. (Plaintiff's Exhibit 4, p. 128, ll. 13-23; p. 129, ll. 1-23).

(hhh) The Plaintiff did not report any abuse to Dr. Law during the four days he was in the hospital from January 16-20, 2004. (Plaintiff's Exhibit 4, p. 132, ll. 11-15).

(iii) The Plaintiff did not report any abuse to Dr. Law when he saw him again during a hospitalization which began on January 28, 2004. (Plaintiff's Exhibit 4, p. 132, ll. 22-23; p. 133, ll. 1-1-23; p. 134, ll. 1-6).

(jjj) The Plaintiff was again seen by Dr. Law in May, July and November 2004. The Plaintiff did not mention any abuse to Dr. Law on any of those visits. (Plaintiff's Exhibit 4, p. 134, ll. 7-15).

(kkk) Dr. Law did not note any seizure disorder during the May, July or November 2004, examinations of the Plaintiff. (Plaintiff's Exhibit 4, p. 134, ll. 20-23; p. 135, ll. 1-3).

(lll)    Dr. Law testified that the Plaintiff's elevated liver enzymes could have changed significantly from January 7, 2004, to January 16, 2004, within a twenty-four hour period of time. (Plaintiff's Exhibit 4, p. 151, ll. 19-23; p. 152, ll. 1-23, p. 153, l. 1).

(mmm)  Dr. Law testified that if the Plaintiff had advised him that he was not getting sufficient fluids prior to his January 16, 2004, that he would have noted it in his records. (Plaintiff's Exhibit 4, pg. 146, ll. 22-23; pg. 147, ll. 1-4).

## ARGUMENT

Terry Wilson, Wendy Roberson and Al Bradley are entitled to qualified immunity and judgment in their favor as a matter of law.  In his Opposition, the Plaintiff does not dispute that any of the Defendants were acting within his discretionary authority at all relevant times.  (Doc. 112 at p. 19).  Consequently, the entirety of the qualified immunity burden rests on the Plaintiff's shoulders for purposes of the instant motion.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Specifically, the Plaintiff must demonstrate that the record, taken as a whole, creates a genuine issue of material fact as to whether these Defendants violated one or more of his federally protected rights.  Id. Additionally, the Plaintiff must demonstrate that clearly established law provided fair warning to the Defendants that his conduct was unlawful.  Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003).

As an initial matter, this brief will address the Plaintiff's argument that the ground-breaking change in the summary judgment standard announced in Scott was essentially limited to the facts of that case.  Next, this brief will refute the Plaintiff's arguments that the record contains sufficient evidence of a constitutional violation.  Finally, this brief will address the lack of clearly established law that provided the Defendants with the requisite fair warning.

## I.    <u>SCOTT V. HARRIS</u> IS NOT LIMITED TO ITS FACTS.

On pages 19 through 21 of Plaintiff's opposition brief, Kelly attempts to distinguish the recent Supreme Court ruling in <u>Scott v. Harris</u>, 127 S. Ct. 1769, 1776 (2007) and its emphasis on what evidence a reasonable juror might find persuasive: "*When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.*" <u>Id</u>. (Emphasis added).  Kelly apparently takes the position that the Court's reasoning in <u>Scott</u> can be applied only to cases involving the following three elements:  (1) "a car chase"; (2) a situation where "The Plaintiff and Defendant told two different stories"; and (3) "[a] video contradicted the Plaintiff's version of the story."  <u>See</u> Plaintiff's Opposition Brief, at p. 20.

Of course, Kelly can cite no authority whatsoever for his very narrow reading of <u>Scott's</u> application. To the contrary, several cases have applied <u>Scott</u>'s analysis to a variety of contexts where there was no car chase or videotape involved.  <u>See Skylstad v. Reynolds</u>, 2007 WL 2766436 at *2 (9th Cir. 2007), <u>Williams v. Martin</u>, 2007 WL 4139476 (N.D. Ga. Oct 29, 2007); <u>see</u> <u>Morales-Arcadio v. Shannon Produce Farms, Inc.</u> 2007 WL 2106188, *9 (S.D. Ga. 2007). These cases were cited in Defendants' initial memorandum brief and remain unrebutted and undistinguished.

The best the Plaintiff can do is to rely on two cases which fail to cite or discuss <u>Scott v. Harris</u> and its impact on the standard for summary judgment—one of which was released eleven years *prior to* <u>Scott's</u> release.  <u>See</u> Doc. 112, p. 20.  Significantly, neither case addresses scenarios where qualified immunity is a defense, as here.  And, while these cases stand for the general proposition that a Plaintiff's testimony alone can establish a genuine issue of fact, neither address a situation like the instant one where the Plaintiff's version of the story "is blatantly

contradicted by the record, so that no reasonable jury could believe it." <u>See</u> 127 S. Ct. at 1776. Kelly's exaggerated claim are not only contradicted by voluminous jail records and the unanimous testimony of the jail staff, they also run contrary to the objective medical records and testimony in evidence. <u>Compare Skylstad,</u> 2007 WL 2766436 at *2 - *3 ("The medical evidence, however, directly contradicts Skylstad's version of events. Although the dog bite was serious and required medical attention, there is no medical evidence of multiple dog bites, head injury, or cuts on the arms. . . . In summary, Skylstad failed to raise a triable issue for a jury on his claim of excessive force.")

Respectfully, this Court should apply the "no reasonable jury" emphasis in <u>Scott</u> to the record in this case and grant the Defendants' motion for summary judgment based on qualified immunity.

## II. DEFENDANTS WILSON, ROBERSON AND BRADLEY DID NOT VIOLATE THE PLAINTIFF'S FEDERALLY PROTECTED RIGHTS.

As stated in the Opposition, the Plaintiff has four kinds of federal claims against these Defendants: (1) deliberate indifference to three different allegedly serious medical conditions; (2) unconstitutional conditions of confinement; (3) failure to stop Al Bradley's alleged abuse of the Plaintiff (Wilson and Roberson only); and (4) excessive force (Bradley only). (Doc. 112 at p. 24). Each of the first three types of claims relies upon there being sufficient evidence in the record that the Defendants deliberately indifferent to a serious to the Plaintiff posed by the conditions of which the Plaintiff complains. The parties appear to be in agreement as to the general law with respect to what is required to show deliberate indifference – i.e., subjective awareness of a risk by an official and disregard of the risk by the official. <u>Farmer v. Bennan</u>, 511 U.S. 825, 847 (1994). The parties also are in agreement that the last claim, excessive force, must be analyzed under the Fourteenth Amendment. However, as set forth in the principal brief and

discussed further below, the Defendants did not violate any right to which the Plaintiff was entitled.

