# EXHIBIT BBB

## DEPOSITION OF DR. DAVID CURRIE

STATE OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT


DANIEL BRYAN KELLEY,

      Plaintiff,

                       Civil Action No.
                       2:05-CV-01150 - MHT

versus

RICKY OWENS, et. al.,

      Defendants.
_____/


## THE DEPOSITION OF DAVID CURRIE, DDS

The deposition of DAVID CURRIE, DDS, was taken before Angela D. Richey, Alabama Certified Court Reporter, Number 281, as Commissioner, commencing at 12:00 p.m. on January 11, 2008, by the Defendant at the offices of Dr. David Currie, 499 West 3rd Street, Sylacauga, Alabama 35150, pursuant to the stipulations set forth herein.

**REGIONAL REPORTING SERVICE, INC.**
**755 WALNUT STREET**
**GADSDEN, ALABAMA 35901-0755**

```
 1                A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3   KRISTI MCDONALD, ESQ.
     McDonald & McDonald
 4   1005 Montgomery Highway
     Birmingham, Alabama 35216-2805
 5

 6   FOR THE DEFENDANT:

 7   GARY WILFORD, ESQ.
     Webb & Eley, P.C.
 8   7475 Halcyon Pointe Drive
     P.O. Box 240909
 9   Montgomery, Alabama 36124

10   FOR THE DEFENDANT:

11   RICHARD STOCKHAM, III, ESQ.
     Stockham, Carroll & Smith, P.C.
12   2204 Lakeshore Drive, Suite 114
     Birmingham , AL 35209-6771
13

14              EXAMINATION INDEX

15   DAVID CURRIE, DDS

16        By Ms. McDonald...........04
          By Mr. Stockham...........16
17        By Mr. Wilford............29

18
     Stipulations .................03
19
     Reporter's Certificate .......37
20

21
                 EXHIBIT INDEX
22   Defendant's              Marked/Offered

23   One                          07      09
```

REGIONAL REPORTING SERVICE, INC.

```
 1            S T I P U L A T I O N S
 2        IT IS STIPULATED AND AGREED, by the
 3   parties, through their respective counsel, that
 4   the deposition of DAVID CURRIE, DDS may be
 5   taken before Angela D. Richey, as Commissioner
 6   and Notary Public, Alabama at Large, at
 7   Sylacauga, Alabama, on January 11, 2008,
 8   commencing at 12:00 p.m.
 9        IT IS STIPULATED AND AGREED that the
10   signature to and reading of the deposition by
11   the witness is waived, the deposition to have
12   the same force and effect as if full compliance
13   were had with all laws and rules of Court
14   relating to the taking of depositions.
15        IT IS STIPULATED AND AGREED that it shall
16   not be necessary for any objections to be made
17   by counsel to any questions except as to form
18   or leading questions and that counsel may make
19   objections and assign grounds at the time of
20   trial or at the time said deposition is offered
21   in evidence or prior thereto.
22        IT IS STIPULATED AND AGREED that notice of
23   filing by the commissioner is waived.
```

REGIONAL REPORTING SERVICE, INC.

```
 1   STATE OF ALABAMA, SYLACAUGA, JANUARY 11, 2008

 2

 3              DAVID CURRIE, DDS,

 4   after having been first duly sworn, was

 5   examined and testified as follows:

 6

 7              EXAMINATION

 8   BY MS. MCDONALD:

 9   Q.   Will you state your full name for the

10        record, please, sir?

11   A.   Dr. David P. Currie.

12   Q.   Dr. Currie, I introduced myself to you

13        earlier.  My name is Kristi McDonald.  I

14        represent Terry Wilson, Al Bradley, and

15        Wendy Roberson in a lawsuit that's been

16        filed by a Daniel Bryan Kelley, who I'm

17        understanding that you have treated.  Is

18        that correct?

19   A.   That is correct.

20   Q.   And can you give me your business address,

21        please, sir, Dr. Currie?

22   A.   Physical address is 499 West 3rd Street,

23        Sylacauga, Alabama 35150; mailing address
```

```
 1            is P.O. Box 2250, same town, same ZIP.
 2    Q.     And what do you do for a living,
 3            Dr. Currie?
 4    A.     I'm a general dentist.
 5    Q.     How long have you been in practice here in
 6            Sylacauga?
 7    A.     Since August of 1975.
 8    Q.     And you are licensed to practice dentistry
 9            in the state of Alabama?
10    A.     Yes.
11    Q.     Have you been licensed since you started
12            practicing here in Sylacauga?
13    A.     Well, actually the year before when I
14            graduated.
15    Q.     Have you practiced --
16    A.     1974.
17    Q.     -- anywhere else other than Sylacauga?
18    A.     Birmingham and Tuscaloosa Veterans
19            Administration Hospital.
20    Q.     And where did you do your undergraduate
21            work?
22    A.     UAB.
23    Q.     Did you do your dental school at UAB as
```

