IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
DANIEL BRYAN KELLEY,          )
                              )
       Plaintiff,             )
                              )        CIVIL ACTION NO.
       v.                     )        2:05cv1150-MHT
                              )             (WO)
RICKY OWENS,                  )
AL BRADLEY,                   )
TERRY WILSON, and             )
WENDY ROBERSON,               )
                              )
       Defendants.            )
```

OPINION

Relying on 42 U.S.C. § 1983, plaintiff Daniel Bryan

Kelley charges that, when he was a pre-trial detainee in

the Coosa County, Alabama Jail, jail officials violated

his right to due process under the Fourteenth Amendment

to the United States Constitution by (1) depriving him of

medical care; (2) subjecting him to violence from a jail

official; and (3) confining him under unconstitutional

conditions.    Kelley names the following persons as

defendants: Sheriff Ricky Owens; Deputy Sheriff Terry

Wilson; Assistant Jail Administrator Wendy Roberson; and

Jailer Al Bradley.  Jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question).

This lawsuit is now before the court on two motions for summary judgment in which the defendants maintain that qualified immunity shields them from liability.  For reasons that follow, the motions will be granted in part and denied in part.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick

<u>v. City of Atlanta</u>, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings. Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Yet, when opposing litigants "tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for the purposes of ruling on

a motion for summary judgment." Scott v. Harris, ___
U.S. ___, ___, 127 S. Ct. 1769, 1776 (2007).


## II. BACKGROUND

The chronology of events giving rise to this litigation, viewed in the light most favorable to Kelley, is as follows.

November 13, 2003: Kelley was arrested for, and accused by Coosa County officials of, violating his probation by failing a drug test. He was detained at the Coosa County Jail.

Kelley provided written notice to jail officials that either he, or someone in his family, had previously suffered from seizures and psychiatric disorders. Within a day, Kelley's mother called the jail as well, informing jail officials that he was at risk of experiencing seizures if he did not take his medicines properly.

November 21 through 26: On November 21, Kelley experienced the first of three episodes that caused him

to fall and injure himself.  He injured his right leg, foot, and knee; he told jail officials that he had had a seizure.

Jail officials responded to this first episode in three ways.  First, on November 23, Kelley was placed in one of the jail's two holding cells for observation; second, on November 25, Kelley was evaluated by Matt Hilyer, a mental-health professional at the Cheah Mental Health Center; and, third, on November 26, Kelley was transported to see Dr. Randall Weaver for a physical evaluation.

November 27 and 28: On November 27, Kelley had another falling episode; he told Administrator Roberson that he had had a seizure.  On November 28, jail officials checked Kelley's blood pressure, but took no additional action to determine the severity of the purported seizure or why these episodes were happening with such frequency.

<u>December 9 through 11</u>: Kelley had another falling episode and tumbled down a flight of stairs in his cell block.  He was not injured, but, as a precaution, jail officials took him to the emergency room at Russell Hospital.  Then, on December 11, officials took Kelley to see Dr. John James to treat pain that Kelly was experiencing as a result of his falls.

<u>December 16, 2003, through January 16, 2004</u>: For a period of 31 days, Kelley was confined in a six-by-eight-foot solitary-holding cell known as "the hole."  The cell lacked a toilet, sink, and, for weeks at a time, toilet paper.  In place of a toilet, there was a hole in the middle of the floor which could be flushed by only jail officials; officials sometimes went as many as three or four days without flushing the toilet.  Therefore, when Kelley would lie down on his five-inch thick mat to rest, he was only a few feet from his own waste for nights at a time.  Kelley was never allowed to exercise outside of

the cell. For drink, he was generally given a small Styrofoam cup of water three times a day.

While in the solitary-holding cell, Jailer Bradley beat Kelley. Though Bradley struck Kelley twice before he was assigned to the solitary holding cell, the violence increased both in frequency and severity after Kelley was placed in the cell. On two occasions, Bradley punched Kelley's face. During another violent attack, Bradley kicked Kelley in his genital area and caused him to urinate blood over the course of the next two days. On yet another occasion, Bradley grabbed Kelley's pants and tried to force a broomstick into Kelley's rectum; Kelley was able to move around enough to thwart Bradley's attempt. Finally, in late December, Bradley kicked Kelley in the mouth.