    **A.    Terry Wilson, Wendy Roberson, and Al Bradley were not deliberately indifferent.**

        **1.    <u>The Defendants were not deliberately indifferent to the Plaintiff's medical needs.</u>**

The Plaintiff alleges that the Defendants were deliberately indifferent to three serious medical conditions. First, the Plaintiff asserts that he had a "seizure" condition. Second, the Plaintiff complains that the Defendants took too long to get him to the dentist for a toothache. Finally, the Plaintiff asserts that the Defendants ignored his allegedly deteriorating medical condition after he was assigned to the holding cells on December 16, 2003. (Doc. 112 at pp. 26-34). The evidence in the record is not sufficient to carry the Plaintiff's burden on any of these claims.

            **a.    The Plaintiff did not have a seizure condition for which Terry Wilson, Wendy Roberson or Al Bradley could have been deliberately indifferent.**

The Plaintiff's seizure claim falls apart at the first hurdle – the existence of a serious medical condition. <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003). In short, there is no evidence in the record whatsoever, that the Plaintiff had a seizure condition other than the Plaintiff's unqualified claim that he had seizures (there is nothing in the record that would establish the Plaintiff's qualification to diagnose himself with a seizure condition). To the contrary, the evidence in the record shows that the Plaintiff created his so-called "seizure disorder". Prior to the Plaintiff's November 13, 2003, incarceration, the Plaintiff had been seen by numerous doctors and had been admitted to several hospitals. The most recent medical records prior to the Plaintiff's incarceration, from two different hospitals and Dr. James, specifically state that the Plaintiff did not suffer from any seizures or epilepsy. (Brookwood

Hospital Records, Exhibits VV and WW, Coosa Valley Medical Records, Exhibit AAA, and Dr. James' records of November 10, 2003, Exhibit AA). It wasn't until the Plaintiff was booked into the Coosa County Jail that he decided that he suffered from seizures. The Plaintiff testified that he did not recall having seizures until he was incarcerated in the Coosa County Jail, yet when he saw Dr. Weaver on November 25, 2003, he reported that he had been suffering from seizures for a period of two and one-half years. (Plaintiff's deposition, p. 57, ll. 7-17, Exhibit G and Dr. Weaver's notes, Exhibit OO). Apparently, the Plaintiff's "seizure" disorder only manifests itself when the Plaintiff thinks he can somehow reap a benefit from it.

The Plaintiff was evaluated by no less than three physicians and two ambulance crews on multiple occasions during his incarceration and ***not once*** did anyone diagnose him as suffering from a seizure disorder. (See generally Russell Medical Center Emergency Room dated 11/26/03; Russell Medical Records dated 12/09/03; Dr. John James Medical Records; Weaver dec.; Jail logs dated 12/16/03; Owens dec., ¶¶ 37 and 38; Statement of Corporal Kay Taylor; Statement of Dana Harris; Statement of Aaron Green). In addition, when the Plaintiff was seen by Dr. David Currie, a dentist, on January 14, 2004, he marked on the patient information sheet that he did NOT suffer from seizures/epilepsy. (Dr. Currie's medical records, Exhibit DD). The Plaintiff has adduced absolutely no competent evidence that he ever had a seizure while in the Coosa County Jail. Consequently, his claim based upon that condition fails. Farrow, 320 F.3d at 1243.

It is also interesting to note that when the Plaintiff was released to the care of Dr. Vincent Law at Russell Medical Center from the jail on January 16, 2004, he did not tell him that he had a seizure disorder. Furthermore, during the follow-up visits with Dr. Law in May, July and November 2004, Dr. Law did not note that the Plaintiff advised him of any seizure disorder. (Dr.

Law's deposition testimony, Plaintiff's Exhibit 4, p.134, ll. 20-23; p. 135, ll. 1-3).  This is only further evidence that the Plaintiff's "seizure disorder" was created by the Plaintiff.

The Plaintiff has two additional arguments with respect to his alleged seizure condition that require response.  The first is the Plaintiff's assertion – directly contradicted by evidence in the record – that no one ever told the Plaintiff's medical providers that he needed to be evaluated for seizures.  (Doc. 112 at pp. 28-29)  Next, using wholly inapplicable case law, the Plaintiff argues that the Defendants were indifferent on the grounds that the health care received by the Plaintiff was "grossly incompetent" and/or was a less efficacious course of treatment.  Id. at pp. 29-30.  Neither of these arguments save the Plaintiff's claims.

The sole and uncontradicted evidence in the record shows that at the very least, Dr. Weaver was informed of Mr. Hillyer's recommendation.  On November 25, 2003 – the same day as the Plaintiff's visit with Mr. Hillyer – ***Mr. Hillyer's note reflecting the recommendation for a doctor to evaluate the Plaintiff for seizures was faxed to Dr. Weaver by jail personnel***. (Hillyer's Notes at p. 1).[2]  Additionally, Dr. Weaver testified in his declaration that the Plaintiff told him he had had a seizure.  (Weaver dec. at ¶ 6).  Dr. Weaver's records also show the Plaintiff reported a two and one-half year history of seizures.  (Exhibit OO).  Consequently, the evidence in the record unmistakably shows that Dr. Weaver was fully informed of the Plaintiff's alleged seizure, alleged history of seizures and Mr. Hillyer's recommendation.  Nonetheless, Dr. Weaver's records do not indicate that the Plaintiff's alleged seizure condition was confirmed.  Id. at Medical records.  Moreover, when the Plaintiff was taken to Russell Hospital for x-rays, he told medical personnel there that he merely slipped on some stairs and only had a history of seizures.  (Russell Medical Center Emergency Room dated 11/26/03 at pp. 2, 5).  Apparently,

---

[2] These notes and the fax cover forwarding the notes is found at Exhibit OO of the Defendants' Joint Evidentiary Submissions.

Dr. Goldhagen at Russell Hospital likewise concluded that no further seizure-related treatment was necessary.

This segues into the Plaintiff's next argument that he received grossly incompetent medical care. The Plaintiff's argument fails for two reasons. First, as with his claim that he had seizures, the Plaintiff's incompetent medical care claim fails due to a lack of evidence. The Plaintiff has provided the Court with no expert testimony indicating that the care given by any of the Plaintiff's treatment providers was substandard and that the Defendants were wrong to rely upon the treatment decisions that were made.