REGIONAL REPORTING SERVICE, INC.

```
 1            well, Dr. Currie?

 2   A.   Well, no.  I did the undergraduate

 3            actually at Alabama.  Excuse me.  I

 4            misunderstood, Alabama and then dental

 5            school was UAB.

 6   Q.   And you graduated from dental school in

 7            1974?

 8   A.   Correct.

 9   Q.   Dr. Currie, in your practice here in

10            Sylacauga have you had the occasion to see

11            a patient by the name of Daniel Bryan

12            Kelley?

13   A.   Yes, ma'am.

14   Q.   Okay.  Could you tell me when you saw him

15            as a patient of yours?

16   A.   January 14th of 2004.

17   Q.   And do your records indicate, Dr. Currie,

18            how he got to your office?

19   A.   I believe it was a deputy sheriff from

20            Coosa County brought him.

21   Q.   Was it your understanding, Dr. Currie,

22            that Mr. Kelley was incarcerated at Coosa

23            County Jail at the time?
```

```
 1   A.   Yes.
 2   Q.   And do you see patients or inmates from
 3        Coosa County Jail --
 4   A.   Yes.
 5   Q.   -- on a regular basis?
 6   A.   Yes.
 7   Q.   Do you have some type of an agreement with
 8        the county?
 9   A.   Yes.
10   Q.   Could you tell us what that is, please,
11        sir?
12   A.   Well, they just call, and we get them
13        worked in when we can, and we send a bill,
14        and the county commission pays us when
15        they get it, nothing formal in writing.
16   Q.   Doctor --
17   A.   That goes back to when Bill Evans was
18        still sheriff down there.  We just said if
19        you have a problem, call us.
20              (Defendant's Exhibit Number One
21                 was marked for identification.)
22   Q.   And Dr. Currie, a subpoena was issued to
23        your office for the records that you have
```

REGIONAL REPORTING SERVICE, INC.

```
 1              on Mr. Kelley.  Let me show you what I

 2              will mark as Defendant's Exhibit One and

 3              ask you, please, sir, if you can tell me

 4              what those are, please?

 5   A.   Okay.  We have a copy of the patient

 6              treatment records, a copy of the statement

 7              that was sent to Coosa County and that was

 8              added in to eliminate somebody else who

 9              was already on there, a receipt for the

10              payment, and a copy of the patient

11              registration and medical history that he

12              filled out when he came for treatment.

13   Q.   Is that a complete and accurate copy of

14              all the records you have in your file?

15   A.   Yes, ma'am, it is.

16   Q.   And were those records generated and kept

17              in the regular course of your business

18              practice?

19   A.   Yes.

20   Q.   And were those records made by you or

21              under your direction and control?

22   A.   Yes.

23
```

REGIONAL REPORTING SERVICE, INC.

1      MS. MCDONALD:  I offer these as

2      Defendant's Exhibit One.

3      (Defendant's Exhibit Number One

4      having previously been marked

5      for identification was offered

6      into evidence.)

7   Q.   You saw Mr. Kelley on January the 14th of

8        2004.  Is that correct?

9   A.   Correct.

10  Q.   Is that the only time you saw him,

11       Dr. Currie?

12  A.   That is the only time I've seen him.

13  Q.   And could you tell us, please, sir, what

14       he presented to you with on that occasion?

15  A.   He had two badly decayed teeth.  They are

16       labeled at teeth number four and five, and

17       we extracted both of those teeth, laced a

18       stitch, and he was done.

19  Q.   Where are those teeth located, Dr. Currie?

20  A.   Upper right.

21  Q.   Okay.  And you said earlier you had a

22       patient information sheet in your file.

23       Is that something that is completed by a

REGIONAL REPORTING SERVICE, INC.

1       patient when they come in to see you?

2   A.  Yes, they complete that.

3   Q.  And did Mr. Kelley complete that?

4   A.  Yes, ma'am.

5   Q.  And is there a place on this information

6       sheet where a patient can provide you with

7       medical information?

8   A.  Yes.

9   Q.  And is there a place on this where they

10      can indicate to you whether they have a

11      history of epilepsy or seizures?

12  A.  Yes.

13  Q.  What did Mr. Kelley mark on that occasion?

14  A.  No.

15  Q.  And did he tell you -- Is there a place

16      where they can indicate if they have other

17      health problems?

18  A.  Yes.

19  Q.  Did Mr. Kelley indicate to you that he had

20      any other health problems on that date?

21  A.  Only that he had had a broken back, which

22      was lumbar 4, 5 and it looks like at S-1.