Kelley told Deputy Wilson and Administrator Roberson, as well as Sheriff Owens, that Bradley had attacked him. None did anything to stop Bradley. To the contrary, when Kelley asked Wilson whether officials would ever stop

7

Bradley's attacks, Wilson grabbed Kelley by the neck and shoved him against the wall.  When Kelley asked Sheriff Owens the same question, Owens responded by laughing at the question and walking away.

Kelley's mental and physical health worsened during his time in solitary confinement.  Mentally, he experienced hallucinations, and to his mother he sounded confused and forgetful when speaking to her on the phone. Physically, a rash broke out on his skin, covering much of his body.  His urine was discolored to a point of almost being black.  His skin took on a yellow complexion, as did the whites of his eyes.

On January 7, Kelley was taken to see Dr. James again, primarily for an examination of his rash.  Dr. James noted that Kelley's liver function was abnormal. Jail officials then transported Kelley back to the jail, and placed him back in the same solitary holding cell.

January 14: Kelley was taken to a dentist after he had complained about a toothache.

8

<u>January 16 through 19</u>: Deputy Wilson reported that Kelley needed to be examined by a doctor because his skin complexion had become "yellow as a post it note." Statement of Brett Oakes, 1/23/04 (Doc. No. 105-33). On January 16, Kelley was taken to the emergency room at Russell Hospital and was placed in the Intensive Care Unit. He was diagnosed with hepatitis and hepatic encephalopathy.[1]

<u>January 20 through 23</u>: On January 20, Russell Hospital transferred Kelley to Brookwood Medical Center "on an urgent basis" for further treatment. He was discharged on January 23.

<u>December 6, 2005</u>: Kelley filed this federal lawsuit.

---

1. Hepatitis is the inflammation of the liver. About.com, <u>Hepatitis Overview</u>, http://hepatitis. about.com/od/ihepatitisoverview/a/hepbasics.htm. (last visited Jan. 31, 2008). Symptoms can include dark urine, jaundice (yellow discoloration of skin and eyes), and muscle aches. <u>Id</u>. Hepatic encephalopathy is a "reversible decrease in the level of consciousness occurring as a consequence of liver disease." Karen K. Kormis & George Y. Wu, <u>Hepatic Encephalopathy</u>, in Diseases of the Liver and Bile Ducts: Diagnosis and Treatment 385 (George Wu & Jonathan Isreal eds., 1998).

**November 30, 2007**:  The defendants filed the two pending motions for summary judgment.

## III. QUALIFIED IMMUNITY

The qualified-immunity defense protects a public employee from liability for acts or omissions arising out of the employee's discretionary authority.  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 807 (1982).  The defense is pillared by the policy that public employees who are sued for monetary damages under § 1983 should have fair notice that certain conduct is unlawful.  <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001).  Upon successfully establishing the qualified-immunity defense, an official is entitled to summary judgment, thus shielding that employee from experiencing the burdens and costs associated with further litigation.  <u>Edwards v. Gilbert</u>, 867 F.2d 1271, 1273 (11th Cir. 1989).

Under United States Supreme Court precedent, courts must answer two questions when determining whether an official is entitled to qualified immunity.  First, did

10

the public official violate a federal statutory or constitutional right? <u>Scott</u>, ___ U.S. at ___, 127 S.Ct. at 1774. Second, if so, was that right clearly established at the time the official derogated the plaintiff's right? <u>Id</u>. When deciding whether an official violated clearly established law, the salient, and ultimate, test "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 202. Only when the answer to both questions is yes may an official be sued for monetary damages in his individual capacity. <u>Scott</u>, ___ U.S. at ___, 127 S.Ct. at 1774.

The Supreme Court has repeatedly underscored that the qualified-immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198 (2004) (citation omitted). That said, the Court has made it abundantly clear that, in an obvious case, litigants seeking to vindicate their rights need not produce identical or even "materially similar" caselaw to

11

overcome the qualified immunity bar. <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2004) (calling the then-existing "materially similar" standard of the Eleventh Circuit "a rigid gloss on the qualified immunity standard" that was inconsistent with Supreme Court precedent.)