Next, the case law relied upon by the Plaintiff to make his argument is inapplicable to Sheriff Owens and his staff. In both Waldrop and Rogers, the Eleventh Circuit only allowed claims to go forward against *medical providers*. Waldrop, 871 F.2d at 1032; Rogers, 792 F.2d at 1063. The statements of law cited by the Plaintiff in his opposition apply to persons who have medical training and experience. In fact, the Plaintiff has somewhat disingenuously cited the Eleventh Circuit in that what it actually stated was "The [deliberate] indifference can be manifested by *prison doctors* in taking the easier and less efficacious route in treating an inmate." 792 F.2d at 1058 (emphasis added). Neither the Supreme Court nor the Eleventh Circuit have ever applied the propositions cited by the Plaintiff to non-medical jail staff. In fact, in Rogers, the Eleventh Circuit *affirmed* the district court's dismissal of claims against the non-medical jail staff. Id. at 1058-59.

Where, as here, the Defendants are not trained medical personnel, but jail officials, a different standard applies. As argued in the principal brief, the Defendants' duty was to get the Plaintiff medical treatment and follow the treatment plans of the medical providers – not second-guess them. Williams v. Limestone County, 198 Fed. App'x 893, 897-98 (11th Cir. 2006). None of the three doctors the Plaintiff saw directed any sort of seizure treatment plan for the

Plaintiff, let alone found that he had a condition.  The Defendants, therefore, were entitled to rely upon those providers.  Id.; see also Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir.1993); Meloy v. Bachmeier, 302 F.3d 845, 847 (8th Cir. 2002); Zentmyer v. Kendall County, 220 F.3d 805, 812 (7th Cir. 2000).  In light of the utter lack of evidence of any seizure condition, these Defendants, together with Sheriff Owens, took the best action they could and had the Plaintiff placed in the holding cells under 24-hour surveillance.  And, as the logs indicate, there were no further "seizures."

Accordingly, as there is no evidence to support any prong of the Plaintiff's deliberate indifference claim with respect to his alleged seizures, the Defendants are entitled to qualified immunity and judgment in their favor as a matter of law.

> **b.     Terry Wilson, Wendy Roberson and Al Bradley were not deliberately indifferent to the Plaintiff's toothache.**

The Plaintiff's claim with respect to his teeth is that it took from December 27, 2003, the date the Plaintiff first informed anyone he had a toothache, until January 14, 2004, to get him to a dentist.  As with the Plaintiff's seizure-related claim, there is no evidence in the record to support a finding that the Plaintiff had a serious medical condition related to his teeth or that the Defendants were deliberately indifferent.  The only medical evidence in the record indicates that work was done on two of the Plaintiff's teeth – and the records contain no statement that the work done was of an emergency nature or that the Plaintiff was suffering from a serious medical condition.  (See generally Dr. Currie Medical Recs., Exhibit DD).

In his Opposition, the Plaintiff relies upon Farrow as establishing that "inadequacy of dental care has been held to constitute a serious medical condition."  (Doc. 112 at p. 31).  The Plaintiff's reading of Farrow is exceptionally broad.  Farrow stands for the proposition that a *fifteen-month* delay in obtaining dentures for an inmate with only two teeth and who is in pain and losing weight *could* be determined by a jury to be a serious medical condition.  320 F.3d at

1243-45.  Defense counsel is aware of no case that stands for the proposition that a toothache by itself constitutes a serious medical condition – particularly where, as here, the Plaintiff was already receiving pain medication.

Moreover, there is no evidence that the delay in this case was due to any indifference on the part of the Defendants.  The Plaintiff filled out his request on Saturday, December 27, 2003, stating that only one tooth was hurting.  (Inmate Request form dated 12/27/03).  The form was received and acted upon following the New Year's holiday and an appointment set up for January 14, 2004.  Id.  At the time, there was only one dentist in Coosa County (and it is believed that this dentist had already perished in an automobile accident at the time the Plaintiff complains), so the Defendants had to send inmates to another dentist, Dr. David Currie, in Sylacauga.  (Roberson dep. 230:17-231:19).  Appointments were made based largely upon the first available appointment with the dentist.  Id. at 231:20-232:3.  There is no indication that there was any other consideration that accounts for the time it took to get the Plaintiff to the dentist.  Id. at 232:4-9.

There are two additional matters that require mentioning regarding the Plaintiff's teeth.  The Plaintiff also claims that he needed work done for two teeth allegedly broken by Al Bradley.  There is no indication in the Plaintiff's Inmate Request Form dated December 27, 2003, that he had broken teeth.  The Plaintiff simply stated his right tooth was hurting.  Assuming the veracity of the Plaintiff's other testimony, there was, at most, three working days between the time of his alleged tooth injury and his appointment with Dr. Currie.  According to the Plaintiff, he was not abused by Al Bradley until *after* the last time he saw his attorney.  (B. Kelly dep. 93:19-94:6).  The last time the Plaintiff saw his attorney was on Friday, January 9, 2004.  (Visitation logs dated 1/9/04).[3]  Assuming the earliest time and the Plaintiff's teeth were broken the next day,

---

[3] The Plaintiff's attorney was Tom Radney.  (B. Kelly dep. 61:10-19).

Saturday, January 10, 2004, the Plaintiff saw the dentist on the third working day following the alleged injury.

The final matter is the fact that the Plaintiff saw Dr. James on January 7, 2004. If the Plaintiff was in pain from the tooth that was not being handled by the medication he was already taking, he could have said something to Dr. James. Dr. James' records, however, are silent as to any complaint from the Plaintiff regarding his teeth. (James recs. dated 1/7/04).

### c.     The Plaintiff's medical condition did not seriously degrade.

The Plaintiff's final medical claim is that his medical condition degraded between December 16, 2003 and January 7, 2004, and the Defendants did nothing about it. To support this claim, the Plaintiff relies principally upon McElligott v. Foley, 182 F.3d 1248, 1256 (11th Cir. 1999). (Doc. 112 at pp. 33-34). As with Farrow, the facts of McElligot bear little resemblance to those of the instant case.

In McElligott, the inmate suffered from severe abdominal pain, vomiting, diarrhea, and weight loss. 182 F.3d at 1252. Written requests for medical treatment were made that were not acted upon and/or did not make it to the inmate's file. Id. The inmate was seen by the jail doctor only a few times over a fifteen-month period, and little was done other than to give him gas medication, run tests, and wait for records from the inmate's previous medical provider. Id. at 1252-54. Eventually, after the inmate stopped tolerating food and liquids, he was discharged from the jail with no diagnosis but eventually received a diagnosis of terminal cancer. Id. at 1253-54. As with Farrow, the medical defendants were denied summary judgment by the Eleventh Circuit. Id. at 1260-61. However, the district court's grant of summary judgment to the non-medical defendant, the county, was affirmed. Id. at 1259.