23  Q.  But that's the only history he gave you as

REGIONAL REPORTING SERVICE, INC.

```
 1              far as any other medical problems were

 2              concerned?

 3     A.       Correct.  Everything else, he marked no,

 4              except anemia, which he didn't mark

 5              anything.

 6     Q.       Did you do x-rays of Mr. Kelley's teeth on

 7              that occasion?

 8     A.       I took one.

 9     Q.       And did that indicate the decay that was

10              present?

11     A.       Yes.

12     Q.       Did you prescribe any medication for

13              Mr. Kelley?

14     A.       No.  I did not.  He had no abscesses.  So

15              we do not prescribe anything, and we --

16              Unless it's something with a real

17              difficult extraction or surgical

18              extraction we generally do not prescribe

19              pain medication for jail inmates.

20     Q.       Was there any signs of trauma to

21              Mr. Kelley's mouth?

22     A.       No.

23     Q.       If there had been trauma to his mouth,
```

REGIONAL REPORTING SERVICE, INC.

1      would that have been seen on an x-ray, or

2      would you have visually seen that in his

3      mouth?

4  A.   I would have had to have just visually

5      seen it.  It wouldn't show on a film.

6  Q.   What causes the decay such as the type

7      Mr. Kelley presented to you with?

8  A.   Just hadn't been getting them cleaned and

9      taken care of over the years, just

10      basically dental neglect.

11  Q.   And you said you saw him on January the

12      14th of 2004?

13  A.   Right.

14  Q.   Is there a period, Dr. Currie, in --

15      during the holidays in which your office

16      is closed?

17  A.   Yes.  That particular year we closed at

18      lunchtime on December 23rd, '03, and we

19      did not reopen until Monday, January 5, at

20      8:00 a.m.

21  Q.   And if somebody had needed an appointment

22      during that period of time, would they

23      have just been sent to your answering

REGIONAL REPORTING SERVICE, INC.

```
 1         machine?
 2    A.   Right.  The answering machine tells them
 3         we're gone, when we'll be back, if they
 4         have something that can't wait, contact
 5         one of the other dentists.
 6    Q.   Okay.  And when you saw Mr. Kelley on
 7         January the 14th, did he have a problem
 8         that was of such that was an emergency?
 9    A.   Well, he had some bad teeth.  Now, they
10         weren't abscessed, or it's not an
11         excruciating pain, but they did need to
12         come out.  They were not teeth that could
13         be saved.
14    Q.   Was it an emergency, though, that he be
15         seen?
16    A.   Well, it's hard to say.  I mean, it wasn't
17         abscessed and in excruciating pain, but it
18         was something that needed to be tended to.
19    Q.   Right.  But if he had started complaining,
20         Dr. Currie, on December the 27th that his
21         tooth was hurting, was there --
22    A.   I don't see any reason it would have been
23         that bad at that point.
```

REGIONAL REPORTING SERVICE, INC.

1   Q.   Okay.

2   A.   Just like, say, had he had an abscess,

3        then that would be excruciating pain.

4        That's different from just, you know,

5        having a hole in your tooth and it's

6        annoying when it get hot or cold or food

7        in it.

8   Q.   And did he show you any signs that he was

9        in excruciating pain when you saw him?

10  A.   No.

11  Q.   Okay.  And when you saw Mr. Kelley, did

12       you see any other signs that he had any

13       other physical health problems going on

14       when you saw him?

15  A.   No.

16  Q.   Did he appear to be jaundiced to you?

17  A.   No.

18  Q.   Is that something that you would notice as

19       a dentist, Dr. Currie?

20  A.   Yes.  People who are jaundiced turn yellow

21       and their whites of the eyes turn yellow

22       also.

23  Q.   In the practice that you've been here, I

REGIONAL REPORTING SERVICE, INC.

1    guess 30 years, over 30 years, Dr. Currie,

2    have you had patients who have come in who

3    have presented with any type of jaundice

4    that you've noticed while you've been

5    doing an examination of them?

6  A.   At least one, and I couldn't even tell you

7    when that is, but I know we have had one.

8  Q.   And if Mr. Kelley had presented with being

9    jaundiced or very yellow on January 14th

10   of 2004, what would you have done?

11 A.   We would not have extracted the teeth.  We

12   would have told the deputy that he needed

13   to go see a medical doctor.

14 Q.   And would that have been indicated in your

15   notes, Dr. Currie?

16 A.   Oh, yes.

17 Q.   And is there anything in your notes that

18   indicate that that's what occurred?

19 A.   No.

20        MS. MCDONALD:  I don't have any other

21           questions.  Thank you, Dr.

22           Currie.

23

REGIONAL REPORTING SERVICE, INC.

```
 1              THE WITNESS:  Okay.

 2

 3                   EXAMINATION

 4   BY MR. STOCKHAM:

 5   Q.   Dr. Currie, my name is Richard Stockham.

 6        I represent Mr. Kelley.  I wanted to get

 7        you to look at your note about the visit.

 8   A.   Uh-huh (indicating yes).

 9   Q.   Do you have an independent recollection of

10        Mr. Kelley from -- other than these five

11        pieces of paper here?

12   A.   No.  This is the only contact I know of

13        with him.

14   Q.   So if he walked in the door, you wouldn't

15        recognize him?

16   A.   That is correct.

17   Q.   And apart from what you've got written

18        down here, do you have any independent

19        recollection of what occurred on that day?

20   A.   No.

21   Q.   Do you know whether or not there was

22        someone else who was here with Mr. Kelley?

23   A.   A deputy brought him, but I don't know
```