Kelley has charged that the defendants violated his right to due process in three distinct ways when he was in their care awaiting trial. First, they displayed deliberate indifference to Kelley's serious medical needs. Second, Bradley committed unjustified acts of violence against Kelley, and the remaining defendants failed to protect Kelley from these violent acts. Third, the defendants confined Kelley under unconstitutional conditions. Each of these claims will be analyzed separately.

## A.  Deprivation of Medical Care

The deliberate and indifferent denial of medical care for serious medical needs, by a jail official to a detainee, gives rise to a constitutional claim. <u>Estelle</u>

12

v. Gamble, 429 U.S. 97, 104 (1976).  "The Due Process
Clause of the Fourteenth Amendment protects a pre-trial
detainee, and the protection corresponds with that
provided to prisoners by the Eighth Amendment."  Harris
v. Coweta County,  21 F.3d 388, 393 n.6 (11th Cir. 1994);
see also Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th
Cir. 1985); Bozeman v. Orum, 199 F.Supp. 2d 1216, 1231
(M.D. Ala. 2002) (Thompson, J.).

Deliberate indifference may be shown in a number of
ways, including intentional refusal to provide care for
a known, serious medical need, Mandel v. Doe, 888 F.2d
783, 788 (11th Cir. 1989); delayed treatment for serious
and painful injuries, Brown v. Hughes, 894 F.2d 1533,
1537 (11th Cir. 1990); Washington v. Dugger, 860 F.2d
1018, 1021 (11th Cir. 1988); and grossly incompetent or
inadequate care that shocks the conscience or is
intolerable to fundamental fairness.  Rogers v. Evans,
792 F.2d 1052, 1058 (11th Cir. 1986);  Waldrop v. Evans,
871 F.2d 1030, 1033 (11th Cir. 1989); Harris v. Thigpen,
941 F.2d 1495, 1505 (11th Cir. 1991).

13

The Eleventh Circuit Court of Appeals has outlined four requirements that a plaintiff must show to prevail on a claim of unconstitutional deprivation of medical care. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000). The plaintiff must show "[1] an objectively serious need, [2] an objectively insufficient response to that need, [3] subjective awareness of facts signaling the need, and [4] an actual inference of required action from those facts." Id.

According to Kelley, the defendants unconstitutionally deprived him of care for three medical conditions: (1) his falling episodes, which he contends were seizures; (2) his generally deteriorating health condition, which, according to him, exacerbated or caused his hepatitis and hepatic encephalopathy; and (3) his tooth pain. The evidence is insufficient to demonstrate that the defendants exhibited deliberate indifference to any of these conditions.

## 1. Falling episodes

The defendants argue that there is a fatal flaw in Kelley's assertion that they exhibited deliberate indifference to a serious medical need by inadequately addressing his falling episodes: Kelley, they say, has not shown that these falling episodes amounted to, or resulted from, a serious medical condition. This court need not reach that question, however, because, even if these falling episodes did constitute a serious medical condition, Kelley has failed to show that any of defendants intentionally disregarded the condition, delayed medical assistance unjustifiably, or treated the condition with gross negligence that shocks the conscience.

Four days after Kelley's first falling episode, Kelley was evaluated by a mental-health professional, Matt Hilyer of the Cheah Mental Health Center. A day later, Kelley was seen by Dr. Weaver.

Jail officials also adequately responded to Kelley's second and third falling episodes. Jail officials

15

checked his blood pressure on the same day that he reported the second falling episode. After Kelley's third falling episode, jail officials rushed him to an emergency room, where it was determined that he was not injured. Two days later, officials took Kelley to see Dr. James, so that he could be treated for the pain resulting from his falls.

In total, then, between November 21 and December 11, jail officials provided medical attention to Kelley a total of five times. Each time, the medical attention came within one to four days of Kelley's reporting his falling episodes to jail officials. Viewing the evidence as whole, the court concludes that the evidence is insufficient to support a finding that the defendants intentionally disregarded Kelley's medical condition or engaged in unreasonable delay. The principle of unconstitutional delay was "developed in contexts involving much longer time frames than the incident at issue here, and with those longer time frames, greater periods for reflection upon a course of action." Taylor,

16

221 F.3d at 1260; compare Farrow v. West, 320 F.3d 1235
(11th Cir. 2003) (15-month delay to repair serious dental
problem found triable) with Hill v. Dekalb Regional Youth
Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994)
(four-hour delay was not triable, where the delay was not
found to result in detrimental effect on the prisoner.)