In the instant case, the period of time at issue is significantly shorter, 23 days. The Plaintiff in this case had an immediate past history of crying "wolf". The Plaintiff had been seen

21

by Dr. James, Dr. Weaver, two doctors at Russell Hospital, Mr. Hillyer, and two ambulance crews in the *three-week* period immediately preceding his assignment to the holding cells. Not one medical provider had diagnosed the Plaintiff with a serious medical condition and, in fact, the last time the ambulance was summoned, the crew said there was nothing wrong with the Plaintiff. After being seen by at least four physicians and a mental health professional in a period of only three weeks, without a diagnosis, there was absolutely no reason for the Defendants to believe the Plaintiff had a serious medical condition. Nonetheless, on the advice of the ambulance crew, they kept him under close observation in the holding cells.

Unlike the inmate in <u>McElligot</u>, there is no evidence – other than the Plaintiff's self-serving and uncorroborated testimony – of any adverse effects prior to January 7, 2004. The Plaintiff has produced no medical evidence of *any* medical condition (other than a rash), let alone a serious one, that predates January 7, 2004. Significantly, the *only* complaint the Plaintiff voiced to Dr. James on January 7, 2004 was the rash. (James recs. dated 1/7/04 at p. 1). If the Plaintiff was suffering from a long list of ailments over the course of 23 days, why did he not mention them to Dr. James? If the Plaintiff had a serious medical condition that was clearly obvious, why did Dr. James release him back to the jail? The answer to both questions is that the Plaintiff did not have a serious medical condition and even if he did, given Dr. James's actions, there was no reason for the Defendants to subjectively believe he had such a condition. <u>Williams</u>, 198 Fed. App'x at 897-98.

Curiously, with respect to the Plaintiff's elevated liver enzymes, he has not produced any evidence, or pointed to any evidence in the record, that refutes the reports of his statements concerning his plan to secret medications and take large numbers of them at one time. According to Dr. Law, had the Plaintiff carried out his plan it could result in drug-induced hepatitis. (Law dep. 142:7-17). It would also explain why there were no problems prior to

January 7, 2004.  Even then, Dr. James's only instruction was for the Plaintiff to follow up with him in two-weeks.  (James recs. Phone Message dated 1/7/04).  This was yet another indication from a doctor to the Defendants that there was nothing seriously wrong with the Plaintiff.  In addition, it would seem that if the Plaintiff was so ill prior to January 16, 2004, that the Defendants should have recognized it, then one would think that Dr. Currie, who is trained in medicine, would have noticed the "deteriorating condition" of the Plaintiff and recommended treatment.  Not only did Dr. Currie not notice the Plaintiff was suffering from any serious medical condition, the Plaintiff himself did not mention to Dr. Currie that he was suffering from any other medical condition.  (Exhibit DD).

The supervisory Defendants in this case had more than just the observations of multiple medical personnel – they had their own employees' observations of the Plaintiff reflected in the jail logs.  The logs reflect a plethora of activities engaged in by the Plaintiff.  There is, however, no indication of any declining medical state anywhere in the logs.  (See generally Jail logs).  Consequently, all of the information available to the supervisory Defendants indicated that there was no decline in the Plaintiff's medical condition.[4]   Dr. Law testified that the Plaintiff's liver enzymes could have elevated from where they were when Dr. James saw him on January 7, 2004, to the level they were when he saw him on January 16, 2004, in a twenty-four hour period.  (Plaintiff's Exhibit 4, p. 152, ll. 14-23; p. 153, l. 1).  Once the Defendants saw that the Plaintiff appeared to be in need of medical attention, they took immediate action and took him to the hospital.  They did this on their own accord, based on their own observations, without being

---

[4] These facts also distinguish the instant case from Carswell v. Bay County, 854 F.2d 454 (11th Cir. 1988), also relied upon by the Plaintiff.  (Doc. 112 at p. 34).  In Carswell, the jail administrator saw that the plaintiff looked like a "concentration camp victim", had the Plaintiff's attorney express his concern to him, and did nothing other than yell into a crowded room for someone to take the plaintiff to the doctor.  854 F.2d at 455.  Here, the Defendants had *repeatedly* taken the Plaintiff to the doctor and were never informed of any serious medical condition.

asked to by the Plaintiff.  The lack of subjective knowledge is fatal to the Plaintiff's claim. Farmer, 511 U.S. at 837.

**2.    Terry Wilson, Wendy Roberson and Al Bradley did not subject the Plaintiff to unlawful jail conditions.**

In his Opposition, the Plaintiff appears to have relied principally upon the allegations in his Amended Complaint – and his recitation of those conditions in his deposition – to meet his qualified immunity burden.  In light of all the evidence in the record, the Plaintiff's unsupported testimony is insufficient to show either the existence of the unconstitutional conditions or knowledge of those conditions on the part of the Defendants.  Additionally, the Plaintiff puts forth additional inapposite case law that fails to support his claims.

**a.    The evidence in the record does not support the Plaintiff's conditions of confinement claim.**

The evidence in the record shows that the Plaintiff was not subjected to unconstitutional conditions of confinement while he was kept in the holding cells.  The evidence supporting this conclusion is set forth in the Defendants' principal brief and will not be repeated here.  There are, however, two new developments that need to be brought to the Court's attention.  After the Defendants' motions for summary judgment were filed, the parties took the deposition of Dr. Vincent Law and filed a proposed pre-trial order that was subsequently adopted by the Court.

Dr. Law testified that there were no signs of physical abuse on the Plaintiff, and he would have noted it in his records if there were any signs or reports of abuse.  (Law dep. 129:3-131:18). Dr. Law testified that the Plaintiff's liquid intake would have been important for his treatment of the Plaintiff and any denial of fluids would have been something he would have noted.  Id. at 146:6-147:4.  There is nothing in the Plaintiff's Russell Hospital medical records for the January 16, 2004 admission regarding abuse or lack of liquid intake while the Plaintiff was in the Coosa County Jail. (See generally Russell Medical Center Medical Records dated 01/16/04).

24

As part of the pre-trial order process, the parties engaged in various joint stipulations.