REGIONAL REPORTING SERVICE, INC.

```
 1        which deputy.
 2   Q.   Do you know whether or not there was
 3        another inmate with him?
 4   A.   That, I do not know.
 5   Q.   Do you know how long it takes to get from
 6        here to Rockford Jail?
 7   A.   Probably 25, 30 minutes.
 8   Q.   And if the jail record shows that he was
 9        taken out with another inmate and brought
10        here named Billy Joe Gray, does that
11        refresh your recollection that he was here
12        with another inmate?
13             THE WITNESS:  Let me look on here and
14                  see.  Let me find out.  As a
15                  matter of fact, there may have
16                  been, because there was a Billy
17                  on the -- Let me see your
18                  exhibit there.  There is a Billy
19                  listed there.  Let me see if
20                  that is him.  I don't recall
21                  him, but I will look and see.
22   A.   January 14th, Billy Gray, yes, about the
23        same time.
```

REGIONAL REPORTING SERVICE, INC.

```
 1   Q.   In fact, the jail records reflect that
 2        Mr. Gray and Mr. Kelley were -- left the
 3        jail at 10:17 and were back at the jail by
 4        11:56.  So that's about an hour and 40
 5        minutes.
 6   A.   Uh-huh, yes.  Okay.
 7   Q.   So Mr. Gray and Mr. Kelley were here
 8        something less than 40 minutes.  Does that
 9        seem about right to you?
10   A.   That would be about right, could have
11        been, yeah.
12   Q.   And looking at the record that you've got,
13        the billing record that reflects a billing
14        from Mr. Kelley and a billing for a Billy.
15   A.   That would have been Billy Gray I would
16        imagine, because he also had an extraction
17        that morning.
18   Q.   Is it common for the jail to send more
19        than one person at a time?
20   A.   Oh, yeah, yeah.
21   Q.   Is that more of the normal that more than
22        one person comes?
23   A.   It varies.  Sometimes they bring one,
```

REGIONAL REPORTING SERVICE, INC.

```
 1        sometimes two.  I don't know that we've

 2        ever had more than two at a time.

 3    Q.  Now, looking at the first page of that

 4        right there, what you've got, in your

 5        handwriting, could you read that first

 6        line for me, please, sir (indicating)?

 7    A.  Okay.  That would be -- Well, it's dated

 8        1/14/04.  Four and five were the teeth

 9        numbers, one film, and my shorthand is

10        that, "It's extracted without difficulty,"

11        and second line, "We place a gut suture,

12        just one," and then gave postoperative

13        instructions," which is a printed sheet.

14    Q.  And right above that, what does it say?

15    A.  Coosa County Jail.

16    Q.  So there's nothing on here that says that

17        the tooth was in decay, is there?

18    A.  No.  We have x-ray for that.

19    Q.  And the x-ray, what on the x-ray shows

20        that there's decay?

21    A.  Right there.  If you hold that up to the

22        light you notice some real dark areas in

23        those two small teeth.  That's decay.
```

REGIONAL REPORTING SERVICE, INC.

```
 1              (Indicating.)

 2      Q.      And when you say "four or five," which two

 3              teeth are they?

 4      A.      That would be -- Well, I don't have one of

 5              those two teeth.  Here we go.  That would

 6              be those two teeth right there

 7              (indicating).

 8      Q.      On the lower or the upper?

 9      A.      The upper, upper right.

10                  MR. WILLARD:  Just for the record,

11                      that was sort on the middle of

12                      the right-hand side.

13                  THE WITNESS:  Yeah.  It's right

14                      behind the eye tooth.

15      Q.      Right behind the eye tooth?

16      A.      Yeah.  The two right behind what people

17              call the eye tooth or cuspid.

18      Q.      And you say that there was no trauma.  You

19              don't have any way of -- There's no note

20              about whether there was trauma or not, is

21              there?

22      A.      No.  If there had been trauma, we make

23              notes.
```

REGIONAL REPORTING SERVICE, INC.

1    Q.    When you say "if there would have been

2          trauma," what would you look for?

3    A.    Bruising, cuts, split lip, fat lip.

4    Q.    And if it had occurred 20 days before?

5    A.    Oh, that would be gone by then.

6    Q.    And if he had been complaining about it

7          for 19, 20 days, is that a long time for

8          someone to be undergoing pain?

9              MS. MCDONALD:  Object to the form.

10   A.    That varies.  Some people's pain tolerance

11         is different.  I've had people come in

12         with a tooth that I've looked at and say,

13         "Well, how long has it been like that,"

14         and said, "Oh, it's been like that for two

15         months, and it's just where last night it

16         woke me up."  So I mean, there's no way to

17         tell on that.

18   Q.    Just what the individual says?

19   A.    Right.

20   Q.    Some people, they could be suffering

21         severe pain for a long time and you just

22         don't know it?