To be sure, the constitutionality of a delay depends
not just on the length of the delay, but also on the
urgency of the medical need. Lancaster v. Monroe County,
Ala., 116 F.3d 1419, 1425-26 (11th Cir. 1997) (finding
that where jail officials had credible evidence that a
pre-trial detainee was likely to have life-threatening
seizure within days, due to alcohol withdrawal, a jury
could find that the officials should have provided
medical attention before the seizure occurred). The
sense of urgency that would support a finding of
unconstitutional delay is not present here. This is
evidenced, in part, by the non-urgent manner that Kelley
himself sometimes described to jail officials his need
for medical care for his episodes. For example, in an

17

inmate request form that Kelley filled out on November 28, 2003, he told officials that he wanted to see a doctor because his "foot still hurts pretty bad." Doc. No. 105-19. Similarly, on November 30, in another inmate request form, he stated that he wanted to see another doctor because his "foot still hurts and [my] back." Doc. No. 105-19. An exception was an inmate request form that he filled out on December 18, 2003, Doc. No. 105-25, in which he informed jail officials that he "[n]eed[ed] to see a real doctor to find out about falling out." However, by that date, jail officials had already provided medical attention to Kelley on five occasions for incidents or injuries related to his falling episodes.

Furthermore, to prove an unconstitutional delay in medical treatment, a litigant "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill, 40 F.3d at 1188, overruled on other grounds in Marsh v. Butler County, Ala., 268 F.3d 1014,

1031 n.8 (11th Cir. 2001) and Hope, 536 U.S. at 739 n. 9). Kelley has, simply put, provided no such medical evidence that any of the delays in medical treatment that he experienced after his falling incidents resulted in any diminishment of his physical or mental health. The absence of such evidence further undermines a finding that the defendants constitutionally delayed Kelley's medical treatment.

Nor can it be said that either jail officials or Dr. Weaver provided care for Kelley's falling episodes in such a grossly incompetent and negligent way as to shock the conscience or run afoul of basic principles of fairness. Rogers, 792 F.2d at 1058. Kelley argues that the defendants' medical efforts were woefully deficient because, while doctors treated him for the injuries he received during his falling episodes, no one treated him for the sources of the seizures themselves.

Even if the doctors and jail officials should have examined Kelley to determine the source of his falling episodes, incidents of negligence or malpractice,

19

standing alone, do not rise to the level of constitutional violations. <u>Estelle</u>, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); <u>Mandel</u>, 888 F.2d at 787-88 (solely showing negligence or medical malpractice "not sufficient" to constitute deliberate indifference). "Nor does a simple difference in medical opinion between" a jail's medical staff and an inmate about that inmate's diagnosis give rise to a constitutional violation. <u>Thigpen</u>, 941 F.2d at 1505. Rather, a plaintiff must show "an unnecessary and wanton infliction" of physical suffering. <u>Taylor</u>, 221 F.3d at 1260 (quoting <u>Estelle</u>, 429 U.S. at 105). The numerous occasions in which jail officials provided medical care to Kelley belie a finding a wantonness.

### 2. Hepatitis and Hepatic Encephalopathy

Kelley contends that, during his time in the solitary holding cell, his health condition deteriorated so severely, and so obviously, that the defendants should

20

have acted by providing him medical attention.  His urine was black and bloody; he was visibly weak; his skin had taken on a yellow complexion; and a rash broke out all over his body.  Additionally, even after he was diagnosed with abnormal liver functioning, jail officials transported him back to the small solitary holding cell.  Their deliberate indifference, he argues, resulted in the onset or exacerbation of his hepatitis and hepatic encephalopathy and caused his health to deteriorate to a point that he found himself in an intensive care unit on January 16, 2004.

Like Kelley's claim with regard to his falling condition, in order to prevail on this charge, he must show that: he had an objectively serious medical need; the defendants' response was objectively insufficient; the defendants were subjectively aware of facts signaling the need; and there is "an actual inference of required action from those facts."  Taylor, 221 F.3d at 1258.