Relevant to the conditions claims, the following facts are established:

- The holding cells do not have a sink, shower or standard toilet located within them. There is, however, a flushable in-ground toilet located in the middle of the floor. The in-ground toilet is primarily used for urination although it could be used for defecation. The in-ground toilet cannot be flushed from inside the cell. There is button on the outside of the holding cells that flushes the in-ground toilet.

- The holding cells have a concrete bench wide enough for an average sized person to lay down upon.

- There are no telephones in the holding cells.

- Each cell has a camera mounted within it so the inmate(s) in the cell can be monitored from the tower at all times.

- Upon incarceration at the Coosa County Jail, inmates are provided with a copy of the Coosa County Jail Inmate Rules and Regulations.

- The Plaintiff was provided with a copy of the Rules and Regulations.

- An ambulance was summoned. Upon arrival, the EMS determined it was not necessary for the Plaintiff to be transported to the hospital. EMS advised to place Kelly under medical observation.

- The Plaintiff was placed in a holding cell. The Plaintiff remained assigned to a holding cell until he was taken to Russell Medical Center on January 16, 2004.

- On December 18, 2003, Sheriff Owens met with his jail supervisors and issued orders to the jail staff that the Plaintiff was allowed to have a bath every night and to use the telephone occasionally. Sheriff Owens also ordered that the Plaintiff be allowed to use the restroom in the medical examination room, which was a room located between the two holding cells. Sheriff Owens also ordered that the Plaintiff be observed by camera continuously and his activities documented.

- The examination room had its own toilet facilities.

(Doc. 109 at pgs 7-11).

Dr. Law's testimony and the stipulations of the parties provide additional overwhelming evidence that no reasonable jury could ignore regarding the Plaintiff's alleged conditions of confinement. The reason for putting the Plaintiff in the holding cells was clearly related to

protecting his well-being. Orders were given for the Plaintiff to have showers and use the toilet. The Plaintiff was ordered to be kept under close supervision and his activities logged – and those logs are in evidence. When the Plaintiff was admitted to Russell Hospital on January 16, 2004, he did not report any abuse or lack of fluid intake to Dr. Law. Given these additional facts and the evidence already highlighted in the principal brief, no reasonable jury could find – based solely on the Plaintiff's self-serving testimony – that he was subjected to the alleged deprivations.

> **c.** **There is no evidence that Terry Wilson or Wendy Roberson had subjective awareness of the Plaintiff's alleged conditions.**

The stipulations made by the parties make even more clear what was already apparent from the evidentiary record, there is absolutely no evidence that Terry Wilson or Wendy Roberson were aware of any alleged unconstitutional jail conditions. The stipulations of the parties show that the Plaintiff was well aware of the grievance procedure at the Coosa County Jail. He could have sent a grievance related to his conditions. Under the policies of the jail, either Terry Wilson or Wendy Roberson would have seen the grievance. However, the Plaintiff filed no such grievance. Therefore there is no evidence of subjective knowledge on the part of Terry Wilson or Wendy Roberson regarding any unconstitutional conditions of confinement – despite the Plaintiff have a clear avenue by which he could have informed him of any complaints.

> **c.** **The case law cited by the Plaintiff does not support his claims.**

As the Plaintiff did at the Rule 12(b)(6) stage, the Plaintiff relies upon Gates v. Collier, 501 F.2d 1291 (5th Cir. 1974); Hope, 536 U.S. at 742; and Chandler v. Baird, 926 F.2d 1057 (11th Cir. 1991) to assert that Sheriff Owens violated his clearly established rights and provided fair warning to Sheriff Owens. (Doc. 112 at pp. 36-39) These cases do not support the Plaintiff's position. In fact, these cases and subsequent cases, actually cut against the Plaintiff's claims.

It is remarkable that the Plaintiff compares himself to the inmates who brought suit in Gates. As alleged, in Gates, inmates were placed in a dark cell, naked, without any hygienic materials,

bedding, adequate food or heat, or an opportunity for cleaning either themselves or the cell. 501 F.2d at 1305. There is no evidence that the Plaintiff was kept in the holding cells naked and without light. There is no evidence that the Plaintiff's cell was not cleaned. The evidence does show that he received bedding, including at least one 5-6"-thick mattress. The evidence shows that the Plaintiff received a shower nearly every day.

The facts of the instant case are so dissimilar from those in Gates that the Fifth Circuit's case cannot possibly clearly establish either a violation of the instant Plaintiff's rights or provide the fair warning required. Moreover, any commentary as to the constitutionality of the conditions in Gates is pure dicta as that Court noted:

> ***The sole argument on appeal is that the state lacks the financial ability to implement the district court's order within the time schedule designated***, and that therefore, the court exceeded its jurisdiction in ordering the total elimination of the armed trusty system, the improvement of the physical facilities, the classification of inmates, the implementation of inmate protection procedures, and emendation of medical facilities. More specifically, the appellants' argument is that after the entry of the judgment they immediately promulgated conforming rules and regulations concerning the censorship of mail, use of corporal punishment, the discipline of inmates, and disciplinary confinement, but lacked the funds to effectuate the other portions of the judgment in accordance with the time guidelines specified. It is important to note that the appellants do not challenge, for example, the court's holding that equal protection requires reclassification of the inmates on a basis other than race or that the Eighth Amendment requires improvements in the physical and medical facilities at Parchman and the elimination of the trusty system. The appellants did not deny the unconstitutionality of their previous operation and administration of Parchman and do not now controvert the constitutional mandate for the reforms ordered. Rather ***their sole argument is that they do not have the financial capacity to effectuate these reforms***. To reiterate, appellants do not challenge a single finding of fact or conclusion of law by the trial court.

501 F.2d at 1299 (emphasis added). Gates was ***not*** a § 1983 case seeking money damages. The inmates there sought equitable relief for unchallenged claims of unconstitutional conditions. Qualified immunity was not an issue. Accordingly, as Gates is factually, legally, and procedurally dissimilar to the instant case, it cannot assist the Plaintiff in overcoming either of his qualified immunity burdens.