23   A.    Right.

REGIONAL REPORTING SERVICE, INC.

1    Q.    It's up to the person?

2    A.    Right.

3    Q.    Now, what is a periapical single?

4    A.    That is a film.  That's the x-ray.

5          That's -- It's a technical thing about

6          which film we took.  Compared to, say, a

7          bitewing film, which we use looking for

8          cavities, this is looking for decay or

9          abscesses or fracture.

10   Q.    And what is -- Looking below that it says

11         E-x-t?

12   A.    Extraction.

13   Q.    E-r-u-p-t?

14   A.    It's an erupted tooth.  So it was through.

15         It was not an impacted tooth that had to

16         be cut out.

17   Q.    And what is Or Expos?

18   A.    Oh, Or would be like if it was an exposed

19         root.

20   Q.    What does that mean?

21   A.    Sometimes people break a tooth off at the

22         gum, but there's still a root where I can

23         get ahold of -- I can see it.  It doesn't

REGIONAL REPORTING SERVICE, INC.

```
 1        have to be cut out.  It's not buried up
 2        under the gum.  Basically that's the
 3        computer's way of saying it's not
 4        impacted.
 5   Q.   And so whether or not Mr. Kelley had
 6        been -- had an injury to his mouth in that
 7        area some 20 days before, you can't say
 8        one way or the other?
 9   A.   No.  That far ahead, no way.
10   Q.   But you testified that he had had a --
11        that if you were out of town and that if
12        there was another dentist -- Do you have a
13        referral dentist that you use?
14   A.   No.  We just tell other dentists we're
15        going to be gone, and generally during
16        that time most of them are too.  There's
17        usually at least one open, but it's
18        nothing formal.  It's just call until you
19        get a dentist who is open.
20   Q.   Here in town?
21   A.   Right.
22   Q.   There are usually some dentists open here
23        in town?
```

REGIONAL REPORTING SERVICE, INC.

1   A.   Usually somebody.  Around Christmas it's a
2        little hard to find somebody.
3   Q.   But certainly after the first of the year
4        there's someone available?
5             MS. MCDONALD:  Object to the form.
6   A.   Maybe not there, because it happens that
7        year, the first was on a Thursday, and
8        there aren't but about two or three of us
9        in town that even work on Fridays.  And
10       that Friday we didn't come in because it's
11       just a half day, and you know, after being
12       off, we didn't come in for a half day.  We
13       just took one more day of vacation.
14  Q.   No reason you couldn't have seen him on
15       the Monday the 5th, though, is there?
16  A.   We might have been booked up and would not
17       have had an opening, and I don't know that
18       they would have been able to have brought
19       him.
20  Q.   What do you mean wouldn't have been able
21       to have brought him?
22  A.   Well, whether they've got a deputy
23       available to transport him.

REGIONAL REPORTING SERVICE, INC.

1  Q.   You indicated that you didn't give pain

2       medicine to prisoners after they had an

3       extraction.

4  A.   Not routinely.

5  Q.   Why is that?

6  A.   That gets into issues down there with

7       people trying to get ahold of those,

8       inmates trying to get ahold of the

9       medication, and it's one of those thing

10      where the jailers have to keep up with it

11      and administer it, and we just sort of try

12      to stay away from that problem.  Also if a

13      prisoner has had a problem with drug abuse

14      and I don't know it, we don't give him

15      something that's going to precipitate a

16      recurrence of that.

17 Q.   Now, was this something that you had

18      worked out with the sheriff and that you

19      just didn't give pain medication to the

20      jail inmates?

21 A.   Not on a routine basis.  Now, if there is

22      a surgical extraction or they had an

23      abscess or something, we give it, but just

REGIONAL REPORTING SERVICE, INC.

```
1            on a routine one, no.

2    Q.     And that is something that you worked out

3           with the sheriff?

4    A.     Right.  We do that with the city jail,

5           same thing.

6    Q.     Now, you said that Mr. Kelley was not

7           showing any signs of --

8    A.     -- jaundice.

9    Q.     -- jaundice?

10   A.     Uh-huh (indicating yes).

11   Q.     Your records don't reflect that, do they?

12   A.     No.  What we do is if we see something out

13          of the ordinary, we write it down and say

14          we have advised the patient or maybe a

15          family member or whatever, depending on

16          the patient, and we make a note that we

17          have advised them that they have this

18          problem.  And additionally, if we had seen

19          that, we wouldn't have extracted two

20          teeth.

21   Q.     You would have -- As I see it, between

22          Mr. Gray and Mr. Kelley you would have had

23          them about 20 minutes apiece; is that
```