Both parties acknowledge that Kelley was diagnosed with abnormal liver functioning, hepatitis, and hepatic

encephalopathy; thus, Kelley had a serious medical condition. The points of dispute are whether the defendants were subjectively aware of facts signaling the existence of that condition and whether the defendants responded sufficiently to that condition.

During Kelley's time in the solitary-confinement cell, jail officials learned of Kelley's deteriorating condition. It is important to assess, though, what exactly each defendant knew and when he or she knew it.

In his deposition, Kelley testified that he informed jail officials that his urine was "almost jet black," and that he bled urine. D. B. Kelley Depo. (Doc. No. 105-13), at 177. The record does not reveal which specific officials he reported these problems to, however, or even when he told them.

On the other hand, at least one jail official, Corporal Steven Hays, was informed by Kelley, sometime between January 5 and 7, that a rash had broken out all over Kelley's body. Wanda Kelley's Notes/Calendar (Doc. No. 103-35). Kelley also reported this rash on an inmate

22

request form on January 6. Inmate Request Form, 1/6/04 (Doc. 105-25). Additionally, Deputy Wilson was aware that Kelley's skin had become jaundiced and had taken on a dark-yellow complexion, for Wilson reported to another officer that Kelley's skin had become "yellow as a post it note." Statement of Brett Oakes, 1/23/04 (Doc. No. 105-33).

Still, while one or more defendants may have been aware of Kelley's rash and jaundiced skin (symptoms that could signal a serious medical problem), the evidence is insufficient to support a finding that the defendants' response was constitutionally insufficient. The rash appeared on Kelley's skin on January 5, and jail officials transported him to a doctor to evaluate the problem two days later. Similarly, Deputy Wilson noticed on January 16 that Kelley's skin had turned yellow, and Kelly was taken to a doctor that day.

### 3. Tooth pain

In late December 2003, Deputy Bradley kicked Kelley in the mouth. On December 27, in a written request for medical attention, Kelley complained to jail officials about tooth pain. Kelley also told Administrator Roberson and Deputy Wilson about the injury within a few days of the incident. Yet, jail officials did not allow Kelley to visit a dentist until January 14.

An inmate's complaints of pain, Kelley notes, can indicate a serious medical need. McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999) (finding that an inmate's complaints of abdominal pain should have signaled a serious medical need). More specifically, Kelley argues, severe dental pain can represent a serious medical condition. Farrow, 320 F.3d at 1235.

Kelley's reliance on McElligott and Farrow is misplaced, however. In McElligott, an inmate suffered severe abdominal pain and frequent vomiting over the course of five and a half months. McElligott, 182 F.3d at 1251-54. That inmate described the pain as a "knot"

24

in his stomach that felt "on fire." Id. at 1251-52. The inmate was ultimately diagnosed with colon cancer. Id. at 1254. In Farrow, an inmate complained about dental pain for 15 months, Farrow, 320 F.3d at 1247; the pain caused weight loss and depression. Id. at 1240. By contrast, when Kelley filled out an inmate request form reporting his dental pain, he described condition as a "toothache." Inmate Request Form, 12/27/07 (Doc. No. 105-25), at 5. The toothache lasted, at the most, two and a half weeks.

More recently, in his deposition, Kelley states that Bradley's late December attack broke two of Kelley's teeth and cracked a third. D. B. Kelley Depo. (Doc. No. 105-12), at 134. The medical evidence contradicts this statement, however. David Currie, the dentist who examined Kelley, found no broken teeth and no evidence of trauma. Currie Depo. (Doc. No. 124-2), at 21-22, 31. Instead, Currie treated Kelley for tooth decay. Id. at 10. As noted earlier, when a litigant offers a fact that is "blatantly contradicted by the record, so that no

25

reasonable jury could believe it, a court should not adopt that version of facts for the purposes of ruling on a motion for summary judgment." <u>Scott</u>, 127 S. Ct. at 1776.  In light of the testimony of the dentist who examined Kelley, the record does not support a finding that Kelley's dental problem constituted a serious medical need.