The Plaintiff also improperly relies on Hope with respect to his drinking water claim. Leaving aside the mountain of evidence in the record clearly indicating that the Plaintiff was given water regularly, and relying only upon the Plaintiff's testimony that he went without water for hours at a time, the Plaintiff's situation does not come close to that faced by the inmate in Hope. Specifically:

> [Hope] took a nap during the morning bus ride to the chain gang's worksite, and when it arrived he was less than prompt in responding to an order to get off the bus. An exchange of vulgar remarks led to a wrestling match with a guard. Four other guards intervened, subdued Hope, handcuffed him, placed him in leg irons and transported him back to the prison where he was put on the hitching post. **The guards made him take off his shirt, and he remained shirtless all day while the sun burned his skin**. He remained attached to the post for approximately seven hours. **During this 7-hour period, he was given water only once or twice and was given no bathroom breaks. At one point, a guard taunted Hope about his thirst. According to Hope's affidavit: "[The guard] first gave water to some dogs, then brought the water cooler closer to me, removed its lid, and kicked the cooler over, spilling the water onto the ground.**"

536 U.S. at 734-35 (footnotes omitted emphasis added).

Clearly, the instant Plaintiff did not face even remotely similar conditions. He was inside. He had clothes on. He was not exposed to the sun in hot temperatures. The guards did not taunt him by giving water to a dog. The Plaintiff was not shackled to a hitching post.

The Plaintiff also asserts that the Hope court cited Eleventh Circuit precedent as establishing "that the denial of drinking water to an inmate violates clearly established constitutional law." (Doc. 112 at p. 38). According to the Plaintiff, the Eleventh Circuit has held that denial of drinking water for as much as two hours violates a prisoner's constitutional rights. Id. (naming, without a specific citation, Hope and Ort v. Wright, 813 F.2d 318 (11th Cir. 1987)). However, what Hope and Ort actually say is radically different:

> **The reasoning, though not the holding**, in a case decided by the Eleventh Circuit in 1987 sent the same message to reasonable officers in that Circuit. **In Ort v. White, 813 F.2d 318, the Court of Appeals held that an officer's temporary denials of drinking water to an inmate who repeatedly refused to do his share of the work assigned to a farm squad "should not be viewed as punishment in the strict sense,**

*but instead as necessary coercive measures undertaken to obtain compliance with a reasonable prison rule, i.e., the requirement that all inmates perform their assigned farm squad duties."* <u>Id.</u>, at 325. "The officer's clear motive was to encourage Ort to comply with the rules and to do the work required of him, after which he would receive the water like everyone else." <u>Ibid</u>. *The court cautioned, however, that a constitutional violation might have been present "if later, once back at the prison, officials had decided to deny [Ort] water as punishment for his refusal to work."* <u>Id.</u>, at 326. *So too would a violation have occurred if the method of coercion reached a point of severity such that the recalcitrant prisoner's health was at risk. Although the facts of the case are not identical, Ort's premise is that "physical abuse directed at [a] prisoner after he terminate[s] his resistance to authority would constitute an actionable eighth amendment violation."* <u>Id.</u>, at 324. This premise has clear applicability in this case. Hope was not restrained at the worksite until he was willing to return to work. Rather, he was removed back to the prison and placed under conditions that threatened his health. Ort therefore gave fair warning to respondents that their conduct crossed the line of what is constitutionally permissible.

<u>Hope</u>, 536 U.S. at 743 (emphasis added).

Neither <u>Hope</u> nor <u>Ort</u> stand for the proposition that a denial of drinking water for two hours violates an inmate's rights *per se*, as the Plaintiff would have the Court believe. In fact, the Eleventh Circuit specifically held that a two-hour denial of water under the facts of that case ***was constitutionally permissible***. 813 F.2d at 325. With respect to <u>Hope</u> it was not the denial of drinking water while the inmate refused to work, but the continued denial of water and other "punishments" back at the prison that constituted the violation of clearly established law. 536 U.S. at 743 (citing <u>Ort</u>, 813 F.2d at 324).

Put into the context of the instant case, the Plaintiff would have to point to evidence that the alleged denial of drinking water was (1) punishment designed to obtain compliance that was continued after the Plaintiff ceased being noncompliant; or (2) placed his health at risk. <u>Hope</u>, 536 U.S. at 743 (citing <u>Ort</u>, 813 F.2d at 324). The record contains no such evidence, and, in fact, the deposition testimony of Dr. Law regarding the failure of the Plaintiff to report such a deprivation, shows just the opposite. The Plaintiff has not pointed to any evidence in the record that the alleged

denial of water was punishment to obtain compliance that was continued after the Plaintiff complied.

The Plaintiff next turns to Chandler v. Baird, 926 F.2d 1057 (11th Cir. 1991) to support his jail conditions claims. The Chandler court did allow an inmate's hygiene and cold temperature claims to proceed. 926 F.2d at 1065. However, this case, too, is easily distinguishable on both its facts and the law upon which it relies.

With respect to the facts, the allegations in Chandler were far more specific than those of the instant case. Inmate Chandler averred that the temperature of his cell was as low as 60 degrees and was "ice cold". 926 F.2d at 1063. He also alleged that he was given no clothing except for undershorts and was forced to sleep huddled with a roommate between two mattresses to stay warm. Id. Chandler also made specific hygiene-related allegations. He claimed that he was deprived of toilet paper for three days, running water for two days, and soap, toothbrush, and toothpaste altogether. Id.

Here, there is some evidence of a failure with the jail's heat pump. However, the uncontroverted evidence also shows that an immediate work order was put in and the problem was fixed. Even if the cold itself was a serious condition, Sheriff Owens and his staff took action and can not be said to have been deliberately indifferent.

Chandler is also distinguishable from the perspective of the law relied upon by the Eleventh Circuit in two ways. First, the Eleventh Circuit rejected a case that was factually distinguishable from the allegations it faced but that was on point with respect to the instant Plaintiff's claims. Second, there has been a fundamental shift in the way Eighth Amendment claims are analyzed since the Chandler decision.

First, the Chandler court examined McMahon v. Beard, 583 F.2d 172 (5th Cir. 1978), and found it distinguishable.[5] In McMahon, the Fifth Circuit found no constitutional violation where an inmate was kept in solitary confinement without clothes, mattress or blankets for three months. 583 F.2d at 175. The Chandler court found that McMahon was distinguishable because unlike Chandler, the inmate in McMahon was placed in isolation because he had attempted suicide, was seen by medical personnel during the relevant period, and was eventually given paper clothes. 926 F.2d at 1064.

Similarly, in the instant case, the Plaintiff was assigned to the holding cells after repeated "falls" and "seizures" that could not be documented by medical personnel and upon the recommendation of the paramedics who came to the jail on the Plaintiff's last fall. The Plaintiff received medical attention an average of once per week during his incarceration. Finally, he was removed from the jail altogether and put in the hospital. Under McMahon, therefore, the Defendants are entitled to summary judgment.