REGIONAL REPORTING SERVICE, INC.

```
 1            right?
 2   A.   It could have been 20, 30.  I don't know.
 3        I know how much time is allotted.  We
 4        don't also use that much time.  And they
 5        could have -- They would have probably
 6        been in an adjacent room.  So while one
 7        gets numb, pulled the tooth on the other
 8        one and go back in the other room and get
 9        the tooth out on the other one.
10   Q.   How long does it take to extract two
11        teeth?
12   A.   It can be as little as a few minutes.  It
13        can take an hour if they break off and
14        don't cooperate.
15   Q.   You don't know whether that was the case?
16   A.   Oh, it wasn't, because we put down it was
17        extracted without difficulty.
18   Q.   Now, you say you don't know who the deputy
19        was who brought him?
20   A.   Have no idea.  They may not have even come
21        back to the room.  They may have just
22        stayed out in the waiting room.
23   Q.   And looking on this medical information it
```

REGIONAL REPORTING SERVICE, INC.

```
 1            indicates that there's a physician's name.

 2            Do you know who that --

 3     A.     Dr. Bill Friday, and he retired a little

 4            over a year ago.

 5     Q.     Is he here in town?

 6     A.     He is.

 7     Q.     And did you understand that Dr. Friday was

 8            currently taking care of Mr. Kelley?

 9     A.     Yes.

10     Q.     For his broken back?

11     A.     Broken back, yes.

12     Q.     Do you know whether Mr. Kelley was

13            confused or disoriented at the time that

14            you met with him?

15     A.     No.

16     Q.     You don't know?

17     A.     I don't know.

18     Q.     Do you know that he had been seen just a

19            week before by Dr. James in Alex City?

20     A.     No.

21     Q.     Okay.  And that at the time that Dr. James

22            had seen him at that time he had elevated

23            liver values?
```

REGIONAL REPORTING SERVICE, INC.

```
 1   A.    No.
 2   Q.    You didn't find out what medication
 3         Mr. Kelley was on?
 4   A.    He did not list any.
 5   Q.    Is there any place for him to?
 6   A.    Yes.  "Is there any other information
 7         about your health that we need to know?
 8         If yes, what," and he left that blank.
 9             MR. STOCKHAM:  Okay.  That's all that
10                 I have.
11
12                   EXAMINATION
13   BY MR. WILFORD:
14   Q.    Dr. Currie, my name is Gary Wilford, and I
15         represent Sheriff Ricky Owens in this
16         case, and I have a few questions of you.
17   A.    Okay.
18   Q.    I think most of the rest of it has been
19         covered.  First question I have to ask for
20         you is with respect to the inmates that
21         you see, do you exercise your independent
22         medical judgment in how you treat them?
23   A.    Yes.
```

REGIONAL REPORTING SERVICE, INC.

1   Q.   So making decisions as to whether or not

2        you're going to prescribe pain medication,

3        that's your independent medical judgment,

4        correct?

5   A.   That is my right.

6   Q.   Okay.  On that x-ray that we just looked

7        at a few minutes ago -- I know it's not in

8        the record -- is there any evidence of a

9        fracture?  As you said, you look for

10       fractures.

11  A.   Not on there, and it would -- The only

12       thing that would show on that would be a

13       fracture of a tooth.  If had he fractured

14       his jaw or something like that, that would

15       not show on there.

16  Q.   Okay.  I'm specifically asking as far as a

17       tooth.  Do you see a fractured tooth on

18       there?

19  A.   No.

20  Q.   I understand the jaw.

21  A.   It was just decayed.

22  Q.   And kind of a general question, do you

23       routinely perform extractions on confused

REGIONAL REPORTING SERVICE, INC.

```
 1        and disoriented patients?
 2   A.   No.
 3   Q.   You'd want to know why they were confused
 4        and disoriented, right?
 5   A.   Correct.
 6   Q.   And there's no indication anywhere in your
 7        records that Mr. Kelley was confused and
 8        disoriented, right?
 9   A.   No.
10             MR. WILFORD:  That's all the
11             questions I have, Dr. Currie.
12             Thank you.
13
14                    EXAMINATION
15   BY MR. STOCKHAM:
16   Q.   Doctor, whether or not Mr. Kelley was
17        confused, that would be something that you
18        would have to a make a determination
19        about?
20   A.   Correct.
21   Q.   Okay.  And if you only saw him for 10 or
22        20 minutes, you may or may not be able to
23        determine that?
```

REGIONAL REPORTING SERVICE, INC.

```
 1   A.   Right.  Because if he understands what I'm

 2        telling him and is cooperative, I would

 3        not classify him as being confused.

 4   Q.   Well, he is -- he comes in with a deputy

 5        and another inmate --

 6   A.   Uh-huh (indicating yes).

 7   Q.   -- and is taken in and put in the chair,

 8        as I understand it, and you go back and

 9        forth between the two; is that correct?

10   A.   Right.

11   Q.   So most of that time he's in a chair?

12   A.   Yeah.

13   Q.   Do you have an assistant in the room with

14        him?

15   A.   Yes, yes.

16   Q.   So he's pretty much in a reclined position

17        with his mouth opened; is that right?

18   A.   Right.

19   Q.   Okay.  So unless something --

20   A.   Or at least it's open while I'm working on

21        him.

22   Q.   Right.  So unless there was something

23        particular that -- someone could be
```