## B.  Violent Attacks from Jail Official

As the United States Supreme Court has held and as was clearly established by late 2003, when jail officials "maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992) (holding that the Fifth Circuit erred in holding the prisoner's claim "untenable" based on his injuries being "minor" where the blows directed at the prisoner had caused bruises, swelling, loosened teeth, and a cracked dental plate). And, while the plaintiff in <u>Hudson</u> relied on the Eighth Amendment for relief, the law is clear that, when a

pretrial detainee alleges the use of excessive force in violation of the Fourteenth Amendment's due process clause, courts should apply the same standard used to assess excessive-force claims by convicted prisoners under the Eighth Amendment. <u>Bozeman v. Orum</u>, 422 F.3d 1265, 1271 (11th Cir. 2005); <u>Cottrell v. Caldwell</u>, 85 F.3d 1480, 1490 (11th Cir. 1996).

Jailer Bradley violated Kelley's right to be free from sadistic, malicious violence. <u>Hudson</u>, 503 U.S. at 9. Bradley not only beat Kelley's face with his fist on two occasions, but also kicked Kelley in his groin area with such force that Kelley urinated blood over the next two days. During another incident, Bradley attempted to force a broomstick into Kelley's rectum. Bradley also kicked Kelley in the mouth.

To be sure, Bradley denies these incidents occurred. However, summary judgment is not the proper juncture to resolve the conflicting evidence between Bradley and Kelley. Viewing the facts in the light most favorable to Kelley, the court concludes that the evidence is

sufficient to support a finding that Bradley's unprovoked violent outbursts did not serve any apparent penal interest and ran afoul of clearly established law.

A closer question is whether Sheriff Owens also violated clearly established law by failing to protect Kelley from his violent employee. Liability in this context is not always limited to the officer who physically commits the malicious or sadistic act against a prisoner; supervisory liability attaches either when the supervisor actively participates in the unconstitutional conduct or when the supervisor's actions or omissions are causally connected to the constitutional violation. <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1360 (11th Cir. 2003); <u>cf.</u> <u>Hartley v. Parnell</u>, 193 F.3d 1263, 1269 (11th Cir. 1999) ("It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.") (internal quotation marks and citation omitted).

28

"The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Braddy v. Fla. Dep't of Labor and Employment Sec., 133 F.3d 797, 802 (11th Cir. 1998). Nonetheless, when a "history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," then a supervisor may be held liable for a constitutional violation that erupts as a result. Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003). "A causal connection can also be established by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Id.

In this instance, Kelley directly informed Sheriff Owens of Bradley's prior acts of violent aggression. Specifically, Kelley asked Owens to stop Bradley from beating him. Owens responded by laughing and walking away, taking no precautions to stop this violence. D. B.

29

Kelley Depo. (Doc. 105-13), at 174-75.  Still, because the record does not reveal when Kelley asked for help from Owens, it is not clear whether any beatings occurred after the request.  Thus, the evidence is insufficient to support a finding that Sheriff Owens's failure to act caused further violent attacks.

The next question is whether Bradley's fellow officers may be held liable for his acts of aggression against Kelley.  Even if an officer does not hold a supervisory position, that officer may be held liable under § 1983 if he "fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence."  <u>Byrd v. Clark</u>, 783 F.2d 1002, 1007 (11th Cir. 1986).  However, "in order for an officer to be liable for failing to stop police brutality, the officer must be in a position to intervene."  <u>Ensley v. Soper</u>, 142 F.3d 1402, 1407 (11th Cir. 1998).  Here, Kelley has testified that, during one of the attacks, Deputy Wilson was present, laughing as Bradley kicked Kelley's genital area.  D. B. Kelley Depo.

30

(Doc. 105-12), at 99, 104.  The evidence is sufficient to support a finding that Wilson refused to intervene during this attack in violation of clearly established law.

On the other hand, there is no evidence that Administrator Roberson idly witnessed Bradley's violent acts or that she otherwise had the ability to protect Kelley from Bradley.  See Ensley, 142 F. 3d at 1407-08 ("[W]e see no evidence in the record that might show that Johnston observed his fellow officers' alleged abuse of Ralph or that he had opportunity to intervene.").

Kelley may pursue his violent-attacks claim against only Jailer Bradley and Deputy Wilson.