Second, the legal analysis used by the Chandler court has changed. Interestingly, the change was noted in another lawsuit filed by the same plaintiff. Chandler v. Crosby, 379 F.3d 1278 (11th Cir. 2004). In Crosby, the Eleventh Circuit rejected Chandler noting:

> We do not find Chandler to be controlling here. First, the Chandler court, in rendering its judgment on qualified immunity, was concerned entirely with the law related to excessive cold claims; the court had no opportunity to treat an excessive heat or inadequate ventilation claim. Second, the Chandler court did not have the benefit of the Supreme Court's rulings in Wilson [v. Seiter, 501 U.S. 294 (1991)], Hudson [v. McMillian, 503 U.S. 1 (1992)], Helling [v. McKinney, 509 U.S. 25 (1993)], or Farmer [v. Brennan, 511 U.S. 825 (1994)]. It was in these cases that the Court refined the Eighth Amendment framework that governs our present cases. See supra Part III.A.
>
> The Chandler court did have the benefit of Estelle and Rhodes, but these foundational cases did not fully establish the current Eighth Amendment framework. Estelle held "that deliberate indifference to serious medical needs of prisoners

---

[5] See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (decisions of the Fifth Circuit handed down before close of business on September 30, 1981 are binding precedent on the Eleventh Circuit).

constitutes" an Eighth Amendment violation. 429 U.S. at 104, 97 S.Ct. at 291. This ruling was landmark but limited. Indeed, the <u>Rhodes</u> Court, writing nearly five years after <u>Estelle</u>, stated,

> until this case, we have not considered a disputed contention that the conditions of confinement at a particular prison constituted cruel and unusual punishment. Nor have we had an occasion to consider specifically the principles relevant to assessing claims that conditions of confinement violate the Eighth Amendment.

452 U.S. at 345, 101 S.Ct. at 2398 (footnote omitted).

<u>Rhodes</u> applies more broadly to all conditions of confinement. <u>See</u> <u>supra</u> Part III.A. Nonetheless, it was not until after <u>Chandler</u> that the Supreme Court clearly delineated the objective and subjective components of Eighth Amendment claims. <u>See</u> <u>Wilson</u>, 501 U.S. at 303, 111 S.Ct. at 2327 (adopting a "deliberate indifference" standard for the subjective component); <u>Farmer</u>, 511 U.S. at 847, 114 S.Ct. at 1984 (holding that a prison official is deliberately indifferent "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"). Furthermore, it was not until after <u>Chandler</u> that the Supreme Court held that a prisoner "states a cause of action under the Eighth Amendment by alleging that [prison officials] have, with deliberate indifference, exposed him to [a condition] that pose[s] an *unreasonable risk of serious damage to his future health*." <u>Helling</u>, 509 U.S. at 35, 113 S.Ct. at 2481 (emphasis added).

The "severe discomfort" language from <u>Chandler</u> **appears to be an anomaly in our jurisprudence**. A quick Lexis search reveals that, after <u>Chandler</u>, **we never again used that phrase in deciding an Eighth Amendment challenge**. We have routinely used language found in the Supreme Court's post-Chandler cases, however. <u>See</u>, <u>e.g.</u>, <u>Marsh v. Butler County</u>, 268 F.3d 1014, 1028 (11th Cir. 2001) ("A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." (citing <u>Helling</u>, 509 U.S. at 32-33, 113 S.Ct. at 2480)); <u>Bass</u>, 170 F.3d at 1317 ("Wantonness has been defined as 'deliberate indifference to a substantial risk of serious harm to a prisoner.'" (quoting <u>Farmer</u>, 511 U.S. at 836, 114 S.Ct. at 1978)). ***In the end, the Supreme Court's holdings, rather than the obsolete and potentially irrelevant phraseology of <u>Chandler</u>, must govern our analysis***.

379 F.3d at 1296-97 (emphasis added).

In other words, <u>Chandler</u> was decided prior to the Supreme Court's imposition of the more demanding deliberate indifference standard containing both an objective and subjective component. The Plaintiff can no longer get by on a mere showing that a given condition caused objective "severe discomfort". The Plaintiff must show that objectively the condition posed "an

*unreasonable* risk of *serious* damage to his future health" and that the Defendants were aware not just of the condition but that it posed such a risk.  Helling, 509 U.S. at 32-33.  As noted in the preceding sections, there is no evidence in the record that the alleged conditions existed, had an impact on the Plaintiff's future health, or that either Terry Wilson or Wendy Roberson even knew the alleged conditions existed.  Therefore, the Plaintiff cannot meet his burden and the Defendants are entitled to summary judgment on the jail conditions claims.

> 3.    **Terry Wilson and Wendy Roberson Did Not Fail to Prevent Harm to the Plaintiff.**

The Plaintiff relies solely upon his uncorroborated testimony regarding alleged abuse by Al Bradley.  The only additional information that needs to be added at this point is the testimony of Dr. Law.  As noted previously, Dr. Law testified that there was no evidence of abuse when the Plaintiff was admitted to Russell Hospital on January 16, 2004.  Also as discussed above, the Plaintiff would have had to have received the alleged abuse no earlier than January 10, 2004, in light of his testimony that the abuse occurred after he last saw his criminal defense attorney. Any abuse would have been visible and would have been noted in the Plaintiff's medical records and the medical records both during and immediately following the Plaintiff's incarceration are simply void of any indication of any abuse.  As there was no abuse, there was nothing for Terry Wilson or Wendy Roberson to stop.

> B.    **Al Bradley did not use excessive force on the Plaintiff.**

Kelly never squarely addresses the arguments made by Defendant Bradley in his initial memorandum brief with respect to the assault/abuse claims.  At best Kelly repeats his own testimony recounting the abuse (see Doc. 112, pp. 16-18) and then devotes only a sentence or two to these claims against Bradley in the Argument section of his brief.  See id. at pp. 39-40. Even there, it appears that most of Kelly's argument is directed at the failure to intervene claims against Owens, Wilson and Roberson—not the direct claim against Bradley.

33

Specifically, Kelly never disputes the arguments made in Bradley's principal brief that (1) "no other eyewitness supports Kelly's account of being regularly mistreated and abused by Al Bradley"; (2) "the undisputed facts show that Bradley was ten to fifteen years Kelly's senior and had been hobbled by six hip-related operations—hardly someone who could have taken the actions alleged by Kelly"; (3) "Kelly never filed a complaint or grievance with respect to his alleged mistreatment at the hands of Bradley although Kelly knew the procedure having filed nearly twenty grievances or complaints during his sixty days in the Coosa County Jail"; (4) "Kelly's account of his mistreatment is also inconsistent with his father's testimony as to what Kelly told him"; (5) "[T]he work records showing that Bradley was not even working when the alleged abuse occurred"; and (6) "most significantly, the medical records concerning Kelly show that he never reported to any medical provider any injury incurred as a result of these alleged beatings, nor do the medical providers record any signs of such abuse."