REGIONAL REPORTING SERVICE, INC.

```
 1        confused and you wouldn't know it.  Is
 2        that right?
 3             MR. WILFORD:  Object to the form.
 4             MS. MCDONALD:  Same objection.
 5   A.   Well, from what I -- The behavior I
 6        observed while I'm in there, there's no
 7        sign of confusion, and unless an assistant
 8        said something to me that said otherwise,
 9        I would assume he's not confused.
10   Q.   But that's just your assumption, though?
11   A.   Right.
12   Q.   And you don't have any particular
13        recollection of that particular incident
14        as we sit here today?
15   A.   No.
16   Q.   And that's true with all this.  You don't
17        have any particular recollection of that
18        incident.  It's just what your general
19        practice is; isn't that correct?
20   A.   As far as being confused or disoriented?
21   Q.   Right.
22   A.   Correct.
23   Q.   The extraction that you did on the other
```

REGIONAL REPORTING SERVICE, INC.

```
 1        inmate, Mr. Gray, same deal?  He had the

 2        same?

 3             MR. WILFORD:  Object to the form.

 4             MS. MCDONALD:  I'll object.

 5             MR. WILFORD:  I'm not sure I

 6                  understand the question.

 7   Q.   I'll back up.  Look at the billing record,

 8        Doctor, if you will.

 9   A.   Okay.  He had a tooth extracted.

10   Q.   And apparently also had an x-ray.  Is that

11        right?

12   A.   Do what, now?

13   Q.   Looking at the billing record, it reflects

14        that it had a --

15   A.   I don't have the billing record.

16             THE WITNESS:  Let me borrow yours.

17             MS. MCDONALD:  I'm sorry.  Okay.

18   Q.   It indicates -- the top line,

19        instructions --

20   A.   He had a film and an extraction.

21   Q.   And so the time for Mr. Gray and the time

22        Mr. Bryan ought to be about the same?

23             MS. MCDONALD:  Object to the form.
```

1   A.    Not necessarily.

2   Q.    Okay.

3   A.    Because he only had one tooth extracted

4         instead of two.  So it may have been -- It

5         would have been quicker.  It would have

6         been, because taking one out is quicker

7         than doing two.

8   Q.    Okay.  How much more time does it usually

9         take?

10  A.    It varies.  Like I say, I mean, I have had

11        teeth out of people before they knew they

12        had it out, and then somebody else is a

13        difficult extraction.  I mean, it might

14        take an hour to get one out.  It just

15        varies with the tooth.

16  Q.    But sitting here today, you can't recall

17        how long it took to do Mr. Kelley's teeth?

18  A.    No.  All I know is I made a note that it

19        was without difficulty.  So that means it

20        was routine, no problems, nothing broke,

21        didn't have to cut anything out.  We just

22        took them out routinely.

23             MR. STOCKHAM:  Thank you very much.

REGIONAL REPORTING SERVICE, INC.

1          THE WITNESS:  Okay.

2          MR. STOCKHAM:  That's it.

3          MR. WILFORD:  I think that's it.

4          MS. MCDONALD:  I don't have anything.

5              That's it.  Thank you,

6              Dr. Currie.

7          THE WITNESS:  You are welcome.

8

9              (AND FURTHER DEPONENT SAITH NOT)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

REGIONAL REPORTING SERVICE, INC.

1    I do hereby certify that the witness whose

2  attached deposition was taken before me was by

3  me first duly cautioned and sworn to tell the

4  truth in the cause aforesaid; that the

5  testimony contained herein was by me reduced to

6  writing in the presence of said witnesses by

7  means of stenography and afterwards transcribed

8  by means of computer-aided transcription. The

9  foregoing is a true and accurate transcript of

10  the whole of the testimony given by said

11  witness, as aforesaid.

12    I do further certify that I am not

13  connected by blood or marriage with any of the

14  parties or their attorneys or agents and that I

15  am not an employee of any of them, nor

16  interested in the matter of controversy.

17    IN WITNESS WHEREOF, I have hereunto set my

18  hand and affixed my notarial seal at Gadsden,

19  Alabama, County of Etowah, this 14th day of

20  January 2008.

21                    --------------------------------
                      Angela D. Richey, ACCR #281
22                    Certified Court Reporter
                      Notary Public Alabama-at-Large
23                    My Commission expires:  05/04/10


REGIONAL REPORTING SERVICE, INC.

Name **Daniel 'Bryan' Kelley**

Residence address

City

| Date | Services rendered | Fees |
|---|---|---|
| 1/14 | Gene W. Kelley | 023 |

Ins. no.

Residence telephone no.

Soc. Sec. no.

Business address

Send statement to (if different from residence address)

Patient no.

Business telephone no.