### C.  Unconstitutional Conditions

Under the due process clause, a pretrial detainee may establish a claim for unconstitutional conditions of confinement in at least one of two ways.  First, it is clearly established that, because "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law," Bell v. Wolfish, 441 U.S. 520,

535 (1979), a jailer may not impose conditions and restrictions that are tantamount to punishment. Id. at 537-38. Second, a jailer may not impose conditions that would run afoul of the Eighth Amendment if the pre-trial detainee were instead a convicted prisoner. Marsh v. Butler County, 268 F.3d at 1024 n. 5.

### 1. Punitive Purpose

Applying the first standard, the court concludes that the evidence is sufficient to support a finding that Kelly was "punished prior to a lawful conviction." Bell, 441 U.S. at 535; McMillian v. Johnson, 88 F.3d 1554, 1564 (11th Cir. 1996). Whether a condition of pretrial detainment amounts to punishment depends on "whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose." Magluta v. Samples, 375 F.3d 1269, 1273 (11th Cir. 2004).

The record reflects that Sheriff Owens and Administrator Roberson made the decision to place Kelley

32

in solitary confinement, Wilson Depo. (Doc. No. 105-15), at 54-56, and there is nothing in the record to indicate that Wilson and Bradley contributed to this decision or did anything to keep Kelley in solitary confinement. Therefore, the sole question for the court at this point is whether Owens and Roberson can he held liable on Kelley's unconstitutional-conditions claim

Sheriff Owens and Administrator Roberson maintain that Kelley was placed in the solitary holding cell so that jail officials could monitor his falling episodes with greater ease. Owens Decl. (Doc. No. 105-3), at 6; Roberson Depo. (105-4), at 164. A reasonable jury could conclude, however, that these officials harbored "an intent to punish," which "is sufficient to show unconstitutional pretrial punishment." Id. at 1273. (citing Bell, 441 U.S. at 538).

In particular, a reasonable jury could find that Owens and Roberson grew tired of Kelley's numerous health problems, and placed him in solitary confinement out of retaliation. These officials' own words support this

33

view.  Roberson testified as to how jail officials grew "weary" of Kelley's complaints and considered him a to be "problem" inmate.  Roberson Depo. (Doc. No. 105-4), at 191.  Roberson further expressed her view that, because of his numerous requests, "Mr. Kelley generally was acting awful." Id. at 181-82.  More starkly, when Kelley inquired as to how long he would remain in solitary confinement, Sheriff Owens used language toward Kelley that contradicts the notion Owens placed him there for non-punitive reasons.  Owens informed Kelley, "You're going to stay in the damn hole as long as you're in my jail."  D. B. Kelley Depo. (Doc. No. 105-12), at 125.

The general conditions of the unhygienic, dark, and small holding cell further support the view that Owens and Roberson placed Kelley there as a punitive measure.  These officials placed him in a cell that was six by eight feet, despite the presence of a ten-by-12-foot holding cell.  In the middle of the cell's floor was a hole for Kelley to defecate and urinate into, and this hole could only be flushed by jail officials.  Due to the

34

size of the cell and the hole and because jail officials did not flush the hole for three to four days, Kelley had to lay beside his own urine and feces.  Additionally, for a period of time, officials forbade Kelley from having toilet paper because he had sometimes wrapped the paper around his feet to stay warm at night, thereby "wasting" the paper, id. at 112; Kelley instead cleaned himself with a candy wrapper.  The cell also lacked a sink.

Indeed, the conditions were severe enough that, under the jail's own policy, inmates generally were not to be detained in this "lockdown" cell for more than a 23-hour period.  Inmate Rulebook (Doc. 105-17).  Kelley remained there for 31 days.  Wilson also testified in his deposition that he was unaware of any other Coosa County Jail inmate being held in this solitary cell as long as Kelley was.  Wilson Depo. (Doc. No. 105-15), at 52.

In sum, a reasonable jury could draw a reasonable inference that Owens and Roberson placed Kelley in the solitary cell for punitive, rather than health, reasons based on: Administrator Roberson's acknowledged view that

35

Kelley was an "awful," "problem" inmate; Sheriff Owens's profane statement that Kelley would remain in the "damn hole" as long as he resided in the jail; the fact that these officials placed him in the smaller of two holding cells; the harsh conditions of the hole itself; and the fact that Kelley was in a cell for a 31-day period.