Given these concessions (by aught that appears in Plaintiff's opposition, this Court would be more than justified in applying the reasoning of Scott v. Harris to the instant case, and concluding that no reasonable jury would believe that Kelly was abused and neglected by Bradley as he alleges. Compare with Skylstad v. Reynolds, 2007 WL 2766436 at *2 (9th Cir. 2007) ("The medical evidence, however, directly contradicts Skylstad's version of events. Although the dog bite was serious and required medical attention, there is no medical evidence of multiple dog bites, head injury, or cuts on the arms. . . . In summary, Skylstad failed to raise a triable issue for a jury on his claim of excessive force.") and Williams v. Martin, 2007 WL 4139476  at *7 -*8 (N.D. Ga. Oct 29, 2007) (concluding that "the evidence supporting William's claim that Hatcher used unconstitutionally excessive force is exceptionally weak" and "[v]iewing the affidavits, depositions, statements, medical information, and other portions of the record as a whole, the Court concludes that no reasonable juror could believe that Hatcher used actionable

force against Williams after the CERT officers arrived.")

To be fair, Kelly does try to rebut the argument that Eighth Amendment uses of excessive force can violate an inmate's rights even without a substantial injury.  See Plaintiff's Opposition, at p. 39 quoting Hudson v. McMillian., 503 U.S. 1, 9 (1992).   However, that does not seem to be the prevailing view:

> Whether force is repugnant to the conscience is evaluated under a multi-factor standard. The extent of injury sustained by a complaining inmate is one factor. Id. at 7. Other factors are "the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response." Id. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. Whitley, 475 U.S. at 327. **At the same time, however, not every "malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9. De minimis uses of force, such as a single push or shove, do not give rise to an Eighth Amendment claim even if the use of force itself is improper.** Id.

> **The Eleventh Circuit applies the objective prong of the Eighth Amendment analysis strictly, allowing claims to proceed *only if* there is an "objectively, sufficiently serious" injury**. Boxer X v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2006). The Eleventh Circuit sets a high standard for actionable harm, finding, for example, that a male prisoner forced to masturbate in front of a female guard, Boxer X, 437 F.3d at 1111, and a prisoner pepper-sprayed in the face, Fischer v. Ellegood, --- F.3d ----, 2007 WL 1624315 (11th Cir., June 6, 2007) suffered only de minimus injuries.

> In the present case, there is no evidence that Williams suffered any injury from Hatcher's uses of force before the CERT team arrived .FN3 Williams testified that Hatcher hit him once with a "glancing" blow too weak even to knock off his glasses, then bear-hugged him until the CERT officers arrived. Even if Hatcher's use of force before the CERT officers arrived was improper, Williams does not allege and the record does not show any substantial injury. Thus, Williams's Eighth Amendment claim fails with regard to Hatcher's actions prior to the CERT officers' arrival.

Williams v. Martin  2007 WL 4139476, *7 (N.D.Ga.) (N.D.Ga., 2007) (All emphasis supplied).

III.    **NO CLEARLY ESTABLISHED LAW PROVIDED THESE DEFENDANTS WITH "FAIR WARNING" THAT THEIR CONDUCT VIOLATED THE PLAINTIFF'S FEDERALLY PROTECTED RIGHTS.**

In his Opposition, the Plaintiff eschews any attempt to present the Court with a materially similar case. (Doc. 112 at p. 26). The Plaintiff principally relies upon two cases for his reasoning. Forming the lynchpin of his argument is the United States Supreme Court's holding in Hope v. Pelzer, 536 U.S. 730, 739 (2002), that the Eleventh Circuit had placed a "rigorous gloss on the qualified immunity standard." Next, the Plaintiff points to the Eleventh Circuit's statement in Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004), that it would "no longer *focus* on whether the facts of a case are materially similar to prior precedent."

The problem for the Plaintiff's argument is that the Eleventh Circuit noted in a case that was remanded by the Supreme Court in light of Hope, that the "criticism" contained in Hope was unwarranted. Willingham v. Loughnan, 321 F.3d 1299, 1303 (11th Cir. 2003). In Willingham, the Eleventh Circuit cited cases in which it had denied qualified immunity in the absence of a materially similar case on the grounds that the law was already sufficiently clear. 321 F.3d at 1303-04 citing Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002); Priester v. City of Riviera Beach, Florida, 208 F.3d 919, 926 (11th Cir. 2000); Slicker v. Jackson, 215 F.3d 1225, 1232-33 (11th Cir. 2000); Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997). Thus, following Hope the law in the Eleventh Circuit changed some, but Hope "did not change the preexisting law of the Eleventh Circuit much." Willingham, 270 F.3d at 1300.

Therefore, as noted in these Defendants' principal brief and discussed further above, this is not an obvious clarity case. The pre-existing law at the time of the Plaintiff's incarceration did not provide Terry Wilson, Wendy Roberson or Al Bradley with the requisite fair warning. Accordingly, the Plaintiff cannot meet his second qualified immunity burden and the Defendants are entitled to judgment in their favor as a matter of law.

## CONCLUSION

Based upon the foregoing, the principal brief, the evidentiary materials submitted, and the parties' stipulation of facts, Defendants Terry Wilson, Wendy Roberson and Al Bradley request that the Court issue an Order granting them judgment in their favor as a matter of law and awarding them attorney's fees pursuant to law and 42 U.S.C § 1988.

Respectfully submitted this 2nd day of January, 2008.

**s/Kristi A. McDonald**
KRISTI A. McDONALD– Bar No. DOW016
Attorney for Defendants Terry Wilson, Wendy Roberson and Al Bradley
MCDONALD & MCDONALD
1005 Montgomery Highway
Birmingham, Alabama 35216
Telephone: (205) 824-0507
Fax: (205) 824-0509
E-mail: felalaw@bellsouth.net

## CERTIFICATE OF SERVICE

I hereby certify that on this the 2nd day of January, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: **Richard J. Stockham, III**, and **Gary L. Willford, Jr.**

**s/Kristi A. McDonald**
OF COUNSEL

37