Card no.

| Date | Services rendered | Fees |
|---|---|---|

DEFENDANT'S
EXHIBIT

Z

Item 594

David P. Currie, DMD
P.O. Box 2250
Sylacauga, AL 35150

Office Phone: 256-245-6039

Commisson Coosa
Law Enforcement Center
P.O. Box 10
Rockford, AL 35136

| Account history for 03-22-04 to 03-22-04, printed on 08-01-07 |
|---|
| (this is not a statement) |

| Date | Patient | Description | Amount | Balance |
|---|---|---|---|---|
| 03-22-04 | Account | ~~Balance as of 03-22-04~~ | | |
| 03-22-04 | | Check pmt; thank you! (13038) | -128.00 | |
| | | ~~Ending balance~~ | | |

| Patient | Charges | Ins Pmts | Patient Pmts | Net Adj |
|---|---|---|---|---|
| Account | 0.00 | 0.00 | 128.00 | 0.00 |
| Totals | 0.00 | 0.00 | 128.00 | 0.00 |

Current Dental Terminology (CDT) © American Dental Association (ADA). All rights reserved.

Date *Jan 14 03*   Patient's Name *Conrad Bryan Talley*

Address   (Street or Box ) *Rt 1 Coccoran Cir*

(City) *Sylacauga*   (State) *Ala*   (Zip) *35150*

Home Phone ( *256* ) *249-5663*   Date of Birth *06 / 17 / 77*   Sex: M ___   F *✓*

Social Security Number *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*   Medicaid Number _____

---

## RESPONSIBLE PARTY INFORMATION

Name *Rickfast Peter Apt · Grosecurity Jail*   Marital Status: S ___   M *6/* W ___

Residence Address   (Street or Box ) _____

(City) *Rickfast*   (State) *Ala*   (Zip) *35150*

Home Phone (_____) _____-_____   Work Phone (_____) _____-_____   Ext._____

Social Security Number _____   Date of Birth _____/_____/_____

Patient's Relation to you: Self ____ Spouse ____ Child ____ Other _____

Spouse's Name _____   Date of Birth _____/_____/_____

Social Security Number _____   Work Phone (_____) _____-_____

---

## INSURANCE INFORMATION

Insured's Name _____   Contract Number _____

Insured's Address (If different from responsible party):

(Street or Box ) _____ (City) _____ (State)____ (Zip)_____

Patient's Relation to you: Self ____ Spouse ____ Child ____ Other _____

Insured's Employer _____

Employer's Address _____

Insurance Company _____   Group # _____

Insurance Company Address _____

Insurance Company Phone Number (_____) _____-_____

Do you have other dental insurance coverage? Yes___ No___. If yes, please fill in the following secondary insurance information

Insured's Name _____   Contract Number _____

Patient's Relation to you: Self ____ Spouse ____ Child ____ Other _____

Employer and Employer's Address _____

Insurance Company _____   Group # _____

Insurance Company Address _____

Insurance Company Phone Number (_____) _____-_____

Do you have or have you ever had:

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| Anemia (low blood) | ___ | ___ | Diabetes | ___ | ✓ |
| Allergies | ___ | ✓ | Abnormal bleeding | ___ | ✓ |
|   to penicillin | ___ | ✓ | Heart attack | ___ | ✓ |
|   to anesthetic | ___ | ✓ | Stroke | ___ | ✓ |
| Artificial heart valve | ___ | ✓ | Artificial joint | ___ | ✓ |
| Mitral valve prolapse | ___ | ✓ | Rheumatic fever | ___ | ✓ |
| Hepatitis | ___ | ✓ | Cancer | ___ | ✓ |
| Tuberculosis (TB) | ___ | ✓ | Thyroid problems | ___ | ✓ |
| High blood pressure | ___ | ✓ | Epilepsy/seizures | ___ | ✓ |

Is there any other information about your health that we need to know?

If yes, what? _____

Are you under a physician's care? If yes, why? _Yes_ _Sickle Cell CY LSS1_

Name of physician _Dr. Frill_ _____ Phone # _____

OR WOMEN ONLY:

Are you pregnant? Yes ____ (what month) _____ No ____

Are you nursing? Yes ____ No ____ Are you taking birth control pills? Yes ____ No ____

---

## FINANCIAL POLICY

We request that you pay for your treatment on the day service is provided, or at least pay the portion not paid by dental insurance. ALL EMERGENCY TREATMENT IS ON A CASH/CHECK BASIS. We can file your insurance to reimburse you for emergency treatment. We are happy to assist you with your dental insurance if you will bring your insurance card and sign a form for us. We usually accept assignment of benefits. However, you are responsible for your account. Most dental plans pay for only a portion of the treatment and plans vary according to your contract.

On open accounts, if payment is not received within 90 days, the account will be turned over for collection. The responsible party will be liable for any collection fees, court costs, or legal fees involved. There will be a $20.00 charge for any returned check.

I understand the above information and hereby consent for David P. Currie, D.M.D. and his staff to provide dental treatment.

_____
(signature of patient or responsible party)