## B. Cruel and Unusual Punishment

Pretrial detainees are not covered by the Eighth Amendment. <u>Tittle v. Jefferson County Comm'n</u>, 10 F.3d 1535, 1539 n.3 (11th Cir. 1994) (en banc). Still, the Fourteenth Amendment's due process clause protects, at a minimum, conditions and restrictions that would contravene the Eighth Amendment's prohibition of cruel and usual punishment. <u>Marsh</u>, 268 F.3d at 1024 n.5 (stating, albeit with limited briefing, that "[w]e accept our precedents treating the Amendments as the same in the context of incarceration"); <u>see also</u> <u>Daniels v. Woodside</u>, 396 F.3d 730, 735 (6th Cir. 2005) (holding that, "[t]hrough the Due Process Clause of the Fourteenth

Amendment, pretrial detainees are entitled to the same Eighth Amendment rights as are other inmates"); Surprenant v. Rivas, 424 F.3d 5, 18 (1st Cir. 2005) (stating that the "parameters" of a pretrial detainees' right to be free from unconstitutional conditions under the Fourteenth Amendment are "coextensive with those of the Eighth Amendment's prohibition against cruel and unusual punishment); McClendon v. City of Albuquerque, 79 F.3d 1014, 1022 (10th Cir. 1996) ("Although pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment, the Eighth Amendment standards applicable to convicted persons provide the benchmark."). This approach comports with common sense. Were it otherwise, an inmate who has actually been convicted of a crime would receive more constitutional protection from cruel conditions than an inmate who, like Kelley, was merely awaiting trial.

The Constitution's bar against cruel and unusual punishment "proscribes more than physically barbarous punishments." Estelle, 429 U.S. at 102. Among other

37

proscriptions, it bans penalties that violate today's "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Hutto v. Finney, 437 U.S. 678, 685 (1978) (citing Estelle, 429 U.S. at 102.) "Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." Id. "Although solitary confinement, as a mode of punishment, is not per se cruel and unusual, there are constitutional boundaries to its use." Gates v. Collier, 501 F.2d 1291, 1304 (5th Cir. 1974).[2] Courts must examine the particular solitary confinement conditions in reaching a conclusion. Id.

In Gates, the former Fifth Circuit Court of Appeals concluded that the solitary-confinement conditions in that case violated the Constitution. At issue was a six-by-six-foot cell, called "the dark hole." It lacked lighting, a toilet, and a sink. In the middle of the

---

2.  In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

concrete floor was a hole where inmates were expected to dispose of bodily wastes. The "dark hole" lacked hygienic material, such as toilet paper; the court noted that substandard hygiene was a "common thread" in cases finding conditions of solitary confinement unconstitutional. Id. at 1301 (citing Wright v. McMann, 387 F.2d 519 (2d Cir. 1967); Hancock v. Avery, 301 F. Supp. 786 (M.D. Tenn. 1969; Jordan v. Fitzharris, 257 F. Supp. 674 (N.D. Cal. 1966)). The court also observed that, in the case before it, inmates often remained in the "dark hole" for more than a 24-hour period; sometimes they remained there up to 72 hours.

In the instant case, "the obvious cruelty inherent," Hope, 536 U.S. at 745, in the practice of placing a highly infirm detainee in the solitary, small, dark, holding cell for 31 days, without hygienic necessities, should have provided Owens and Roberson with "notice that their alleged conduct violated [Kelley's] constitutional protection against cruel and unusual punishment." Id. These two officers, especially in light of Gates, had

39

"fair and clear warning" of the unconstitutionality of their alleged conduct such that they are not entitled to qualified immunity.  Id. at 746.

Kelley may pursue his unconstitutional-conditions claim to the extent it is against Sheriff Owens and Administrator Roberson.


                              ***


For the foregoing reasons, the defendants' motions for summary judgment will be denied to the extent that Kelley may pursue his violent-attacks claim against Jailer Bradley and Deputy Wilson and his unconstitutional-conditions claim against Sheriff Owens and Administrator Roberson.  These claims to the extent they are against these defendants will go to trial.  The motions will be granted in all other respects.  An appropriate judgment will be entered.

DONE, this the 1st day of February, 2008.


                    /s/ Myron H. Thompson
                 UNITED STATES DISTRICT JUDGE